No. 22-35314

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY,
Plaintiff-Appellee,

v.

U.S. FISH AND WILDLIFE SERVICE et al.,
Defendants-Appellees,

and

SAFARI CLUB INTERNATIONAL, the NATIONAL RIFLE ASSOCIATION
OF AMERICA, SPORTSMEN'S ALLIANCE FOUNDATION, and the ROCKY
MOUNTAIN ELK FOUNDATION,
Proposed Defendants-Intervenors-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
No. 9:21-cv-00144-DWM
Honorable Donald Molloy

## OPENING BRIEF OF APPELLANTS

Jeremy E. Clare
Regina Lennox
Safari Club International
501 2nd Street NE
Washington, DC 20002
202-543-8733
jclare@safariclub.org
rlennox@safariclub.org
*Attorneys for*
*Safari Club International*

Michael T. Jean
National Rifle Assn. of
America—Institute for
Legislative Action
11250 Waples Mill Road
Fairfax, VA 22030
703-267-1158
mjean@nrahq.org
*Attorney for National*
*Rifle Assn. of America*

James H. Lister
Brian Gerd
Birch Horton Bittner &
Cherot, P.C.
1100 Connecticut
Avenue, NW, Ste. 825
Washington, DC 20036
202-659-5800
jlister@bhb.com
bgerd@bhb.com
*Attorneys for*
*Sportsmen's Alliance*
*Foundation & the Rocky*
*Mountain Elk*
*Foundation*

# DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1(a), Proposed Defendants-Intervenors-Appellants Safari Club International, the National Rifle Association of America, Sportsmen's Alliance Foundation, and the Rocky Mountain Elk Foundation submit the following Corporate Disclosure Statement.

Safari Club International is a non-profit membership association, incorporated in the State of Arizona under Section 501(c)(4) of the Internal Revenue Code. Safari Club International is not publicly traded and has no parent corporation. There is no publicly held corporation that owns 10 percent or more of its stock.

The National Rifle Association of America, Inc. ("NRA") is a non-profit Section 501(c)(4) membership organization, incorporated in the State of New York with its principal place of business in Virginia. NRA is not publicly traded and has no parent corporation. There is no publicly held corporation that owns 10 percent or more of its stock.

Sportsmen's Alliance Foundation is a national non-profit Section 501(c)(3) organization, incorporated in the State of Ohio. Sportsmen's Alliance Foundation is not publicly traded and has no parent corporation. There is no publicly held corporation that owns 10 percent or more of its stock.

The Rocky Mountain Elk Foundation is a public benefit non-profit Section 501(c)(3) organization, incorporated in the State of Montana. The Rocky Mountain Elk Foundation is not publicly traded and has no parent corporation. There is no publicly held corporation that owns 10 percent or more of its stock.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ................................................................. i

TABLE OF AUTHORITIES ................................................................. v

REQUEST FOR ORAL ARGUMENT ................................................. 1

STATEMENT OF ISSUES .................................................................. 2

STATEMENT REGARDING ADDENDUM ....................................... 3

STATEMENT OF THE CASE ............................................................ 4

    A.  The Service issued the 2020 Rule consistent with the purposes of the
Refuge System and Improvement Act. ............................................. 4

    B.  Procedural History of the Center's Suit. ........................................... 6

SUMMARY OF ARGUMENT ........................................................... 9

STANDARD OF REVIEW ................................................................ 12

ARGUMENT ...................................................................................... 13

    A.  The Hunting Coalition has a protectable interest in defending the 2020
Rule expanding hunting in National Wildlife Refuges. ................... 14

        1.  The Hunting Coalition has protectable interests because hunters are
the beneficiaries of the openings and expansions in the 2020 Rule. ... 15

        2.  The Hunting Coalition has protectable interests because the
organizations participated in the agency proceedings leading to
adoption of the 2020 Rule. ............................................................... 22

        3.  The District Court erred in its characterization of the Hunting
Coalition's interests, leading to its erroneous ruling there was no
protectable interest. ......................................................................... 23

        4.  The scanty caselaw cited by the District Court is readily
distinguishable. ................................................................................ 26

    B.  The disposition of this case may impair or impede the Hunting Coalition's
ability to protect its interests. .......................................................... 30

    C.  The Hunting Coalition has satisfied its "minimal" burden in demonstrating
that its interests may not be adequately represented by the Service. ........... 32

        1.  The Service *may* not raise the same arguments as the Hunting
Coalition and therefore does not adequately represent its interests. ..... 34

        2.  A presumption of adequacy does not apply in this case. ..................... 39

CONCLUSION ...................................................................................43

FORM 8 CERTIFICATE OF COMPLIANCE ......................................................45

CERTIFICATE OF SERVICE ...........................................................46

ADDENDUM ...................................................................................47

# TABLE OF AUTHORITIES

**Cases**

*Alaska v. Zinke*, No. 17-CV-13, 2017 WL 1745020
(D. Alaska May 3, 2017) ....................................................................21

*Alaska Wildlife All. v. Haaland*, 20-CV-209 (D. Alaska Nov. 19, 2020) ..............21

*Animal Prot. Inst. v. Martin*, 241 F.R.D. 66 (D. Me. 2007) ....................................20

*Atchafalaya Basinkeeper v. Bernhardt*, No. 20-CV-651,
2021 WL 4785496 (M.D. La. Oct. 13, 2021)......................................................20

*Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*,
366 F.3d 692 (9th Cir. 2004) ..............................................................33

*California ex rel. Lockyer v. United States*, 450 F.3d 436
(9th Cir. 2006) ................................................................ 16, 20, 30

*Citizens for Balanced Use v. Mont. Wilderness Ass'n*,
647 F.3d 893 (9th Cir. 2011) .......................................................... passim

*Conservation Law Found. of New England, Inc. v. Mosbacher*,
966 F.2d 39 (1st Cir. 1992) ................................................................16

*Crossroads Grassroots Policy Strats. v. Fed. Election Comm'n*,
788 F.3d 312 (D.C. Cir. 2015) .................................................... 16, 29

*Ctr. for Biological Diversity v. Haaland*, No. 20-CV-461
(D. Ariz. June 16, 2021) ......................................................................37

*Defs. of Wildlife v. U.S. Fish & Wildlife Service*,
No. 21-CV-344 (N.D. Cal. May 6, 2021) ...........................................................37

*Dimond v. District of Columbia*, 792 F.2d 179 (D.C. Cir. 1986)...........................40

*Forest Conservation Council v. U.S. Forest Serv.*,
66 F.3d 1489 (9th Cir. 1995)...................................................... 38, 39

*Fresno Cnty. v. Andrus*, 622 F.2d 436 (9th Cir. 1980)...........................................14

*Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995) ............... 22, 26

*In re Sierra Club*, 945 F.2d 776 (4th Cir. 1991) ...................................................40

*Kalbers v. U.S. Dep't of Justice*, 22 F.4th 816 (9th Cir. 2021) ............ 10, 12, 13, 32

*Kleissler v. U.S. Forest Serv.*, 157 F.3d 964 (3d Cir. 1998) ..................................40

*Legal Aid Soc'y of Alameda Cnty. v. Dunlop,* 618 F.2d 48 (9th Cir. 1980)...........34

*Pub. Emps. for Envtl. Resp. v. Bernhardt*, No. 18-CV-1547
   (D.D.C. Mar. 22, 2019) .....................................................................................20

*Pub. Emps. for Envtl. Resp. v. Bernhardt*, No. 18-CV-1547,
   2020 WL 601783 (D.D.C. Feb. 7, 2020)...........................................................37

*S. Cal. Edison Co. v. Lynch,* 307 F.3d 794 (9th Cir. 2002) .............................. 26, 27

*Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525 (9th Cir. 1983) ............... 2, 22, 26

*San Francisco Baykeeper v. U.S. Fish & Wildlife Serv.*, No. 21-CV-2566,
   2021 WL 3426961 (N.D. Cal. Aug. 5, 2021)............................................... 28, 29

*Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843 (9th Cir. 2016) ..................21

*Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810
   (9th Cir. 2001) .................................................................. 12, 15, 34, 40

*Texas v. United States*, 805 F.3d 653 (5th Cir. 2015)............................................20

*Trbovich v. United Mine Workers of Am.*, 404 U.S. 528 (1972) ............................34

*United States v. City of Los Angeles*, 288 F.3d 391 (9th Cir. 2002)................. 13, 15

*W. Watersheds Project v. Haaland*, 22 F.4th 828, 841 (9th Cir. 2022) ..... 37, 38, 41

*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2009) .................14

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*, 834 F.3d 562
   (5th Cir. 2016) ...................................................................................................16

*Wash. State Bldg. & Constr. Trades Council v. Spellman*,
   684 F.2d 627 (9th Cir. 1982) .................................................................22

*Whiteside v. United States*, 833 F.2d 820 (9th Cir.  1987) ......................................20

*WildEarth Guardians v. Nat'l Park Serv.*, 604 F.3d 1192
   (10th Cir. 2010) .............................................................. 17, 22

*WildEarth Guardians v. U.S. Forest Serv.*, 573 F.3d 992 (10th Cir. 2009) ...........39

*Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011) ............ 38, 40

**Statutes**

16 U.S.C. § 1536(a)(2) ...................................................................................7

16 U.S.C. § 1540(g)(1)(A) ..............................................................................2

16 U.S.C. § 668dd ...........................................................................................4, 5

16 U.S.C. § 668dd(a)(3) ................................................................. 4, 15, 20, 25

16 U.S.C. § 668dd(a)(4)(K) ........................................................... 5, 20, 25

16 U.S.C. § 668dd(e)(1)(M) ...........................................................................5

16 U.S.C. § 668ee ...........................................................................................4, 20

28 U.S.C. § 1291 .............................................................................................2

28 U.S.C. § 1331 .............................................................................................2

42 U.S.C. §§ 4321 et seq ..............................................................................2, 7

44 U.S.C. § 1507 .............................................................................................33

5 U.S.C. § 706 ............................................................................... 2, 7, 15, 20

**Other Authorities**

143 Cong. Rec. H3225-01 (June 3, 1997) ................................................4

143 Cong. Rec. H7646-02 (Sept. 23, 1997)............................................4

**Rules**

Fed. R. App. P. 4(a) ...............................................................................2

Fed. R. Civ. P. 24(a).......................................................................passim

**Treatises**

Wright & Miller, Federal Practice & Procedure: § 1909 (3d ed.)...........34

**Regulations**

50 C.F.R. § 20.21(j)(2)..........................................................................25

50 C.F.R. § 32.69 ...................................................................................6

50 C.F.R. § 32.7 .....................................................................................6

50 C.F.R. § 71.11 ...................................................................................6

50 C.F.R. § 71.12 ...................................................................................6

85 Fed. Reg. 54,076 (Aug. 31, 2020)..............................................passim

87 Fed. Reg. 35,136 (June 9, 2022) ...................................... 11, 33, 36, 41

# REQUEST FOR ORAL ARGUMENT

Appellants Safari Club International ("SCI"), NRA, Sportsmen's Alliance Foundation ("SAF"), and the Rocky Mountain Elk Foundation ("RMEF" and collectively, the "Hunting Coalition") hereby request oral argument because it will: (a) allow the Hunting Coalition to answer questions the Court may have regarding the nature of the Hunting Coalition's interest in this matter, which was the key issue for the District Court; (b) allow the Hunting Coalition to further explain why Defendants-Appellees U.S. Fish and Wildlife Service et al. ("Federal Defendants") may not adequately represent the Hunting Coalition's interests, which was an issue that the District Court did not reach but this Court may address to expedite the appeal; (c) update the Court regarding the status of the ongoing case in the district court, which is proceeding concurrently with this appeal; and (d) update the Court regarding the status of a newly published proposed rule by the U.S. Fish and Wildlife Service ("Service") relating to this case, which was raised by Federal Defendants in their May 16, 2022, response to the Hunting Coalition's now-withdrawn motion to expedite this appeal, and which is discussed in the Argument below.

# STATEMENT OF JURISDICTION

Plaintiff-Appellee the Center for Biological Diversity (the "Center") challenged a 2020 rule that opened hundreds of new hunting and fishing

opportunities on National Wildlife Refuges around the United States, sometimes by opening specific Refuges to hunting for the first time.  85 Fed. Reg. 54,076 (Aug. 31, 2020) ("2020 Rule"), under 16 U.S.C. § 1540(g)(1)(A) (Endangered Species Act citizen suit provision), 42 U.S.C. §§ 4321 et seq. (National Environmental Policy Act), and 5 U.S.C. § 702 (Administrative Procedure Act).  The District Court had subject matter jurisdiction under 28 U.S.C. § 1331 (federal question).  This Court has jurisdiction under 28 U.S.C. § 1291.  *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 527 (9th Cir. 1983) (holding that the denial of a motion to intervene as of right is an appealable "final order" within the meaning of § 1291).  Furthermore, this appeal is timely under Federal Rule of Appellate Procedure 4(a).  The Hunting Coalition filed its notice of appeal on April 15, 2022, nine days after the District Court's order denying its motion to intervene.

## STATEMENT OF ISSUES

(1)     Does the Hunting Coalition have a significant protectable interest under Federal Rule of Civil Procedure 24(a), when it has offered declarations from individual members who are taking advantage of (or wish to take advantage of) the newly opened or expanded hunting opportunities provided by the 2020 Rule?

(2)      Could the outcome of this litigation impair or impede the ability of the Hunting Coalition to protect its interests when the Center seeks to vacate or enjoin these newly opened or expanded hunting and fishing opportunities?

(3)      "May" representation of the Hunting Coalition by Federal Defendants be inadequate given that: (a) nothing suggests that Federal Defendants will make or be willing or able to make the same arguments that the Hunting Coalition will make in defense of the 2020 Rule; (b) Federal Defendants must represent the interests of the public as a whole, while the Hunting Coalition represents much more narrow and parochial interests; ***and*** (c) Federal Defendants in a proposed rule have tentatively found lead ammunition to be harmful and indicated an intent to restrict its use on National Wildlife Refuges, while the Center in this lawsuit seeks to restrict use of lead ammunition in Refuges, and the Hunting Coalition seeks to defend its use consistent with current federal and state law?

## STATEMENT REGARDING ADDENDUM

An addendum reproducing relevant statutes, regulations, and other authorities is attached at the end of this brief.

# STATEMENT OF THE CASE

## A.    The Service issued the 2020 Rule consistent with the purposes of the Refuge System and Improvement Act.

The National Wildlife Refuge System ("Refuge System") consists of 568 different Refuges that span 95 million acres across all 50 states and five territories. The Service oversees the Refuge System in accordance with the National Wildlife Refuge System Administration Act of 1966 and the National Wildlife Refuge System Improvement Act of 1997, the "organic act" for the Refuge System.  Pub. L. 105–57, 111 Stat. § 1252 (Oct. 9, 1997) ("Improvement Act").  These Acts are codified at 16 U.S.C. §§ 668dd-ee.

One of the Refuge System's purposes is to facilitate the relationship between people and nature by encouraging human engagement on National Wildlife Refuges.  *Id*. § 668dd(a)(3)(B)-(C).  To achieve that goal, the Improvement Act declares that hunting, fishing, and four other "wildlife-dependent recreational uses" are the "big six" priority uses of Refuges.  *Id.* § 668dd(a)(3)(C); § 668ee(2).[1]  In

---

[1] In enacting the Improvement Act, Congress recognized the critical contributions of hunters and anglers to wildlife and habitat conservation, particularly for the Refuge System.  *E.g.*, 143 Cong. Rec. H3225-01 (June 3, 1997) (statement of Rep. Dingell) (noting "it was the hunters who set up and who maintained and who preserved, protected, and funded the wildlife refuge system, and it is the hunter with his small contribution of one duck stamp each hunting season that makes possible the continued acquisition of land for the precious purpose of protecting this system"); 143 Cong. Rec. H7646-02 (Sept. 23, 1997) (statement of Rep. Tanner) (acknowledging that "hunters and anglers are the unquestioned leaders

administering the Refuge System, the Service is directed to "provide increased opportunities for families to experience wildlife-dependent recreation, particularly opportunities … such as fishing and hunting." *Id.* § 668dd(a)(4)(K). The Improvement Act further requires the Service to work with States and their wildlife agencies as much as practicable to make the federal regulations governing Refuges consistent with State fish and wildlife laws, regulations, and management plans. *Id.* § 668dd(e)(1)(M). To administer the Refuge System in accordance with the Congressional directives set forth in 16 U.S.C. § 668dd, the Service collaborates with State fish and wildlife agencies to review the regulations governing Refuges and opens new hunting and fishing opportunities.

The 2020 Rule under judicial review in this case (85 Fed. Reg. 54,076) is one example of this annual effort. The 2020 Rule expanded hunting and fishing access on 2.3 million acres, opened eight Refuges and nine National Fish Hatcheries to hunting and sport fishing for the first time, and expanded hunting and fishing access at 89 Refuges on new acres or by permitting new methods of harvest

---

when it comes to wildlife and fisheries restoration and conservation. America's hunters and anglers have contributed well over $6 billion to wildlife and fisheries restoration over the past 60 years …."). Excise taxes on hunting, fishing, and shooting equipment provides significant funding for the Refuge System and State wildlife agencies, including over $1.5 billion in 2021. Press Release, U. S. Department of the Interior (Feb. 11, 2022), https://www.doi.gov/pressreleases/interior-department-announces-over-15-billion-support-state-wildlife-conservation-and

consistent with State law.  85 Fed. Reg. at 54,076; *see also id.* at 54,094 (Table 1).

In individual Refuges, the Service authorized the hunting of additional species

such as black bear, pronghorn antelope, and quail, and expanded existing hunting

seasons for game such as elk.  *Id.* at 54,092.  Cumulatively, the 2020 Rule added

approximately 20,628 additional days a year for hunting and 5,074 days a year for

fishing across all such Refuges.  *Id.* at 54,097 (Table 2).  The 2020 Rule amended

and updated federal hunting and fishing regulations for National Wildlife Refuges

in 45 states, bringing federal regulations more in line with State laws.  *See id.* at

54,079-80; *see also* 50 C.F.R. §§ 32.7, 32.69, 71.11, 71.12.  The regulations are

printed in the 2020 Rule.

Thus, the agency action expanding hunting was the publication of a long set

of Refuge-by-Refuge regulations in the Code of Federal Regulations.  So long as

those regulations remain in effect, the Hunting Coalition's members may rely on

them to hunt.  But if those regulations are invalidated or enjoined in this case, the

hunting opportunities they create cease immediately, rather than after further

regulatory proceedings.

## B.    Procedural History of the Center's Suit.

The Service published the 2020 Rule on August 31, 2020.  Fifteen months

later, the Center filed suit in the U.S. District Court for the District of Montana.

ER-121–175.  The Center objects to the Service allowing hunters and anglers to

use lead ammunition and tackle as part of the newly opened or expanded hunting and fishing opportunities, and raised concerns that expanding hunting and fishing would result in harassment of endangered species.  The Center alleges that the 2020 Rule violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, because the Service failed to comply with consultation requirements in Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2), and did not adequately consider environmental impacts of the 2020 Rule under the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq.  *See* ER-121–175.  The Center requests immediate vacatur of the 2020 Rule, or for the district court to enjoin the expanded hunting and fishing opportunities in the rule.  *See* ER-173–174.

On February 2, 2022, in lieu of filing an answer to the Center's Complaint, the Service filed a joint motion with the Center requesting a stay while the parties engage in settlement discussions.  ER-117–120.  The district court granted the motion, staying the case until April 8, 2022.  ER-115–116.

On March 7, 2022, before the parties filed any further pleadings with the district court, the Hunting Coalition moved to intervene as a matter of right.  ER-60–65 (motion), ER-24–59 (brief in support).  The Hunting Coalition alternatively requested permission to intervene or, as a last resort, to participate as amicus curiae.  ER-53–57.  Along with its motion, the Hunting Coalition submitted numerous declarations of individual members who have utilized or intend to utilize

the newly opened hunting and fishing opportunities.  ER-66–114.  The Hunting

Coalition also lodged a proposed motion to dismiss for lack of jurisdiction and

failure to state a claim.  ER-178 (District Court docket, showing Dkt. 12,

attachment 19 (proposed motion to dismiss and brief in support)).  On March 21,

2022, the Service filed a response taking no position on the motion to intervene.

ER-21–23.  The Center did not file any response by the due date, but asserted in

communications with the Hunting Coalition's counsel that it could respond to the

motion to intervene at a later date after the expiration of the stay.

On April 1, 2022, the Center and Service moved the Court to extend the stay

until June 7, 2022.  The parties represented that furthering the stay promoted active

settlement discussions and stated that the Service anticipated submitting a

proposed rule that may resolve the Center's complaint.  ER-16–20.  The District

Court granted the motion to extend on April 6, 2020, choosing sua sponte to extend

the stay through July 5 rather than the requested June 7, 2022.  ER-7–8.  On the

same day, the District Court denied the Hunting Coalition's motion to intervene,

even though no oppositions to intervention had been filed.  ER-9–15.  The District

Court denied the Hunting Coalition's requests to intervene as a matter of right, to

intervene with permission, and to participate as amicus curiae to address the public

interest concerns of the case's potential impact on hunters nationwide.  *Id.*  The

District Court held that the Hunting Coalition's interest in the expanded hunting

and fishing opportunities was not legally protectable and concluded that disposition of the case would not impair the Hunting Coalition's ability to protect its interests. ER-11. The District Court found that the Hunting Coalition satisfied all elements necessary for permissive intervention, but denied permissive intervention as a matter of discretion, and it also denied the Hunting Coalition even amicus curiae status. ER-12–13.[2]

The Hunting Coalition now appeals the District Court's denial of intervention as of right and timely filed its notice of appeal on April 15, 2022. ER-4–6.

## SUMMARY OF ARGUMENT

This Court should reverse the District Court's order and grant the Hunting Coalition intervention as of right.

The Hunting Coalition has significant protectable interests in the hunting opportunities opened or expanded by the 2020 Rule. The Center challenges and seeks to enjoin or vacate that rule and close down those opportunities. The

---

[2] The District Court chose to deny the Hunting Coalition's request for permission to intervene because it found "[t]he Hunting Coalition does not contribute some 'element necessary to the adjudication of the case that would otherwise be omitted' if it is not allowed to intervene." ER-13–14. The District Court denied the Hunting Coalition's request to participate as amicus curiae by finding the Hunting Coalition's arguments would be "irrelevant" as outside the administrative record. ER-14.

Hunting Coalition's individual members—hunters and fishermen who use public lands and National Wildlife Refuges—are the intended beneficiaries of those opportunities. This satisfies Rule 24(a)'s interest requirement, which is intended to be a practical, threshold inquiry which includes as many concerned persons in the case as compatible with efficiency and due process. The interest requirement is not intended as a high bar to block proposed intervenors, like the Hunting Coalition, and they have been admitted into many similar cases to defend agency actions like the 2020 Rule.

Further, the disposition of this case may impair or impede the Hunting Coalition's ability to defend its members' rights to engage in the hunting opportunities authorized by the 2020 Rule. An order granting the Center's requested relief would immediately result in closing down those opportunities. The District Court erred, because participation in a potential future rulemaking cannot provide relief for the immediate effects of the rights lost if the 2020 Rule is suspended or vacated.

Finally, Federal Defendants "may" not adequately represent the Hunting Coalition's interests. Although the District Court did not address this element in its analysis of intervention as of right, this Court can and should reach undecided intervention elements during the appeal of the denial of an intervention motion, to

avoid delay.[3]  After considering the "minimal" burden of establishing inadequate representation where the existing parties ***may*** not adequately represent the interests of a proposed intervenor, this Court should reverse the District Court and grant the Hunting Coalition's motion to intervene.

Based on the posture of the case thus far, it is not clear if the Service intends to defend the 2020 Rule or negotiate an alternative to it.  The Service has yet to file a brief defending the 2020 Rule on the merits, or even an answer denying liability, and has instead engaged in settlement negotiations.  But even if the Service defends the rule, it is unlikely to present and emphasize the same arguments or particular interests of the Hunting Coalition in expanding and preserving hunting opportunities in the Refuge System.  Federal Defendants are charged with representing the broad public interest.  They do not represent the more "narrow and parochial" interests of the Hunting Coalition in defending its members' hunting in particular ways and places, using particular ammunition.

Federal Defendants' recent actions underscore the likelihood—not even possibility—that their interests will diverge from the Hunting Coalition's.  The Service recently published a proposed rule to begin to phase out lead ammunition

---

[3] *E.g.*, *Kalbers v. U.S. Dep't of Justice,* 22 F.4th 816, 827 (9th Cir. 2021).  The District Court carefully avoided discussing adequacy of representation in the section of its opinion analyzing intervention as of right.  ER-10–12.  It discussed an issue relevant to representation, but only in the context of permissive intervention, which is governed by a separate and largely discretionary analysis.  ER-12–14.

and tackle in the Refuge System.  87 Fed. Reg. 35,136, 35,138 (June 9, 2022).

This proposal bears more in common with the Center's lawsuit—claiming that the

2020 Rule must be vacated because it does not prohibit the use of lead

ammunition—than the Hunting Coalition's interest in aligning federal and state

hunting regulations, which largely permit the use of lead ammunition and tackle.

Based on this proposed rule, there can be no assurance that Federal Defendants

will find a way to persuasively defend their past decisions to allow use of lead

ammunition, while simultaneously seeking to phase out its use going forward.

This potential divergence supports a finding of inadequate representation.  And

since the other elements of Rule 24(a) are satisfied, this Court should reverse the

District Court's erroneous order and direct that the Hunting Coalition's motion to

intervene be granted.

## STANDARD OF REVIEW

This Court reviews the District Court's denial of a motion to intervene *de

novo*.  *Kalbers v. U.S. Dep't of Justice*, 22 F.4th 816, 822 (9th Cir. 2021).[4]  In its

review, the Court takes all well-pleaded, nonconclusory allegations in the motion

to intervene and supporting declarations as true, "absent sham, frivolity or other

---

[4] The Court reviews district court's "'timeliness determination for abuse of discretion.'"  *Kalbers*, 22 F.4th at 822.  The District Court's determination that the motion to intervene was timely is not contested, so there is no appeal of that ruling in favor of the Hunting Coalition.

objections." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001).

## ARGUMENT

The District Court's denial of the Hunting Coalition's motion to intervene should be reversed. The Hunting Coalition is comprised of hunting and conservation advocacy organizations. They represent individuals who intend to take advantage of the new hunting and fishing opportunities opened by the 2020 Rule and whose ability to do so will be lost if the Center obtains its requested relief. That satisfies the requirements of Federal Rule of Civil Procedure 24(a).

Under Rule 24(a), a party moving for intervention as a matter of right must show:

> (1) its motion is timely; (2) it has a significantly protectable interest relating to ... the subject of the action; (3) it is so situated that the disposition of the action may as a practical matter impair or impede [its] ability to protect that interest; and (4) its interest is inadequately represented by the parties to the action.

*Kalbers,* 22 F.4th at 822 (internal quotations and citation omitted).

This Court has "repeatedly instructed that the requirements for intervention are [to be] broadly interpreted in favor of intervention." *Id.* (internal quotation and citation omitted; alteration in original); *United States v. City of Los Angeles*, 288 F.3d 391, 397-98 (9th Cir. 2002) ("A liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts. By allowing

parties with a ***practical*** interest in the outcome of a particular case to intervene, we often prevent or simplify future litigation involving related issues…") (internal quotation and citation omitted; original emphasis).

Associations, such as those that make up the Hunting Coalition, may move to intervene to defend the interests of their individual members when the case is germane to the purpose of the association, and there is no practical need for the direct participation of individual association members. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 482 (9th Cir. 2009). These requirements are also not contested and were established by the declarations of individual hunter members and association officers that the Hunting Coalition submitted. ER-68–114. The District Court did not find fault with any of these declarations.

### A.  The Hunting Coalition has a protectable interest in defending the 2020 Rule expanding hunting in National Wildlife Refuges.

The District Court erred in denying the Hunting Coalition's motion based on the interest element of Rule 24(a). That is not the purpose of this element, and the court appears to have applied a much stricter standard than this Circuit applies.

"The 'interest test' is basically a threshold one, rather than the determinative criterion for intervention" and "is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Fresno Cnty. v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980) (citation omitted); *see also Citizens for Balanced Use v. Mont. Wilderness*

*Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) ("Whether an applicant for intervention as of right demonstrates sufficient interest in an action is a 'practical, threshold inquiry,' and '[n]o specific legal or equitable interest need be established.'") (internal quotation and citation omitted).

A proposed intervenor satisfies this test when "the interest [asserted] is protectable under some law, and … there is a relationship between the legally protected interest and the claims at issue." *Sw. Ctr. for Biological Diversity*, 268 F.3d at 818 (internal quotation and citation omitted) (reversing denial of motion to intervene by owners on list of approved projects, which was enough to constitute legally protectable interests given the breadth of the relief sought by the plaintiff).[5] The second part of the test is met when "'resolution of the plaintiff's claims *actually will affect* the applicant.'" *City of Los Angeles*, 288 F.3d at 398 (citation omitted) emphasis added). The "interest test" is not a bright line rule. *Id*.

1. <u>The Hunting Coalition has protectable interests because hunters are the beneficiaries of the openings and expansions in the 2020 Rule</u>.

The District Court's one-sentence denial of the Hunting Coalition's motion to intervene should be reversed because the court ignored well-established law

---

[5] In addition to having protectable interests to enforce the 2020 Rule under the APA, *see* 5 U.S.C. § 706, the Hunting Coalition has protectable interests under the Improvement Act, which requires the Service to prioritize the opening of compatible hunting and fishing opportunities on Refuges. 16 U.S.C. § 668dd(a)(3)(C); *see also, e.g.*, 85 Fed. Reg at 54,076, 54,077.

protecting the interests of the beneficiaries of agency actions, like the 2020 Rule.

The beneficiary of a statute, regulation, or some other agency action generally has

a protectable interest under Rule 24(a) in defending the validity of the statute, rule,

or agency action. *E.g.*, *California ex rel. Lockyer v. United States*, 450 F.3d 436,

440-41 (9th Cir. 2006) (holding that physicians who were intended beneficiaries of

federal statute denying funding to States which required physicians to perform

emergency abortion services had protectable interest under Rule 24(a));

*Crossroads Grassroots Policy Strats. v. Fed. Election Comm'n*, 788 F.3d 312, 317

(D.C. Cir. 2015) ("Our cases have generally found a sufficient injury in fact where

a party benefits from agency action, the action is then challenged in court, and an

unfavorable decision would remove the party's benefit."); *Wal-Mart Stores, Inc. v.

Tex. Alcoholic Bev. Comm'n*, 834 F.3d 562, 566 (5th Cir. 2016) (granting

intervention to an association of small independent liquor stores to defend state

alcohol permitting scheme which discouraged the grant of liquor licenses to larger

corporations and finding "our precedent dictates that the Association has a legally

protectable interest in the regulatory scheme because, … the Association is the

scheme's beneficiary").

The principle that the beneficiary has a protectable interest under Rule 24(a)

holds true whether there is one beneficiary or many. *See Lockyer*, 450 F.3d at 440-

41 (finding physicians opposed to providing abortion services had a protectable

interest in defending the lawsuit, not a "generalized" or "undifferentiated" interest). The principle holds true in cases seeking to shut down or limit regulated activity in which the proposed intervenor engages. *Conservation Law Found. of New England, Inc. v. Mosbacher*, 966 F.2d 39, 43 (1st Cir. 1992) (reversing denial of motion to intervene by commercial fishing groups in lawsuit by environmental organizations seeking to overturn agency's plan for regulated commercial fishing because "[t]he fishing groups seeking intervention are the real targets of the suit and are the subjects of the regulatory plan" that the plaintiffs challenged). The principle also holds true whether the proposed intervenor who benefited from an agency action opposes or engages in the use of the natural resources in controversy. *See, e.g.*, *WildEarth Guardians v. Nat'l Park Serv.*, 604 F.3d 1192, 1199-1201 (10th Cir. 2010) (citing cases allowing groups opposed to use of natural resources to intervene in lawsuits to defend agency actions that restrict use of those resources, and relying on those same cases to conclude that SCI had a protectable interest in defending an agency decision allowing hunting of elk in a national park unit).

Here, the Hunting Coalition's pro-hunting members who are taking advantage of the hunting opportunities opened or expanded by the 2020 Rule are

the beneficiaries of that Rule and have a substantial interest in defending it. The 2020 Rule is addressed to hunters. It tells them what they can and cannot do.[6]

The 2020 Rule expanded hunting opportunities on over 2.3 million acres of public land. 85 Fed. Reg. at 54,095. The 2020 Rule's extension of hunting seasons in numerous Refuges created over 20,000 additional hunting days. *Id.* at 54,097. The Center seeks vacatur as to all the hunting and fishing openings and expansions in the more than 100 Refuges and National Fish Hatcheries addressed in the 2020 Rule. ER-174. The Hunting Coalition, through its respective members, has protectable interests in each of these refuges and hatcheries,[7] and has demonstrated a specific protectable interest in the Refuges that the Center highlights in its complaint and in which it identifies—and seeks to curtail or eliminate—new hunting opportunities created by the 2020 Rule. *Compare* ER-146, ¶ 69 (opening black bear hunts in the Swan River National Wildlife Refuge

---

[6] A search for the phrase "you may" in the C.F.R. sections printed at the end of the 2020 Rule yields approximately 70 instances in which the Service addresses the hunter or angler as "you," telling the hunter or angler what he or she can do, and the limits on that activity. Searching for the phrase "we allow" yields about 915 instances of the Service using that phrasing to accomplish the same purpose.

[7] *See also* the declarations of additional SCI, NRA, SAF, and RMEF members who intend to take advantage of hunting opportunities that the Center does not highlight, but which would be vacated if the Center succeeds in obtaining its requested relief: ER-67, ¶ 4 (Bancroft Declaration), ER-71, ¶ 10 (Edwards Declaration), ER-79, ¶ 8 (Hernandez Declaration), ER-88, ¶ 3 (Mass Declaration), ER-95, ¶ 7 (Moon Declaration), and ER-104, ¶¶ 7-8 (Sages Declaration).

for the first time), *with* ER-76, ¶¶ 8-10 (NRA member Hedstrom intends to take advantage of this opportunity); *compare* ER-148, ¶ 76 (opening migratory bird, upland game, and big game hunting in Leslie Canyon National Wildlife Refuge for the first time), *with* ER-101, ¶¶ 7-10 (SCI and NRA member Rusing intends to take advantage of these opportunities); *compare* ER-155–156, ¶ 98 & ER-158, ¶ 106 (opening migratory bird, upland game, big game hunting, and sport fishing for the first time at Everglades Headwaters National Wildlife Refuge and expanding acreage and methods of take at St. Marks National Wildlife Refuge), *with* ER-109, ¶¶ 5-7 (SCI, NRA, and SAF member Walters intends to take advantage of these opportunities); *compare* ER-161, ¶ 113 (expanding acreage for hunting and sport fishing and expanding the species for take at Kirwin National Wildlife Refuge, *with* ER-98, ¶¶ 5-7 (SCI and NRA member Rabbe intends to take advantage of these opportunities with his children and grandchildren); *compare* ER-163–164, ¶ 121 (increasing acreage for hunting and expanding the huntable species at Patoka National Wildlife Refuge, *with* ER-70, ¶¶ 6-9 (SCI member Edwards intends to hunt deer on this refuge); and *compare* ER-165–166, ¶ 126 (opening hunting for mountain lion, bobcat, rabbit, and fox and expanding acreage for hunting at Lacreek National Wildlife Refuge), *with* ER-92, ¶¶ 8-11) (SCI, NRA, and RMEF member Mann intends to take advantage of these opportunities with his family)

*and* ER-98, ¶¶ 5-7 (SCI and NRA member Rabbe intends to take advantage of these opportunities with his children and grandchildren).

The substantial nature of the Hunting Coalition's interest is defending the hunt openings accomplished by the 2020 Rule is further buttressed by the governing statute, which makes hunting and fishing two of six priority uses of National Wildlife Refuges, and directs the Service to work to increase hunting and fishing opportunities on these important conservation land units. *See* Statement of Case above (reviewing 16 U.S.C. §§ 668dd(a)(3)(C) and (4)(K), 668ee(2)).[8]

Applying this principle, courts regularly grant intervention to the hunting conservation organizations comprising the Hunting Coalition to defend regulations or agency actions that benefit their members' interests in engaging in hunting

---

[8] Moreover, the hunting opportunities afforded by the 2020 Rule are legally enforceable by hunters, because the Service like any agency is bound to comply with its own rules. 5 U.S.C. § 706; *Whiteside v. United S*tates, 833 F.2d 820, 823 (9th Cir. 1987) ("The Secretary had broad authority to shape these regulations but having done so, he is bound by them."). The legally enforceable nature of the Hunting Coalition's interest here supports the substantial nature of the interest, but that characteristic is not needed for a proposed intervenor's interest to qualify as a protectable interest under Rule 24(a). *See Lockyer,* 450 F.3d at 439, 441 (finding that physicians opposed to abortion who benefited from the challenged statute that denied federal funding could not have directly sued the United States to enjoin distribution of funds to California, but they nonetheless had a protectable interest sufficient for intervention); *Texas v. United States*, 805 F.3d 653, 659 (5th Cir. 2015) (holding a protectable interest "need not be legally ***enforceable***") (original emphasis).

opportunities and preserving public access for hunting and related activities.[9]  In

these cases, the courts properly applied the liberal policy in favor of intervention.

By contrast, the District Court erred in failing to do so.  This Court has held that,

"[t]o the extent there is any doubt as to Appellants' establishment of this factor, our

resolution of it in favor of intervention is consistent with the rule that 'the

requirements for intervention are [to be] broadly interpreted in favor of

intervention.'"  *Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 864 (9th

Cir. 2016) (alterations in original, citation omitted).  The District Court's ruling

---

[9] For example, in *Atchafalaya Basinkeeper v. Bernhardt*, the district court granted SCI's motion to intervene as of right (over the plaintiffs' objection) in a lawsuit challenging the removal of the Louisiana black bear from the ESA list of threatened species.  The court found SCI on behalf of its members had a significant protectable interest in future hunting seasons for Louisiana black bears, which could be opened under State law, but which could not take place while the bears were federally listed.  No. 20-CV-651, 2021 WL 4785496, *2 & n.22 (M.D. La. Oct. 13, 2021); *see also Pub. Emps. for Envtl. Resp. v. Bernhardt*, No. 18-CV-1547, Dkt. 22 (D.D.C. Mar. 22, 2019) (similarly holding that the ESA listing of the bears served as a "bar" to the future hunting, and the delisting benefited SCI's members by removing the bar); *Animal Prot. Inst. v. Martin*, 241 F.R.D. 66, 68-70 (D. Me. 2007) (granting intervention by SAF).  In another recent case, SCI and SAF were granted intervention to defend a 2020 rule that removed restrictions on State-authorized hunting on federal preserves, where the plaintiffs (including the Center) seek to vacate the rule and reimpose restrictions on certain hunting.  The withdrawal rule benefited SCI and SAF's members by allowing them to engage in certain hunting; the plaintiffs' suit would erase those benefits.  *Alaska Wildlife All. v. Haaland*, 20-CV-209, Dkt. 14 (D. Alaska Nov. 19, 2020).  On the flipside, the same plaintiffs (which included the Center) were intervenor-defendants in a case brought by SCI to challenge a prior rule restricting hunting, and the district court granted their motion to intervene over the State of Alaska's objection.  *Alaska v. Zinke*, No. 17-CV-13, 2017 WL 1745020, *3 (D. Alaska May 3, 2017).

(reviewable de novo) that the Hunting Coalition lacked a protectable interest runs counter to the "broad[ ] interpret[ation] in favor of intervention" of Rule 24(a)'s "interest test." *E.g.*, *Citizens for Balanced Use*, 647 F.3d at 897.

2.  <u>The Hunting Coalition has protectable interests because the organizations participated in the agency proceedings leading to adoption of the 2020 Rule.</u>

The District Court's ruling should also be reversed because the Hunting Coalition, as active participants in the regulatory process in support of the 2020 Rule, have the required interest under Rule 24(a).

In this Circuit, "[a] public interest group is entitled ***as a matter of right*** to intervene in an action challenging the legality of a measure it has supported." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995) (emphasis added) (citing *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 527 (9th Cir. 1983) and *Wash. State Bldg. & Constr. Trades Council v. Spellman*, 684 F.2d 627, 630 (9th Cir. 1982)). In *Idaho Farm Bureau*, this Court affirmed the district court's grant of a motion to intervene by environmental groups who demonstrated the required interest because they were "active in the process" of listing a snail under the ESA. *Id.* at 1398. This Court relied on *Sagebrush Rebellion*, in which this Court reversed the district court's denial of the motion to intervene by a national non-profit focused on bird conservation, which had "participated actively in the administrative process surrounding" establishment of a conservation area for

birds of prey.  713 F.2d at 526–27; *see also WildEarth Guardians*, 604 F.3d at 1200 (noting SCI's participation in rulemaking in reversing district court order finding lack of protectable interest).  Like the public interest groups in those cases, the Hunting Coalition seeks to intervene to defend the legality of a measure it supported before the agency through public comments filed by SCI, SAF, and RMEF on the proposed Rule that became the 2020 Rule.[10]

> 3. <u>The District Court erred in its characterization of the Hunting Coalition's interests, leading to its erroneous ruling there was no protectable interest</u>.

The District Court apparently misunderstood the interests at stake in the litigation for the Hunting Coalition.  The District Court erred in holding that the Hunting Coalition's interests in defending the hunting opportunities afforded by the 2020 Rule did not satisfy Rule 24(a) because the Center's suit represents a "mere ***possibility***" of "***eventual*** limitations on hunting and fishing opportunities and access—limitations that were ***long the status quo***."  ER-11 (emphasis added).

---

[10] ER-36 (noting SCI comments filed in FWS-HQ-NWRS-2020-0013, the 2020 Rule's docket); ER-84, ¶ 8 (noting SAF comments); ER-113, ¶ 10 (noting RMEF comments).  The full text of these comments will be in the Administrative Record when it is filed later in the litigation and can be seen now in the rulemaking docket:

https://www.regulations.gov/docket/FWS-HQ-NWRS-2020-0013/comments?filter=safari%20club (SCI);
https://www.regulations.gov/docket/FWS-HQ-NWRS-2020-0013/comments?filter=%22sportsmen%27s%20alliance%22 (SAF);
https://www.regulations.gov/docket/FWS-HQ-NWRS-2020-0013/comments?filter=%22rocky%20mountain%20elk%22 (RMEF).

The District Court failed to explain its reasoning any further, and was just plain wrong.

While the Hunting Coalition certainly has interests in promoting and defending expanded hunting and fishing opportunities as a general matter, its interests in this case are specific to defending the opportunities provided by the 2020 Rule. Concrete, present-tense hunting and fishing opportunities are at stake. *See, e.g.*, 85 Fed. at Reg. 54,076 (opening nine National Wildlife Refuges to hunting and fishing for the first time, while expanding hunting and fishing on 89 additional refuges); *id.* at 54,095 (expanding hunting on over 2.3 million acres of public land); *id.* at 54,097 (extending hunting seasons on certain Refuges to create over 20,000 additional hunting days).

There is nothing hypothetical about the Center's requested relief: abrogation or curtailment of the hunting and fishing opportunities opened by the 2020 Rule by vacatur of the 2020 Rule or injunction. ER-173–174. Either remedy would immediately (not "eventually") and certainly (not "possibly") terminate the additional hunting opportunities provided to hunters by the 2020 Rule. The Complaint identifies specific Refuges—and the Hunting Coalition submitted evidence from individual members who will no longer be able to take advantage of new opportunities on these Refuges. For example, the Center seeks to curtail or eliminate archery black bear hunts on the Swan River National Wildlife Refuge.

ER-146, ¶ 69.  NRA member Hedstrom intends to hunt black bear on this Refuge

for the first time under the 2020 Rule.  ER-76, ¶¶ 8-10.  The Center seeks to curtail

or eliminate expanded migratory bird and upland game hunting on the Lacreek

National Wildlife Refuge (among other things).  ER-165–166, ¶ 126.  SCI member

Edwards intends to hunt on newly opened acreage on that Refuge.  ER-70, ¶¶ 7-8.

The Center seeks to curtail or eliminate big game hunting on the Everglades

Headwaters and St. Marks National Wildlife Refuges (among other things).  ER-

155–156, 158, ¶¶ 98, 106.  SCI and SAF member Walters wishes to hunt alligator,

a newly authorized species, on these Refuges.  ER-109, ¶ 5.

Further, while these specific opportunities are new changes to the

management of those individual Refuges, the limitations on hunting and fishing

within the Refuge System for which the Center advocates are new requests.

Although ultimately it makes no difference (because intervention may be sought

both to defend a favorable change in the status quo and to defend a favorable status

quo), the District Court was wrong in saying those limitations were the "status

quo."  Providing for hunting and fishing opportunities is one of the statutory

purposes directing how the Service is to manage the Refuge System.  16 U.S.C.

§§ 668dd(a)(3), (a)(4)(K).  Contrary to the District Court's statement, the lawful

use of lead ammunition is also the status quo and is widespread across the Refuge

System for all types of hunting except waterfowl hunting.  *See* 50 C.F.R.

§ 20.21(j)(2).  Thus, the Center's suit challenges the status quo of how the Service manages the Refuge System by seeking to overturn the 2020 Rule's expansion of traditional hunting and fishing opportunities and methods.  The Hunting Coalition seeks to intervene to defend a favorable status quo that allows its members hunting opportunities.[11]

> 4.     The scanty caselaw cited by the District Court is readily distinguishable.

The District Court should also be reversed because the limited cases it cited in support of its erroneous holding are readily distinguishable from this case.  The interests at stake in this litigation differ greatly from those at issue in *Southern California Edison Company v. Lynch,* 307 F.3d 794, 803 (9th Cir. 2002), the only appellate opinion the District Court cited in support of its conclusion a protectable interest was lacking.

In *Lynch*, the first set of proposed-intervenors sought to intervene as plaintiffs based upon a contingent, unsecured debt owed to them by the existing

---

[11] Moreover, even if these expanded hunting opportunities truly were a departure from the status quo (which they are not), that would only serve to heighten the Hunting Coalition's interest in defending the 2020 Rule.  The loss of a newly afforded opportunity is no less harmful or detrimental to a person's interests just because it was not an opportunity previously provided under the status quo.  In *Idaho Farm Bureau* and *Sagebrush Rebellion*, the challenged actions—listing of the snail and establishment of the bird conservation area—were changes to the status quo.  *E.g.*, *Idaho Farm Bureau*, 58 F.3d at 1397; *Sagebrush Rebellion*, 713 F.2d at 527.

plaintiff, who had sued the defendant for refusing to let it raise the rates it charged

consumers for electric services. *Id.* at 801-03. The proposed intervenors claimed

an interest in the potential additional revenue that the plaintiff would earn if it were

able to raise rates, which could be directed towards paying their claim. *Id.* at 803.

The Court found this remote and contingent interest too indirect to justify

intervention and lacking any common questions of law and fact with the

underlying case about electric utility rate regulation. *Id.* The Court also affirmed

the denial of a motion to intervene as defendants filed by a coalition of 800 electric

utility customers, finding their interest in keeping electric rates low was shared by

a substantial portion of the entire population, and thus was too generalized and

attenuated for intervention. *Id.*[12]

By contrast, the Hunting Coalition's interest is in defending the very hunting

opportunities opened, expanded, and authorized through the 2020 Rule, which is

being challenged by Plaintiffs. Members of the organizations comprising the

Hunting Coalition are the direct, intended beneficiaries of the 2020 Rule, and these

interests are precisely the "direct, non-contingent, substantial and legally

protectable" interests required for intervention as of right. *Id.* Further, while there

are a significant number of hunters, by no means do the individual hunters who

---

[12] Another advocate for low utility rates (TURN) had already been granted
permissive intervention. *Id.* at 802.

utilize these particular hunting opportunities on particular lands, as described in their Declarations, constitute a "substantial portion of the population," like the nearly-universal class of people who purchase electricity. These hunters have narrow interests not shared by the general populace.

The only other case cited by the District Court in ruling there was no protectable interest was an unpublished opinion from the Northern District of California, which also does not support the ruling. ER-12. In *San Francisco Baykeeper v. U.S. Fish and Wildlife Service*, the plaintiff challenged the Service's decision not to afford ESA protections to a fish population (smelt). No. 21-CV-2566, 2021 WL 3426961, *3 (N.D. Cal. Aug. 5, 2021). The Westlands Water District ("Westlands") moved for intervention as of right, asserting that its contractual water rights may be impacted if the Service afforded ESA protections to the fish. *Id.* at *5.

The district court denied Westlands' motion. It held that Westlands' contractual water rights were not implicated by the plaintiff's requested remedy, which was to require the Service to issue a proposed rule seeking public comment on whether the fish population warranted receiving ESA protections. *Id.* at *7. It concluded that federal rulemaking procedure, which would start with the species not receiving ESA protections, would provide Westlands with an opportunity to protect its rights. *Id.* The plaintiff was not seeking a judicial order compelling the

Service to immediately extend ESA protections to the species to the detriment of Westlands, but rather sought a judicial order compelling the Service to begin an agency proceeding that might or might not result in ESA protections for the species. *Id.* Because no practical change to the legal status of the species would occur at the very least until some point in the future agency rulemaking that would follow if plaintiff prevailed in the lawsuit, Westlands' interests were protected by the opportunity to defend its water rights through participating in such a future rulemaking. *Id.*[13]

Here, to the contrary, the Center requests immediate vacatur of the 2020 Rule, which would result in the immediate elimination of over 100 new hunting and fishing opportunities, prior to the commencement of any rulemaking process. If such relief is granted, future participation through public comments cannot restore the opportunities lost in the meantime. Further, the Hunting Coalition's interests would be impaired even when participating in future rulemaking processes if its position changes from defending and advocating for the retention of hunting opportunities established in the Refuge System and permissible under the operative rules, as here, to advocating for a change of existing law to reinstate such

---

[13] Other attenuating factors lurked in the facts and arguments of the parties opposing intervention, including uncertainty as to whether protecting the species would actually result in Westlands' water allocations being reduced. *See* 2021 WL 3426961, at 6.

opportunities.  *Accord Crossroads*, 788 F.3d at 319 (holding that the impairment

element is satisfied where a requested judicial finding that the rule was contrary to

law would make the task of reestablishing the status quo more burdensome).

The Hunting Coalition has a significant protectable interest in the 2020 Rule.

The District Court erred in ruling that it does not, and this Court should reverse.

**B.     The disposition of this case may impair or impede the Hunting
        Coalition's ability to protect its interests**.

The conclusion that the Hunting Coalition is intervening to defend a

protectable interest leads naturally to the conclusion that that this interest will be

impaired if the Center prevails in this litigation.  "Under similar circumstances,

'[h]aving found that appellants have a significant protectable interest, [this court

had] little difficulty concluding that the disposition of th[e] case may, as a practical

matter, affect it.'"  *Citizens for Balanced Use*, 647 F.3d at 898 (quoting *Lockyer*,

450 F.3d at 442) (alterations in original).

Rule 24(a)'s impairment requirement focuses on whether the proposed

intervenor's interest may be impaired or impeded "as a practical matter."  Fed. R.

Civ. P. 24(a).  If a proposed intervenor "'would be substantially affected in a

practical sense by the determination made in an action, [it] should, as a general

rule, be entitled to intervene.'"  *Id.* (citations omitted).  In *Citizens for Balanced

Use*, the district court denied the motion to intervene of three organizations that

sought to defend a U.S. Forest Service rule restricting motorized vehicle use.  *Id.* at

895.  This Court reversed and held that the proposed intervenors' interests would be impaired because, if the plaintiff prevailed and the restrictions on motorized vehicle use were lifted, the proposed intervenors' interest in conserving and enjoying wilderness in the area affected by the rule "may, as a practical matter, be impaired." *Id.* at 898.

Here, the Hunting Coalition's interests will be substantially affected by a determination made in the Center's favor.  The 2020 Rule opens or expands hunting opportunities on National Wildlife Refuges, which the Hunting Coalition's members are enjoying or will enjoy.  *E.g.*, ER-66–114.  The Hunting Coalition's interests are advanced by the 2020 Rule.  As in *Citizens for Balanced Use*, if the Center prevails and these new opportunities are shut down, then the interests of the Hunting Coalition and its members may, as a practical matter, be impaired.  No longer having access to these opportunities on Refuges, which the Hunting Coalition's members enjoy under the 2020 Rule, represents a similar impairment to not being able to enjoy access to public lands without motorized vehicles, like the proposed intervenors in *Citizens for Balanced Use*.

The District Court erroneously concluded that the Hunting Coalition will suffer no impairment because, if the 2020 Rule is "revoked," the Hunting Coalition can "weigh-in during any comment period concerning future hunting and fishing access rulemaking."   ER-11–12.  As explained above, the Hunting Coalition's

opportunity to participate in a future rulemaking is no substitute for being able to use the Refuges now, and does not eliminate the impairment to the Hunting Coalition's interests if the 2020 Rule is vacated. The hunting opportunities granted by the 2020 Rule are immediately lost if the Center obtains its relief or some version thereof. The ability to participate and comment in future rulemaking that might or might not eventually lead to restoration of some of the lost hunting opportunities does not remove the harms that may result from the resolution of a pending case.

**C.**     **The Hunting Coalition has satisfied its "minimal" burden in demonstrating that its interests may not be adequately represented by the Service.**

The District Court's order did not consider whether the Hunting Coalition's interest were adequately represented in the context of the intervention-as-of-right analysis. ER-12.[14] But the issue was fully briefed in the Hunting Coalition's motion to intervene and is fully briefed in this appeal. To avoid a piecemeal

---

[14] As discussed in n.3 above, the District Court avoided discussing adequacy of representation in the section of its opinion analyzing intervention as of right. ER-10–12 ("Intervention as a Matter of Right"). Later in the opinion, it discussed a stricter version of one of the issues relevant to inadequate representation, but only in the context of permissive intervention, which is governed by a separate and largely discretionary analysis. ER-12–14 ("Intervention as a Matter of Discretion") (erroneously holding that "the Hunting Coalition has not demonstrated that Defendants are 'incapable or unwilling to make all available arguments in support of their common objectives," which is a stricter standard than under Rule 24(a)) (notably, citing a district court opinion from California and not this Court's precedent).

remand that may lead to a further appeal regarding intervention, this Court should

consider this final intervention element now and grant the Hunting Coalition's

motion.  This Court has generally proceeded to address the adequacy of

representation element in similar situations.  *E.g.*, *Kalbers*, 22 F.4th at 827.

It is particularly appropriate for the Court to address the fourth element now,

given the Service's recent publication of a proposed rule that underscores its

divergence of interest from the Hunting Coalition.  In the 2022-2023 proposed rule

opening or expanding a few new hunting opportunities in the Refuge System, the

Service also tentatively determined to phase out the use of lead ammunition and

tackle on these Refuges.  87 Fed. Reg. 35,136, 35,138 (June 9, 2022).[15]  The 2022-

2023 rule partially and significantly aligns the Service more with the Center,

whose lawsuit seeks a ban on the use of lead ammunition in the Refuge System,

ER-174, than the Hunting Coalition.  Thus, the new development is highly relevant

to the adequacy of representation inquiry, and leaves it utterly clear (if it were not

already clear) that the Service cannot adequately represent the Hunting Coalition.

The alternative of relegating the Hunting Coalition to starting over with a second

---

[15] This Court may take judicial notice of the proposed rule.  44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed…."); *Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*, 366 F.3d 692, 702 n.5 (9th Cir. 2004) (taking judicial notice of and considering a proposed rule published in the Federal Register during the course of the appeal).

motion to intervene in the District Court citing the new development would be highly inefficient.

1. The Service **may** not raise the same arguments as the Hunting Coalition and therefore does not adequately represent its interests.

The Supreme Court has concluded that the burden of proof to establish the possibility of inadequate representation is "minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972); *see also Legal Aid Soc'y of Alameda Cnty. v. Dunlop,* 618 F.2d 48, 50–51 (9th Cir. 1980) (overturning denial of motion to intervene where the district court incorrectly relied on assertion that the government's defense on the merits would fully protect interest of proposed intervenor). The Hunting Coalition need not establish with certainty that existing parties will fail to adequately represent its interests: intervention is warranted whenever there "**may be**" a divergence of interests between the parties seeking intervention and those already in the case. *See Sw. Ctr. for Biological Diversity*, 268 F.3d at 823 (emphasis added); *see also Citizens for Balanced Use*, 647 F.3d at 900. Further, "there is good reason in most cases to suppose that the applicant is the best judge of the representation of the applicant's own interests," and "all reasonable doubts should be resolved in favor of allowing the absentee, who has an interest different from that of any existing party, to intervene…." Wright & Miller, Federal Practice & Procedure: § 1909 (3d ed.).

In determining whether the existing parties' representation "may be" inadequate, this Circuit considers:

> (1) whether the interest of a present party is such that it will undoubtedly make all the intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether the would-be intervenor would offer any necessary elements to the proceedings that other parties would neglect.

*Citizens for Balanced Use*, 647 F.3d at 898 (citation omitted). Here, the Service will not "undoubtedly" make or be capable and willing to make all the Hunting Coalition's arguments. And the Hunting Coalition offers the perspective of the beneficiaries of the 2020 Rule (hunters and anglers), which offers a necessary element to the case that the Service's representation, alone, would neglect.

First, nothing in the record supports an assumption that the Service will "undoubtedly" raise or be willing to raise all of the Hunting Coalition's potential arguments. Because the Service has not yet filed an answer or motion in response to the Center's Complaint, the Hunting Coalition and the Court do not know what allegations the Service contests or if it will even defend the 2020 Rule. The Hunting Coalition need not show that the Service will not raise a specific defense, only that the Service will not "undoubtedly" raise such a defense. Moreover, the Service's participation in settlement discussions raises questions as to whether the Service's representation of the Hunting Coalition's interests ***may*** be inadequate. ER-18.

It also seems doubtful that the Service will be willing to raise all potential arguments, for two reasons. First, the Service indicated in its May 16, 2022 opposition to the Hunting Coalition's now-withdrawn motion to expedite that the Center "may simply decide not to pursue this case once it has an opportunity to view the Service's anticipated 2022-2023 Station-Specific Hunting and Sport Fishing Regulations." That proposed rule was published on June 9, 2022, and it involves only one of the eight Refuges on which new hunting opportunities are specifically challenged in the Center's Complaint. *See* 87 Fed. Reg. 35,136. While the Center could choose to withdraw this suit because one of its issues may be resolved in a final rule, that seems doubtful. Adoption of the final 2022-2023 rule is unlikely to resolve the current case, notwithstanding the Service's representations.

Second, the 2022-2023 rule proposes to treat use of lead ammunition and fishing tackle more strictly than under State law on the 19 National Wildlife Refuges on which new hunting or fishing opportunities are proposed. The Service proposes to prohibit or phase-out lead ammunition and tackle in conjunction with the newly opened opportunities. 87 Fed. Reg. at 35,136, 35,138. The Hunting Coalition disagrees with any conclusion that "[t]he best available science … indicates that lead ammunition and tackle may have negative impacts on both wildlife and human health," which is also an allegation made in the Center's

Complaint. *See* 87 Fed. Reg. at 35,138; ER-140–142. If this is a new position of the Service's, then it certainly casts doubt on whether the Service will be willing and able to make the same arguments with respect to lead ammunition and tackle as the Hunting Coalition will make.

And, notably, the Hunting Coalition has a history of raising procedural, jurisdictional, and other types of arguments not raised by federal defendants in similar cases.[16] This factor weighs heavily in favor of granting intervention—this Court has recently held that the identification of arguments not raised by existing parties demonstrated that existing parties did not adequately represent the proposed intervenor's interests. *W. Watersheds Project v. Haaland*, 22 F.4th 828, 841 (9th Cir. 2022). Because the Hunting Coalition and Federal Defendants have differing interests and mandates as well as different litigation strategies, it is more than doubtful that Federal Defendants will be capable and willing to make all the same arguments that the Hunting Coalition will make.

---

[16] *E.g.*, *Pub. Emps. for Envtl. Resp. v. Bernhardt*, No. 18-CV-1547, 2020 WL 601783, *3 (D.D.C. Feb. 7, 2020) (obtaining dismissal of plaintiffs' complaint due to lack of standing; the federal defendants did not challenge the court's jurisdiction); *Ctr. for Biological Diversity v. Haaland*, No. 20-CV-461, Dkt. 23 (D. Ariz. June 16, 2021) (Safari Club motion to dismiss challenging the injury prong of standing and raising the Act of State doctrine); *Defs. of Wildlife v. U.S. Fish & Wildlife Service*, No. 21-CV-344, Dkt. 39 (N.D. Cal. May 6, 2021) (Safari Club and NRA Motion to Dismiss for Lack of Jurisdiction, raising arguments not raised by the Service).

The third factor also favors intervention. Based on past experience, Federal Defendants will defend the 2020 Rule (assuming they defend it) on the administrative record. The Hunting Coalition offers a necessary element that would otherwise be neglected—the perspective of the hunters and anglers who are the intended beneficiaries of the 2020 Rule, especially those wishing to use lead ammunition and tackle. *Accord W. Watersheds Project*, 22 F.4th at 842 (in case challenging agency action limited to the administrative record, finding existing parties did not adequately represent proposed intervenor's interests in part because proposed intervenor "actually participated" in the challenged conduct, unlike the existing parties). Federal Defendants do not and cannot present this perspective, as they are government regulators who must represent a constituency of diverse interests, and as they have recently taken a more limited position with respect to lead.[17] Thus, all three factors support the Hunting Coalition's intervention in this case. The Hunting Coalition satisfies the "minimal" burden of showing that the Service ***may*** not adequately represent its interests.

---

[17] *E.g.*, *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1499 (9th Cir. 1995) (finding intervenors satisfied the minimal showing of inadequate representation when the Forest Service must represent broader public interests instead of the narrower, parochial interests of the State), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011).

2. <u>A presumption of adequacy does not apply in this case</u>.

In this Circuit, a presumption of adequacy of representation may arise if the proposed intervenor "share[s] the same ultimate objective" with an existing party, or "when the government is acting on behalf of a constituency that it represents." *Citizens for Balanced Use*, 647 F.3d at 898 (internal quotation and citation omitted). The presumption may be rebutted with a "compelling showing." *Id.* Even if the Service and the Hunting Coalition both defend the 2020 Rule, no presumption of adequate representation exists here because the Hunting Coalition's interests are distinct from the Service's: "the government's representation of the public interest may not be 'identical to the individual parochial interest' of a particular group just because 'both entities occupy the same posture in the litigation.'" *Id.* at 899 (quoting *WildEarth Guardians v. U.S. Forest Serv.*, 573 F.3d 992, 996 (10th Cir. 2009)).

The Hunting Coalition and Federal Defendants have differing interests at stake in defending the 2020 Rule. The Service's interests in the Rule presumably lie in defending its process in rulemaking and its compliance with APA requirements whereas the Hunting Coalition will argue that the 2020 Rule provides permissible hunting access, conservation, and wildlife management under federal and State law. The Service necessarily must also defend the 2020 Rule through a lens representing broader public interests, instead of the Hunting Coalition's

narrower and more parochial interests of the hunters and anglers who intend to take advantage of the expanded opportunities provided by the 2020 Rule.

In fact, the different interests here shows that this is a case where "[i]nadequate representation is most likely to be found." *See Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1499 (9th Cir. 1995) (finding intervenors satisfied the minimal showing of inadequate representation when the Forest Service must represent broader public interests instead of the narrower, parochial interests of the State), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011); *Sw. Ctr. for Biological Diversity*, 268 F.3d at 823 (holding that the "federal agency … cannot be expected … to protect these private interests" of the proposed intervenor); *Dimond v. District of Columbia*, 792 F.2d 179, 193 (D.C. Cir. 1986) (holding that government entity charged with representing the public interest has a broader interest than proposed intervenor seeking to advance narrower, "parochial" interest not shared by all citizens); *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998) ("when an agency's views are necessarily colored by its view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it, the burden [to overcome the presumption of adequate representation] is comparatively light"); *In re Sierra Club*, 945 F.2d 776, 780 (4th Cir. 1991) (ruling that district court abused its discretion in denying organization's motion to

intervene as of right because state government defendant represents all citizens of the state, whereas organization represents a small subset of citizens and need not consider the interests of the state as a whole).

This Court recently considered an even closer relationship than the government and private organizations in reversing the denial of a motion to intervene. In *Western Watersheds*, an industry group representing oil and gas companies had already intervened in a suit brought by the Center challenging oil and gas leases on federal land, when an individual oil and gas lessee also moved to intervene. 22 F.4th at 842. This Court noted that the industry group "intervened for the express purpose of representing companies, such as [proposed intervenor]," but held that the industry group was tasked with representing "the more general interests of the oil and gas industry as a whole," while the proposed intervenor sought "to defend a specific property interest" and financial interest of its own. *Id.*

Finally, as more fully discussed above, the Service's 2022-2023 proposed rule for hunting and fishing on National Wildlife Refuges confirms that the Service's interests may (and will) diverge from the Hunting Coalition's. The Service states a tentative finding (subject to public comments) that lead ammunition and fishing tackle may be harmful to wildlife, and proposes to restrict or phase out lead ammunition and fishing tackle on the 19 Refuges where hunting and fishing are proposed to be opened or expanded. 87 Fed. Reg. at 35,138. The

Hunting Coalition opposes any such restrictions because, among other reasons, the research on which the Service apparently relies is not undisputed, particularly with respect to whether lead has any harmful effects beyond avian species. Further, prohibiting the use of lead ammunition will deny access to many hunters who cannot afford or do not have access to non-lead ammunition. Such restrictions will effectively diminish hunting opportunities for many hunters. The Hunting Coalition's narrow interests in the specific hunting opportunities provided by the 2020 Rule—such as permitting the use of lead ammunition when hunting on newly opened Refuges, the establishment of new bow hunting seasons for black bear, or extensions of particular hunting seasons to more closely align with State hunting practices—are narrower and more focused than the Service's concern for governance of the Refuge System as a whole, and for the public, rather than parochial, interest. The Hunting Coalition has therefore established under applicable law that the Service may not adequately represent it in these proceedings.

For these reasons, the Hunting Coalition has demonstrated that it meets all elements for intervention as of right under Rule 24(a), and this Court should reverse the District Court's erroneous denial of the Hunting Coalition's Motion to Intervene.

## <u>CONCLUSION</u>

This case does not involve theoretical interests or imagined concerns. The 2020 Rule provides concrete and easily recognized benefits to the Hunting Coalition's members that Plaintiffs seek to revoke. The Hunting Coalition's interests are at risk by this litigation, and that risk is in no way mitigated by the prospect of engaging in rulemaking activity after the rights at issue are lost. The Service may defend the 2020 Rule, but it may do so for reasons that do not implicate the concerns of the Hunting Coalition, or it may elect not to defend the rule as presently written and negotiate a revised rule with the Center that may have adverse effects on the interests of the Hunting Coalition. All that need be shown here is that there are distinct interests at stake, that those interests are threatened by possible outcomes in this case, and that the Service possibly may not represent those interests in part or in whole. That showing was made in the Hunting Coalition's Motion to Intervene and the supporting declarations. The Court should therefore reverse the District Court's ruling, and direct that the Hunting Coalition's Motion for intervention as a matter of right be granted.

Respectfully submitted,

June 21, 2022                              */s/ Jeremy Clare*
                                          Jeremy E. Clare
                                          Regina Lennox
                                          Safari Club International
                                          501 2nd Street NE
                                          Washington, DC 20002

202-543-8733
jclare@safariclub.org
rlennox@safariclub.org
*Attorneys for Safari Club*
*International*

/s/ Michael Jean
Michael T. Jean
National Rifle Assn. of America—
Institute for Legislative Action
11250 Waples Mill Road
Fairfax, VA 22030
703-267-1158
mjean@nrahq.org
*Attorney for the National Rifle*
*Association of America*

/s/ James Lister
James H. Lister
Brian Gerd
Birch Horton Bittner & Cherot, P.C.
1100 Connecticut Avenue, NW
Suite 825
Washington, DC 20036
202-659-5800
jlister@bhb.com
bgerd@bhb.com
*Attorneys for Sportsmen's Alliance*
*Foundation and the Rocky Mountain*
*Elk Foundation*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-35314

I am the attorney or self-represented party.

**This brief contains** | 10,315 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ( • ) complies with the word limit of Cir. R. 32-1.
- ( ○ ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ( ○ ) is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ( ○ ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ( ○ ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*
    - ( ○ ) it is a joint brief submitted by separately represented parties;
    - ( ○ ) a party or parties are filing a single brief in response to multiple briefs; or
    - ( ○ ) a party or parties are filing a single brief in response to a longer joint brief.
- ( ○ ) complies with the length limit designated by court order dated [          ].
- ( ○ ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Regina Lennox | **Date** | June 21, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                            *Rev. 12/01/2018*

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2022, I electronically filed the foregoing with the Clerk of the Court for the by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/   Regina Lennox
*Attorney for Safari*
*Club International*

# ADDENDUM

## Pertinent Excerpts of Federal Statutes

5 U.S.C. § 706 ..................................................................49

16 U.S.C. § 688dd(a)(3), (a)(4)(K), (e)(1)(m) .................48

16 U.S.C. § 668ee(2) .........................................................48

16 U.S.C. § 1536(a)(2) ......................................................49

44 U.S.C. § 1507 ...............................................................50

## Pertinent Excerpts of Federal Regulations

50 C.F.R. § 20.21(j)(2) ......................................................50

## Pertinent Excerpts of Rules

85 Fed. Reg. 54,076 (Aug. 31, 2020) ...............................51

16 U.S.C. § 668dd. National Wildlife Refuge System
Effective: October 30, 1998

**(a) Designation; administration; continuance of resources-management-programs for refuge lands in Alaska; disposal of acquired lands; proceeds**
…
**(3)** With respect to the System, it is the policy of the United States that--
 …
  **(B)** compatible wildlife-dependent recreation is a legitimate and appropriate general public use of the System, directly related to the mission of the System and the purposes of many refuges, and which generally fosters refuge management and through which the American public can develop an appreciation for fish and wildlife;
  **(C)** compatible wildlife-dependent recreational uses are the priority general public uses of the System and shall receive priority consideration in refuge planning and management; and
**…**
**(4)** In administering the System, the Secretary shall--
...
  **(K)** provide increased opportunities for families to experience compatible wildlife-dependent recreation, particularly opportunities for parents and their children to safely engage in traditional outdoor activities, such as fishing and hunting;
**…**
**(e) Refuge conservation planning program for non-Alaskan refuge lands**
**(1) … (m) State authority**

Nothing in this Act shall be construed as affecting the authority, jurisdiction, or responsibility of the several States to manage, control, or regulate fish and resident wildlife under State law or regulations in any area within the System. Regulations permitting hunting or fishing of fish and resident wildlife within the System shall be, to the extent practicable, consistent with State fish and wildlife laws, regulations, and management plans.

16 U.S.C. § 668ee
Effective: October 9, 1997
For purposes of this Act:
 …

**(2)** The terms "wildlife-dependent recreation" and "wildlife-dependent recreational use" mean a use of a refuge involving hunting, fishing, wildlife observation and photography, or environmental education and interpretation.

5 U.S.C. § 706
§ 706. Scope of review
To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and
**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
**(B)** contrary to constitutional right, power, privilege, or immunity;
**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
**(D)** without observance of procedure required by law;
**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

16 U.S.C.A. § 1536
§ 1536. Interagency cooperation
**(a) Federal agency actions and consultations**
…
**(2)** Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such

action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

44 U.S.C.A. § 1507
§ 1507. Filing document as constructive notice; publication in Federal Register as presumption of validity; judicial notice; citation

A document required by section 1505(a) of this title to be published in the Federal Register is not valid as against a person who has not had actual knowledge of it until the duplicate originals or certified copies of the document have been filed with the Office of the Federal Register and a copy made available for public inspection as provided by section 1503 of this title. Unless otherwise specifically provided by statute, filing of a document, required or authorized to be published by section 1505 of this title, except in cases where notice by publication is insufficient in law, is sufficient to give notice of the contents of the document to a person subject to or affected by it. The publication in the Federal Register of a document creates a rebuttable presumption--
(1) that it was duly issued, prescribed, or promulgated;
(2) that it was filed with the Office of the Federal Register and made available for public inspection at the day and hour stated in the printed notation;
(3) that the copy contained in the Federal Register is a true copy of the original; and
(4) that all requirements of this chapter and the regulations prescribed under it relative to the document have been complied with.

The contents of the Federal Register shall be judicially noticed and without prejudice to any other mode of citation, may be cited by volume and page number.

50 C.F.R. § 20.21
§ 20.21 What hunting methods are illegal?
Effective: August 8, 2019
Migratory birds on which open seasons are prescribed in this part may be taken by any method except those prohibited in this section. No persons shall take migratory game birds:

(j) …
    (2) Each approved shot type must contain less than 1 percent residual lead (see § 20.134).

# DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

### 50 CFR Parts 32, 36, and 71

**[Docket No. FWS–HQ–NWRS–2020–0013; FXRS12610900000–201–FF09R20000]**

**RIN 1018–BE50**

### 2020–2021 Station-Specific Hunting and Sport Fishing Regulations

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), are opening, for the first time, eight National Wildlife Refuges (NWRs) that were previously closed to hunting and sport fishing. In addition, we are opening or expanding hunting and sport fishing at 89 other NWRs and adding pertinent station-specific regulations for other NWRs that pertain to migratory game bird hunting, upland game hunting, big game hunting, and sport fishing for the 2020–2021 season. We are also opening hunting or sport fishing on nine units of the National Fish Hatchery System (NFHs). We are also adding pertinent station-specific regulations that pertain to migratory game bird hunting, upland game hunting, big game hunting, and sport fishing at these nine NFHs for the 2020–2021 season. Further, we are opening 41 limited-interest easement NWRs in North Dakota for upland and big game hunting and sport fishing in accordance with State regulations. Access to these NWRs is controlled by the current landowners, and, therefore, they are not open to the public unless authorized by the landowner. We are also making regulatory changes to existing station-specific regulations in order to reduce the regulatory burden on the public, increase access for hunters and anglers on Service lands and waters, and comply with a Presidential mandate for plain language standards. Lastly, we are prohibiting domestic sheep, goat, and camelid pack animals on the Arctic National Wildlife Refuge.

**DATES:** This rule is effective August 31, 2020.

**FOR FURTHER INFORMATION CONTACT:** Katherine Harrigan, (703) 358–2440.

**SUPPLEMENTARY INFORMATION:**

## Background

The National Wildlife Refuge System Administration Act of 1966 closes NWRs in all States except Alaska to all uses until opened. The Secretary of the Interior (Secretary) may open refuge areas to any use, including hunting and/ or sport fishing, upon a determination that the use is compatible with the purposes of the refuge and National Wildlife Refuge System mission. The action also must be in accordance with provisions of all laws applicable to the areas, developed in coordination with the appropriate State fish and wildlife agency(ies), consistent with the principles of sound fish and wildlife management and administration, and otherwise in the public interest. These requirements ensure that we maintain the biological integrity, diversity, and environmental health of the Refuge System for the benefit of present and future generations of Americans.

We annually review hunting and sport fishing programs to determine whether to include additional stations or whether individual station regulations governing existing programs need modifications. Changing environmental conditions, State and Federal regulations, and other factors affecting fish and wildlife populations and habitat may warrant modifications to station-specific regulations to ensure the continued compatibility of hunting and sport fishing programs and to ensure that these programs will not materially interfere with or detract from the fulfillment of station purposes or the Service's mission.

Provisions governing hunting and sport fishing on refuges are in title 50 of the Code of Federal Regulations in part 32 (50 CFR part 32), and on hatcheries in part 71 (50 CFR part 71). We regulate hunting and sport fishing to:
• Ensure compatibility with refuge and hatchery purpose(s);
• Properly manage fish and wildlife resource(s);
• Protect other values;
• Ensure visitor safety; and
• Provide opportunities for fish- and wildlife-dependent recreation.

On many stations where we decide to allow hunting and sport fishing, our general policy of adopting regulations that are identical to State hunting and sport fishing regulations is adequate in meeting these objectives. On other stations, we must supplement State regulations with more-restrictive Federal regulations to ensure that we meet our management responsibilities, as outlined under Statutory Authority, below. We issue station-specific hunting and sport fishing regulations when we open wildlife refuges and fish hatcheries to migratory game bird hunting, upland game hunting, big game hunting, or sport fishing. These regulations may list the wildlife species that you may hunt or fish; seasons; bag or creel (container for carrying fish) limits; methods of hunting or sport fishing; descriptions of areas open to hunting or sport fishing; and other provisions as appropriate.

In the case of this rule, we are issuing one regulation for an Alaska refuge. In 2015, the Arctic National Wildlife Refuge finalized their comprehensive conservation plan (CCP), which included a prohibition on domestic sheep, goat, and camelid use on the refuge based on the risk of disease transmission to Dall's sheep. Any closures or restrictions of recreational uses on Alaska refuges must go through extensive public outreach and comment, including publication in the **Federal Register**.

## Statutory Authority

The National Wildlife Refuge System Administration Act of 1966 (Administration Act; 16 U.S.C. 668dd–668ee, as amended by the National Wildlife Refuge System Improvement Act of 1997 [Improvement Act]) governs the administration and public use of refuges. The Refuge Recreation Act of 1962 (16 U.S.C. 460k–460k–4) (Recreation Act) governs the administration and public use of refuges and hatcheries. The Alaska National Interest Lands Conservation Act (ANILCA, 16 U.S.C. 3101, *et seq.*) governs the administration of public lands, including refuges, in Alaska.

Amendments enacted by the Improvement Act were built upon the Administration Act in a manner that provides an "organic act" for the Refuge System, similar to organic acts that exist for other public Federal lands. The Improvement Act serves to ensure that we effectively manage the Refuge System as a national network of lands, waters, and interests for the protection and conservation of our Nation's wildlife resources. The Administration Act states first and foremost that we focus our Refuge System mission on conservation of fish, wildlife, and plant resources and their habitats. The Improvement Act requires the Secretary, before allowing a new use of a refuge or before expanding, renewing, or extending an existing use of a refuge, to determine that the use is compatible with the purpose for which the refuge was established and the mission of the Refuge System. The Improvement Act established as the policy of the United States that wildlife-dependent recreation, when compatible, is a legitimate and appropriate public use of the Refuge System, through which the American public can develop an appreciation for fish and wildlife. The Improvement Act established six wildlife-dependent recreational uses as the priority general public uses of the

Refuge System. These uses are hunting, fishing, wildlife observation and photography, and environmental education and interpretation.

The Recreation Act authorizes the Secretary to administer areas within the Refuge System and Hatchery System for public recreation as an appropriate incidental or secondary use only to the extent that doing so is practicable and not inconsistent with the primary purpose(s) for which Congress and the Service established the areas. The Recreation Act requires that any recreational use of refuge or hatchery lands be compatible with the primary purpose(s) for which we established the refuge and not inconsistent with other previously authorized operations.

The Administration Act and Recreation Act also authorize the Secretary to issue regulations to carry out the purposes of the Acts and regulate uses.

We develop specific management plans for each refuge prior to opening it to hunting or sport fishing. In many cases, we develop station-specific regulations to ensure the compatibility of the programs with the purpose(s) for which we established the refuge or hatchery and the Refuge and Hatchery System mission. We ensure initial compliance with the Administration Act and the Recreation Act for hunting and sport fishing on newly acquired land through an interim determination of compatibility made at or near the time of acquisition. These regulations ensure that we make the determinations required by these acts prior to adding refuges to the lists of areas open to hunting and sport fishing in 50 CFR parts 32 and 71. We ensure continued compliance by the development of CCPs, step-down management plans, and by annual review of hunting and sport fishing programs and regulations.

For refuges in Alaska, we regulate the uses of refuge lands in compliance with ANILCA. Section 1110(a) of ANILCA defines our authority to regulate the use of nonmotorized surface transportation in Alaska. Under that section of ANILCA, we may close an area on a temporary or permanent basis to these nonmotorized transportation uses when we find that such use would be detrimental to the resource values of the area. This section of ANILCA also provides that if an NWR in Alaska needs to close or restrict a public use or mode of access in order to protect resources of the refuge, we must do extensive public outreach and provide opportunities for public comment as described by section 1110(a) of ANILCA and the associated implementing regulations (*i.e.,* 43 CFR 36.11 and 50 CFR 36.42).

## Summary of Comments and Responses

On April 9, 2020, we published in the **Federal Register** (85 FR 20030) a proposed rule to open hunting or sport fishing at 9 NFHs, open 41 limited-interest easement NWRs in North Dakota, open 8 NWRs that are currently closed to hunting and sport fishing, expand hunting and sport fishing at 89 other NWRs, and add pertinent station-specific regulations for other NWRs that pertain to migratory game bird hunting, upland game hunting, big game hunting, and sport fishing for the 2020–2021 season. We accepted public comments on the proposed rule for 60 days, ending June 8, 2020. By that date, we received 3,177 comments on the proposed rule. Among these comments were 21 that were either intended for a different Department of the Interior rulemaking or otherwise irrelevant to this rule. We discuss the remaining 3,156 comments we received below by topic. As we received 53 comments specific to the Arctic NWR regulation prohibiting domestic sheep, goats, and camelids on the refuge, those comments will be discussed by topic after all other comments. Beyond our responses below, additional station-specific information on how we responded to comments on particular hunting or fishing opportunities at a given refuge or hatchery can be found in that station's final hunting and/or fishing package, each of which can be located online here: *https://www.fws.gov/refuges/hunting/rules-regulations-and-improved-access/*.

*Comment (1):* A few comments were wholly or in part a request that we extend the 60-day public comment period for the proposed rule; a couple of these comments specifically mention the current viral pandemic as a reason for the requested extension.

*Our Response:* We declined to extend the comment period for our April 9, 2020, proposed rule (85 FR 20030). The standard public comment period for the annual rule proposing amendments to the regulations governing hunting and sport fishing on NWRs and NFHs is 30 days. The Service provided a 60-day comment period, which allowed for the submission of more than 3,000 public comments, for the 2020–2021 proposed rule. We recognize the impact of COVID–19, but believe that 60 days was an adequate amount of time for all interested parties to provide their comments to us. Moreover, extending the comment period could have disrupted coordination with State agencies or prevented the publication of a final rule in time for the start dates of relevant hunting and sport-fishing

seasons, which would have effectively delayed the applicability of this rule.

*Comment (2):* We received a substantial number of comments expressing general support for the proposed changes in the rule. Of the 3,177 comments on the rule, 920 were in general support of the proposed changes. These comments of general support either expressed appreciation for the increased hunting and fishing access in the rule overall, expressed appreciation for increased access at particular refuges, or both. In addition to this general support, some commenters requested additional hunting and fishing opportunities at specific stations or generally in several States.

*Our Response:* Hunting and fishing on U.S. Fish and Wildlife Service lands is a tradition that dates back to the early 1900s. In passing the Improvement Act, Congress reaffirmed that the Refuge System was created to conserve fish, wildlife, plants, and their habitats, and would facilitate opportunities for Americans to participate in compatible wildlife-dependent recreation, including hunting and fishing on Refuge System lands. We prioritize wildlife-dependent recreation, including hunting and fishing, when doing so is compatible with the purpose of the refuge and the mission of the NWRS. Hunting or fishing on hatcheries, unlike Refuge System lands, is authorized, "when such activity is not detrimental to the propagation and distribution of fish or other aquatic wildlife" (50 CFR 71.1).

We will continue to open and expand hunting and sport fishing opportunities across refuges and hatcheries; however, as detailed further in our response to *Comment (3),* below, opening or expanding hunting or fishing opportunities on Service lands is not a quick or simple process. The annual regulatory cycle begins in June or July of each year for the following hunting and sport fishing season (the planning cycle for this 2020–2021 final rule began in June 2019). This annual timeline allows us time to collaborate closely with our State, tribal, and territorial partners, as well as other partners including nongovernmental organizations, on potential opportunities. It also provides us with time to complete environmental analyses and other requirements for opening or expanding new opportunities. Therefore, it would be impracticable for the Service to complete multiple regulatory cycles in one calendar year due to the logistics of coordinating with various partners. Once we determine that a hunting or

sport fishing opportunity can be carried out in a manner compatible with individual station purposes and objectives, we work expeditiously to open it.

We did not make any changes to the rule as a result of these comments.

*Comment (3):* Many commenters expressed general opposition to any hunting or fishing in the Refuge System. Of the 3,177 comments on the rule, 1,939 were in general opposition to the proposed changes. In many cases, commenters stated that hunting was antithetical to the purposes of a "refuge," which, in their opinion, should serve as an inviolate sanctuary for all wildlife. Some of these commenters generically opposed expanded or new hunting or fishing opportunities at specific stations.

*Our Response:* The Service prioritizes facilitating wildlife-dependent recreational opportunities, including hunting and fishing, on Service land in compliance with applicable Service law and policy. For refuges, the Administration Act, as amended, stipulates that hunting (along with fishing, wildlife observation and photography, and environmental education and interpretation), if found to be compatible, is a legitimate and priority general public use of a refuge and should be facilitated (16 U.S.C. 668dd(a)(3)(D)). Thus, we only allow hunting of resident wildlife on NWRs if such activity has been determined compatible with the established purpose(s) of the refuge and the mission of the Refuge System as required by the Administration Act. For hatcheries, we allow hunting and fishing when such activity is determined not to be detrimental to the propagation and distribution of fish or other aquatic wildlife (50 CFR 71.1). For all 147 stations opening and/or expanding hunting and/or fishing in this rule, we determined that the proposed actions were compatible or would not have detrimental impacts.

Each station manager makes a decision regarding hunting and fishing opportunities only after rigorous examination of the available information, consultation and coordination with States and tribes, and compliance with the National Environmental Policy Act (NEPA; 42 U.S.C. 4321 *et seq.*) and section 7 of the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*), as well as other applicable laws and regulations. The many steps taken before a station opens or expands a hunting or fishing opportunity on the refuge ensure that the Service does not allow any opportunity that would compromise the purpose of the station or the mission of the agency.

Hunting of resident wildlife on NWRs generally occurs consistent with State regulations, including seasons and bag limits. Refuge-specific hunting regulations can be more restrictive (but not more liberal) than State regulations and often are more restrictive in order to help meet specific refuge objectives. These objectives include resident wildlife population and habitat objectives, minimizing disturbance impacts to wildlife, maintaining high-quality opportunities for hunting and other wildlife-dependent recreation, eliminating or minimizing conflicts with other public uses and/or refuge management activities, and protecting public safety.

The word "refuge" includes the idea of providing a haven of safety for wildlife, and as such, hunting might seem an inconsistent use of the Refuge System. However, again, the Administration Act stipulates that hunting, if found compatible, is a legitimate and priority general public use of a refuge. Furthermore, we manage refuges to support healthy wildlife populations that in many cases produce harvestable surpluses that are a renewable resource. As practiced on refuges, hunting and fishing do not pose a threat to wildlife populations. It is important to note that taking certain individuals through hunting does not necessarily reduce a population overall, as hunting can simply replace other types of mortality. In some cases, however, we use hunting as a management tool with the explicit goal of reducing a population; this is often the case with exotic and/or invasive species that threaten ecosystem stability. Therefore, facilitating hunting opportunities is an important aspect of the Service's roles and responsibilities as outlined in the legislation establishing the Refuge System, and the Service will continue to facilitate these opportunities where compatible with the purpose of the specific refuge and the mission of the Refuge System.

We did not make any changes to the rule as a result of these comments.

*Comment (4):* We received a comment from the Shoshone-Bannock Tribes expressing concern about public safety, compatibility with nonconsumptive uses, and the cultural value of certain areas to the tribes at Minidoka NWR. The tribes also requested that we list the 1868 Fort Bridger Treaty between the Shoshone-Bannock Tribes and the Federal Government in the background section of our refuge and NEPA planning documents for Minidoka NWR as a source of applicable law.

*Our Response:* We address the public safety and compatibility with nonconsumptive uses concerns of all commenters as a common topic of interest below, in our responses to Comments *(19)* and *(20)*, respectively. As for the tribes' concern about impacts on culturally valuable areas, we understand the concern and note that protection of cultural resources, including religious, sacred, and ceremonial sites, archaeological sites, and traditional use areas, is a priority for Minidoka NWR. Moreover, protection of these resources is mandated under Federal law and policy, including, for example, NEPA, the National Historic Preservation Act (54 U.S.C. 300101 *et seq.*), and the Archaeological Resources Protection Act (16 U.S.C. 470aa *et seq.*). Staff monitors cultural resources and will note any unusual activity or disturbance. Our cultural resource staff will visit the resources and note any changes in condition, taking appropriate action. The cultural resources staff will also be notified of discovery of previously unknown resources and will ensure compliance with all applicable regulations and procedures.

As a result of the tribes' request with respect to the 1868 Fort Bridger Treaty, while we note that the treaty and our obligations under it are discussed in the relevant environmental analysis documents and the elk hunt plan for the Minidoka NWR, we will amend these documents to acknowledge the treaty in the background section and in additional key locations throughout the documents.

*Comment (5):* We received a comment from the Tohono O'odham Nation concerning coyote hunting, "trophy hunting," impacts on wilderness areas, impacts on the endangered Sonoran pronghorn antelope, and impacts on cultural resource areas at Cabeza Prieta NWR.

*Our Response:* We respond generally to all commenters who raised predator hunting (including coyote), "trophy hunting," and impact on wilderness concerns at any particular refuge or across the Refuge System, in our responses to Comments *(15)*, *(16)*, and *(17)*, respectively. As to the effect on Sonoran pronghorn (*Antilocapra americana sonoriensis*) from hunting activities at Cabeza Prieta NWR, we fully assessed all hunts in this rule as part of our environmental analysis processes for the refuge and did not proceed with any hunts that could be expected to have an adverse affect on the pronghorn or any other endangered or threatened species. Furthermore, we have provided mitigation measures to

ensure that the impacts to pronghorn, in particular, are minimized. There is a 0.25-mile (0.4-kilometer) no-shoot/hunting buffer zone around the Sonoran pronghorn captive breeding pen. These no-shoot/hunting zones will protect the endangered Sonoran pronghorn and personnel at the breeding facility. The zone will also minimize the negative effects of hunting-related human activity on captive Sonoran pronghorn. Also, mule deer hunters will be provided with educational materials to prevent accidental take of Sonoran pronghorn.

In recognition of the cultural concerns expressed by the Tohono O'odham Nation, in this final rule, we have reduced the proposed hunting areas by 30,000 acres and rescinded proposed hunting of three specific species of cultural importance to the nation on Cabeza Prieta NWR. We will consult with the Tohono O'odham on how these acres and species may be considered for opening to hunting in the future, without adverse effects to cultural resources on the refuge.

*Comment (6):* The Hopi Tribe submitted a comment requesting an extension of the public comment period for our April 9, 2020, proposed rule (85 FR 20030), citing the COVID–19 pandemic as a reason for an extension.

*Our Response:* At Comment *(1)* above, we responded generally to the requests of those who submitted comments requesting an extension of the proposed rule's comment period, including those who specifically based their requests on the circumstances of the current viral pandemic. Our response reflects what we stated in letters to organizations that requested an extension of the comment period by letter separately from the public comment process.

*Comment (7):* We received comments from 20 State agencies, one regional association of fish and wildlife agencies, and one national association of fish and wildlife agencies either through the public comment on our April 9, 2020, proposed rule (85 FR 20030), the NEPA public comment process at one or more stations, or both. Among these comments, we received generally supportive comments with expressions of interest in continued collaboration from the Texas Parks and Wildlife Department; North Carolina Wildlife Resources Commission; Oklahoma Department of Wildlife Conservation; West Virginia Division of Natural Resources; Washington Department of Fish and Wildlife; Oregon Department of Fish and Wildlife; Nebraska Game and Parks Commission; Pennsylvania Fish and Boat Commission; Missouri Department of Conservation; Wyoming

Game and Fish Department; Nevada Department of Conservation and Natural Resources; Kansas Department of Wildlife, Parks & Tourism; and Illinois Department of Natural Resources. We received comments from the Alaska Department of Fish & Game and from the Association of Fish & Wildlife Agencies (AFWA) that were also generally supportive of the rule but objected to the rule's approach to the State of Alaska, in particular the inclusion of a prohibition on certain pack animals at Arctic NWR. The Northeast Association of Fish & Wildlife Agencies expressed concerns about consistency and alignment with State regulations with respect to our regulations on the use of hunting dogs, in addition to expressing support for other parts of the rule. The remaining State agencies expressed support for much of the rule as well, but raised one or more concerns or requests for consideration on the proposed rule: The Georgia Department of Natural Resources requested further alignment of our regulations with State regulations. The South Dakota Department of Game, Fish and Parks submitted two comments;one expressing general support and the other requesting additional consideration for proposed hunts at LaCreek NWR. The Massachusetts Division of Fisheries & Wildlife raised concerns about limitations on certain hunts at stations within the State. The Idaho Department of Fish and Game expressed concerns about the Minidoka and Camas NWRs, indicating they are "ready to assist" with the CCP process for Minidoka NWR. The Arizona Department of Fish and Game advocated for further alignment with Arizona's hunting regulations, including on falconry as a method of take. The Florida Fish and Wildlife Conservation Commission expressed concerns about the impacts of off-road vehicle use on Everglades Headwaters NWR.

*Our Response:* The Service appreciates the support of, and is committed to working with, our State partners to identify additional opportunities for expansion of hunting and sport fishing on Service lands and waters. Our response to the concerns of the State of Alaska and AFWA are fully addressed in this comment summary and response under *Alaska,* below. Our response to the concerns of the Northeast Association of Fish and Wildlife Agencies is detailed at Comment *(24).*

In response to the request by the Georgia Department of Natural Resources, we made a change to the rule that fully aligns hours for alligator

hunting with State regulations. In response to the concerns of the South Dakota Department of Game, Fish and Parks, we revised the rule to allow the use of electric trolling motors on Pool #10 and broader hunter access. In response to the concerns of the Massachusetts Division of Fisheries & Wildlife, we are committed to working with the State in future rulemakings as we consider hunting opportunities on stations within the State while also balancing this with due consideration of other recreational uses and biological and environmental factors. In response to the concerns of the Idaho Department of Fish and Game, we will consider their recommendations and plan to consult with them in shaping our proposed rule for 2021–2022. We also welcome their cooperation and assistance in completing a CCP for Minidoka NWR. In response to the concerns of the Arizona Department of Fish and Game, we specifically use the term "archery," as requested, in our regulations for Cibola NWR, and we respond to their, and another commenter's, concerns about falconry at Comment *(23).* We will continue to regularly consult and communicate with the State as requested in the comment. In response to the concerns of the Florida Fish and Wildlife Conservation Commission, we will consider refuge use of off-road vehicles by hunters and anglers and how to balance impacts against other uses at Everglades Headwaters NWR.

*Comment (8):* Several commenters stated that we are improperly deferring to State wildlife management authority with the proposed hunting and fishing regulation changes.

*Our Response:* The Service works closely with our State partners in managing hunting and fishing programs on Service lands. We generally allow hunting or fishing of wildlife on refuges and hatcheries consistent with State regulations, including seasons and bag limits. Refuge-specific hunting and fishing regulations can be more restrictive (but not more liberal) than State regulations and often are more restrictive in order to help meet specific refuge objectives. Our authority to do so stems from the Administration Act, as amended, which states that when the Secretary determines that a proposed wildlife-dependent recreational use is a compatible use within a refuge, that activity should be facilitated, subject to such restrictions or regulations as may be necessary, reasonable, and appropriate (16 U.S.C. 668dd(a)(3)(D)). The Administration Act further provides that regulations permitting hunting or fishing of fish and resident

wildlife within the Refuge System shall be, to the extent practicable, consistent with State fish and wildlife laws, regulations, and management plans (16 U.S.C. 668dd(m)). For hatcheries, hunting or fishing programs must be mutually agreed upon and managed with the States (50 CFR 70.1).

We did not make any changes to the rule as a result of these comments.

*Comment (9):* We received several comments that alleged the proposed rule is, or certain parts of the proposed rule are, a violation of the Service's mandate to ensure that the biological integrity, diversity, and environmental health of the Refuge System are maintained for the benefit of present and future generations of Americans (16 U.S.C 668dd(a)(4)(B)).

*Our Response:* We do not allow hunting on a refuge if it is found incompatible with that individual refuge's purposes or with the mission of the Refuge System. Part of the mission of the Refuge System is to ensure that the biological integrity, diversity, and environmental health of the Refuge System are maintained for the benefit of present and future generations of Americans (16 U.S.C. 668dd(a)(4)(B)). Therefore, each Service station manager uses his or her "sound professional judgment" (see the definition of this term in the Service Manual at 603 FW 2.6.U., available online at *https:// www.fws.gov/policy/603fw2.html*) in making these inherently complex management decisions to ensure that each proposed action complies with this mandate. Each manager incorporates field experience, knowledge of refuge resources, considerations of the refuge's role within an ecosystem, applicable laws, and best available science in making these decisions. Service biologists and wildlife professionals, in consultation with the State, determine the optimal number of each game animal that should reside in an ecosystem and then establish hunt parameters (*e.g.,* bag limits, sex ratios) based on those analyses. We carefully consider how a proposed hunt fits with individual refuge goals, objectives, and strategies before allowing the hunt. The new or expanded hunting and/or fishing opportunities in this rule are not expected to individually or collectively result in significant adverse direct, indirect, or cumulative impacts to hunted populations of migratory birds and resident wildlife, nonhunted migratory and resident wildlife, endangered and threatened species, habitat and plant resources, or other natural resources. We analyzed these impacts not only in each refuge's NEPA

document, but also in the 2020–2021 cumulative impacts report.

We did not make any changes to the rule as a direct result of these comments, but changes that we made for other reasons may reduce the potential for even minimal biological and environmental impacts.

*Comment (10):* We received several comments expressing concern that specific stations amended either their compatibility determinations (CDs) or CCPs without sufficient explanation in order to open or expand hunting or fishing opportunities on a refuge.

*Our Response:* Based on these comments, we have reviewed our CDs and CCPs in connection with all opening and expansions in this rule, and, as a result, for each opening or expansion we have either modified the relevant regulations or determined that no changes were necessary. Both the Administration Act (16 U.S.C. 668dd(e)) and ANILCA anticipate that revisions may need to be made to CCPs from "time to time" based on new information. Service policy allows minor revisions to CCP objectives and strategies as long as they do not significantly change the management direction of the refuge (603 FW 2). A refuge manager always may reevaluate the compatibility of a use at any time, but must review a CD every 15 years for wildlife-dependent recreational opportunities (603 FW 2.11.H.(1)). When making revisions to a CCP or CD we must document the reasons for the change, make the revised CCP publicly available or put forward the CD for public comment, and comply with NEPA and the Endangered Species Act of 1973 (ESA; 16 U.S.C. 1531 *et seq.*), as amended, for any resulting changes in management actions taken by the Service. In the case of this rule, we took the additional step of inviting public comment on even minor changes to CCPs.

We did make one regulatory change to the rule based on these comments. Specifically, in the regulations governing Quivira NWR in Kansas, we expressly added a requirement for a State-issued permit for the take of furbearers to clarify consistency with the refuge's CCP and with the Kansas Department of Wildlife, Parks and Tourism.

For any nonregulatory changes based on these comments, such as clarification in environmental analysis documents, please see the specific station's response to comments, available online here: *https://www.fws.gov/refuges/hunting/ rules-regulations-and-improved-access/.*

*Comment (11):* We received several comments concerned with the direct,

indirect, and cumulative impacts of the April 9, 2020, proposed rule on migratory birds, particularly as related to the requirements of the Migratory Bird Treaty Act (MBTA; 16 U.S.C. 703– 712), the Service's February 3, 2020, proposed rule defining the scope of the MBTA (85 FR 5915), and that proposed rule's associated draft environmental impact statement (EIS). A few of these commenters were particularly concerned about those refuges whose purposes include "inviolate sanctuaries for migratory birds" or that have been designated as Important Bird Areas (IBAs) by the Audubon Society.

*Our Response:* All of the migratory bird hunting opportunities in the Service are done within the frameworks set by the Service in compliance with the MBTA. These frameworks set season lengths, bag limits, and areas for migratory game bird hunting and ensure that hunting will not have adverse impacts on the populations of the various species of migratory birds through rigorous biological monitoring, information collection, and data review. To determine the appropriate frameworks for each species, the Service considers factors such as population size and trend, geographical distribution, annual breeding effort, the condition of breeding and wintering habitat, the number of hunters, and the anticipated harvest. After frameworks are established for season lengths, bag limits, and areas for migratory game bird hunting, States may select season dates, bag limits, and other regulatory options for the hunting seasons. States may always be more conservative in their selections than the Federal frameworks, but never more liberal. For more information on this process, see the 2020–2021 cumulative impacts report on *http://www.regulations.gov* under Docket No. FWS–HQ–NWRS–2020– 0013.

Although it does not directly affect migratory bird hunting, the Service is developing a rulemaking that limits the scope of the Migratory Bird Treaty Act (MBTA) to actions directed at migratory birds, thus excluding incidental take as a violation of the MBTA. The draft EIS associated with this proposed rule analyzed the impacts of incidental take on migratory bird populations at a continental scale and found that the preferred alternative, to promulgate regulations that define the scope of the MBTA to exclude incidental take, would likely lead to an increase in incidental take over time, without specifying what bird taxa may be the most affected or where. Consistent with this draft EIS, the Service anticipates that the proposed MBTA rule will have

minor impacts to migratory game birds that occur on NWRs. If the proposed rule defining the scope of the MBTA becomes final and impacts to migratory game birds occur as a result, we anticipate any impacts that might occur as a result of that proposed rule will be detected through the system of population monitoring and modeling cooperatively maintained by the Flyways. Any such impacts would then be addressed by adapting, as needed, migratory game bird management to meet obligations under the MBTA.

The expansion of hunting of migratory game birds on NWRs indicate that the proposed harvests, or intentional take, of each species will constitute a negligible component of both national and flyway harvest. Migratory game bird hunting regulations are established within the above discussed frameworks compliant with NEPA to ensure that adverse impacts will not accumulate over time; thus, the proposed harvest will have a negligible impact on migratory bird resources within NWRs.

In addition to all hunting for migratory game birds being set within this national framework, each station must also ensure that the hunting or fishing opportunity is compatible, or in the case of NFHs not detrimental, to the purpose of that station, and comply with applicable provisions of NEPA, the ESA, and other applicable laws and policy before opening or expanding migratory bird game hunting. This thorough process ensures that the Service has analyzed the potential impacts of the proposed hunting or fishing opportunity and determined that the opportunity would not have a significant impact on any migratory bird species, not just the targeted species.

Where inviolate sanctuaries occur on NWRs, all uses must be evaluated for appropriateness and, if necessary, compatibility. The language within the Administration Act only applies to those lands with the designation of inviolate sanctuary for migratory birds. With this in mind, other uses (*e.g.,* big game hunting, hiking, auto tours, etc.) can be allowed as long as they are compatible. When determining compatibility, the Service must consider the high bar that the inviolate sanctuary designation established.

In addition, refuges with this designation will have to evaluate the influence of uses occurring or potentially occurring on other portions of the refuge and how they may affect the inviolate sanctuaries. Although this designation sets a higher level of consideration, it is clear that Congress intended for these areas to be considered for use when compatible. In the case of IBA designations from the Audubon Society, while several refuges in the rule do have these IBA designations, these designations do not place any additional legal restrictions related to migratory birds on management of these refuges. As discussed previously, each station goes through several different processes, including compatibility determinations, NEPA compliance, and ESA compliance to ensure that the hunting and fishing opportunities proposed would have no significant impacts on populations of migratory birds in compliance with the Service's mandates under the MBTA, Administration Act, or other applicable laws and policies.

We did not make any changes to the rule as a result of these comments.

*Comment (12):* We received several comments arguing that we should have prepared an environmental impact statement (EIS) instead of station-specific environmental analyses combined with a national cumulative impact report. Some of these comments also argued that specific stations should have prepared an EIS where we prepared an environmental assessment (EA) or an EA where we prepared a categorical exclusion.

*Our Response:* The Service disagrees with the assertion that we should prepare an EIS before proposing expanded hunting and fishing opportunities on refuges or hatcheries. We completed individual EAs for, or applied categorical exclusions to, 147 refuges and hatcheries, in compliance with NEPA, to evaluate the impacts of opening or expanding hunting and fishing opportunities on the stations through this rulemaking. These EAs and categorical exclusions underwent regional and national review to address and consider these actions from a local, regional, multi-State, and/or flyway perspective, and to consider the cumulative impacts from this larger geographical context. The 2020–2021 cumulative impacts report concludes, after analyzing the impacts, collectively, of all EAs and categorical exclusions prepared in connection with this rule, that the rule would not have significant impacts at the local, regional, or national level. The commenters who have raised these environmental analysis concerns have provided no additional information that would change this analysis or our conclusion. As discussed above, we annually conduct management activities on refuges and hatcheries that minimize or offset impacts of hunting and fishing on physical and cultural resources, including establishing designated areas for hunting; restricting levels of use; confining access and travel to designated locations; providing education programs and materials for hunters, anglers, and other users; and conducting law enforcement activities.

In this rulemaking, the Service is expanding opportunities for recreational hunting and fishing. Expanding opportunities does not necessarily result in increased impacts to refuge resources. We anticipate that for some refuges, these expansions will not result in changes in usage of the refuge. In other cases, these expansions may lead to some increase in use of refuges, but these changes would likely by minor. Opening of new refuges may attract people to the refuge, but these hunters and/or anglers were likely already participating elsewhere on State or other Federal lands. Overall, considering the decreasing trends in hunting and fishing generally, and decreasing trends of these activities on refuges specifically, we do not expect this final rule to have a significant impact on the environment. As noted in our cumulative impacts report, hunter participation trends have been generally declining, some refuges attract a very small number of participants, and often participation rates decline over the course of a season.

Finally, a Federal court found that this approach, using a bottom-up analysis to assess the cumulative impact of increased hunting and fishing across the entire Refuge System, was an appropriate way for the Service to analyze the impacts of the rule in compliance with NEPA (see *Fund for Animals* v. *Hall,* 777 F. Supp. 2d 92, 105 (D.D.C. 2011)).

In response to comments, we reviewed all EAs and categorical exclusions. The Service disagrees with the assertion that, for any of the stations in this rule, we should have prepared an EIS instead of an EA or an EA instead of a categorical exclusion. We did, however, determine that the use of a categorical exclusion to expand existing migratory bird and upland game hunting at Alamosa and Monte Vista NWRs may require additional consideration. While this does not result in any changes to the rule that are codified in the Code of Federal Regulations, the proposed expansions of 1,079 acres at Alamosa NWR and 472 acres at Monte Vista NWR for migratory bird and upland game hunting will not be adopted.

We did not make any changes to the rule as result of these comments.

*Comment (13):* Many commenters expressed concern over the use of lead ammunition and/or lead fishing tackle on refuges and hatcheries. Some

individual commenters objected to these potential sources of lead at a particular refuge or hatchery, and multiple organizations were concerned about lead nationwide and referred us to scientific literature on the subject.

*Our Response:* The Service shares the commenters' concerns regarding the bioavailability of lead in the environment. See, *e.g.,* Nancy Golden, et al., ''A Review and Assessment of Spent Lead Ammunition and Its Exposure and Effects to Scavenging Birds in the United States,'' which is available online at *https://www.fws.gov/midwest/ refuges/Review%20and %20Assessment%20paper.pdf.* Historically, the principal cause of lead poisoning in waterfowl was the collection of high densities of lead shot in wetland sediments associated with migratory bird hunting activities (Kendall et al. 1996). In 1991, as a result of high bird mortality, the Service instituted a nationwide ban on the use of lead shot for hunting waterfowl and coots (50 CFR 32.2(k)). The Service requires any new shot types for waterfowl and coot hunting to undergo rigorous testing in a three-tier approval process that involves an ecological risk assessment and an evaluation of the candidate shot's physical and chemical characteristics, short- and long-term impacts on reproduction in waterbirds, and potential toxic impacts on invertebrates (50 CFR 20.134). Because of this rigorous testing, the shot toxicity issue of the past is now substantially less of an ecological concern.

However, there remains a concern about the bioavailability of spent lead ammunition (bullets) and sinkers on the environment, endangered and threatened species, birds, mammals, humans, and other fish and wildlife susceptible to biomagnification. For example, as one commenter noted, ''The impacts of lost lead tackle can be significant; for example, ingested lead fishing tackle is the leading cause of mortality in adult common loons'' (Grade, T. et al., 2017, in Population-level effects of lead fishing tackle on common loons. The Journal of Wildlife Management 82(1): 155–164.) The impacts of lead on human health and safety have been a focus of several scientific studies. As related to hunting and fishing, studies have found the ingestion of animals harvested via the use of lead ammunition increased levels of lead in the human body (*e.g.,* Buenz, E. (2016). Lead exposure through eating wild game. American Journal of Medicine, 128: 458.).

We share the commenters' concerns about the adverse impacts of lead. We have reviewed the literature provided during the public comment period and have updated our station-specific analyses, as well as the national cumulative impact report as appropriate.

Although there is not a Service-wide ban on lead ammunition for non-migratory bird hunting activities or on lead sport fishing tackle, the Service has taken specific steps to limit the use of lead in hunting and fishing activities on refuges and hatcheries. Notably, we continue, in these annual rulemakings updating the regulations for hunting and sport-fishing on NWRs and NFHs, to phase out the use of lead on Service lands. On several refuges and hatcheries, the Service does prohibit the use of lead tackle or ammunition; since 2015, not counting this rule, 122 refuges and wetland management districts have implemented restrictions on the use of lead ammunition and lead sport fishing tackle for upland game, migratory bird, or sport fishing harvest activities. In this rule, Stillwater NWR prohibits the use of lead shot for hunting upland game; 21 other stations only allow nontoxic shot for upland, big game, and/or turkey hunting; and 10 refuges and hatcheries limit the use of lead tackle in sport fishing. Three of these stations have both a hunting and a fishing lead restriction, so there are 29 total stations with lead restrictions in this rule.

The Service continues to educate hunters and anglers on the impacts of lead on the environment, and particularly on human health and safety concerns of ingesting animals harvested with lead ammunition. We always encourage hunters and fishers to voluntarily use nontoxic ammunition and tackle for all harvest activities. Lead alternatives to both ammunition and tackle are becoming more widely available and used by hunters and anglers; however, they remain more expensive.

The Service believes it is important to encourage refuge-State partnerships to reach decisions on lead usage. We continue to research this issue and engage with States and other partners to promote the use of non-lead ammunition and tackle. We share a strong partnership with the States in managing wildlife, and, therefore, we are proceeding with the phase-out of toxic ammunition in a coordinated manner with each respective State wildlife agency. For example, in California, the use of lead ammunition is prohibited Statewide including on all Service lands, largely in response to the adverse impacts of lead on the endangered California condor (*Gymnogyps californianus*).

At those stations where the Service is continuing to allow lead ammunition and tackle in order to be consistent with the States, the number of new hunters or anglers expected to use lead bullets or lead tackle as a result of the new or expanded opportunities is anticipated to be very low, so the resulting addition of lead into the environment should be negligible or minor. Where lead ammunition or tackle is still allowed (although discouraged) on Service lands, the addition of lead and the associated impacts to the environment are negligible when compared to the lead in the environment as a result from other fishing, hunting, or other activities in the local, regional, and national area.

We disagree with the assertion of some commenters that any use of lead shot in connection with opening and expanding hunting and fishing on the refuges and fish hatcheries in this rulemaking will harm endangered or threatened species. Each refuge and hatchery carefully evaluated possible impacts on endangered and threatened species as part of the NEPA process. As discussed above, on refuges, where lead ammunition or tackle is allowed, we found that the low number of hunters and anglers using lead ammunition or tackle would result in no more than a negligible increase of lead in the environment when compared to the lead ammunition and tackle being used in the surrounding areas. In addition, every refuge and hatchery looked at the impacts of these new or expanded hunting and fishing opportunities, including the allowance or prohibition of lead, on endangered and threatened species in compliance with requirements under section 7 of the ESA. The ESA requires Federal agencies to ensure that the actions they carry out, fund, or authorize do not jeopardize the continued existence of endangered or threatened species (listed species). For each refuge, the Service determined that the proposed action was not likely to adversely affect any listed species. We have reviewed commenters' concerns regarding insufficient analyses on the impact of lead in certain station-specific NEPA documents, and we have clarified or added additional analyses where appropriate.

We have also updated the 2020–2021 cumulative impacts report to clarify and discuss additional information on the impacts of lead brought to our attention through the public comment period. While we will continue to phase out the use of lead ammunition and tackle on Service lands in cooperation with our State partners, we did not make any changes to the rule as a direct result of these comments. We have, however,

added new prohibitions for use of toxic shot for multiple hunts at Coldwater River, Patoka River, Ottawa, and Horicon NWRs in this rule. Therefore, this rule contains a total of 33 lead-limiting hunting and fishing provisions at 29 stations.

*Comment (14):* We received several comments that claimed the Service had not adequately addressed the cumulative impacts to endangered and threatened species. Some of these comments pointed to one or more particular species.

*Our Response:* In compliance with section 7 of the ESA, every station determined that their proposed actions would have either "no effect" or were "not likely to adversely affect" endangered and threatened species or designated critical habitat. Because endangered and threatened species are usually highly localized, minor or negligible impacts on an endangered or threatened species at a local or even regional scale would likely have no cumulative impact on national populations of those species.

While there may be some minor, localized, and temporary (short-term) impacts to endangered and threatened species as a result of hunting or fishing activities, every station ensured that these impacts were minimized and, in many cases, offset them through a variety of management activities. For example, one commenter expressed concerns over the cumulative impact to the endangered northern aplomado falcon (*Falco femoralis septentrionalis*) at Lower Rio Grande Valley NWR and Laguna Atacosta NWR. The majority of hunts at these refuges are not taking place during the nesting season and are not occurring in areas utilized by aplomado falcons. Hunts are occurring in association with brush habitats and not within the coastal prairie habitats utilized by the aplomado falcon. Over the course of nearly three decades, no adverse effects to aplomado falcons from the conduct of the hunts on refuges in south Texas or elsewhere has ever been documented.

We did not make any changes to the rule as a result of these comments.

*Comment (15):* We received many comments expressing concern about opening and expanding opportunities for hunting of predator species. Several of these comments objected to all proposed hunting of a predator species on a Service station and named all such stations. Some commenters alleged that we did not give enough consideration to the impacts of those proposed hunts, and that the hunts conflicted with the Service's mandates under the Administration Act to maintain the biological integrity, diversity, and environmental health of the refuge. Some commenters were also concerned that the cumulative impacts report was not sufficient in its analysis of furbearer species specifically.

*Our Response:* Refuge managers consider predator management decisions on a case-by-case basis. As with all species, a refuge manager makes a decision about managing predator populations, which are included in the category of resident wildlife, including allowing predatory species to be hunted, only after careful examination to ensure the action would comply with relevant laws, policies, and directives. The Administration Act, as amended, directs the Service to manage refuges for "biological integrity, diversity, and environmental health." Predators play a critical role in the integrity, diversity, and overall health of ecosystems, so before allowing predators to be hunted, a refuge manager must ensure that these actions do not threaten the integrity, diversity, or health of the refuge ecosystem. The manager must also determine that the action is compatible with refuge purposes and the mission of the Refuge System, and in keeping with the refuge's CCP and other step-down plans. In addition, the refuge manager analyzes the impacts of the actions on the environment through the NEPA process and section 7 of the ESA. Therefore, a refuge manager must take many steps to ensure that any opportunity for hunting predators on a refuge meets the Service's applicable laws and policies.

The Administration Act, as amended, also mandates that regulations permitting hunting or fishing of fish and resident wildlife within the Refuge System shall be, to the extent practicable, consistent with State fish and wildlife laws, regulations, and management plans (16 U.S.C. 668dd(m)). Therefore, all the opportunities for hunting predators in this rule that are intended to bring greater consistency with State fish and wildlife laws, regulations, and management plans are part of realizing the Service's mission. Moreover, these, as with all predator hunting determinations and all hunting and fishing determinations, were only made after careful consideration by the refuge manager to ensure that such actions would not threaten the integrity, diversity, and overall health of the ecosystem and were compatible with both the purpose of the refuge and the mission of the Refuge System. For NFHs, the hatchery manager made the decision that such opportunities were not detrimental to the propagation of fish, wildlife, or aquatic species (50 CFR 70.1). Finally, both the NEPA process and the rulemaking process provide the opportunity for the public to provide comments and any additional information on impacts of our actions. We considered the additional information provided from the public on this issue during these public comment periods and determined that they did not affect our initial determinations that these small and minor opportunities for hunting predators on specific refuges or hatcheries will have no more than minor impacts on the population health of these species or other wildlife at the local, regional, or national level.

To clarify, our determination of the rule's impact on furbearers, like many other resident wildlife species in this rule, is not based on bag limits, but rather on the limited number of hunters that we expect to pursue these opportunities as a result of the rule. Hunting for furbearers (including some predators) on refuges is often limited by season date ranges and hours of day. In other cases, the terrain and habitat of the refuge or hatchery are not conducive to these types of hunting opportunities. Therefore, it is our determination that this rule, while bringing greater alignment with State hunting regulations, will not result in significant impacts to predator or furbearer species. We have updated the 2020–2021 cumulative impacts report to clarify these points of public concern.

We did not make any changes to the rule as a result of these comments.

*Comment (16):* We also received various comments expressing the sentiment that "trophy hunting," trapping, baiting, and hounding of predators are "unsportsmanlike" activities and inappropriate uses on Service lands.

*Our Response:* The Service does not attempt to define or authorize "trophy hunting" in any of our laws, regulations, or policies concerning hunting. We follow State hunting and fishing regulations (except for where we determine it is necessary to be more restrictive on individual stations), including State regulations concerning responsible hunting, or prohibitions on wanton waste (defined as "to intentionally waste something negligently or inappropriately"). We only allow hunting on refuges and hatcheries when we have determined that the opportunity is sustainable and compatible.

The use of dogs for hounding is prohibited on refuges by 50 CFR 26.21(b) unless authorized by station-specific regulations, and many refuges

only authorize the use of dogs for retrieval of migratory birds, upland game birds, and small game. Most refuges that allow dogs require the dogs to be under the immediate control of the hunter at all times, or leashed unless actively retrieving an animal. There are also some hatcheries that allow hounding. All of them do so in order to provide complete consistency with State regulations in the interest of effective law enforcement, as the hatcheries that allow this activity are small and are only providing access on their land for hounding because they are surrounded by State land that allows this practice. In cases where there may be concerns with use of dogs impacting the management and purpose of the hatchery, those hatcheries have also been closed to hounding.

In States where baiting is allowed, some refuges have elected to be more restrictive and not support this method of hunting. In cases where hatcheries have allowed this activity, they do not expect the hunting activity for species such as bear will occur, and thus no baiting would occur on the hatchery. Some hatcheries allow this use to be in complete consistency with State regulations for law enforcement reasons.

Trapping is not a valid method of take as part of hunting programs in the Refuge System. Under the Improvement Act, trapping is not considered a priority wildlife-dependent recreational use of the Refuge System. Trapping on refuges is generally only implemented to accomplish specific wildlife management objectives. These objectives vary between refuges and are often an essential tool in meeting refuge management objectives (*e.g.,* trapping of predators may be necessary to accomplish waterfowl production objectives or to protect an endangered species).

We did not make any changes to the rule as a result of these comments.

*Comment (17):* Several commenters raised the issue of the impact of the rule on wilderness, particularly as defined by the 1964 Wilderness Act (16 U.S.C. 1131–1136). Some of these comments focused on wilderness concerns at specific refuges, including Cabeza Prieta NWR in Arizona.

*Our Response:* Hunting and fishing are generally compatible wildlife-dependent recreational activities allowed in many wilderness areas managed by both the Service and other land management agencies, such as the Bureau of Land Management and the National Park Service. However, in order to be compatible with wilderness purpose and values, hunting and fishing activites within wilderness areas are subject to certain limitations, including foot or nonmotorized watercraft access only, primitive weapons only, and in some cases special use permit requirements that ensure wilderness values are protected. Because hunting and fishing in wilderness is not easily accessible and has many restrictions, we anticipate the number of hunters or anglers in wilderness to be very low, and we determined there will be no significant impacts to wilderness areas or wilderness values from this rule. For example, the wilderness area at Cabeza Prieta NWR is fairly accessible to visitors due to the unique non-wilderness road corridors along El Camino del Diablo and Christmas Pass Road. Yet, due to the rugged terrain and extreme weather conditions, the Service does not anticipate hunters traveling more than 5 miles from these roads. Therefore, increased hunting opportunities will potentially affect a maximum of 19 percent of the 860,000-acre refuge. Hunting will be limited to foot access only to ensure wilderness values are protected. We anticipate the number of hunters will be low, and there will be negligible increase in impacts to the refuge's wilderness area.

We did not make any changes to the rule as a result of these comments.

*Comment (18):* A couple commenters had questions about permitting for hunting and fishing at certain refuges.

*Our Response:* First, the best source for answers to detailed questions on permitting at a given refuge is still the refuge website, brochures, station signage, and/or station staff. Second, these inquiries may have been prompted by the fact that in this rule we made a significant number of regulatory changes related to permits, many of them specifying the particular Federal form required. The forms that the Service uses to issue permits must be approved by the Office of Management and Budget (OMB) and assigned an OMB control number. Therefore, the rule ensures that our regulations list the approved form number of the permit, which displays a valid OMB control number, that is required at the station. These clarifying changes to our regulations should benefit all hunters and anglers who visit the refuges and hatcheries. Each station has further instructions on the permit process at that station's office, listed in the station's hunting or fishing brochure, and/or on various signs and placards located around the station.

*Comment (19):* We received many comments that expressed concern over some aspect of public safety. Commenters raised concerns about openings or expansions of hunting at several stations based on the potential for trespassing, the location of refuges in crowded areas, potential conflicts with other visitors to the refuge, or the need for adequate funding and/or staffing. In particular, the most common specific concern was that the increase in openings and expansions of hunting and sport fishing would overwhelm existing law enforcement capacity. These concerns were expressed for multiple specific stations and as a nationwide issue, but we received the most comments about public safety concerns both nationally and locally around hunting at Sachuest Point NWR.

*Our Response:* The Service considers public safety to be a top priority. In order to open or expand hunting or sport fishing on a refuge, we must find the activity compatible. In order to find an activity compatible, the activity must not "materially interfere or detract from" public safety, wildlife resources, or the purpose of the refuge (see the Service Manual at 603 FW 2.6.B., available online at *https://www.fws.gov/ policy/603fw2.html*). For this rulemaking, we specifically analyzed the possible impacts of the changes to hunting programs at each refuge and hatchery on visitor use and experience, including public safety concerns and possible conflicts between user groups.

Hunting of resident wildlife on refuges generally occurs consistent with State regulations, which are designed to protect public safety. Refuges may also develop refuge-specific hunting regulations that are more restrictive than State regulations in order to help meet specific refuge objectives, including protecting public safety. Refuges use many techniques to ensure the safety of hunters and visitors, such as requiring hunters to wear blaze orange, controlling the density of hunters, limiting where firearms can be discharged (*e.g.,* not across roads, away from buildings), and using time and space zoning to limit conflicts between hunters and other visitors. It is worth noting that injuries and deaths related to hunting are extremely rare, both for hunters themselves and for the nonhunting public.

However, public comment is important in making sure we have considered all available information and concerns before making a final decision on a proposed opening or expansion. For Sachuest Point NWR, the Service proposed a non-annual, short-duration, limited (maximum 8 hunters), mentored firearms hunt for white-tailed deer, with the chance to opportunistically hunt coyote or fox while deer hunting. Opposition to the proposal was widespread, including from the

municipality, State representatives, and the State's congressional delegation. The refuge received over 600 comments on the proposed hunt at the refuge, and 97 percent of those commenters were opposed to the plan, with particular concerns about public safety and impacts to recently restored marshland. For these reasons, the hunt unit area is being decreased from 223 acres to 150 acres to exclude areas near town beaches and the salt marsh, and the allowed method of take is changed from firearms to archery only. For Bosque del Apache NWR, we are not adopting the proposed hunting of dark goose, American coot, common moorhen, common snipe, duck, and merganser in order to ensure no negative impacts to public safety or to important habitat on the refuge. This means we are removing 663 acres for migratory bird hunting on Bosque del Apache NWR from what we proposed on April 9, 2020 (85 FR 20030). This final rule also incorporates changes from the proposed rule to the designated areas where hunting can occur for public safety reasons at three other refuges that are not codified in the Code of Federal Regulations but that will be reflected on the refuges' websites, in their brochures, and on their signage. Specifically, from the designated hunting areas we proposed on April 9, 2020 (85 FR 20030): (1) We removed 16 acres from the designated hunting area for John H. Chafee NWR in response to public safety concerns, including a comment from local law enforcement; (2) we removed 16 acres from the designated hunting area for Ottawa NWR in order to reduce the risk of trespassing through adjacent lands in the interest of public safety; and (3) we removed 80 acres from the designated hunting area for LaCreek NWR in order to reduce the risk of trespassing on adjacent lands in the interest of public safety.

For the rest of the proposed openings or expansions of hunting in our April 9, 2020, proposed rule (85 FR 20030), we have determined that there are sufficient protections in place as part of the hunt program at that station to ensure public safety. For more information on the Service's efforts to ensure public safety at a particular station, please see that station's hunt plan, compatibility determination, and associated NEPA analysis.

Regarding concerns about lack of funding or staffing, Service policy (603 FW 2.12.A.(7)) requires that station managers to determine that adequate resources (including personnel, which in turn includes law enforcement) exist or can be provided by the Service or a partner to properly develop, operate,

and maintain the use in a way that will not materially interfere with or detract from fulfillment of the refuge purpose(s) and the Service's mission. If resources are lacking for establishment or continuation of wildlife-dependent recreational uses, the refuge manager will make reasonable efforts to obtain additional resources or outside assistance from States, other public agencies, local communities, and/or private and nonprofit groups before determining that the use is not compatible. When Service law enforcement resources are lacking, we are often able to rely upon State fish and game law-enforcement capacity to assist in enforcement of hunting and fishing regulations. For all 147 stations opening or expanding hunting and/or sport fishing in this rule, we have determined that we have adequate resources, including law enforcement personnel, to develop, operate, and maintain the proposed hunt programs.

We did not make any additional changes (other than those described in this response) to the rule as a result of these comments.

*Comment (20):* Many commenters stated and even put forward statistics on the fact that the majority of Americans do not hunt. Most of these commenters were also of the opinion that allowing hunting would impede "non-consumptive" uses of refuges, including photography and wildlife viewing. A few of these commenters mentioned our obligation to manage the refuges in the interest of multiple uses, particularly those listed in the Administration Act.

*Our Response:* Congress, through the Administration Act, as amended, envisioned that hunting, fishing, wildlife observation and photography, and environmental education and interpretation would all be treated as priority public uses of the Refuge System. Therefore, the Service facilitates all of these uses on refuges, as long as they are found compatible with the purposes of the specific refuge and the mission of the Refuge System. For this rulemaking, we specifically analyzed the possible impacts of the changes to hunting programs at each refuge and hatchery on visitor use and experience, including public safety concerns and possible conflicts between user groups.

The refuges and hatcheries in this rulemaking use a variety of techniques to reduce user conflict, such as specific hunt seasons, limited hunting hours, restricting which parts of the station are open to hunting, and restricting the number of hunters. Station managers also use public outreach tools, such as signs and brochures, to make users

aware of hunting and their options for minimizing conflict. Most stations have station-specific regulations to improve the quality of the hunting experience as well as provide for quality wildlife-dependent experiences for other users. The Service is aware of several studies showing a correlation between increased hunting and decreased wildlife sightings, which underscores the importance of using the aforementioned techniques, particularly time and space zoning of hunting, to ensure a quality experience for all refuge and hatchery visitors. More information on how a specific station facilitates various wildlife-dependent recreation opportunities can be found in the station's CCP, hunt plan, and/or station-specific associated NEPA document. The public may contact the specific refuge or hatchery for any of these materials, and the NEPA documents associated with this rule are available here for all stations: *https:// www.fws.gov/refuges/hunting/rules-regulations-and-improved-access/.*

In response to public comments, this rule incorporates changes to Bosque del Apache NWR's refuge-specific hunting regulations to help address impacts on other wildlife-dependent recreation users and partners working on the refuge, as well as possible impacts to habitat on the refuge. In addition, we have made modifications to the designated hunting area, in order to reduce risk of conflict with other priority public uses, at Lee Metcalf NWR that are not codified in the Code of Federal Regulations but that will be reflected on the refuge's website, in its brochures, and on its signage. Specifically, from the designated hunting area we proposed on April 9, 2020 (85 FR 20030), we removed 1,463 acres at Lee Metcalf NWR in the interest of balancing priority public uses.

*Comment (21):* One comment centered on the impact of muzzleloaders (firearms loaded through the open end of the barrel, as opposed to modern breech-loaded firearms) on wildlife and public health and safety for a long list of refuges. A few of the refuges named do not allow muzzleloader firearms, with this rule or otherwise, but the majority of those listed do under this rule.

*Our Response:* We have determined that the allowance of muzzleloader rifles as a method of take at these refuges is compatible with the purposes of those refuges and the mission of the Refuge System. We have also determined that allowing this method of take will have negligible impacts on wildlife and public safety for the following reasons:

(a) Numbers of hunters using muzzleloaders on the specific refuges named in the comment and on Service lands in general are expected to remain low. The 2016 National Survey of Hunting and Fishing reported that only 12 percent of all hunters reported using muzzleloaders.

(b) Noise produced by muzzleloading and modern rifles and shotguns of the same caliber and barrel length are similar in decibel range (approximately 150–160 dB for shotguns). However, the noise produced by these weapons has quite different characteristics. Black powder used in muzzleloaders makes a much lower frequency noise of longer duration. Smokeless cartridges used in modern firearms have a faster burn, which gives a much higher pitched noise that is much shorter. The high-pitched crack of modern firearms is more damaging to hearing, and likely more disturbing to wildlife than the lower-pitched sound of black-powder weapons.

(c) Muzzleloading weapons have a shorter effective range and require a closer approach to game than when using modern firearms. In addition, the long reloading time of muzzleloaders (approximately 30 seconds) means that hunters typically wait for better opportunities, and fewer shots are fired.

(d) Muzzleloaders use a variety of propellants, including black powder, a mixture of potassium nitrate, charcoal, and sulfur. Black powder does produce relatively large quantities of smoke when fired. If combustion of black powder is complete, smoke would contain primarily nitrogen and carbon dioxide. However, since combustion is incomplete, black powder combustion produces hydrogen sulfide, sulfur oxides, carbon monoxide, and nitrogen oxides. (See Del'Aria, Cynthia and Opperman, David A. 2017. "Pyrotechnics in the Entertainment Industry: An Overview." pp. 791–802 In: Sataloff, Robert T. (ed) 2017. Professional Voice, Fourth Edition: The Science and Art of Clinical Care (3 vol). Plural Publishing.) These compounds are toxic if breathed in high concentrations; however, in field conditions encountered when hunting, black powder smoke disperses rapidly. Total amounts produced as a result of hunting activity would be negligible, and therefore effects to wildlife would also be negligible.

(e) Muzzleloaders do take significantly more knowledge to operate than modern firearms, and involve greater risk. However, a political and social research firearm injury surveillance study, which accumulated data from 1993 to 2008, reported that

firearm-related incidents (all firearms) occurred in only 9 out of every 1 million hunting days. (See Loder, Randall T. and Farren, Neil. 2014. "Injuries from firearms in hunting activities." Injury: International Journal of the Care of the Injured 45(8): 1207–1214. Online at: *https://doi.org/10.1016/j.injury.2014.04.043*.) In 2017, there were over 17 million hunters with firearms according to the National Sporting Goods Association (NSGA), and only 35 injuries occurred per 100,000 participants, of which a vast majority were not serious injuries. (See Target Tamers. 2020. "Hunting Accident Statistics: Fatalities, Injuries, and Tree Stand Accidents." Online at: *https://www.targettamers.com/guides/hunting-accident-statistics/#_ftn24*.) Thus, while hunting with any type of firearm involves risk, overall it is an extremely safe activity.

We did not make any changes to the rule as a result of this comment.

*Comment (22):* We received one comment stating there was no mention of "catch and release" in the proposed rule and asking us to "advocate for" this method of fishing in the interest of maintaining fish populations.

*Our Response:* We agree with the commenter that catch-and-release restrictions can be a good way to both allow fishing and ensure population health of the targeted species. We do have catch-and-release restrictions on many of our stations. For example, we have three stations (Assabet River NWR, Cherry Valley NWR, and Wallkill River NWR) in this rule that retain their regulations allowing only catch-and-release fishing. Where catch-and-release is not required, it usually means that, consistent with the State, the fishery populations are healthy enough to sustain some take or that the targeted species are nonnative.

*Comment (23):* Two comments, one of them referencing the other, advocate for falconry as an approved method of take in alignment with State regulations, specifically in the State of Arizona.

*Our Response:* We allow hunting of resident wildlife on NWRs only if such activity has been determined compatible with the established purpose(s) of the refuge and the mission of the Refuge System as required by the Administration Act. Service policy, as outlined in our Service manual at 605 FW 2.7.M. (Special Hunts), stipulates, "We will address special types of hunts, such as falconry, in the hunt section of the visitor service plan (VSP)." In other words, each refuge manager, when developing their step-down VSP (which would include a hunt plan, if appropriate) from their CCP, must first

determine if hunting is compatible. Assuming it is found to be compatible, the refuge manager would next determine the conduct of the hunt, which might include the use of falconry. A refuge manager has discretion to restrict hunting and types of hunting, including falconry, if, for example, endangered or threatened species are present, the cumulative impacts of a type of hunt have not been analyzed or are not available, or if a type of special hunt is not compatible with the refuge purpose. Thus, this issue is decided individually on a refuge-by-refuge basis. The Service remains committed to opening hunting methods, including falconry and especially those methods allowed by State regulations, whenever it is possible to do so at a given refuge in a manner consistent with all purposes and objectives of the refuge, in the professional judgment of the refuge manager.

We did not make any changes to the rule as a result of these comments.

*Comment (24):* One commenter requested that we change our regulations on the use of dogs for hunting to be more consistent Service-wide and to align them with State regulations.

*Our Response:* Even though State regulations may allow dogs during hunting activities, our general refuge regulations prohibit all domesticated animals at 50 CFR 26.21(b) unless authorized by refuge-specific regulations. While refuges adopt State hunting and fishing regulations to the extent practicable, they must also comply with the general refuge regulations. Therefore, in order to allow dogs during hunting activities, each refuge must authorize the use of dogs during hunting activities in their refuge-specific entries at 50 CFR part 32. As explained above, all uses on refuges must be found compatible and must not conflict with refuge objectives. Some refuges have found that the use of dogs during hunting activities must be limited or not authorized in order to avoid conflict with refuge objectives. Where we do allow the use of dogs while hunting, we attempt to have consistency with regulations between refuges, especially within States and geographic regions.

As an example of such efforts, the Northeast Region, based on conversations and cooperation with Northeast Association of Fish & Wildlife Agencies leadership, evaluated its current practices and ultimately proposed in our April 9, 2020, proposed rule (85 FR 20030) to allow some use of dogs while hunting to increase consistency. Nearly all refuges in the

Northeast Region will soon be aligned with their respective State's regulations on the use of dogs during hunting seasons for big game, upland game, and migratory game birds.

We did not make any changes to the rule as a direct result of this comment, but we did make some changes to regulations related to the use of dogs for other reasons, and these changes may increase consistency across stations and further align with State regulations.

*Comment (25):* We received one comment that urged the development of a user fee that would be consistently applied for all refuges and hatcheries and for all recreational uses.

*Our Response:* The Service collects entrance and recreation fees under the authorities of the Refuge Revenue Sharing Act of 1935 (16 U.S.C. 715s) and the Federal Lands Recreation Enhancement Act (FLREA; 16 U.S.C. 6801 *et seq.*). Service policy requires refuge managers to consider two factors in determining fees for any activity: Fair market value and costs involved in providing the use. Because fair market value and refuge costs can differ among localities, there is often a range of different fees for similar activities in different locations. For locations that collect fees under FLREA, public comment periods are required when refuges initiate fees and to change the types and amounts of fees. We encourage public participation in this process.

We did not make any changes to the rule as a result of this comment.

*Comment (26):* A number of commenters mentioned climate change, as a general environmental issue, as something we should consider in developing this rule. A few of these commenters specifically argued that we did not fully consider the impacts of this rule in the context of the separate impacts of climate change on fish, wildlife, and other refuge resources in our cumulative impacts report.

*Our Response:* The Service considers the impacts of climate change on the management of wildlife and responds to a changing climate through its annual process of setting hunting and fishing seasons. Hunting seasons are based on biological monitoring and coordination with our State partners. In some circumstances, seasons may be adjusted based on predicted harvest rates, population levels, seasonal factors, and other assessments. While this process is not necessarily climate-based, over time, as the variables mentioned above change, the Service responds by altering its regulations accordingly. These regulatory changes are only incremental changes that build on previous changes.

Any major changes in station or environmental conditions, such as an unsustainable decrease in a species population or sizeable increases in refuge or hatchery acreage or public uses, would trigger additional planning, NEPA review, Compatibility Determinations, and ESA section 7 evaluation processes. The Service may reevaluate compatibility at any time if conditions warrant. These required planning and management processes ensure that adverse impacts will not accumulate over time.

As a result of these comments, we have updated the 2020–2021 cumulative impacts report to further clarify our approach to considering climate change. We did not make any changes to the rule as a result of these comments.

*Comment (27):* Several comments noted the potential benefits of this rule in reducing the spread of wildlife diseases due to the increase in hunting opportunities. One of these comments further urged us to ensure that our regulations provide flexibility for individual stations to address chronic wasting disease in deer populations.

*Our Response:* We agree that in States where chronic wasting disease (CWD) is prevalent, hunting can be a useful emergency management tool for reducing the spread and prevalence of CWD. Population reduction can minimize disease transmission and selective culling of deer in areas where CWD occurs and can control the prevalence of the disease (Mateus-Pinilla, N., M.O. Ruiz, P. Shelton, and J. Novakofski. 2013. Evaluation of a wild white-tailed deer population management program for controlling chronic wasting disease in Illinois, 2003–2008. Preventative Veterinary Medicine, 110(3–4): 541–548). For many of the refuges in affected States, there are strategies to coordinate with the State on responses to CWD outbreaks outlined in the station's hunt plan or CD. Beyond opening additional emergency hunts, stations can, when necessary, coordinate with States to monitor for CWD and provide additional staff support and resources for the State's response to an outbreak.

We did not make any changes to the rule as a result of these comments.

*Comment (28):* We received two comments that touched on the proposed rule's discussion of the economic impacts of the rule. One commenter argued that we must include local economies with no expected changes to revenues as a result of the proposed rule alongside those that may see changes because omitting them "skews the results" in our conclusion that the rule will not significantly affect a substantial

number of small entities. The second commenter claimed that we must conduct a Regulatory Flexibility Act analysis for this rule and that it must include the impact of the rule on non-consumptive users.

*Our Response:* For the first comment, if we were to include estimates of zero impact for any number of local economies in areas unaffected by the rule, it would not change our estimate of the maximum nationwide economic impact and would not change anything about the potential economic significance of the rule.

Regarding the second comment, a Regulatory Flexibility Act analysis is required for some rulemakings, but this rulemaking does not require such an analysis because we can certify that it will not significantly affect a substantial number of small entities. The commenter is correct that non-consumptive users are an important user group at our refuges and hatcheries, and they do bring benefits to local economies. However, the commenter's argument that we need to consider economic impacts of the rule on non-consumptive users, and presumably that it would change our finding on significance of the rule's impact if we did, does not persuade us for two key reasons. First, if the impacts the commenter describes, lost revenue for local economies from fewer non-consumptive use days at refuges and hatcheries, were to occur as a result of this rule, they would be offset by the increased revenues that we have calculated for the added hunting and fishing use days. This means that calculating both impacts, again assuming there were lost non-consumptive use days, could never find as much of an impact as calculating one or the other alone. Calculating impacts related to both user groups would be inefficient. Second, calculating only the economic impact of the rule's effects on non-consumptive users of the refuges would not likely result in a higher estimate of maximum nationwide economic impact because there are no expected effects on this user group, which means the estimated economic impacts would be zero. As discussed above in our response to Comment *(20)*, this rule is not expected to significantly impact non-consumptive users. None of the provisions in this rule regulate non-consumptive uses of the refuge, and all openings and expansions of hunting and fishing are assessed for compatibility with non-consumptive uses. The Service has put in place many restrictions on hunting and fishing programs, including some added in response to comments on this rule, in

order to ensure that we balance the various priority wildlife-dependent recreation uses on all refuges and hatcheries. We do not expect the rule to effect non-consumptive use of the refuges and hatcheries, and we fully expect the trends of increasing non-consumptive use mentioned by the commenter to continue alongside the implementation of the rule.

We did not make any changes to the rule, including to our discussion of the Regulatory Flexibility Act analysis and the Secretary's certification that this rule will not have a significant impact on a substantial number of small entities, as a result of these comments.

*Comment (29):* A few comments maintained that we need to account for the ongoing impacts to habitat and wildlife from border operations and border wall construction in assessing the hunting and fishing opportunities at our refuges on the border with Mexico (*i.e.,* Lower Rio Grande Valley, Laguna Atascosa, and Cabeza Prieta NWRs). These commenters argue that the combined impacts of border operations and increased hunting and fishing pose too much of a risk to habitats and to certain species, particularly endangered and threatened species.

*Our Response:* The Service disagrees with commenters that opening these areas to hunting would have more than minor cumulative impacts on habitat and species. In general, the potential impacts of providing additional hunting opportunities, which are minimal and temporary in nature, are negligible to minor for both habitats and species. The refuge-specific documents at Cabeza Prieta, Buenos Aires, and Lower Rio Grande Valley NWRs have been updated to further clarify the anticipated impacts and how they have been minimized. Specifically at Lower Rio Grande Valley NWR, hunt tracts, with the exception of La Casita East, are removed by several miles (25–30 miles) from the border. Therefore, since the effects of hunting and border wall activities are, for the most part, separated by substantial distances, the refuge does not anticipate that hunting activities (including through vehicle traffic or foot traffic) would contribute to any cumulative impacts to species from border activities and development occurring along or within the Rio Grande tracts of the refuge. At Cabeza Prieta NWR, hunter use days would predominantly occur from October through February when wildlife, including Sonoran pronghorn, are less likely to be stressed by environmental conditions. Cabeza Prieta NWR does not allow hunters access via motorized transport or mechanized equipment within designated wilderness or on any administrative roads or trails within designated wilderness. Additionally, the terrain at Cabeza Prieta NWR is very rough and mountainous, with hot Sonoran desert conditions. Therefore, most hunting will likely occur within 5 miles of the public roads that run through non-wilderness corridors. Additionally, there are a number of mitigation measures put in place to reduce adverse effects on pronghorn, which include restricting dove hunting to late season only, enforced speed limits, and no hunting zones around captive breeding facilities. Even though these activities are occurring in the same area, we expect a very limited number of hunters. This means that the minimal human activity associated with hunting is not likely to significantly add to disturbance of pronghorn, even when considered in the context of border-related activities. The vast size of the refuge (860,000 acres) also weighs in favor of our assessment that any impacts of these potentially overlapping human activities would be negligible. Finally, these refuges use an adaptive management approach, as do all of our stations, and will make all necessary adjustments to their hunt programs should they determine that hunting activities are adversely impacting a listed species.

*Comment (30):* A significant number of comments advocated for openings and expansions of additional waterfowl hunting opportunities. Most of these specifically requested opportunities in the State of California and the Southeastern United States.

*Our Response:* We appreciate the support for and interest in waterfowl hunting in California and in the Southeast. We are committed to evaluating additional waterfowl hunting opportunities on refuges wherever it is compatible with refuge purposes, sanctuary requirements, local conditions, and other objectives and obligations of the Refuge System. These requests for additional openings and expansions will have to be a consideration for future rulemakings, as they have not yet been evaluated and thus cannot be accommodated between a proposed and final rule. Nevertheless, given the degree of public interest, it is appropriate to note some considerations specific to waterfowl hunting in California and the southeastern United States.

In California, for a variety of reasons, our ability to further expand some of the highlighted opportunities at our NWRs is limited. These reasons include, but are not limited to, limited access, unreliable water supplies, and recovery of endangered species. Also, despite the high demand during opening weekend, we have many waterfowl hunt opportunities throughout the season in California that are undersubscribed. In the Southeast, many NWRs face limits in opening and expanding beyond current opportunities as many are closed or partially closed to migratory bird hunting in order to meet inviolate sanctuary requirements or because of a specific establishing purpose inconsistent with waterfowl hunting. Yet, there are many more refuges in the region that are accessible and open to waterfowl hunting, with regulations that are aligned or closely aligned to State regulations.

We did not make any changes to the rule as a result of these comments.

*Alaska*

*Comment (31):* We received multiple comments that we failed to provide credible scientific evidence that camelids present a disease threat to wildlife in Arctic National Wildlife Refuge (Arctic NWR).

*Our Response:* We disagree with these comments. The Service must make decisions on what uses to allow on a refuge consistent with principles of sound fish and wildlife management and administration, available science and resources, and adherence to the requirements of ANILCA, the Administration Act, and other applicable laws.

While few peer-reviewed studies have directly investigated the transmission of pathogens from camelids to wild sheep, there have been assessments that advise caution. Schwantje and Stephen (2003) stated that llamas commonly carry pathogens that can cause disease in wild ungulates (H. Schwantje and C. Stephen. 2003. Communicable disease risks to wildlife from camelids in British Columbia. British Columbia Ministry of Water, Land and Air Protection Biodiversity Branch, Victoria, BC). They expressed particular concern for fecal-borne disease, such as Johne's disease and *Pasteurella* spp. Johne's disease is fatal, is easily transmitted among ruminants, is long-lived in the environment, and has no known treatment. In another risk assessment by the Centre for Coastal Health (2017), seven common camelid pathogens were identified that could potentially present significant risks to wild sheep populations: *Mannheimia haemolytica, Pasteurella* spp., contagious ecthyma, bovine viral diarrhea virus, *Mycobacterium avium paratuberculosis* (Johne's disease), bluetongue virus, and *Mycobacterium bovis.* They concluded that *Mannheimia haemolytica, Pasteurella* spp., contagious ecthyma,

and Johne's disease were of particular concern. Both studies expressed concern regarding disease transmission from contact between camelids and wild sheep and their habitat (Centre for Coastal Health. 2017. Risk assessment on the use of South American camelids for back country trekking in British Columbia. British Columbia Ministry of Forests, Lands, Natural Resource Operations and Rural Development Division of Wildlife conservation, Alaska Department of Fish and Game). These assessments informed the Service's decision to prohibit camelids on Arctic NWR.

Limited clinical/pen testing studies have been conducted that co-mingle various domestic (including llamas) and wild animals in an effort to detect disease transmission (Foreyt, W. J. 1994. Effects of controlled contact exposure between healthy bighorn sheep and llamas, domestic goats, mountain goats, cattle, domestic sheep, or mouflon sheep. Northern Wild Sheep and Goat Council Proceedings 9: 7–14.). While this limited study suggests that llamas do not likely pose as serious of a threat to wild sheep as do domestic sheep, it fails to provide compelling evidence that llamas do not pose any risk of pathogen transmission to wild sheep. There were several limitations of the study: (1) It was a symposium presentation, not a peer-reviewed paper; (2) it limited investigation to the transmission of *Pasteurella haemolytica* and did not investigate other pathogens of concern; (3) it is unclear the total numbers of animals that were involved in the study; and (4) it is unclear if the llamas housed with the sheep were in fact infected with *Pasteurella haemolytica*.

We did not make any changes to the rule as a result of these comments.

*Comment (32):* We received several comments questioning the Service's risk tolerance and precautionary approach to prohibiting camelids on the Arctic NWR.

*Our Response:* As discussed above, the Service must make decisions on what uses to allow on a refuge consistent with principles of sound fish and wildlife management and administration, available science and resources, and adherence to the requirements of ANILCA, the Administration Act, and other applicable laws.

Vast, natural, and wild, Arctic NWR serves a distinctive function in the National Wildlife Refuge System. As a completely intact ecosystem, Arctic NWR offers the opportunity to preserve a range of tangible and intangible values in addition to the traditional fish,

wildlife, and habitat values and focal species conservation found on most refuges. One of the core purposes of the Arctic NWR, as directed by ANILCA's section 303(2)(B)(i), is to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, Dall's sheep.

With that mandate in mind, Arctic NWR sought further professional guidance, including from the Western Association of Fish and Wildlife Agencies (WAFWA) Wild Sheep Working Group's "Recommendations for Domestic Sheep and Goat Management in Wild Sheep Habitat." Those recommendations state: "We recommend that wild sheep managers design and implement management strategies by taking the first step of assessing and prioritizing conservation value and relative importance of wild sheep populations. The greater the conservation value and the greater the risk of association with domestic sheep or goats, the more aggressive and comprehensive a strategy to ensure effective separation should be." The Arctic NWR places the highest importance and conservation value on the area's wildlife, including Dall's sheep. Therefore, a most aggressive and comprehensive "effective separation" strategy is warranted. Furthermore, the WAFWA document provides an additional recommendation relating to disease transmission risk mitigation: "It is generally acknowledged that thinhorn sheep (*Ovis dalli* spp.) in Alaska and northwestern Canada are likely naïve to exposure to many organisms commonly carried by domestic species, compared to wild sheep occurring in southern Canada and the continental [United States]. Until this is confirmed and the effects of exposure to infectious organisms are clearly understood, it is essential that no association occurs between thinhorn sheep and domestic sheep or goats" (Garde, E., S. Kutz, H. Schwantje, A. Veitch, E. Jenkins, and B. Elkin. 2005. Examining the risk of disease transmission between wild Dall's sheep and mountain goats and introduced domestic sheep, goats and llamas in the Northwest Territories. Northwest Territories Agricultural and Policy Framework and Environment and Natural Resources Government of the Northwest Territories, Yellowknife, Canada; CAST (Council for Agricultural Science and Technology). 2008. Pasteurellosis transmission risks between domestic and wild sheep. CAST Commentary QTA 2008–1. Council for Agricultural Science and Technology, Ames, Iowa). In light of this acknowledged potential for

exposure, the Service finds that precluding any association between Dall's sheep and domestic sheep or goats within the Arctic NWR is warranted at this time.

The Service also included camelid species in this rule because they too have been documented as carriers of pathogens that could potentially harm Dall's sheep. Preventing the introduction (*e.g.,* pathway management) of invasive species and pathogens is the first line and most cost-effective defense against biological invasion. The cost of managing pathogen(s) that may be transmitted by domestic sheep, goats, and camelids through other means (*i.e.,* eradicating or controlling) is exponentially higher. Additionally, there is uncertainty that the recovery of these populations would be achievable if the Dall's sheep populations were to be infected with any of these pathogens. Response and recovery efforts would be made even more difficult considering the Arctic NWR's vast size and remoteness, and the overall difficulty of accessing the sheep and their habitats. Much of the sheep habitat is in designated Wilderness, adding a layer of administrative complexity to any kind of management response to a disease outbreak. To conserve the natural diversity of the Arctic NWR and integrity of Dall's sheep populations in the Arctic NWR, the best course of action is to prevent the introduction of pathogens until there is more information available on how or if pathogens can be effectively managed through other mitigation strategies.

A study that helps illustrate the value of prevention (Cassirer et al. 2018. Pneumonia in bighorn sheep: Risk and resilience. The Journal of Wildlife Management, 82(1): 32–45) found that no vaccine or antibiotic treatment has controlled infection in domestic or wild sheep, and management actions to mitigate morbidity and mortality in wild sheep populations once exposed have been unsuccessful. This is true for populations in the lower 48 States where access and associated logistics for such efforts are relatively feasible. Sheep populations in the Brooks Range are considerably more challenging to access and attempt to treat for disease, supporting the decision that prevention is the best course of action.

*Comment (33):* We received a comment noting that llamas and horses are both widely separated from wild sheep taxonomically and that consequently these species enjoy strong species barriers against disease transmission that the Service failed to recognize by "mis-categorizing camelids

with domestic sheep and goats as a common disease risk.'' The commenter stated that domestic sheep and goats (bovids) are not widely separated from wild sheep (also bovids) taxonomically, and consequently they do not enjoy the same species barriers against disease transmission to wild sheep that horses and llamas do.

*Our Response:* We agree with the commenter that llamas and horses are separated from wild sheep taxonomically. The inclusion of camelid species with domestic sheep and goat species in this rule is not due to taxonomic association. Camelids are included because, similar to domestic sheep and goats, they can harbor the pathogens that are of high risk for enzootic disease outbreak in native wildlife populations. These diseases include *Mannheimia haemolytica, Pasteurella* spp., contagious ecthyma, bovine viral diarrhea virus, bluetongue virus, and *Mycobacterium bovis. Mannheimia haemolytica, Pasteurella* spp., contagious ecthyma, and Johne's disease are of particular concern for native ungulate species in Alaska.

*Comment (34):* We received several comments expressing concern that camelids were being treated differently than other pack animals. Several commenters stated that if camelids are identified as an ''unreasonable risk'' by the Service, the Service should also consider the unreasonable disease risk posed by humans and other pack animals.

*Our Response:* As discussed above, there is potentially great risk to Dall's sheep from sheep, goats, and camelids due to the suite of pathogens they can carry. Similar risks do not exist with respect to other common pack animals, such as horses and mules, or humans. Therefore, we did not make any changes to the rule based on these comments.

*Comment (35):* One commenter noted that *Mycoplasma ovipneumoniae* has recently been identified in Dall's sheep in the northern Brooks Range and, according to the Alaska Department of Fish and Game (ADFG), evidence suggests they (wild ungulates) may have been carriers all along; therefore, there is no need to prohibit llamas on Arctic NWR. The commenter also noted that additional evidence from ADFG suggested that moose and caribou also carry the pathogen and may be potential vectors.

*Our Response:* Multiple strains of *Mycoplasma ovipneumoniae* have been identified. The *Mycoplasma ovipneumoniae* that ADFG documented in Dall's sheep is apparently a unique Alaska wildlife-only strain that has not been found in any domestic animals,

and there is no known cross immunity from different strains. Domestic pack animals can transmit other strains of *Mycoplasma ovipneumoniae* or other diseases and parasites that are novel to the Arctic NWR populations and pose serious risks to these populations. Furthermore, ADFG has not suggested that Alaska's moose and caribou carry the pathogen, nor are they considered potential vectors to Dall's sheep (Dr. Kimberlee Beckmen, June 9, 2020, pers. comm.).

Several studies highlight the vulnerability of Dall's sheep to novel strains of *Mycoplasma ovipneumoniae.* Cassirer et al. (2017) state that transmission of pathogens carried by domestic sheep and goats pose a severe threat to bighorn sheep populations (Cassirer, E.F., K.R. Manlove, R.K. Plowright, and T.E. Besser. 2017. Evidence for strain-specific immunity to pneumonia in bighorn sheep. The Journal of Wildlife Management, 81(1): 133–143). Large die-offs occur from pneumonia caused by exposure to *Mycoplasma ovipneumoniae.* This is further complicated by the fact that some of the survivors from these epidemics are asymptomatic, but can pass this pathogen on to other sheep, including new lambs. These lambs usually succumb to pneumonia and die. Additionally, they cited a situation in Hells Canyon in which a novel *Mycoplasma ovipneumoniae* strain introduced by domestic goats caused high levels of morbidity and mortality among adult sheep in the population. In another study, researchers sampled 137 animals in 24 flocks of domestic sheep and goats for *Mycoplasma ovipneumoniae* and found that 37.5 percent of the flocks tested positive. Additionally, they found that 78 percent of these animals had incidences of escape from their pens, thus potentially transmitting this pathogen to wild sheep (Heinse, L.M., Hardesty, L.H., and Harris R.B. 2016. Risk of pathogen spillover to bighorn sheep from domestic sheep and goat flocks on private land. Wildlife Society Bulletin, 40(4): 625–633).

Kamathet al. (2019) examined the pneumonia-associated bacterium *Mycoplasma ovipneumoniae* in domestic sheep, domestic goats, bighorn sheep, and mountain goats across the western United States using samples collected from 1984 to 2017. They found that there was a much higher genetic diversity of *Mycoplasma ovipneumoniae* (*i.e.,* many more strains) in domestic animals than in wild populations of bighorn sheep and mountain goats. They concluded that ''the ability to predict [*Mycoplasma*

*ovipneumoniae*] spillover into wildlife populations may remain a challenge given the high strain diversity in domestic sheep and need for more comprehensive pathogen surveillance'' (Kamath, P.L., K. Manlove, E.F. Cassirer, P.C. Cross, and T.E. Besser. 2019. Genetic structure of Mycoplasma ovipnumoniae informs pathogen spillover dynamics between domestic and wild Caprinae in the western United States. Scientific Reports, 9:15318).

*Comment (36):* Multiple commenters stated that the Service's assertion that the proposed regulation is better aligned with ADFG regulations and WAFWA recommendations is inaccurate, because neither ADFG regulations nor WAFWA recommendations prohibit the use of camelids.

*Our Response:* The Service agrees with commenters that we were not clear in the assertions made regarding alignment with ADFG regulations and WAFWA recommendations. The amendment to the Arctic NWR regulations does align with ADFG regulations to the extent that it restricts the use of domestic sheep and goats when hunting Dall's sheep, mountain goats, and musk ox in Alaska. The prohibition on camelids on the Arctic NWR is more protective than ADFG's current regulations, which are silent on camelid species. While WAFWA recommendations do not specifically address camelids, they advise wildlife managers to maximize effective separation between wild sheep and potential disease vectors. As camelids are potential disease vectors, the Service has determined that prohibiting camelids on the Arctic NWR is necessary in order to more closely align with WAFWA's recommendations.

*Comment (37):* We received a few comments that the proposed prohibition would not expand public use opportunities, but instead would restrict these activities in remote areas where pack animals might be necessary for public access.

*Our Response:* The Service finds that the prohibition on certain domestic pack animals in the Arctic NWR is an appropriate measure to conserve Dall's sheep. Ensuring the health and population of Alaska wildlife ensures that wildlife-dependent public use opportunities can continue into the future. While the prohibition does restrict rather than expand public use opportunities, it will help preserve wildlife-dependent public uses such as hunting, wildlife observation, and wildlife photography (priority public uses defined by the Improvement

Act) by preventing disease transfer to Dall's sheep and other wildlife species.

*Comment (38):* We received a request to amend our proposal to allow the use of camelids for public uses on Arctic NWR a case-by-case basis through a refuge permit or, similarly, to allow pack goat use through implementation of "best management practices."

*Our Response:* The Service considered amending the regulations in a manner that could allow for future uses of these pack animals through an Arctic NWR-administered permit program but decided against doing so. As discussed in our response to Comment *(32),* preventing the introduction (*e.g.,* pathway management) of invasive species and pathogens is the first line and most cost-effective defense against biological invasion. The cost of managing pathogen(s) once transmitted to wild sheep by domestic sheep, goats, and camelids (*i.e.,* eradicating or controlling) is exponentially higher. Additionally, there is uncertainty that if the Dall's sheep populations were to be infected with any these pathogens, the recovery of these populations would be achievable. To conserve the natural diversity of the Arctic NWR and integrity of Dall's sheep populations on the refuge, the best course of action is to prevent the introduction of pathogens until there is more information available on how (or if) pathogens can be effectively managed through other mitigation strategies. As a permitting system would not necessarily prevent the introduction of pathogens and would do nothing to help control an outbreak or mitigate adverse effects to Dall's sheep, the Service chose not to include a permit option in this final rule.

The Service reviewed the North American Packgoat Association (NAPgA) "best management practices" (BMP) document submitted by the commenter and determined that the referenced practices fail to adequately address disease risk mitigation of pack goats beyond careful owner oversite (identification and control), co-mingling mitigation, and lost goat response. Consistent with the reasoning described above, the Service chose not to make an exception in this final rule for pack goat use that adheres to the NAPgA's BMP document standards.

Therefore, we did not make any changes to the rule as a result of this comment.

*Comment (39):* Several commenters expressed concerns that the llama packing user group was not informed of or included in the 2011–2015 public review process for the Arctic NWR's CCP and associated NEPA process that ultimately determined that camelid use on the refuge would be prohibited.

*Our Response:* The public process that resulted in the 2015 Arctic NWR CCP and Record of Decision (ROD) involved both a 90-day public comment period on the 2011 draft Arctic NWR CCP and associated draft environmental impact statement (draft EIS) (see 76 FR 50490; August 15, 2011) and various public meetings, which the Service informed the public of through extensive outreach. In addition to the 90-day public comment period on the draft CCP and draft EIS, the Service held two open houses, six public hearings, and four community meetings. Through the public comment period, the Service received 612,285 public comments on the draft CCP/draft EIS, 6 of which requested that the Service prohibit certain domestic pack animals due to their potential threat as a wildlife disease vector.

Public comment periods allow agencies to learn more from the public, Alaska Native Tribal governments and corporations, and other agencies, and to refine their proposals as appropriate. Because of this, the agency's final action, which is only made after the conclusion of the public comment period, may be different from the agency's original proposal. In the case of the Arctic NWR CCP, the original proposed action did not contain a prohibition on pack llama use on the refuge, but after reviewing the public comments and additional scientific literature, and considering the purposes of the Arctic NWR, the Service determined that a change to the CCP was warranted, and incorporated a proposed prohibition in the final EIS.

On January 27, 2015, we published a notice of availability (80 FR 4303) of the revised CCP and final EIS for the Arctic NWR; that notice announced a 30-day public review period for those documents, which began when the Environmental Protection Agency published its requisite notice on February 6, 2015 (80 FR 6705). This review period provided the public with an opportunity to understand changes made between the draft CCP/draft EIS and the revised CCP/final EIS, to read responses to public comments on the draft CCP/draft EIS, and to learn about the Service's preferred alternative. That revised CCP includes references to the additional information that informed the inclusion of camelids. This process was consistent with both the Service's planning laws (16 U.S.C. 3101 *et seq.*) and policies (602 FW 3), as well as the requirements of NEPA (42 U.S.C. 4332).

*Comment (40):* We received several comments that the inclusion of a proposed closure of a use on Arctic NWR (*i.e.,* the prohibition on domestic sheep, goats, and camelids) within the station-specific rulemaking does not adhere to rulemaking and closure procedures for Alaska refuges as provided by ANILCA.

*Our Response:* The Service has done extensive outreach on the amendment to the regulations, including, but not limited to, announcing the proposed amendment on the Arctic NWR's public website; mailing and emailing affected Tribal governments, user groups, wildlife organizations, and other partners and stakeholders; informing and communicating with both the ADFG and Alaska's congressional representatives; publishing the proposed rule in the **Federal Register** (85 FR 20030; April 9, 2020) with a 60-day public comment period; holding a virtual public hearing on May 13, 2020 (due to the COVID–19 pandemic it could not be held safely in person); publishing notice of the proposed Arctic NWR regulation and virtual public hearing in both regional and local newspapers; posting notice of the proposed Arctic NWR regulation at community post offices; and announcing the proposed Arctic NWR regulation via two public service announcements run on KUAC (Fairbanks). We received numerous comments on the proposed rule, including the Arctic NWR regulation, and offer our responses to those comments in this rule. Therefore, we have fully satisfied the requirements for notice-and-comment rulemaking under the Administrative Procedure Act (5 U.S.C. 551 *et seq.*).

The commenters state that the prohibition of certain domestic pack animals in the Arctic NWR constitutes a "closure" that triggers additional notice and public hearing requirements under ANILCA. The Service remains in full compliance with ANILCA because we conducted the types of public outreach specified at section 1110(a) of ANILCA and the associated implementing regulations (*i.e.,* 43 CFR 36.11 and 50 CFR 36.42). Regardless, the State of Alaska has requested that the promulgation of regulations for NWRs in Alaska be conducted under separate rulemaking processes, and not be included in the larger annual hunting and fishing rulemaking for the Refuge System. They state this is preferable because of the unique public input and notice requirements mandated by ANILCA and the associated implementing regulations. We agree, and we intend to conduct rulemaking

for NWRs in Alaska separately from the annual station-specific regulations in the future.

*Comment (41):* We have received comments from the State of Alaska and AFWA directing our attention to the recent *Sturgeon* v. *Frost* decision of the U.S. Supreme Court. 139 S. Ct. 1066 (2019). These comments note that the Supreme Court held the National Park Service cannot impose regulations on lands it does not own and reaffirmed the State of Alaska's right to manage fish, wildlife, and public access over non-Federal lands, including submerged lands.

*Our Response:* We agree with the ADFG and AFWA that the State of Alaska has the right to manage fish, wildlife, and public access over non-Federal lands, including submerged lands owned by the State of Alaska. We value the partnership with the State of Alaska for managing the wildlife, lands, and waters within Alaska NWRs for the benefit of the American public. The Alaska regulation in this rule applies to federally owned lands in the Arctic NWR and does not impose restrictions on non-Federal lands, including State of Alaska-owned submerged lands and is, therefore, consistent with the *Sturgeon* v. *Frost* decision.

**Changes From Proposed Rule**

Based on consultation with States and other partners, comments we received on the proposed rule, and comments we received on NEPA documents for individual refuges and hatcheries, we made a number of changes between the proposed rule and this final rule, some of which have been discussed above under Summary of Comments and Responses.

For one, we have added regulatory text to open hunts for species that we reason should have been included alongside other new hunts at the same refuge. Regulatory language allowing hunting for bear at Oxbow NWR, quail at Valentine NWR, pronghorn antelope at Fort Niobrara NWR, and for dove and quail at Tallahatchie River are included in this final rule. We also corrected *Table 1* below to reflect an expansion of elk hunting at Monte Vista NWR, which does not require a change to the regulatory text because we are only expanding an existing hunt to new acres. We have conducted the same NEPA processes for these species as all of the other species in this rule, and they have been subject to public review and comment through that process. In the case of bear at Oxbow NWR, opening hunting of this species in this rule will maintain consistency, as bear hunting is opened at three refuges (Great

Meadows NWR, Assabet River NWR, and Oxbow NWR) in close proximity to each other in the Eastern Massachusetts National Wildlife Refuge Complex. The refuge did receive NEPA process public comments in support of and in opposition to the opening of bear hunting at each of these three refuges in the complex, including Oxbow. None of these comments raised concerns particular to Oxbow; they were relevant to all three refuges.

Conversely, we are not adopting 23 proposed hunting opportunities for particular species at four refuges in this final rule. At Cabeza Prieta NWR, as summarized in response to Comment *(5)* above, we are not adopting the proposed hunting of ringtail cat, badger, and skunk due to cultural concerns in consultation with the Tohono O'odham Nation of Arizona. At Bosque del Apache NWR, as summarized in response to Comment *(19)* above, we are not adopting the proposed hunting of dark goose, American coot, common moorhen, common snipe, duck, and merganser in response to public comments and in order to ensure no negative impacts to public safety or to important habitat. At Alamosa and Monte Vista NWRs, as mentioned in response to *Comment (12)* above, we are not adopting proposed expansions onto new acres for the hunting of the same seven species (rabbit, duck, dark geese, light geese, coot, dove, and snipe) at both refuges because the categorical exclusions for these expansions may require further consideration.

Also, as mentioned in response to comments above, we are adding a special permit requirement for the take of furbearers at Quivira NWR. Requiring this Kansas Department of Wildlife, Parks and Tourism (KDWPT) permit will further alignment of our regulations with the State of Kansas and is consistent with the refuge CCP.

Another change made, again as mentioned in response to comments above, is that we added regulatory language for Coldwater River, Patoka River, Ottawa, and Horicon refuges that results in this final rule having four more regulatory provisions limiting the use of lead shot than were in the proposed rule. These changes were not directly in response to public comments received that expressed concern about lead ammunition, but they do reduce the number of openings and expansions under this rule for which hunters may use lead ammunition.

We made multiple regulatory changes that affect the hours and seasons for hunts or for related activities such as constructing stands and blinds. These changes were each made to better align

with State regulations, to promote intrastate alignment of station-specific regulations, or in response to comments. For example, as discussed above, the hours of the day open to weekend alligator hunting at Banks Lake NWR were adjusted based on a comment from the Georgia Department of Natural Resources to align with Georgia's alligator daily hunting hours. Another example is that, after extensive public response to proposed big game hunting at Sachuest Point NWR, we added a provision explicitly stating these hunts will be periodic rather than annual and will be strictly limited to a small number of hunters.

Similarly, we added regulations that limit the method or manner of take as a response to public comments or for clarification of refuge policy. This includes making the mentored deer hunting at Sachuest Point NWR archery only, limiting the number of individuals that can participate in muzzleloader deer hunting at Fort Niobrara NWR by instituting a limited permit lottery, prohibiting handgun and rifle hunting of upland and big game at Assabet and Oxbow refuges, allowing only shotgun when hunting migratory birds at Turnbull NWR, and revising the proposed feral hog hunt at Bosque del Apache NWR into incidental take of feral hog during other big game seasons. Note also that we made several changes that clarified the use of dogs. In some cases this was in response to public comments, while in others it was to promote intrastate alignment of station-specific regulations. For example, in response to public comments, for LaCreek NWR, the rule now clarifies that the current use of dogs when hunting is expanded to newly opened areas and that the use of dogs while predator hunting is prohibited; whereas changes clarifying that dogs can only be used in the context of bird hunting were made for Buenos Aires, Fallon, and Stillwater refuges.

At LaCreek and Laguna Atascosa refuges, specifically, we added regulations concerning field dressing of certain hunting take as a result of public comments and to balance refuge uses.

Next, we made several changes to regulations that concerned various methods of transportation. These changes were made either in consultation with and to further align with States or in response to public comments. These changes include not adopting the proposed use of bicycles at Bosque del Apache NWR, clarifying motorized vessel and airboat regulations at Loxahatchee NWR, and allowing boat use for access purposes at LaCreek NWR.

At Montezuma and North Platte refuges, we clarified regulations for youth and special hunts.

Additionally, as referenced in response to Comment *(18)*, above, we made numerous changes throughout the rule, in addition to regulatory revisions already proposed, to ensure the specific required forms, which display a valid OMB control number, are indicated whenever our regulations mention the need for one of our Federal permits. This reflects a nationwide effort to be clear in our regulations regarding which Federal permit form is being referenced in a given regulation to promote public understanding and compliance.

Finally, we also made various nonsubstantive, editorial corrections and clarifying revisions throughout the rule. These changes ensure clarity and accuracy for the benefit of the public in relying on the regulatory text and the benefit of the stations in administering the regulations.

**Effective Date**

We are making this rule effective upon publication (see **DATES**, above). We provided a 60-day public comment period for the April 9, 2020, proposed rule (85 FR 20030). We have determined that any further delay in implementing these station-specific hunting and sport fishing regulations would not be in the public interest, in that a delay would hinder the effective planning and administration of refuges' and hatcheries' hunting and sport fishing programs. This rule does not impact the public generally in terms of requiring lead time for compliance. Rather, it primarily relieves restrictions in that it allows activities on refuges and hatcheries that we would otherwise prohibit. Therefore, we find good cause under 5 U.S.C. 553(d)(3) to make this rule effective upon publication.

**Amendments to Existing Regulations**

*Updates to Hunting and Fishing Opportunities on NWRs and NFHs*

This document codifies in the Code of Federal Regulations all of the Service's hunting and/or sport fishing regulations that are updated since the last time we published a rule amending these regulations (84 FR 47640; September 10, 2019) and that are applicable to Refuge System and Hatchery System units previously opened to hunting and/or sport fishing. We do this to better inform the general public of the regulations at each station, to increase understanding and compliance with these regulations, and to make enforcement of these regulations more efficient. In addition to now finding these regulations in 50 CFR parts 32 and 71, visitors to our refuges and hatcheries may find them reiterated in literature distributed by each station or posted on signs.

### TABLE 1—CHANGES FOR 2020–2021 HUNTING/SPORT FISHING SEASON

| Station | State | Migratory bird hunting | Upland game hunting | Big game hunting | Sport fishing |
|---|---|---|---|---|---|
| Abernathy Fish Technology Center. | Washington | Closed | Closed | Closed | A. |
| Alamosa | Colorado | Already Open | Already Open | Already Open | B. |
| Arthur R. Marshall Loxahatchee. | Florida | D | Closed | C | D. |
| Assabet River | Massachusetts | C | C | C/D | Already Open. |
| Balcones Canyonlands | Texas | Already Open | Already Open | D | Closed. |
| Bamforth | Wyoming | Closed | A | A | Closed. |
| Banks Lake | Georgia | Closed | Closed | B | Already Open. |
| Berkshire NFH | Massachusetts | Closed | Closed | Closed | A. |
| Big Branch Marsh | Louisiana | E | C/E | Already Open | Already Open. |
| Bitter Lake | New Mexico | E | Already Open | D | Closed. |
| Black Bayou Lake | Louisiana | Already Open | Already Open | E | Already Open. |
| Blackwater | Maryland | D | Closed | D | Already Open. |
| Block Island | Rhode Island | B | Closed | D | Already Open. |
| Bogue Chitto | Louisiana and Mississippi | E | E | E | Already Open. |
| Bombay Hook | Delaware | C/D | C/D | D | B. |
| Bosque del Apache | New Mexico | C/D | C/D | C/D/E | Already Open. |
| Browns Park | Colorado | Already Open | Already Open | C | Already Open. |
| Buenos Aires | Arizona | C | C | C | Closed. |
| Buffalo Lake | Texas | B | C/D | Already Open | Closed. |
| Cabeza Prieta | Arizona | B | B | C | Closed. |
| Canaan Valley | West Virginia | D | D | D | B. |
| Carolina Sandhills | South Carolina | Already Open | C | Already Open | Already Open. |
| Catahoula | Louisiana | C | Already Open | Already Open | Already Open. |
| Cedar Island | North Carolina | E | Closed | Closed | Closed. |
| Cibola | Arizona and California | D | C/D | D | Already Open. |
| Clarks River | Kentucky | C | Already Open | Already Open | Already Open. |
| Cokeville Meadows | Wyoming | C | Already Open | Already Open | B. |
| Coldwater River | Mississippi | C | C | Already Open | Already Open. |
| Crab Orchard | Illinois | D/E | Already Open | D/E | Already Open. |
| Crescent Lake | Nebraska | C/D | D | C | E. |
| Dahomey | Mississippi | C | C | E | Already Open. |
| Deer Flat | Idaho and Oregon | Already Open | Already Open | Already Open | D. |
| Dwight D. Eisenhower NFH | Vermont | Closed | Closed | Closed | A. |
| Edwin B. Forsythe | New Jersey | Already Open | Already Open | Already Open | D. |
| Eufaula | Georgia and Alabama | E | Already Open | Already Open | Already Open. |
| Everglades Headwaters | Florida | A | A | A | A. |
| Fallon | Nevada | A | A | A | Closed. |
| Fish Springs | Utah | C | B | B | Closed. |
| Flint Hills | Kansas | Already Open | C | C | Already Open. |
| Fort Niobrara | Nebraska | B | B | C/E | Already Open. |

TABLE 1—CHANGES FOR 2020–2021 HUNTING/SPORT FISHING SEASON—Continued

| Station | State | Migratory bird hunting | Upland game hunting | Big game hunting | Sport fishing |
|---|---|---|---|---|---|
| Great Meadows | Massachusetts | D | B | C/D | Already Open. |
| Great River | Illinois and Missouri | C | Already Open | E | Already Open. |
| Hart Mountain | Oregon | B | C/D | Already Open | Already Open. |
| Horicon | Wisconsin | C | C | C | Already Open. |
| Hutton Lake | Wyoming | Already Open | C | B | Closed. |
| Iroquois | New York | D/E | E | B | Already Open. |
| John W. and Louise Seier | Nebraska | A | A | A | Closed. |
| John H. Chafee | Rhode Island | A | A | A | A. |
| Jordan River NFH | Michigan | A | A | A | Closed. |
| Kirwin | Kansas | C | C/E | D | E. |
| Kootenai | Idaho | C | Already Open | Already Open | D. |
| LaCreek | South Dakota | D | C/D | C/D | Already Open. |
| Laguna Atascosa | Texas | Closed | Closed | C | Already Open. |
| Lamar NFH | Pennsylvania | Closed | Closed | Closed | A. |
| Leavenworth NFH | Washington | B | B | B | Already Open. |
| Lee Metcalf | Montana | Already Open | B | D | D. |
| Leslie Canyon | Arizona | A | A | A | Closed. |
| Little White Salmon NFH | Washington | B | B | B | Already Open. |
| Lower Rio Grande Valley | Texas | D/E | B | C/D/E | Closed. |
| Marais des Cygnes | Kansas | C/E | C/E | E | Already Open. |
| Mattamuskeet | North Carolina | E | Closed | Already Open | Closed. |
| Merced | California | C | Closed | Closed | Closed. |
| Middle Mississippi River | Illinois and Missouri | C | C | Already Open | Already Open. |
| Minidoka | Idaho | C/D | C/D | C/D/E | Already Open. |
| Monte Vista | Colorado | Already Open | Already Open | D | Closed. |
| Montezuma | New York | C | B | E | D. |
| Muscatatuck | Indiana | B | C | E | Already Open. |
| Nestucca Bay | Oregon | C | Closed | Closed | Already Open. |
| Ninigret | Rhode Island | Closed | B | C/E | Already Open. |
| Northern Tallgrass Prairie | Minnesota | D | D | D | D. |
| North Platte | Nebraska | Closed | C/E | D/E | Already Open. |
| Ottawa | Ohio | D | D | D | Already Open. |
| Overflow | Arkansas | C | Already Open | Already Open | Closed. |
| Oxbow | Massachusetts | D | C/D/E | C/D/E | Already Open. |
| Pahranagat | Nevada | Already Open | D | Closed | Already Open. |
| Pathfinder | Wyoming | C | Already Open | Already Open | Closed. |
| Patoka River | Indiana | C/D | C/D | D | D. |
| Quivira | Kansas | C | C | B | Already Open. |
| Rachel Carson | Maine | Already Open | Already Open | Already Open | D. |
| Rydell | Minnesota | B | B | E | Already Open. |
| Sachuest Point | Rhode Island | Closed | B | B | Already Open. |
| San Diego Bay | California | Closed | Closed | Closed | A. |
| San Luis | California | C | Closed | C | Already Open. |
| Savannah | South Carolina and Georgia | Already Open | C | C | Already Open. |
| Seatuck | New York | Closed | Closed | B | Already Open. |
| Spring Creek NFH | Washington | B | B | B | Already Open. |
| Stewart B. McKinney | Connecticut | D/E | Closed | B | Closed. |
| Stillwater | Nevada | Already Open | Already Open | C | Closed. |
| St. Marks | Florida | Already Open | D/E | D/E | Already Open. |
| St. Vincent | Florida | Closed | E | E | Already Open. |
| Swan River | Montana | Already Open | Closed | C | Already Open. |
| Swanquarter | North Carolina | E | Closed | Closed | Closed. |
| Tallahatchie | Mississippi | C | C | E | Already Open. |
| Tennessee | Tennessee | C/D | C/E | E | Already Open. |
| Tensas River | Louisiana | Already Open | C | Already Open | Already Open. |
| Tishomingo | Oklahoma | Already Open | Closed | Already Open | E. |
| Trustom Pond | Rhode Island | C | Closed | Closed | Already Open. |
| Turnbull | Washington | A | Already Open | Already Open | Already Open. |
| Two Rivers | Illinois and Missouri | D | D | D | Already Open. |
| Umbagog | New Hampshire and Maine | Already Open | Already Open | Already Open | B. |
| Union Slough | Iowa | C | C | Already Open | Already Open. |
| Valentine | Nebraska | C/D | C | C | Already Open. |
| Wapato Lake | Oregon | A | Closed | Closed | Closed. |
| Wertheim | New York | Closed | Closed | C/E | Already Open. |
| Willapa | Washington | Already Open | Closed | D | Already Open. |
| Willard NFH | Washington | Closed | Closed | Closed | A. |

**Key:**
A = New station opened (Opening).
B = New activity on a station previously open to other activities (Opening).
C = Station already open to activity but added new species to hunt (Opening).

D = Station already open to activity, but added new lands/waters or modified areas open to hunting or fishing (Expansion).
E = Station already open to activity, but existing opportunity expanded through season dates, method of take, bag limits, quota permits, youth hunt, etc. (Expansion).

The changes for the 2020–2021 hunting/fishing season noted in the table above are each based on a complete administrative record which, among other detailed documentation, also includes a hunt plan, a compatibility determination (for refuges), and the appropriate National Environmental Policy Act (NEPA; 42 U.S.C. 4321 *et seq.*) analysis, all of which were the subject of a public review and comment process. These documents are available here: *https://www.fws.gov/refuges/hunting/rules-regulations-and-improved-access/*.

Through these openings and expansions, we are opening or expanding hunting or sport fishing on 2,264,796 acres of NWRs and, as discussed below, opening 47,419 acres on limited-interest easement NWRs. We are also opening hunting or sport fishing on 1,484 acres of the National Fish Hatchery System. These totals combine for an overall total of 2,313,699 acres opened or expanded to hunting or sport fishing by this rule.

*Limited-Interest Openings in North Dakota*

We are also opening limited-interest NWRs (easement refuges) to hunting and fishing in accordance with State regulations and with access controlled by the current landowners. These easement refuges in North Dakota are a unique mix of government-owned and private property that were established during the 1930s in response to drought and economic depression in North Dakota. The Easement Refuge Program began in 1935, and executed agreements that granted the Federal Government migratory bird and flowage easements, many of them perpetual, for the purposes of water conservation, drought relief, and migratory bird and wildlife conservation. The overarching purpose of the program is management of migratory birds, with these easements serving as breeding grounds for many migratory waterfowl. The easements thus established were later formally designated NWRs and became the 41 easement refuges that the Service now administers (and which the Service retains the right to close to hunting/fishing, and later open, for wildlife, safety, or other reasons).

We are opening all 41 of these easement refuges to upland game and big game hunting, with migratory bird hunting prohibited due to the migratory bird management purpose of these refuges. This rule also opens 38 of the easement refuges to sport fishing, as the remaining 3 are already open to sport fishing. This opens a total of 47,419 acres to hunting and fishing, subject to the permission of current landowners.

*Other Updates to the Regulations for NWRs*

We are making one change to 50 CFR part 36, the regulations concerning Alaska NWRs. Specifically, we are prohibiting domestic sheep, goats, and camelids on the Arctic National Wildlife Refuge. The purpose of this prohibition is to prevent the spread of diseases and parasites to native wildlife populations, including mountain goats, musk oxen, and especially Dall's sheep. Dall's sheep in Alaska, including on the Arctic National Wildlife Refuge, are free of domestic livestock diseases and are believed to have very low immunity to many of these diseases. Domestic sheep, goats, and camelids (*e.g.,* llamas and alpacas) are recognized as being at high risk for carrying disease organisms, often asymptomatically, that are highly contagious and cause severe illness or death in Dall's sheep.

**Fish Advisory**

For health reasons, anglers should review and follow State-issued consumption advisories before enjoying recreational sport fishing opportunities on Service-managed waters. You can find information about current fish-consumption advisories on the internet at: *http://www.epa.gov/fish-tech.*

**Required Determinations**

*Regulatory Planning and Review (Executive Orders 12866 and 13563)*

Executive Order 12866 provides that the Office of Information and Regulatory Affairs (OIRA) will review all significant rules. OIRA has determined that this rulemaking is not significant.

Executive Order (E.O.) 13563 reaffirms the principles of E.O. 12866 while calling for improvements in the nation's regulatory system to promote predictability, to reduce uncertainty, and to use the best, most innovative, and least burdensome tools for achieving regulatory ends. The executive order directs agencies to consider regulatory approaches that reduce burdens and maintain flexibility and freedom of choice for the public where these approaches are relevant, feasible, and consistent with regulatory objectives. E.O. 13563 emphasizes further that regulations must be based on the best available science and that the rulemaking process must allow for public participation and an open exchange of ideas. We have developed this rule in a manner consistent with these requirements.

*Executive Order 13771—Reducing Regulation and Controlling Regulatory Costs*

This final rule is not an Executive Order (E.O.) 13771 (82 FR 9339, February 3, 2017) regulatory action because this rule is not significant under E.O. 12866.

*Regulatory Flexibility Act*

Under the Regulatory Flexibility Act (as amended by the Small Business Regulatory Enforcement Fairness Act [SBREFA] of 1996) (5 U.S.C. 601 *et seq.*), whenever a Federal agency is required to publish a notice of rulemaking for any proposed or final rule, it must prepare and make available for public comment a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.,* small businesses, small organizations, and small government jurisdictions). However, no regulatory flexibility analysis is required if the head of an agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. Thus, for a regulatory flexibility analysis to be required, impacts must exceed a threshold for "significant impact" and a threshold for a "substantial number of small entities." See 5 U.S.C. 605(b). SBREFA amended the Regulatory Flexibility Act to require Federal agencies to provide a statement of the factual basis for certifying that a rule will not have a significant economic impact on a substantial number of small entities.

As a preface to this analysis, we note that this rule opens 41 easement refuges to hunting and/or sport fishing, but because these openings are subject to individual landowner permission, we are not including them in the calculation of the rule's estimated economic impact. We anticipate negligible economic impact due to limited demand from hunters and anglers in the area. In our EAs analyzing these openings, we provided an estimate for biological evaluation purposes of the hunting and fishing use days for all 41 easement refuges cumulatively. We have not converted those estimates of potential use days into dollar figures for

this rule because it is difficult to predict whether private landowners will grant access and because it may not be justifiable to use the same impact calculation methods to these lands with uncertain, privately controlled access as we do for the other lands in this rule with public access.

This final rule opens or expands hunting and sport fishing on 97 NWRs

and 9 NFHs. As a result, visitor use for wildlife-dependent recreation on these stations will change. If the stations establishing new programs are a pure addition to the current supply of those activities, it would mean an estimated maximum increase of 25,702 user days (one person per day participating in a recreational opportunity; see Table 2).

Because the participation trend is flat in these activities since 1991, this increase in supply will most likely be offset by other sites losing participants. Therefore, this is likely to be a substitute site for the activity and not necessarily an increase in participation rates for the activity.

## TABLE 2—ESTIMATED MAXIMUM CHANGE IN RECREATION OPPORTUNITIES IN 2020–2021

[Dollars in thousands]

| Station | Additional hunting days | Additional fishing days | Additional expenditures |
|---|---|---|---|
| Abernathy Fish Technology Center (FTC) | | | |
| Alamosa | | 200 | $6.9 |
| Arthur R. Marshall (ARM) Loxahatchee | 57 | 242 | 10.3 |
| Assabet River | 195 | | 6.5 |
| Balcones Canyonlands | 30 | | 1.0 |
| Bamforth | 25 | | 0.8 |
| Banks Lake | 6 | | 0.2 |
| Berkshire NFH | | 365 | 12.6 |
| Big Branch Marsh | 38 | | 1.3 |
| Bitter Lake | 16 | | 0.5 |
| Black Bayou Lake | | | |
| Blackwater | | | |
| Block Island | 67 | | 2.2 |
| Bogue Chitto | 75 | | 2.5 |
| Bombay Hook | 50 | 365 | 14.3 |
| Bosque del Apache | 1,472 | | 49.0 |
| Browns Park | 40 | | 1.3 |
| Buenos Aires | 100 | | 3.3 |
| Buffalo Lake | 12 | | 0.4 |
| Cabeza Prieta | 1,505 | | 50.1 |
| Canaan Valley | | 365 | 12.6 |
| Carolina Sandhills | | | |
| Catahoula | | | |
| Cedar Island | 150 | | 5.0 |
| Cibola | 800 | | 26.6 |
| Clarks River | 760 | | 25.3 |
| Cokeville Meadows | 5 | 30 | 1.2 |
| Coldwater River | | | |
| Crab Orchard | 21 | | 0.7 |
| Crescent Lake | 200 | 600 | 27.4 |
| Dahomey | 172 | | 5.7 |
| Deer Flat | | 120 | 4.2 |
| Dwight D. Eisenhower NFH | | 365 | 12.6 |
| Edwin B. Forsythe | | | |
| Eufaula | 1 | | |
| Everglades Headwater | 140 | 365 | 17.3 |
| Fallon | 3,883 | | 129.2 |
| Fish Springs | 21 | | 0.7 |
| Flint Hills | 50 | | 1.7 |
| Fort Niobrara | 60 | | 2.0 |
| Great Meadows | 178 | | 5.9 |
| Great River | 55 | | 1.8 |
| Hart Mountain | 100 | | 3.3 |
| Horicon | 110 | | 3.7 |
| Hutton Lake | 100 | | 3.3 |
| Iroquois | 160 | | 5.3 |
| John W. and Louise Seier | 200 | | 6.7 |
| John H. Chafee | 153 | 365 | 17.7 |
| Jordan NFH | 17 | | 0.6 |
| Kirwin | 245 | | 8.2 |
| Kootenai | | 50 | 1.7 |
| LaCreek | 275 | | 9.1 |
| Laguna Atascosa | 75 | | 2.5 |
| Lamar NFH | | 365 | 12.6 |
| Leavenworth NFH | | | |
| Lee Metcalf | 60 | | 2.0 |
| Leslie Canyon | 116 | | 3.9 |
| Little White Salmon NFH | 50 | | 1.7 |

TABLE 2—ESTIMATED MAXIMUM CHANGE IN RECREATION OPPORTUNITIES IN 2020–2021—Continued

[Dollars in thousands]

| Station | Additional hunting days | Additional fishing days | Additional expenditures |
|---|---|---|---|
| Lower Rio Grande Valley | 48 | | 1.6 |
| Marais des Cygnes | 25 | | 0.8 |
| Mattamuskeet | 64 | | 2.1 |
| Merced | 50 | | 1.7 |
| Middle Mississippi River | 35 | | 1.2 |
| Minidoka | 100 | | 3.3 |
| Monte Vista | | | |
| Montezuma | 211 | | 7.0 |
| Muscatatuck | 53 | | 1.8 |
| Nestucca Bay | 32 | | 1.1 |
| Ninigret | 46 | | 1.5 |
| North Platte | 27 | | 0.9 |
| Northern Tallgrass Prairie | 82 | 7 | 3.0 |
| Ottawa | 20 | | 0.7 |
| Overflow | | | |
| Oxbow | 207 | | 6.9 |
| Pahranagat | 99 | | 3.3 |
| Pathfinder | 20 | | 0.7 |
| Patoka River | 89 | 15 | 3.5 |
| Quivira | 425 | | 14.1 |
| Rachel Carson | | | |
| Rydell | 110 | | 3.7 |
| Sachuest Point | 30 | | 1.0 |
| San Diego Bay | | 365 | 12.6 |
| San Luis | 50 | | 1.7 |
| Savannah | 1,245 | | 41.4 |
| Seatuck | 90 | | 3.0 |
| Spring Creek NFH | 20 | | 0.7 |
| St. Marks | 520 | | 17.3 |
| St. Vincent | 300 | | 10.0 |
| Stewart B. McKinney | 262 | | 8.7 |
| Stillwater | 63 | | 2.1 |
| Swan River | 15 | | 0.5 |
| Swanquarter | 75 | | 2.5 |
| Tallahatchie | 172 | | 5.7 |
| Tennessee | 265 | | 8.8 |
| Tensas | 9 | | 0.3 |
| Tishomingo | | 525 | 18.2 |
| Trustom Pond | | | |
| Turnbull | 120 | | 4.0 |
| Two Rivers | 162 | | 5.4 |
| Umbagog | | 365 | 12.6 |
| Union Slough | 15 | | 0.5 |
| Valentine | 750 | | 25.0 |
| Wapato Lake | 2,304 | | 76.7 |
| Wertheim | 81 | | 2.7 |
| Willapa | 492 | | 16.4 |
| Willard NFH | | | |
| Total | 20,628 | 5,074 | 862.1 |

To the extent visitors spend time and money in the area of the station that they would not have spent there anyway, they contribute new income to the regional economy and benefit local businesses. Due to the unavailability of site-specific expenditure data, we use the national estimates from the 2016 National Survey of Fishing, Hunting, and Wildlife Associated Recreation to identify expenditures for food and lodging, transportation, and other incidental expenses. Using the average expenditures for these categories with the maximum expected additional

participation of the Refuge System and the Hatchery System yields approximately $862,100 in recreation-related expenditures (see Table 2, above). By having ripple effects throughout the economy, these direct expenditures are only part of the economic impact of these recreational activities. Using a national impact multiplier for hunting activities (2.51) derived from the report ''Hunting in America: An Economic Force for Conservation'' and for fishing activities (2.51) derived from the report ''Sportfishing in America'' yields a total

maximum economic impact of approximately $3.4 million (2019 dollars) (Southwick Associates, Inc., 2018). Using a local impact multiplier would yield more accurate and smaller results. However, we employed the national impact multiplier due to the difficulty in developing local multipliers for each specific region.

Since we know that most of the fishing and hunting occurs within 100 miles of a participant's residence, then it is unlikely that most of this spending will be ''new'' money coming into a local economy; therefore, this spending

will be offset with a decrease in some other sector of the local economy. The net gain to the local economies will be no more than $3.4 million, and likely less. Since 80 percent of the participants travel less than 100 miles to engage in hunting and fishing activities, their spending patterns will not add new money into the local economy and, therefore, the real impact will be on the order of about $680,000 annually.

Small businesses within the retail trade industry (such as hotels, gas stations, taxidermy shops, bait-and-tackle shops, and similar businesses) may be affected by some increased or decreased station visitation. A large percentage of these retail trade establishments in the local communities around NWRs and NFHs qualify as small businesses (see Table 3, below). We expect that the incremental recreational changes will be scattered, and so we do not expect that the rule will have a significant economic effect on a substantial number of small entities

in any region or nationally. As noted previously, we expect at most $862,100 to be spent in total in the refuges' local economies. The maximum increase will be less than four-tenths of 1 percent for local retail trade spending (see Table 3, below). Table 3 does not include entries for those NWRs and NFHs for which we project no changes in recreation opportunities in 2020–2021; see Table 2, above.

TABLE 3—COMPARATIVE EXPENDITURES FOR RETAIL TRADE ASSOCIATED WITH ADDITIONAL STATION VISITATION FOR 2020–2021

[Thousands, 2019 dollars]

| Station/county(ies) | Retail trade in 2012[1] | Estimated maximum addition from new activities | Addition as percent of total | Establishments in 2012[1] | Establishments with fewer than 10 employees in 2012[1] |
|---|---|---|---|---|---|
| Alamosa: | | | | | |
| Alamosa, CO | $312,549 | $3.5 | <0.01 | 85 | 62 |
| Conejos, CO | 40,009 | 3.5 | 0.01 | 18 | 12 |
| ARM Loxahatchee: | | | | | |
| Palm Beach, FL | 21,936,473 | 10.3 | <0.01 | 5,236 | 3,925 |
| Assabet River: | | | | | |
| Middlesex, MA | 23,767,638 | 6.5 | <0.01 | 5,156 | 3,594 |
| Balcones Canyonlands: | | | | | |
| Travis, TX | 17,352,705 | 0.3 | <0.01 | 3,469 | 2,432 |
| Burnet, TX | 687,767 | 0.3 | <0.01 | 182 | 148 |
| Williamson, TX | 9,559,523 | 0.3 | <0.01 | 1,277 | 840 |
| Bamforth: | | | | | |
| Albany, WY | 533,993 | 0.8 | <0.01 | 141 | 103 |
| Banks Lake: | | | | | |
| Lanier, GA | D | 0.2 | D | 21 | 17 |
| Berkshire NFH: | | | | | |
| Berkshire, MA | 2,134,074 | 12.6 | <0.01 | 711 | 508 |
| Big Branch Marsh: | | | | | |
| St. Tammany, LA | 3,953,819 | 1.3 | <0.01 | 915 | 656 |
| Bitter Lake: | | | | | |
| Chaves, NM | 996,707 | 0.5 | <0.01 | 233 | 153 |
| Block Island: | | | | | |
| Washington, RI | 1,865,967 | 2.2 | <0.01 | 548 | 394 |
| Bogue Chitto: | | | | | |
| St. Tammany, LA | 3,953,819 | 0.8 | <0.01 | 915 | 656 |
| Washington, LA | 330,750 | 0.8 | <0.01 | 138 | 104 |
| Pearl River, MS | 531,519 | 0.8 | <0.01 | 172 | 128 |
| Bombay Hook: | | | | | |
| Kent, DE | 2,996,217 | 14.3 | <0.01 | 561 | 368 |
| Bosque del Apache: | | | | | |
| Socorro, NM | 133,401 | 49.0 | 0.04 | 39 | 31 |
| Browns Park: | | | | | |
| Moffat, CO | 224,866 | 1.3 | <0.01 | 72 | 58 |
| Buenos Aires: | | | | | |
| Pima, AZ | 12,668,688 | 3.3 | <0.01 | 2,770 | 1,857 |
| Buffalo Lake: | | | | | |
| Randall, TX | 2,009,993 | 0.4 | <0.01 | 352 | 247 |
| Cabeza Prieta: | | | | | |
| Yuma, AZ | 2,222,557 | 25.0 | <0.01 | 449 | 302 |
| Pima, AZ | 12,668,688 | 25.0 | <0.01 | 2,770 | 1,857 |
| Canaan Valley: | | | | | |
| Tucker, WV | 55,811 | 12.6 | 0.02 | 28 | 18 |
| Cedar Island: | | | | | |
| Carteret, NC | 1,083,228 | 5.0 | <0.01 | 363 | 276 |
| Cibola: | | | | | |
| La Paz, AZ | 485,448 | 13.3 | <0.01 | 81 | 57 |
| Imperial, CA | 1,867,209 | 13.3 | <0.01 | 446 | 297 |
| Clarks River: | | | | | |
| Marshall, KY | 436,873 | 8.4 | <0.01 | 103 | 54 |
| Graves, KY | 449,527 | 8.4 | <0.01 | 123 | 90 |
| McCracken, KY | 1,824,502 | 8.4 | <0.01 | 411 | 256 |
| Cokeville Meadows: | | | | | |

TABLE 3—COMPARATIVE EXPENDITURES FOR RETAIL TRADE ASSOCIATED WITH ADDITIONAL STATION VISITATION FOR 2020–2021—Continued

[Thousands, 2019 dollars]

| Station/county(ies) | Retail trade in 2012 [1] | Estimated maximum addition from new activities | Addition as percent of total | Establishments in 2012 [1] | Establishments with fewer than 10 employees in 2012 [1] |
|---|---|---|---|---|---|
| Lincoln, WY | 201,089 | 1.2 | <0.01 | 79 | 54 |
| Crab Orchard: | | | | | |
| Williamson, IL | 1,243,002 | 0.2 | <0.01 | 271 | 185 |
| Union, IL | 186,073 | 0.2 | <0.01 | 64 | 47 |
| Jackson, IL | 1,122,791 | 0.2 | <0.01 | 225 | 143 |
| Crescent Lake: | | | | | |
| Garden, NE | 13,232 | 27.4 | 0.21 | 12 | 8 |
| Dahomey: | | | | | |
| Bolivar, MS | 413,290 | 5.7 | <0.01 | 161 | 120 |
| Deer Flat: | | | | | |
| Canyon, ID | 2,393,412 | 2.1 | <0.01 | 485 | 351 |
| Malheur, OR | 595,184 | 2.1 | <0.01 | 120 | 78 |
| Dwight D. Eisenhower NFH: | | | | | |
| Rutland, VT | 1,205,694 | 12.6 | <0.01 | 411 | 303 |
| Eufaula: | | | | | |
| Quitman, GA | 13,494 | <0.1 | <0.01 | 10 | 10 |
| Stewart, GA | 19,042 | <0.1 | <0.01 | 15 | 15 |
| Barbour, AL | 229,916 | <0.1 | <0.01 | 94 | 77 |
| Russell, AL | 556,440 | <0.1 | <0.01 | 155 | 120 |
| Everglades Headwater: | | | | | |
| Polk, FL | 7,232,622 | 8.7 | <0.01 | 1,756 | 1,317 |
| Okeechobee, FL | 565,749 | 8.7 | <0.01 | 157 | 120 |
| Fallon: | | | | | |
| Churchill, NV | 261,819 | 129.2 | 0.05 | 69 | 50 |
| Fish Springs: | | | | | |
| Juab, UT | 127,530 | 0.7 | <0.01 | 33 | 23 |
| Flint Hills: | | | | | |
| Coffey, KS | 123,995 | 0.8 | <0.01 | 50 | 35 |
| Lyon, KS | 549,988 | 0.8 | <0.01 | 162 | 121 |
| Fort Niobrara: | | | | | |
| Cherry, NE | 97,237 | 2.0 | <0.01 | 38 | 27 |
| Great Meadows: | | | | | |
| Middlesex, MA | 23,767,638 | 5.9 | <0.01 | 5,156 | 3,594 |
| Great River: | | | | | |
| Pike, IL | 194,031 | 0.6 | <0.01 | 53 | 36 |
| Clark, MO | 130,470 | 0.6 | <0.01 | 36 | 28 |
| Shelby, MO | 65,630 | 0.6 | <0.01 | 35 | 25 |
| Hart Mountain: | | | | | |
| Lake, OR | 83,366 | 3.3 | <0.01 | 30 | 22 |
| Horicon: | | | | | |
| Dodge, WI | 927,521 | 1.8 | <0.01 | 234 | 159 |
| Fond du Lac, WI | 1,561,559 | 1.8 | <0.01 | 354 | 225 |
| Hutton Lake: | | | | | |
| Albany, WY | 533,993 | 3.3 | <0.01 | 141 | 103 |
| Iroquois: | | | | | |
| Genesee, NY | 874,965 | 2.7 | <0.01 | 219 | 163 |
| Orleans, NY | 281,049 | 2.7 | <0.01 | 95 | 65 |
| John W. and Louise Seier: | | | | | |
| Rock, NE | 7,556 | 6.7 | 0.09 | 7 | 5 |
| John H. Chafee: | | | | | |
| Washington, RI | 1,865,967 | 17.7 | <0.01 | 548 | 394 |
| Jordan River NFH: | | | | | |
| Antrim, MI | 188,903 | 0.6 | <0.01 | 88 | 77 |
| Kirwin: | | | | | |
| Phillips, KS | 57,317 | 8.2 | 0.01 | 35 | 27 |
| Kootenai: | | | | | |
| Boundary, ID | 111,427 | 1.7 | <0.01 | 47 | 37 |
| LaCreek: | | | | | |
| Bennett, SD | 36,017 | 9.1 | 0.03 | 15 | 9 |
| Laguna Atascosa: | | | | | |
| Cameron, TX | 4,593,067 | 2.5 | <0.01 | 1,119 | 758 |
| Lamar NFH: | | | | | |
| Clinton, PA | 648,726 | 12.6 | <0.01 | 121 | 82 |
| Lee Metcalf: | | | | | |
| Ravalli, MT | 368,170 | 2.0 | <0.01 | 166 | 124 |
| Leslie Canyon: | | | | | |
| Cochise, AZ | 1,411,126 | 3.9 | <0.01 | 408 | 301 |

Table 3—Comparative Expenditures for Retail Trade Associated With Additional Station Visitation for 2020–2021—Continued

[Thousands, 2019 dollars]

| Station/county(ies) | Retail trade in 2012 [1] | Estimated maximum addition from new activities | Addition as percent of total | Establishments in 2012 [1] | Establishments with fewer than 10 employees in 2012 [1] |
|---|---|---|---|---|---|
| Little White Salmon NFH: | | | | | |
| Skamania, WA .................................... | 28,090 | 1.7 | 0.01 | 21 | 18 |
| Lower Rio Grande Valley: | | | | | |
| Willacy, TX ........................................ | 131,872 | 0.5 | <0.01 | 32 | 24 |
| Hidalgo, TX ....................................... | 175,611 | 0.5 | <0.01 | 26 | 20 |
| Starr, TX ............................................ | 484,809 | 0.5 | <0.01 | 135 | 98 |
| Marais des Cygnes: | | | | | |
| Linn, KS ............................................ | 59,571 | 0.8 | <0.01 | 35 | 25 |
| Mattamuskeet: | | | | | |
| Hyde, NC ........................................... | 33,868 | 2.1 | 0.01 | 36 | 35 |
| Merced: | | | | | |
| Merced, CA ........................................ | 2,181,912 | 1.7 | <0.01 | 528 | 348 |
| Middle Mississippi River: | | | | | |
| Monroe, IL ......................................... | 536,378 | 0.4 | <0.01 | 96 | 72 |
| Randolph, IL ...................................... | 415,738 | 0.4 | <0.01 | 100 | 62 |
| Jefferson, MO .................................... | 435,265 | 0.4 | <0.01 | 128 | 92 |
| Minidoka: | | | | | |
| Power, ID ........................................... | 32,991 | 0.8 | <0.01 | 16 | 13 |
| Cassia, ID .......................................... | 360,659 | 0.8 | <0.01 | 116 | 89 |
| Blaine, ID .......................................... | 332,491 | 0.8 | <0.01 | 183 | 153 |
| Minidoka, ID ...................................... | 175,875 | 0.8 | <0.01 | 62 | 47 |
| Montezuma: | | | | | |
| Cayuga, NY ....................................... | 973,987 | 2.3 | <0.01 | 260 | 195 |
| Seneca, NY ....................................... | 545,489 | 2.3 | <0.01 | 183 | 114 |
| Wayne, NY ......................................... | 915,984 | 2.3 | <0.01 | 267 | 181 |
| Muscatatuck: | | | | | |
| Jackson, IN ........................................ | 660,019 | 0.9 | <0.01 | 183 | 140 |
| Jennings, IN ...................................... | 219,265 | 0.9 | <0.01 | 66 | 58 |
| Nestucca Bay: | | | | | |
| Lincoln, OR ....................................... | 646,693 | 1.1 | <0.01 | 307 | 251 |
| Ninigret: | | | | | |
| Washington, RI .................................. | 1,865,967 | 1.5 | <0.01 | 548 | 394 |
| North Platte: | | | | | |
| Scotts Bluff, NE ................................ | D | 0.9 | D | 178 | 128 |
| Northern Tallgrass Prairie: | | | | | |
| Pipestone, MN ................................... | 150,875 | 1.0 | <0.01 | 52 | 40 |
| Pope, MN ........................................... | 154,224 | 1.0 | <0.01 | 41 | 32 |
| Swift, MN ........................................... | 104,292 | 1.0 | <0.01 | 45 | 32 |
| Ottawa: | | | | | |
| Ottawa, OH ........................................ | 476,239 | 0.7 | <0.01 | 144 | 109 |
| Oxbow: | | | | | |
| Middlesex, MA ................................... | 23,767,638 | 3.4 | <0.01 | 5,156 | 3,594 |
| Worcester, MA ................................... | 12,155,780 | 3.4 | <0.01 | 2,572 | 1,788 |
| Pahranagat: | | | | | |
| Lincoln, NV ........................................ | D | 3.3 | D | 16 | 6 |
| Pathfinder: | | | | | |
| Natrona, WY ...................................... | 1,656,388 | 0.3 | <0.01 | 363 | 262 |
| Carbon, WY ....................................... | 340,129 | 0.3 | <0.01 | 86 | 73 |
| Patoka River: | | | | | |
| Pike, IN ............................................. | 80,767 | 1.7 | <0.01 | 31 | 23 |
| Gibson, IN ......................................... | 620,865 | 1.7 | <0.01 | 120 | 84 |
| Quivira: | | | | | |
| Stafford, KS ...................................... | 38,722 | 4.7 | 0.01 | 17 | 13 |
| Rice, KS ............................................ | 55,698 | 4.7 | 0.01 | 39 | 31 |
| Reno, KS ........................................... | 911,013 | 4.7 | <0.01 | 265 | 194 |
| Rydell: | | | | | |
| Polk, MN ............................................ | 369,241 | 3.7 | <0.01 | 109 | 74 |
| Sachuest Point: | | | | | |
| Newport, RI ........................................ | 1,243,192 | 1.0 | <0.01 | 430 | 332 |
| San Diego Bay: | | | | | |
| San Diego, CA ................................... | 44,302,582 | 12.6 | <0.01 | 9,219 | 6,314 |
| San Luis: | | | | | |
| Merced, CA ........................................ | 2,181,912 | 1.7 | <0.01 | 528 | 348 |
| Savannah: | | | | | |
| Chatham, GA ..................................... | 4,739,604 | 13.8 | <0.01 | 1,198 | 851 |
| Effingham, GA ................................... | 399,251 | 13.8 | <0.01 | 108 | 79 |
| Jasper, SC ......................................... | 640,060 | 13.8 | <0.01 | 104 | 80 |

Table 3—Comparative Expenditures for Retail Trade Associated With Additional Station Visitation for 2020–2021—Continued

[Thousands, 2019 dollars]

| Station/county(ies) | Retail trade in 2012[1] | Estimated maximum addition from new activities | Addition as percent of total | Establishments in 2012[1] | Establishments with fewer than 10 employees in 2012[1] |
|---|---|---|---|---|---|
| Seatuck: | | | | | |
| Suffolk, NY .......................................... | 26,383,026 | 3.0 | <0.01 | 6,524 | 3,904 |
| Spring Creek NFH: | | | | | |
| Skamania, WA ..................................... | 28,090 | 0.3 | <0.01 | 21 | 18 |
| Klickitat, WA ........................................ | 71,785 | 0.3 | <0.01 | 47 | 36 |
| St. Marks: | | | | | |
| Wakulla, FL .......................................... | 186,734 | 5.8 | <0.01 | 62 | 49 |
| Jefferson, FL ....................................... | 98,784 | 5.8 | 0.01 | 43 | 35 |
| Taylor, FL ............................................ | 230,580 | 5.8 | <0.01 | 86 | 67 |
| St. Vincent: | | | | | |
| Franklin, FL .......................................... | 108,995 | 10.0 | 0.01 | 67 | 52 |
| Stewart B. McKinney: | | | | | |
| Fairfield, CT ......................................... | 16,888,208 | 2.9 | <0.01 | 3,459 | 2,453 |
| New Haven, CT .................................... | 12,880,670 | 2.9 | <0.01 | 2,901 | 2,015 |
| Middlesex, CT ...................................... | 2,452,586 | 2.9 | <0.01 | 659 | 455 |
| Stillwater: | | | | | |
| Churchill, NV ....................................... | 261,819 | 2.1 | <0.01 | 69 | 50 |
| Swan River: | | | | | |
| Lake, MT .............................................. | 66,984 | 0.5 | <0.01 | 30 | 23 |
| Swanquarter: | | | | | |
| Hyde, NC ............................................. | 33,868 | 2.5 | 0.01 | 36 | 35 |
| Tallahatchie: | | | | | |
| Tallahatchie, MS .................................. | 60,260 | 2.9 | <0.01 | 40 | 36 |
| Grenada, MS ....................................... | 462,248 | 2.9 | <0.01 | 120 | 90 |
| Tennessee: | | | | | |
| Henry, TN ............................................ | 545,041 | 2.2 | <0.01 | 139 | 98 |
| Benton, TN .......................................... | 167,976 | 2.2 | <0.01 | 59 | 47 |
| Decatur, TN ......................................... | 85,132 | 2.2 | <0.01 | 45 | 35 |
| Hunphreys, TN ..................................... | 206,806 | 2.2 | <0.01 | 65 | 54 |
| Tensas: | | | | | |
| Madison, LA ......................................... | 176,886 | 0.1 | <0.01 | 38 | 27 |
| Richland, LA ........................................ | 278,783 | 0.1 | <0.01 | 65 | 49 |
| Franklin, LA ......................................... | 279,412 | 0.1 | <0.01 | 78 | 55 |
| Tensas, LA .......................................... | 30,800 | 0.1 | <0.01 | 15 | 14 |
| Tishomingo: | | | | | |
| Johnston, OK ....................................... | 68,010 | 9.1 | 0.01 | 35 | 31 |
| Marshall, OK ........................................ | 177,989 | 9.1 | 0.01 | 53 | 42 |
| Turnbull: | | | | | |
| Spokane, WA ....................................... | 7,305,612 | 4.0 | <0.01 | 1,617 | 1,108 |
| Two Rivers: | | | | | |
| Jersey, IL ............................................. | 256,816 | 1.3 | <0.01 | 69 | 49 |
| Calhoun, IL .......................................... | 30,438 | 1.3 | <0.01 | 15 | 9 |
| Greene, IL ........................................... | 139,806 | 1.3 | <0.01 | 49 | 32 |
| St. Charlies, MO .................................. | 5,536,064 | 1.3 | <0.01 | 1,085 | 695 |
| Umbagog: | | | | | |
| Oxford, ME .......................................... | 680,802 | 6.3 | <0.01 | 222 | 163 |
| Coos, NH ............................................. | 630,944 | 6.3 | <0.01 | 184 | 143 |
| Union Slough: | | | | | |
| Kossuth, IA .......................................... | 274,837 | 0.5 | <0.01 | 93 | 69 |
| Valentine: | | | | | |
| Cherry, NE ........................................... | 97,237 | 25.0 | 0.03 | 38 | 27 |
| Wapato Lake: | | | | | |
| Washington, OR ................................... | 9,342,147 | 38.3 | <0.01 | 1,573 | 1,002 |
| Yamhill, OR ......................................... | 987,290 | 38.3 | <0.01 | 283 | 201 |
| Wertheim: | | | | | |
| Suffolk, NY .......................................... | 26,383,026 | 2.7 | <0.01 | 6,524 | 3,904 |
| Willapa: | | | | | |
| Pacific, WA .......................................... | 120,098 | 16.4 | 0.01 | 89 | 68 |

[1] U.S. Census Bureau. "D" denotes sample size too small to report data.

With the small change in overall spending stemming from this rule, it is unlikely that a substantial number of small entities will have more than a small impact from the spending change near the affected stations. Therefore, we certify that this final rule will not have a significant economic effect on a substantial number of small entities as defined under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*). A regulatory flexibility analysis is not required.

Accordingly, a small entity compliance guide is not required.

*Small Business Regulatory Enforcement Fairness Act*

This final rule is not a major rule under 5 U.S.C. 804(2), the Small Business Regulatory Enforcement Fairness Act. We anticipate no significant employment or small business effects. This rule:

a. Will not have an annual effect on the economy of $100 million or more. The minimal impact will be scattered across the country and will most likely not be significant in any local area.

b. Will not cause a major increase in costs or prices for consumers; individual industries; Federal, State, or local government agencies; or geographic regions. This final rule will have only a slight effect on the costs of hunting opportunities for Americans. If the substitute sites are farther from the participants' residences, then an increase in travel costs will occur. The Service does not have information to quantify this change in travel cost but assumes that, since most people travel less than 100 miles to hunt, the increased travel cost will be small. We do not expect this rule to affect the supply or demand for hunting opportunities in the United States, and, therefore, it should not affect prices for hunting equipment and supplies, or the retailers that sell equipment.

c. Will not have significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of U.S.-based enterprises to compete with foreign-based enterprises. This rule represents only a small proportion of recreational spending at NWRs. Therefore, this final rule will have no measurable economic effect on the wildlife-dependent industry, which has annual sales of equipment and travel expenditures of $72 billion nationwide.

*Unfunded Mandates Reform Act*

Since this rule applies to public use of federally owned and managed refuges, it will not impose an unfunded mandate on State, local, or Tribal governments or the private sector of more than $100 million per year. The final rule does not have a significant or unique effect on State, local, or Tribal governments or the private sector. A statement containing the information required by the Unfunded Mandates Reform Act (2 U.S.C. 1531 *et seq.*) is not required.

*Takings (E.O. 12630)*

In accordance with E.O. 12630, this rule does not have significant takings

implications. This final rule affects only visitors at NWRs and NFHs, and describes what they can do while they are on a Service station.

*Federalism (E.O. 13132)*

As discussed under *Regulatory Planning and Review* and *Unfunded Mandates Reform Act*, above, this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement under E.O. 13132. In preparing this rule, we worked with State governments.

*Civil Justice Reform (E.O. 12988)*

In accordance with E.O. 12988, the Department of the Interior has determined that this rule does not unduly burden the judicial system and that it meets the requirements of sections 3(a) and 3(b)(2) of the Order.

*Energy Supply, Distribution or Use (E.O. 13211)*

On May 18, 2001, the President issued E.O. 13211 on regulations that significantly affect energy supply, distribution, and use. E.O. 13211 requires agencies to prepare Statements of Energy Effects when undertaking certain actions. Because this final rule adds 8 NWRs and 41 limited-easement NWRs to the list of refuges open to hunting and sport fishing, opens or expands hunting or sport fishing at 89 other NWRs, and opens 9 NFHs to hunting and/or sport fishing, it is not a significant regulatory action under E.O. 12866, and we do not expect it to significantly affect energy supplies, distribution, or use. Therefore, this action is not a significant energy action, and no Statement of Energy Effects is required.

*Consultation and Coordination With Indian Tribal Governments (E.O. 13175)*

In accordance with E.O. 13175, we have evaluated possible effects on federally recognized Indian tribes and have determined that there are no effects. We coordinate recreational use on NWRs and NFHs with Tribal governments having adjoining or overlapping jurisdiction before we finalize the regulations.

*Paperwork Reduction Act (PRA)*

This final rule does not contain any new collections of information that require approval by the Office of Management and Budget (OMB). All information collections require approval under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*). We may not conduct or sponsor and you are not required to respond to a collection of

information unless it displays a currently valid OMB control number. The OMB has reviewed and approved the information collection requirements associated with hunting and sport fishing activities across the National Wildlife Refuge System and assigned the following OMB control numbers:

• 1018–0140, "Hunting and Sport Fishing Application Forms and Activity Reports for National Wildlife Refuges, 50 CFR 25.41, 25.43, 25.51, 26.32, 26.33, 27.42, 30.11, 31.15, 32.1 to 32.72" (Expires 07/30/2021),

• 1018–0102, "National Wildlife Refuge Special Use Permit Applications and Reports, 50 CFR 25, 26, 27, 29, 30, 31, 32, & 36" (Expires 08/31/2020),

• 1018–0135, "Electronic Federal Duck Stamp Program" (Expires 01/31/2023),

• 1018–0093, "Federal Fish and Wildlife Permit Applications and Reports—Management Authority; 50 CFR 13, 15, 16, 17, 18, 22, 23" (Expires 08/31/2020), and

• 1024–0252, "The Interagency Access Pass and Senior Pass Application Processes" (Expires 08/31/2020).

*Endangered Species Act Section 7 Consultation*

We comply with section 7 of the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*), when developing CCPs and step-down management plans—which would include hunting and/or fishing plans—for public use of refuges and hatcheries, and prior to implementing any new or revised public recreation program on a station as identified in 50 CFR 26.32. We have completed section 7 consultation on each of the affected stations.

*National Environmental Policy Act*

We analyzed this rule in accordance with the criteria of the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4332(C)), 43 CFR part 46, and 516 Departmental Manual (DM) 8.

A categorical exclusion from NEPA documentation applies to publication of amendments to station-specific hunting and fishing regulations because they are technical and procedural in nature, and the environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis (43 CFR 46.210 and 516 DM 8). Concerning the actions that are the subject of this rulemaking, we have complied with NEPA at the project level when developing each station's regulatory changes. This is consistent with the Department of the Interior instructions

for compliance with NEPA where actions are covered sufficiently by an earlier environmental document (43 CFR 46.120).

Prior to the addition of a refuge or hatchery to the list of areas open to hunting and fishing in 50 CFR parts 32 and 71, we develop hunting and fishing plans for the affected stations. We incorporate these proposed station hunting and fishing activities in the station CCP and/or other step-down management plans, pursuant to our refuge planning guidance in 602 Fish and Wildlife Service Manual (FW) 1, 3, and 4. We prepare these CCPs and step-down plans in compliance with section 102(2)(C) of NEPA, the Council on Environmental Quality's regulations for implementing NEPA in 40 CFR parts 1500 through 1508, and the Department of Interior's NEPA regulations 43 CFR part 46. We invited the affected public to participate in the review, development, and implementation of these plans. Copies of all plans and NEPA compliance are available from the stations at the addresses provided below.

**Available Information for Specific Stations**

Individual refuge and hatchery headquarters have information about public use programs and conditions that apply to their specific programs and maps of their respective areas. We have also created the following website to house all NEPA documents for the openings and expansions in this rule from each refuge: *https://www.fws.gov/ refuges/hunting/rules-regulations-and- improved-access/*. To find out how to contact a specific refuge or hatchery, contact the appropriate Service office for the States listed below:

Hawaii, Idaho, Oregon, and Washington. Regional Chief, National Wildlife Refuge System, U.S. Fish and Wildlife Service, Eastside Federal Complex, Suite 1692, 911 NE 11th Avenue, Portland, OR 97232–4181; Telephone (503) 231–6214.

Arizona, New Mexico, Oklahoma, and Texas. Regional Chief, National Wildlife Refuge System, U.S. Fish and Wildlife Service, P.O. Box 1306, 500 Gold Avenue SW, Albuquerque, NM 87103; Telephone (505) 248–6937.

Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, Ohio, and Wisconsin. Regional Chief, National Wildlife Refuge System, U.S. Fish and Wildlife Service, 5600 American Blvd. West, Suite 990, Bloomington, MN 55437–1458; Telephone (612) 713–5360.

Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee, Puerto Rico, and the Virgin Islands. Regional Chief, National Wildlife Refuge System, U.S. Fish and Wildlife Service, 1875 Century Boulevard, Atlanta, GA 30345; Telephone (404) 679–7166.

Connecticut, Delaware, District of Columbia, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont, Virginia, and West Virginia. Regional Chief, National Wildlife Refuge System, U.S. Fish and Wildlife Service, 300 Westgate Center Drive, Hadley, MA 01035–9589; Telephone (413) 253– 8307.

Colorado, Kansas, Montana, Nebraska, North Dakota, South Dakota, Utah, and Wyoming. Regional Chief, National Wildlife Refuge System, U.S. Fish and Wildlife Service, 134 Union Blvd., Lakewood, CO 80228; Telephone (303) 236–8145.

Alaska. Regional Chief, National Wildlife Refuge System, U.S. Fish and Wildlife Service, 1011 E. Tudor Rd., Anchorage, AK 99503; Telephone (907) 786–3545.

California and Nevada. Regional Chief, National Wildlife Refuge System, U.S. Fish and Wildlife Service, 2800 Cottage Way, Room W–2606, Sacramento, CA 95825; Telephone (916) 414–6464.

**Primary Author**

Katherine Harrigan, Division of Natural Resources and Conservation Planning, National Wildlife Refuge System, is the primary author of this rulemaking document.

**List of Subjects**

*50 CFR Part 32*

Fishing, Hunting, Reporting and recordkeeping requirements, Wildlife, Wildlife refuges.

*50 CFR Part 36*

Alaska, Recreation and recreation areas, Reporting and recordkeeping requirements, Wildlife refuges.

*50 CFR Part 71*

Fish, Fishing, Hunting, Wildlife.

**Regulation Promulgation**

For the reasons set forth in the preamble, we amend title 50, chapter I, subchapters C and E of the Code of Federal Regulations as follows:

**Subchapter C—The National Wildlife Refuge System**

**PART 32—HUNTING AND FISHING**

■ 1. The authority citation for part 32 continues to read as follows:

**Authority:** 5 U.S.C. 301; 16 U.S.C. 460k, 664, 668dd–668ee, and 715i; Pub. L. 115–20, 131 Stat. 86.

■ 2. Amend § 32.7 by:
■ a. Redesignating paragraph (c)(8) as paragraph (c)(9) and adding a new paragraph (c)(8);
■ b. Redesignating paragraphs (e)(17) through (22) as paragraphs (e)(18) through (23) and adding a new paragraph (e)(17);
■ c. Redesignating paragraphs (i)(5) through (14) as paragraphs (i)(6) through (15) and adding a new paragraph (i)(5);
■ d. Redesignating paragraphs (aa)(4) through (6) as paragraphs (aa)(5) through (7) and adding a new paragraph (aa)(4);
■ e. Redesignating paragraphs (bb)(3) through (6) as paragraphs (bb)(4) through (7) and adding a new paragraph (bb)(3);
■ f. Revising paragraph (hh);
■ g. Redesignating paragraph (kk)(20) as paragraph (kk)(21) and adding a new paragraph (kk)(20);
■ h. Redesignating paragraphs (mm)(2) through (4) as paragraphs (mm)(3) through (5) and adding a new paragraph (mm)(2); and
■ i. Redesignating paragraphs (xx)(1) through (5) as paragraphs (xx)(2) through (6) and adding a new paragraph (xx)(1).

The additions and revision read as follows:

**§ 32.7 What refuge units are open to hunting and/or sport fishing?**

\* \* \* \* \*

(c) \* \* \*

(8) Leslie Canyon National Wildlife Refuge.

\* \* \* \* \*

(e) \* \* \*

(17) San Diego Bay National Wildlife Refuge.

\* \* \* \* \*

(i) \* \* \*

(5) Everglades Headwaters National Wildlife Refuge.

\* \* \* \* \*

(aa) \* \* \*

(4) John W. and Louise Seier National Wildlife Refuge.

\* \* \* \* \*

(bb) \* \* \*

(3) Fallon National Wildlife Refuge.

\* \* \* \* \*

(hh) *North Dakota.* (1) Appert Lake National Wildlife Refuge.

(2) Ardoch National Wildlife Refuge.

(3) Arrowwood National Wildlife Refuge.

(4) Arrowwood Wetland Management District.

(5) Audubon National Wildlife Refuge.

(6) Audubon Wetland Management District.

(7) Bone Hill National Wildlife Refuge.

(8) Brumba National Wildlife Refuge.

(9) Buffalo Lake National Wildlife Refuge.

(10) Camp Lake National Wildlife Refuge.

(11) Canefield Lake National Wildlife Refuge.

(12) Chase Lake National Wildlife Refuge.

(13) Chase Lake Wetland Management District.

(14) Cottonwood Lake National Wildlife Refuge.

(15) Crosby Wetland Management District.

(16) Dakota Lake National Wildlife Refuge.

(17) Des Lacs National Wildlife Refuge.

(18) Devils Lake Wetland Management District.

(19) Half Way Lake National Wildlife Refuge.

(20) Hiddenwood Lake National Wildlife Refuge.

(21) Hobart Lake National Wildlife Refuge.

(22) Hutchinson Lake National Wildlife Refuge.

(23) J. Clark Salyer National Wildlife Refuge.

(24) J. Clark Salyer Wetland Management District.

(25) Johnson Lake National Wildlife Refuge.

(26) Kulm Wetland Management District.

(27) Lake Alice National Wildlife Refuge.

(28) Lake George National Wildlife Refuge.

(29) Lake Ilo National Wildlife Refuge.

(30) Lake National Wildlife Refuge.

(31) Lake Nettie National Wildlife Refuge.

(32) Lake Otis National Wildlife Refuge.

(33) Lake Patricia National Wildlife Refuge.

(34) Lake Zahl National Wildlife Refuge.

(35) Lambs Lake National Wildlife Refuge.

(36) Little Goose Lake National Wildlife Refuge.

(37) Long Lake National Wildlife Refuge.

(38) Long Lake Wetland Management District.

(39) Lords Lake National Wildlife Refuge.

(40) Lost Lake National Wildlife Refuge.

(41) Lostwood National Wildlife Refuge.

(42) Lostwood Wetland Management District.

(43) Maple River National Wildlife Refuge.

(44) Pleasant Lake National Wildlife Refuge.

(45) Pretty Rock National Wildlife Refuge.

(46) Rabb Lake National Wildlife Refuge.

(47) Rock Lake National Wildlife Refuge.

(48) Rose Lake National Wildlife Refuge.

(49) School Section National Wildlife Refuge.

(50) Sheyenne Lake National Wildlife Refuge.

(51) Sibley Lake National Wildlife Refuge.

(52) Silver Lake National Wildlife Refuge.

(53) Slade National Wildlife Refuge.

(54) Snyder Lake National Wildlife Refuge.

(55) Springwater National Wildlife Refuge.

(56) Stewart Lake National Wildlife Refuge.

(57) Stoney Slough National Wildlife Refuge.

(58) Storm Lake National Wildlife Refuge.

(59) Sunburst Lake National Wildlife Refuge.

(60) Tewaukon National Wildlife Refuge.

(61) Tewaukon Wetland Management District.

(62) Tomahawk National Wildlife Refuge.

(63) Upper Souris National Wildlife Refuge.

(64) Wild Rice National Wildlife Refuge.

(65) Willow Lake National Wildlife Refuge.

(66) Wintering River National Wildlife Refuge.

(67) Wood Lake National Wildlife Refuge.

\*　　\*　　\*　　\*　　\*

(kk) \* \* \*

(20) Wapato Lake National Wildlife Refuge.

\*　　\*　　\*　　\*　　\*

(mm) \* \* \*

(2) John H. Chafee National Wildlife Refuge.

\*　　\*　　\*　　\*　　\*

(xx) \* \* \*

(1) Bamforth National Wildlife Refuge.

\*　　\*　　\*　　\*　　\*

■ 3. Amend § 32.22 by:
■ a. Revising paragraphs (b), (c), (d)(1) introductory text, (d)(1)(i), (d)(1)(iv), (d)(2)(i) and (ii), (d)(3), and (d)(4);
■ b. Redesignating paragraph (h) as paragraph (i); and
■ c. Adding a new paragraph (h).
The revisions and addition read as follows:

**§ 32.22 Arizona.**

\*　　\*　　\*　　\*　　\*

(b) *Buenos Aires National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of goose, duck, coot, merganser, moorhen (gallinule), common snipe, and mourning, white-winged, and Eurasian collared-dove on designated areas of the refuge subject to the following conditions:

(i) We allow portable or temporary blinds and stands, but you must remove them at the end of each day's hunt (see § 27.93 of this chapter).

(ii) We prohibit falconry.

(iii) We allow dogs only for the retrieval of birds.

(2) *Upland game hunting.* We allow hunting of black-tailed and antelope jackrabbit; cottontail rabbit; badger; bobcat; coati; kit and gray fox; raccoon; ringtail; coyote; and hog-nosed, hooded, spotted, and striped skunk on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (b)(1)(i) through (iii) of this section apply.

(ii) We prohibit night hunting from ½ hour after legal sunset until ½ hour before legal sunrise the following day.

(3) *Big game hunting.* We allow hunting of mule and white-tailed deer, javelina, mountain lion, and feral hog on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (b)(1)(i) and (b)(2)(ii) of this section apply.

(ii) We prohibit the use of dogs when hunting big game.

(4) [Reserved]

(c) *Cabeza Prieta National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of mourning dove on designated areas of the refuge subject to the following conditions:

(i) We require hunters to obtain a Barry M. Goldwater Range Entry Permit (Department of Defense form/requirement) from the refuge.

(ii) We prohibit falconry.

(iii) We allow dogs only for the pointing and retrieval of birds.

(iv) We allow hunting only during the late season dove hunt.

(2) *Upland game hunting.* We allow hunting of Gambel's quail, Eurasian

collared-dove, desert cottontail rabbit, antelope and black-tailed jackrabbit, coyote, bobcat, and fox in designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (c)(1)(i) through (iii) of this section apply.

(ii) We do not allow wheeled carts in designated Wilderness.

(iii) We prohibit night hunting from ½ hour after legal sunset until ½ hour before legal sunrise the following day.

(3)*Big game hunting.*We allow hunting of desert bighorn sheep, mule deer, and mountain lion on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (c)(1)(i) and (c)(2)(ii) of this section apply.

(ii) We require Special Use Permits for all hunters (FWS Form 3–1383–G), guides (FWS Form 3–1383–C), and stock animals (FWS Form 3–1383–G).

(iii) We prohibit the use of dogs when hunting big game.

(4) [Reserved]

(d) * * *

(1)*Migratory game bird hunting.*We allow hunting of goose, duck, coot, moorhen (gallinule), common snipe, mourning and white-winged dove, and Eurasian collared-dove on designated areas of the refuge subject to the following conditions:

(i) We allow only shotgun and archery.

* * * * *

(iv) The Hart Mine Marsh area is open to entry from 10 a.m. to 3 p.m. from October 1 through March 14.

* * * * *

(2) * * *

(i) For cottontail rabbit, we allow only shotgun, archery, handgun, rifle, and muzzleloader.

(ii) For quail, we allow only shotgun, archery, and handgun shooting shot.

* * * * *

(3) *Big game hunting.* We allow hunting of mule deer on designated areas of the refuge subject to the following condition: We allow rifle, shotgun, handgun, muzzleloader, and archery, except for archery-only hunts.

(4) *Sport fishing.* We allow sport fishing and frogging subject to the following condition: Cibola Lake is open to fishing and frogging from March 15 through September 30.

* * * * *

(h) *Leslie Canyon National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of mourning, white-winged, and Eurasian collared-dove on designated areas of the refuge subject to the following conditions:

(i) We prohibit falconry.

(ii) We prohibit the use of dogs.

(iii) We prohibit pneumatic weapons.

(2) *Upland game hunting.* We allow hunting of Gambel's and scaled quail; cottontail; black-tailed jackrabbit; gray fox; coati; badger; striped, hooded, spotted, and hog-nosed skunk; bobcat; raccoon; ring-tailed cat; and coyote on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (h)(1)(i) through (iii) of this section apply.

(ii) We prohibit night hunting.

(iii) We will allow hunting of these upland game species only when the State season dates overlap with a general or archery State deer and/or javelina hunt season.

(3) *Big game hunting.* We allow hunting of mule deer, white-tailed deer, javelina, and black bear on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (h)(2)(i) and (ii) of this section apply.

(ii) We will allow hunting of black bear only when the State season dates overlap with a general or archery State deer and/or javelina hunt season.

(4) [Reserved]

* * * * *

■ 4. Amend § 32.23 by revising paragraphs (d)(1) introductory text, (d)(1)(ii), (v), and (vii), and (g)(1) introductory text to read as follows:

## § 32.23 Arkansas.

* * * * *

(d) * * *

(1) *Migratory game bird hunting.* We allow hunting of waterfowl (ducks, mergansers, and coots) on designated areas of the refuge subject to the following conditions:

* * * * *

(ii) We allow waterfowl hunting from legal shooting hours until 12 p.m. (noon).

* * * * *

(v) Waterfowl hunters may enter the North Unit, Jack's Bay Hunt Area, and Levee Hunt Area no earlier than 4 a.m.

* * * * *

(vii) We allow waterfowl hunting on outlying tracts; paragraph (d)(1)(v) of this section applies.

* * * * *

(g) * * *

(1) *Migratory game bird hunting.* We allow hunting of American woodcock, duck, goose, and coot on designated areas of the refuge subject to the following conditions:

* * * * *

■ 5. Amend § 32.24 by:

■ a. Revising paragraphs (l)(1) introductory text, (m)(1)(viii), and (m)(2)(i);

■ b. Redesignating paragraphs (q) through (v) as paragraphs (r) through (w);

■ c. Adding a new paragraph (q); and

■ d. Revising newly redesignated paragraphs (r)(1)(vii), (s)(2)(ii), and (v)(2)(ii).

The revisions and addition read as follows:

## § 32.24 California.

* * * * *

(l) * * *

(1) *Migratory game bird hunting.* We allow hunting of goose, duck, coot, snipe, and moorhen on designated areas of the refuge subject to the following conditions:

* * * * *

(m) * * *

(1) * * *

(viii) Hunters must enter and exit the hunting area from the three designated hunt parking lots, which we open 1½ hours before legal sunrise and close 1 hour after legal sunset each hunt day.

* * * * *

(2) * * *

(i) We limit hunting to junior hunters possessing a valid State Junior Hunting License and refuge Junior Pheasant Hunt Permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System).

* * * * *

(q) *San Diego Bay National Wildlife Refuge.* (1)–(3) [Reserved]

(4) *Sport fishing.* We allow sport fishing from boats and other flotation devices on designated areas of the refuge subject to the following condition: We prohibit shoreline fishing.

(r) * * *

(1) * * *

(vii) We prohibit the use of motorized boats and other flotation devices in the free-roam units with the exception of the Freitas Unit.

* * * * *

(s) * * *

(2) * * *

(ii) The conditions set forth at paragraphs (s)(1)(ii) and (iii) of this section apply.

* * * * *

(v) * * *

(2) * * *

(ii) The conditions set forth at paragraphs (v)(1)(i) through (viii) of this section apply.

* * * * *

■ 6. Amend § 32.25 by revising paragraph (a)(2), adding paragraph

(a)(4), and revising paragraphs (d)(3) and (e)(2) to read as follows:

### § 32.25  Colorado.

\* \* \* \* \*

(a) \* \* \*

(2) *Upland game hunting.* We allow hunting of cottontail rabbit, and black-tailed and white-tailed jackrabbit, on designated areas of the refuge subject to the following condition: The only acceptable methods of take are shotgun, rifle firing rimfire cartridges less than .23 caliber, hand-held bow, pellet gun, slingshot, and hawking/falconry.

\* \* \* \* \*

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following condition: We prohibit launching or removing any type of watercraft from the refuge on the Rio Grande or Chicago Ditch.

\* \* \* \* \*

(d) \* \* \*

(3) *Big game hunting.* We allow hunting of pronghorn antelope, moose, mule deer, and elk on designated areas of the refuge.

\* \* \* \* \*

(e) \* \* \*

(2) *Upland game hunting.* We allow hunting of cottontail rabbit, and black-tailed and white-tailed jackrabbit, on designated areas of the refuge subject to the following condition: The only acceptable methods of take are shotgun, rifle firing rimfire cartridges less than .23 caliber, hand-held bow, pellet gun, slingshot, and hawking/falconry.

\* \* \* \* \*

■ 7. Revise § 32.26 to read as follows:

### § 32.26  Connecticut.

The following refuge units are open for hunting and/or fishing as governed by applicable Federal and State regulations, and are listed in alphabetical order with additional refuge-specific regulations.

(a) *Silvio O. Conte National Fish and Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of migratory game birds on designated areas of the refuge subject to the following conditions:

(i) We allow refuge access 1½ hours prior to legal sunrise until 1½ hours after legal sunset.

(ii) We allow the use of dogs consistent with State regulations.

(2) *Upland game hunting.* We allow hunting of upland game on designated areas of the refuge subject to the following condition: The conditions set forth at paragraphs (a)(1)(i) and (ii) of this section apply.

(3) *Big game hunting.* We allow hunting of big game on designated areas

of the refuge subject to the following condition: The conditions set forth at paragraphs (a)(1)(i) and (ii) of this section apply.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) The condition set forth at paragraph (a)(1)(i) of this section applies.

(ii) We prohibit launching of motorboats from the refuge.

(iii) We prohibit the use of reptiles and amphibians as bait.

(b) *Stewart B. McKinney National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of duck, coot, merganser, brant, sea duck, and goose on designated areas of the refuge subject to the following conditions:

(i) For the Great Meadows unit, we will limit hunt days to Tuesdays, Wednesdays, and Saturdays during the regular duck, sea duck, and brant seasons.

(ii) We allow the use of dogs consistent with State regulations.

(iii) We allow the use of temporary tree stands and blinds, which must be removed at the end of each day's hunt (see § 27.93 of this chapter).

(2) [Reserved]

(3) *Big game hunting.* We allow archery hunting of white-tailed deer and wild turkey on designated areas of the refuge subject to the following condition: The condition set forth at paragraph (b)(1)(iii) of this section applies.

(4) [Reserved]

■ 8. Revise § 32.27 to read as follows:

### § 32.27  Delaware.

The following refuge units are open for hunting and/or fishing as governed by applicable Federal and State regulations and are listed in alphabetical order with additional refuge-specific regulations.

(a) *Bombay Hook National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of migratory game birds on designated areas of the refuge subject to the following conditions:

(i) We require a refuge permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) for waterfowl hunting.

(ii) You must complete and return a Migratory Bird Hunt Report (FWS Form 3–2361), available at the refuge administration office or on the refuge's website, within 15 days of the close of the season.

(iii) We allow the use of dogs consistent with State regulations.

(2) *Upland game hunting.* We allow hunting of grey squirrel, cottontail

rabbit, ring-necked pheasant, bobwhite quail, raccoon, opossum, coyote, and red fox on designated areas of the refuge subject to the following condition: The condition set forth at paragraph (a)(1)(iii) of this section applies.

(3) *Big game hunting.* We allow hunting of turkey and deer on designated areas of the refuge subject to the following conditions:

(i) We require a refuge permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System).

(ii) Hunting on the headquarters deer hunt area will be by lottery. You must obtain and possess a refuge permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) from the refuge office or website and have the permit in your possession while hunting.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following condition: We prohibit the use of lead fishing tackle on the refuge.

(b) *Prime Hook National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow the hunting of waterfowl, coot, mourning dove, snipe, and woodcock on designated areas of the refuge subject to the following conditions:

(i) You must obtain and possess a refuge permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) from the refuge office or website and have the permit in your possession while hunting.

(ii) You must complete and return a Migratory Bird Hunt Report (FWS Form 3–2361), available at the refuge administration office or on the refuge's website, within 15 days of the close of the season.

(iii) We allow State certified hunters with disabilities hunting privileges in the Disabled Waterfowl Draw Area subject to the following condition: We do not allow assistants to enter a designated disabled hunting area unless they are accompanied by a certified disabled hunter.

(iv) We allow the use of dogs consistent with State regulations.

(2) *Upland game hunting.* We allow hunting of rabbit, quail, pheasant, and red fox on designated areas of the refuge subject to the following condition: The conditions set forth at paragraphs (b)(1)(i) and (iv) of this section apply.

(3) *Big game hunting.* We allow hunting of white-tailed deer and turkey on designated areas of the refuge subject to the following conditions:

(i) We prohibit organized deer drives. We define a "deer drive" as an organized or planned effort to pursue, drive, chase, or otherwise frighten or

cause deer to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the deer.

(ii) Hunting on the headquarters deer hunt area will be by lottery.

(iii) The condition set forth at paragraph (b)(1)(i) of this section applies.

(4) *Sport fishing.* We allow sport fishing and crabbing on designated areas of the refuge subject to the following conditions:

(i) On Turkle and Fleetwood ponds, we allow boats only with electric trolling motors.

(ii) You must attend all crabbing and fishing gear at all times.

(iii) You must remove all personal property at the end of each day's fishing activity (see §§ 27.93 and 27.94 of this chapter).

■ 9. Amend § 32.28 by:
■ a. Revising paragraph (a);
■ b. Redesignating paragraphs (e) through (n) as paragraphs (f) through (o);
■ c. Adding a new paragraph (e);
■ d. Revising newly redesignated paragraphs (i)(2)(i) and (i)(3)(i);
■ e. In newly redesignated paragraph (j):
■ i. Revising paragraphs (j)(1)(ii) and (x);
■ ii. Adding paragraph (j)(1)(xi);
■ iii. Revising paragraphs (j)(3)(iv) through (viii) and (x);
■ iv. Removing paragraph (j)(3)(xiv);
■ v. Redesignating paragraphs (j)(3)(xv) through (xix) as paragraphs (j)(3)(xiv) through (xviii);
■ vi. Revising newly redesignated paragraphs (j)(3)(xv) and (j)(3)(xviii); and
■ f. Revising newly redesignated paragraphs (m)(2)(iii) and (vii), (m)(3) introductory text, (m)(3)(i), (ii), (iv), (viii) and (ix), and (n)(3)(vii).

The revisions and additions read as follows:

### § 32.28  Florida.

\* \* \* \* \*

(a) *Arthur R. Marshall Loxahatchee National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of duck and coot on designated areas of the refuge subject to the following conditions:

(i) You must possess and carry a signed current refuge hunt permit (signed brochure) while hunting. You must have on your person all applicable licenses and permits.

(ii) We prohibit hunting from all refuge structures, canals, and levees; within ½ mile of canoe trails, campsites, and boat ramps; and in areas posted as closed. We allow motorized vessels in the Motorized Zone, south of latitude line 26°27.130. We allow nonmotorized vessels in the Refuge

Interior. We allow only one motorized vessel per party.

(iii) Hunters may only enter and leave the refuge at designated entrances.

(iv) We allow only temporary blinds of native vegetation.

(v) Hunters must remove decoys and other personal property from the hunting area at the end of each day's hunt (see § 27.93 of this chapter).

(vi) Hunters may only use boats equipped with factory-manufactured, water-cooled outboard motors; boats with electric motors; and nonmotorized boats. We prohibit boats with air-cooled engines, fan boats, hovercraft, and personal watercraft (jet skis, jet boats, wave runners, etc.). We allow airboats by permit only (Special Use Permit (FWS Form 3–1383–G)). We will issue airboat permits through a separate lottery. There is a 35 miles per hour (mph) speed limit in all waters of the refuge. A 500-foot (150-meter) ''idle speed zone'' is at each of the refuge's three boat ramps.

(vii) Hunters operating boats in the Refuge Interior, outside of the perimeter canal, are required to display a 10-inches by 12-inches (25-centimeters by 30-centimeters) orange flag 10 feet (3 meters) above the vessel's waterline.

(viii) We will allow the use of airboats for a limited number of duck and coot hunters by permit (Special Use Permit (FWS Form 3–1383–G)) during Phase 2 of the State duck and coot season only. We will issue airboat permits through a separate lottery. Contact the Refuge headquarters for airboat permitting information.

(ix) Motorized vessels used while hunting must be stopped and shut off for 15 minutes prior to shooting. Permitted motorized vessels must be in place 1 hour before legal sunrise and not move until 1 hour after legal sunrise.

(x) All hunters must leave the hunt area once their bag/tag limit has been reached.

(xi) We prohibit unrestricted airboat travel not associated with hunting.

(xii) All hunters younger than age 18 must be supervised by a licensed and permitted adult age 21 or older, and must remain with the adult while hunting. Hunters younger than age 18 must have completed a hunter education course.

(xiii) No entry and/or limited activity buffer zones or closures may be created to protect endangered or threatened species and other species.

(xiv) Licenses, permits, equipment, and effects and vehicles, vessels, and other conveyances are subject to inspection by law enforcement officers.

(2) [Reserved]

(3) *Big game hunting.* We allow hunting of alligator, white-tailed deer, and feral hog on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (a)(1)(i) and (iii), (v) through (vii), and (x) and (xi) of this section apply.

(ii) We prohibit hunting from all refuge structures and levees; within ½ mile of canoe trails, campsites, and boat ramps; and in areas posted as closed. We allow motorized vessels in the Motorized Zone, south of latitude line 26°27.130. We allow alligator hunting in the Motorized Zone and perimeter canal south of latitude line 26°27.130. We allow nonmotorized vessels in the Refuge Interior. We allow only one motorized vessel per party.

(iii) We allow alligator hunting on the refuge 1 hour before legal sunset on Friday night through 1 hour after legal sunrise Saturday morning, and 1 hour before legal sunset on Saturday night through 1 hour after legal sunrise Sunday morning. We allow alligator hunting the first two weekends during Harvest Period 1 (August) and the first two weekends during Harvest Period 2 (September). Following the close of Harvest Period 2, the remaining weekends in October will be open for alligator harvest permittees who possess unused CITES tags (OMB Control No. 1018–0093). Specific dates for the alligator hunt are on the harvest permit issued by the State.

(iv) Alligator hunters age 18 and older must be in possession of all necessary State and Federal licenses, permits, and CITES tags, as well as a signed refuge hunt permit (signed brochure) while hunting on the refuge. They must possess an Alligator Trapping License with CITES tag or an Alligator Trapping Agent License (State-issued), if applicable.

(v) Persons younger than age 18 may not hunt but may only accompany an adult age 21 or older who possesses an Alligator Trapping Agent License (State-issued).

(vi) You may take alligators using hand-held snare, harpoon, gig, snatch hook, artificial lure, manually operated spear, spear gun, or crossbow. We prohibit the taking of alligators using baited hook, baited wooden peg, or firearm. We allow the use of bang sticks (a hand-held pole with a pistol or shotgun cartridge on the end in a very short barrel) with approved nontoxic ammunition (see § 32.2(k)) only for taking alligators attached to a restraining line. Once an alligator is captured, it must be killed immediately. We prohibit catch-and-release of alligators. Once the

alligator is dead, you must lock a CITES tag through the skin of the carcass within 6 inches (15.2 centimeters) of the tip of the tail. The tag must remain attached to the alligator at all times.

(vii) We allow the use of airboats for a limited number of alligator hunters by permit (Special Use Permit (FWS Form 3–1383–G)). Airboat permits will be issued through a separate lottery. Contact the refuge headquarters for airboat permitting information.

(viii) Alligators must remain in whole condition while on refuge lands.

(ix) We allow a limited quota permit for the taking of white-tailed deer and incidental take of feral hog in the Refuge Interior, by airboat (requires Special Use Permit (FWS Form 3–1383–G)) and nonmotorized vessels only. Airboat access will be for deer hunt permit holders only.

(x) White-tailed deer and feral hog hunters age 18 and older must be in possession of all necessary State and Federal licenses, permits, as well as a current refuge hunt permit (signed brochure) while hunting on the refuge.

(xi) We have limited quota and specialty hunts for the taking of white-tailed deer, and incidental take of feral hogs during the deer hunts on the Strazzulla Marsh and the Cypress Swamp.

(xii) Motorized vessels used while deer hunting must be stopped and shut off for 15 minutes prior to shooting. Permitted motorized vessels must be in place 1 hour before legal sunrise and not move until 1 hour after legal sunrise.

(xiii) We close the Refuge Interior to all other uses during the limited quota white-tailed deer hunt in the Refuge Interior.

(xiv) White-tailed deer hunters younger than age 18 must be supervised by a licensed and permitted adult age 21 or older, and must remain with the adult while hunting. Hunters younger than age 18 must have completed a hunter education course.

(xv) We prohibit the use of dogs for the take or attempt to take of white-tailed deer and feral hogs. We allow the use of dogs for blood trailing only.

(xvi) We require nontoxic ammunition (see § 32.2(k)) when deer hunting on the refuge.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) We allow fishing on all areas of the refuge, except those areas posted as closed to fishing or closed to the public.

(ii) Anglers may only use boats equipped with factory-manufactured-water-cooled outboard motors, boats with electric motors, and nonmotorized boats. We prohibit boats with air-cooled engines, fan boats, hovercraft, and personal watercraft (jet skis, jet boats, wave runners, etc.). We allow the use of airboats by permit only (Special Use Permit (FWS Form 3–1383–G)). Airboat permits will be issued through a separate lottery. Contact the refuge headquarters for airboat permitting information.

(iii) We allow motorized vessels in the Motorized Zone, south of latitude line 26°27.130, and perimeter canal. We allow only nonmotorized vessels in the Non Motorized Watercraft Zone, northern portion of Refuge Interior.

(iv) Anglers operating boats in the Refuge Interior, outside of the perimeter canal, are required to display a 10-inches by 12-inches (25 cm x 30 cm) orange flag 10-feet (3 meters) above the vessel's waterline.

(v) We only allow the use of rods and reels and poles and lines, and anglers must attend them at all times. We prohibit the possession or use of cast nets, seines, trot lines, jugs, and other fishing devices.

(vi) We allow frog gigging, bow fishing, and fish gigging in all areas open to sport fishing, except in the A, B, and C Impoundments and Strazzulla Marsh.

(vii) We prohibit frog gigging, bow fishing, and fish gigging from structures and from within ½ mile of refuge boat ramps, campsites, and canoe trails, and in areas posted as closed.

(viii) We allow the taking of frogs from July 16 through March 15 of each year.

(ix) The daily bag limit for frogs is 50 frogs per vessel or party.

(x) Fish and frogs must remain in whole condition while on refuge lands.

(xi) Frogs may only be taken by gig, blowgun, or hook and line, or by hand.

(xii) We limit frogging or fishing by airboat to nonhunting airboat permittees only.

(xiii) We prohibit commercial fishing, including unpermitted commercial guiding, and the taking of turtles and other wildlife (see § 27.21 of this chapter).

(xiv) We allow 17 fishing tournaments a year by Special Use Permit only (General Activities—Special Use Permit Application, FWS Form 3–1383–G).

*      *      *      *      *

(e) *Everglades Headwaters National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of migratory game birds on designated areas of the refuge in accordance with State regulations and applicable State Wildlife Management Area regulations.

(2) *Upland game hunting.* We allow upland game hunting on designated areas of the refuge in accordance with State regulations and applicable State Wildlife Management Area regulations.

(3) *Big game hunting.* We allow big game hunting on designated areas of the refuge in accordance with State regulations and applicable State Wildlife Management Area regulations.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge in accordance with State regulations and applicable State Wildlife Management Area regulations.

*      *      *      *      *

(i) * * *

(2) * * *

(i) The conditions set forth at paragraphs (i)(1)(i) through (viii) of this section apply.

*      *      *      *      *

(3) * * *

(i) The conditions set forth at paragraphs (i)(1)(i) through (viii) of this section apply.

*      *      *      *      *

(j) * * *

(1) * * *

(ii) You must carry (or hunt within 30 yards of a hunter who possesses) a valid State-issued Merritt Island Waterfowl Quota Permit, while hunting in areas 1 or 4 during the State's regular waterfowl season. The Waterfowl Quota Permit can be used for a single party consisting of the permit holder and up to three guests. The permit holder must be present. The Waterfowl Quota Permit is a limited entry quota permit, is zone-specific, and is nontransferable.

*      *      *      *      *

(x) You must stop at a posted refuge waterfowl check station and report statistical hunt information on the Migratory Bird Hunt Report (FWS Form 3–2361) to refuge personnel.

(xi) When inside the impoundment perimeter ditch, you may use gasoline or diesel motors. Outside the perimeter ditch, you must propel vessels by paddling, push pole, or electric trolling motor.

*      *      *      *      *

(3) * * *

(iv) We allow hunting within the State's deer season on specific days as defined by the refuge hunt brochure. Each hunt will be a 3-day weekend. Legal shooting hours are ½ hour before legal sunrise to ½ hour after legal sunset.

(v) Hunters possessing a valid permit (State-issued permit) may access the refuge no earlier than 4 a.m. and must leave the refuge no later than 2 hours after legal sunset. If you wish to track wounded game beyond 2 hours after legal sunset, you must gain consent from a Federal Wildlife Officer to do so.

(vi) We prohibit hunting from refuge roads or within 150 yards of roads open to public vehicle traffic or within 200 yards of a building or Kennedy Space Center facility.

(vii) Each permitted hunter may have one adult guest and one youth hunter per adult. All guests must remain within 30 yards of the permitted hunter. The party must share a single bag limit. Each adult may supervise one youth hunter and must remain within sight and normal voice contact.

(viii) You may set up stands or blinds up to 7 days prior to the permitted hunt; you must remove them on the last day of your permitted hunt. You must clearly mark stands and blinds with your Florida State customer identification (ID) number found on your hunting license. You may have no more than one stand or blind per person on the refuge at any time. You must place a stand or blind for a youth hunter within sight and normal voice contact of the supervisory hunter's stand and mark it with the supervisory hunter's Florida State customer ID number and the word "YOUTH."

* * * * *

(x) If you use flagging or other trail-marking material, you must print your Florida State customer ID number on each piece or marker. You may set out flagging and trail markers up to 7 days prior to the permitted hunt, and you must remove them on the last day of the permitted hunt.

* * * * *

(xv) You may field dress game; however, we prohibit cleaning game within 150 yards of any public area, road, game-check station, or gate. We prohibit dumping game carcasses on the refuge.

* * * * *

(xviii) You must stop at one of two check stations and report statistical hunt information on the Self-Clearing Check-In/Out Permit (FWS Form 3–2405).

* * * * *

(m) * * *
(2) * * *

(iii) You may only use .22 caliber or smaller rim-fire rifles, shotguns (#4 bird shot or smaller) (see § 32.2(k)), or muzzleloaders to harvest squirrel, rabbit, and raccoon. In addition, you may use shotgun slugs, buckshot, archery equipment including crossbows, center fire weapons, or pistols to take feral hogs.

* * * * *

(vii) You must check out all game taken at a game check station. You must use the State harvest recording system to check out all white-tail deer harvested on the refuge.

(3) *Big game hunting.* We allow hunting of white-tailed deer, feral hog, and turkey in areas and during seasons designated in the hunting brochure subject to the following conditions:

(i) We require State-issued refuge permits. Permits are nontransferable. Each hunter must possess and carry a signed permit when participating in a hunt.

(ii) The conditions set forth at paragraphs (m)(2)(ii) and (iv) through (vii) of this section apply.

* * * * *

(iv) There is a two deer limit per hunt, as specified at paragraph (m)(3)(vi) of this section, except during the youth hunt, when the limit is as specified at paragraph (m)(3)(vii) of this section. The limit for turkey is one per hunt.

* * * * *

(viii) Mobility-impaired hunters may have an assistant accompany them. You may transfer permits (State-issued permit) issued to assistants. We limit those hunt teams to harvesting white-tailed deer and feral hog within the limits provided at paragraph (m)(3)(vi) of this section.

(ix) You may harvest one bearded turkey per hunt. You may only use shotguns or archery equipment, including crossbows, to harvest turkey. We prohibit hunting after 1 p.m.

* * * * *

(n) * * *
(3) * * *

(vii) We limit weapons to primitive weapons (bow and arrow, muzzleloader, and crossbow) on the primitive weapons sambar deer hunt and the primitive weapons white-tailed deer hunt. We limit the archery hunt to bow and arrow, and crossbow. You may take feral hog and raccoon only with the weapons allowed for that period.

* * * * *

■ 10. Amend § 32.29 by:
■ a. Adding paragraph (a)(3);
■ b. Redesignating paragraph (h)(1)(iv) as paragraph (h)(1)(v);
■ c. Adding a new paragraph (h)(1)(iv);
■ d. Revising paragraphs (h)(2)(i), (h)(3) introductory text, and (h)(3)(i); and
■ e. Adding paragraph (h)(3)(vii).
The revisions and additions read as follows:

§ 32.29 Georgia.

(a) * * *
(3) *Big game hunting.* We allow alligator hunting on designated areas of the refuge subject to the following condition: We only allow alligator hunting during the first two weekends (from legal sunset Friday through legal

sunrise Monday) of the State alligator season.

* * * * *

(h) * * *
(1) * * *

(iv) We allow the incidental take of armadillo, beaver, opossum, and raccoon during all refuge hunts (migratory bird, upland, and big game) with firearms and other equipment authorized for use on refuge lands in Georgia only.

* * * * *

(2) * * *

(i) The conditions set forth at paragraphs (h)(1)(i), (iii), and (iv) of this section apply.

(3) *Big game hunting.* We allow hunting of white-tailed deer, turkey, alligator, feral hog, and coyote on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (h)(1)(i), (iii), and (iv) of this section apply.

* * * * *

(vii) We prohibit catch-and-release of alligators.

* * * * *

■ 11. Amend § 32.31 by:
■ a. Removing paragraph (c)(3)(iv);
■ b. Redesignating paragraph (c)(3)(v) as paragraph (c)(3)(iv); and
■ c. Revising paragraphs (c)(4)(i), (e)(1) introductory text, (f)(1) introductory text, and (f)(2) and (3).
The revisions read as follows:

§ 32.31 Idaho.

* * * * *

(c) * * *
(4) * * *

(i) From October 1 through April 14, we allow ice fishing on the Lake Lowell Unit, unless otherwise posted by the Bureau of Reclamation.

* * * * *

(e) * * *
(1) *Migratory game bird hunting.* We allow hunting of goose, duck, coot, and snipe on designated areas of the refuge subject to the following conditions:

* * * * *

(f) * * *
(1) *Migratory game bird hunting.* We allow hunting of duck, goose, coot, snipe, dove, and crow on designated areas of the refuge subject to the following conditions:

* * * * *

(2) *Upland game hunting.* We allow hunting of pheasant, grouse, partridge (chukar and gray partridge), cottontail rabbit, and bobcat on designated areas of the refuge subject to the following condition: The condition set forth at

paragraph (f)(1)(i) of this section applies.

(3) *Big game hunting.* We allow hunting of deer and elk on designated areas of the refuge subject to the following condition: Deer and elk hunters may enter the hunt area from 1½ hours before legal hunting time to 1½ hours after legal hunting time.

\* \* \* \* \*

■ 12. Amend § 32.32 by:
■ a. Revising paragraphs (b)(3)(iv)(A), (e)(1), (e)(3)(iii) and (v), (g), and (i)(2);
■ b. Removing paragraph (i)(3)(iii);
■ c. Redesignating paragraph (i)(3)(iv) as paragraph (i)(3)(iii); and
■ d. Revising paragraphs (k)(1), (2), and (3).

The revisions read as follows:

### § 32.32 Illinois.

\* \* \* \* \*
(b) \* \* \*
(3) \* \* \*
(iv) \* \* \*
(A) In the area west of Division Street and east of Blue Heron Marina;

\* \* \* \* \*
(e) \* \* \*
(1) *Migratory game bird hunting.* We allow hunting of migratory game birds on designated areas of the refuge subject to the following condition: On the Long Island Division, we allow hunting only from blinds constructed on sites posted by the Illinois Department of Natural Resources.

\* \* \* \* \*
(3) \* \* \*
(iii) On the Fox Island Division, Slim Island Division, Cherry Box Division, and Hickory Creek Division, we only allow archery deer hunting during the Statewide archery season. We prohibit archery hunting during the State firearm season.

\* \* \* \* \*
(v) We prohibit organized deer drives. We define a ''deer drive'' as an organized or planned effort to pursue, drive, chase, or otherwise frighten or cause deer to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the deer.

\* \* \* \* \*
(g) *Kankakee National Wildlife Refuge.* (1) [Reserved]
(2) *Upland game hunting.* We allow hunting of wild turkey on designated areas of the refuge subject to the following conditions:
(i) For hunting, you may possess only approved nontoxic shot shells while in the field (see § 32.2(k)).
(ii) You must remove all boats, decoys, blinds, blind materials, stands, platforms, and other hunting equipment

(see §§ 27.93 and 27.94 of this chapter) brought onto the refuge at the end of each day's hunt.

(3) *Big game hunting.* We allow hunting of white-tailed deer on designated areas of the refuge subject to the following condition: The condition set forth at paragraph (g)(2)(ii) of this section applies.

(4) [Reserved]

\* \* \* \* \*
(i) \* \* \*
(2) *Upland game hunting.* We allow hunting of small game, furbearers, and game birds on designated areas of the refuge subject to the following condition: We open the refuge divisions for upland game hunting from ½ hour before legal sunrise to ½ hour after legal sunset.

\* \* \* \* \*
(k) *Two Rivers National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of migratory game birds on designated areas of the refuge subject to the following conditions:
(i) Hunters must remove boats, decoys, blinds, blind materials, stands, and platforms brought onto the refuge at the end of each day's hunt (see §§ 27.93 and 27.94 of this chapter).
(ii) We allow the use of dogs while hunting, provided the dog is under the immediate control of the hunter at all times.

(2) *Upland game hunting.* We allow upland game hunting for wild turkey, small game, furbearers, and nonmigratory game birds on designated areas of the refuge subject to the following conditions:
(i) The conditions set forth at paragraphs (k)(1)(i) and (ii) of this section apply.
(ii) For hunting, you may use or possess only approved nontoxic shot shells while in the field, including shot shells used for hunting wild turkey (see § 32.2(k)).
(iii) We prohibit hunters using rifles or handguns with ammunition larger than .22 caliber rimfire, except they may use black powder firearms up to and including .50 caliber.
(iv) We allow the use of .22 and .17 caliber rimfire lead ammunition for the taking of small game and furbearers during open season.
(v) We allow hunting from legal sunrise to legal sunset.

(3) *Big game hunting.* We allow hunting of white-tailed deer on designated areas of the refuge subject to the following conditions:
(i) The condition set forth at paragraph (k)(1)(i) of this section applies.

(ii) We prohibit organized deer drives. We define a ''deer drive'' as an organized or planned effort to pursue, drive, chase, or otherwise frighten or cause deer to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the deer.

\* \* \* \* \*

■ 13. Amend § 32.33 by:
■ a. Revising paragraphs (b), (c)(1) introductory text, and (c)(2) introductory text;
■ b. Adding paragraph (c)(2)(iii);
■ c. Revising paragraph (c)(3)(i);
■ d. Redesignating paragraph (c)(3)(iv) as paragraph (c)(3)(v); and
■ e. Adding new paragraph (c)(3)(iv).

The revisions and additions read as follows:

### § 32.33 Indiana.

\* \* \* \* \*
(b) *Muscatatuck National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of duck, goose, coot, merganser, woodcock, and dove on designated areas of the refuge subject to the following conditions:
(i) You must remove all boats, decoys, blinds, blind materials, stands, and platforms brought onto the refuge at the end of each day's hunt (see § 27.93 of this chapter).
(ii) We allow the use of dogs when hunting, provided the dogs are under the immediate control of the hunter at all times.
(iii) We prohibit hunting and the discharge of a firearm within 100 yards (30 meters) of any dwelling or any other building that people, pets, or livestock may occupy.

(2) *Upland game hunting.* We allow hunting of turkey, quail, squirrel, raccoon, opossum, coyote, fox, skunk, and rabbit on designated areas of the refuge subject to the following conditions:
(i) For hunting, you may use or possess only approved nontoxic shot shells while in the field, including shot shells used for hunting wild turkey (see § 32.2(k)).
(ii) We allow the use of rimfire weapons for upland/small game hunting.
(iii) We prohibit the use of centerfire rifles for any hunts on refuge property.
(iv) During spring turkey hunting, hunters must possess a State-issued hunting permit during the first 6 days of the season.
(v) We prohibit turkey hunting after 1 p.m. each day.
(vi) We allow the incidental take of coyote only during other refuge hunting seasons.

(vii) The conditions set forth at paragraphs (b)(1)(ii) through (iii) of this section apply.

(3) *Big game hunting.* We allow hunting of white-tailed deer on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (b)(1)(i) through (iii) and (b)(2)(i) through (iii) of this section apply.

(ii) We prohibit organized deer drives. We define a "deer drive" as an organized or planned effort to pursue, drive, chase, or otherwise frighten or cause deer to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the deer.

(iii) We prohibit the use or possession of tree spikes, plastic flagging, and reflective tacks.

(iv) We prohibit firearms deer hunting during the State deer firearm season (archery and muzzleloader only).

(v) We close archery deer hunting during the State muzzleloader season.

(vi) We prohibit the possession of game trail cameras on the refuge.

(vii) We require you to remove arrows from crossbows during transport in a vehicle.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) We prohibit the use of any type of motor.

(ii) We allow the use of kayaks, canoes, belly boats, or float tubes in all designated fishing areas.

(iii) We allow fishing only with rod and reel, or pole and line.

(iv) We prohibit harvest of frog and turtle (see § 27.21 of this chapter).

(v) We prohibit the use of lead fishing tackle.

(vi) We allow only youth age 15 and younger to fish in the Discovery Pond.

(c) * * *

(1) *Migratory game bird hunting.* We allow hunting of duck, goose, merganser, coot, woodcock, dove, snipe, rail, and crow on designated areas of the refuge and the White River Wildlife Management Area subject to the following conditions:

*       *       *       *       *

(2) *Upland game hunting.* We allow hunting of bobwhite quail, pheasant, cottontail rabbit, squirrel (gray and fox), red and gray fox, coyote, opossum, striped skunk, and raccoon subject to the following conditions:

*       *       *       *       *

(iii) You may only use or possess approved nontoxic shot shells (see § 32.2(k)) while in the field.

(3) * * *

(i) The condition set forth at paragraph (c)(2)(iii) applies while turkey hunting.

*       *       *       *       *

(iv) On the Columbia Mine Unit, if you use a rifle to hunt, you may use only rifles allowed by State regulations for hunting on public land.

*       *       *       *       *

■ 14. Amend § 32.34 by:
■ a. Revising paragraph (d)(1) introductory text;
■ b. Removing paragraph (d)(1)(i);
■ c. Redesignating paragraphs (d)(1)(ii) through (d)(1)(v) as paragraphs (d)(1)(i) through (d)(1)(iv); and
■ d. Revising paragraphs (d)(2) introductory text, (d)(2)(i), (g)(1) introductory text, (g)(1)(ii), (g)(2) introductory text, (g)(2)(ii), and (g)(3)(i).

The revisions read as follows:

### § 32.34 Iowa.

*       *       *       *       *

(d) * * *

(1) *Migratory game bird hunting.* We allow the hunting of dove, duck, goose, and coot on designated areas of the refuge subject to the following conditions:

*       *       *       *       *

(2) *Upland game hunting.* We allow hunting of ring-necked pheasant, bobwhite quail, pigeon, crow, cottontail rabbit, gray and fox squirrel, and wild turkey on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (d)(1)(i) through (iv) of this section apply.

*       *       *       *       *

(g) * * *

(1) *Migratory game bird hunting.* We allow hunting of duck, goose, coot, rail (Virginia and sora only), woodcock, dove, crow, and snipe on designated areas of the refuge subject to the following conditions:

*       *       *       *       *

(ii) We allow boats or other floating devices when hunting. You may not leave boats unattended.

*       *       *       *       *

(2) *Upland game hunting.* We allow hunting of pheasant, gray partridge, cottontail rabbit, squirrel (fox and gray), groundhog, raccoon, opossum, fox, coyote, and skunk on designated areas of the refuge subject to the following conditions:

*       *       *       *       *

(ii) The conditions set forth at paragraphs (g)(1)(i), (ii), (iv), and (v) of this section apply.

(3) * * *

(i) The conditions set forth at paragraphs (g)(1)(i), (ii), (iv), and (v) of this section apply.

*       *       *       *       *

■ 15. Revising § 32.35 to read as follows:

### § 32.35 Kansas.

The following refuge units are open for hunting and/or fishing as governed by applicable Federal and State regulations, and are listed in alphabetical order with additional refuge-specific regulations.

(a) *Flint Hills National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of coot, crow, mourning dove, duck, goose, rail, woodcock, and snipe on designated areas of the refuge subject to the following conditions:

(i) You must remove portable hunting blinds and decoys at the end of each day's hunt (see § 27.93 of this chapter).

(ii) We only allow rimfire firearms, shotguns, and archery equipment.

(iii) We prohibit shooting from or over roads and parking areas.

(iv) We allow the use of dogs when hunting migratory birds.

(v) We close hunting areas on the north side of the Neosho River to all hunting from November 1 through March 1.

(2) *Upland game hunting.* We allow hunting of coyote, pheasant, prairie chicken, quail, rabbit, State-defined furbearers, and squirrel on designated areas of the refuge subject to the following conditions:

(i) We allow the use of dogs when hunting upland game, except that we prohibit the use of dogs when hunting coyotes and furbearers.

(ii) Shooting hours for upland game species are ½ hour before legal sunrise until legal sunset.

(iii) We prohibit the harvest of beaver and otter.

(iv) The conditions set forth at paragraphs (a)(1)(ii) and (iii) of this section apply.

(3) *Big game hunting.* We allow hunting of white-tailed deer and turkey on designated areas of the refuge subject to the following conditions:

(i) You may possess only approved nontoxic shot for turkey hunting (see § 32.2(k)).

(ii) We allow one portable blind or stand per hunter. You may place a stand on the refuge no more than 14 days prior to the season, and you must remove it within 14 days of the close of the season. You must remove a portable blind at the end of each day's hunt (see § 27.93 of this chapter). You must label any portable blind or stand with the owner's name and Kansas Department of Wildlife, Parks and Tourism

(KDWPT) number. Labels must be clearly visible from the ground.

(iii) We prohibit the use of dogs when hunting turkey.

(iv) The condition set forth at paragraph (a)(1)(iii) of this section applies.

(v) We only allow muzzleloaders, shotguns, and archery equipment.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following condition: We prohibit the take of reptiles and amphibians.

(b) *Kirwin National Wildlife Refuge—* (1) *Migratory game bird hunting.* We allow hunting of coot, crow, duck, goose, merganser, mourning dove, rail, snipe, and woodcock on designated areas of the refuge subject to the following conditions:

(i) You must remove portable hunting blinds and decoys at the end of each day's hunt (see § 27.93 of this chapter).

(ii) We prohibit shooting from or over roads and parking areas.

(iii) In Bow Creek, we allow hunting access by boat or on foot year round.

(iv) We allow the use of dogs when hunting migratory birds.

(2) *Upland game hunting.* We allow hunting of cottontail rabbit, jack rabbit, pheasant, prairie chicken, quail, State-defined furbearers, and squirrel (fox and grey) on designated areas of the refuge subject to the following conditions:

(i) We only allow shotguns and archery equipment when hunting upland game.

(ii) We allow the use of dogs when hunting upland game, except that we prohibit the use of dogs when hunting coyotes and furbearers.

(iii) Shooting hours for upland game species are ½ hour before legal sunrise until legal sunset.

(iv) We prohibit the harvest of beaver and otter.

(v) The condition set forth at paragraph (b)(1)(ii) of this section applies.

(3) *Big game hunting.* We allow hunting of deer and turkey on designated areas of the refuge subject to the following conditions:

(i) We only allow archery hunting of deer.

(ii) We allow one portable blind or stand per hunter. You may place a stand on the refuge no more than 14 days prior to the season, and you must remove it within 14 days of the close of the season. You must remove a portable blind at the end of each day's hunt (see § 27.93 of this chapter). You must label any portable blind or stand with the owner's name and KDWPT number. Labels must be clearly visible from the ground.

(iii) You must obtain a refuge-issued permit (FWS Form 3–2405, Self-Clearing Check-In/Out Permit) to hunt deer on the refuge.

(iv) The condition set forth at paragraph (b)(1)(ii) of this section applies.

(v) We prohibit the use of dogs when hunting turkey.

(vi) You may possess only approved nontoxic shot for turkey hunting (see § 32.2(k)).

(4) *Sport fishing.* We allow sport fishing on designated areas on the refuge subject to the following conditions:

(i) We only allow boats for activities related to fishing.

(ii) We prohibit boating for fishing between October 1 and April 1 when the reservoir water elevation falls below 1,722 feet (measured on October 1), except in the Bow Creek Hunting Unit. Boats may be launched only at Scout Cove during this period.

(iii) We allow boating for fishing year-round, on the entire reservoir, only when the reservoir water elevation is above 1,722 feet (measured on October 1).

(iv) We allow noncommercial collection of baitfish as governed by State regulations.

(v) We prohibit all activities associated with fishing tournaments, outside of sport fishing itself, to include organized gatherings, registrations, weigh-ins, and award presentations to be held or organized on the refuge.

(vi) We prohibit the take of reptiles and amphibians.

(c) *Marais des Cygnes National Wildlife Refuge—*(1) *Migratory game bird hunting.* We allow hunting of coot, crow, duck, goose, mourning dove, rail, snipe, and woodcock on designated areas of the refuge subject to the following conditions:

(i) You must remove portable hunting blinds and decoys at the end of each day's hunt (see § 27.93 of this chapter).

(ii) We prohibit shooting from or over roads and parking areas.

(iii) We allow the use of dogs when hunting migratory birds.

(iv) We only allow shotguns and archery equipment.

(2) *Upland game hunting.* We allow hunting of coyote, cottontail rabbit, State-defined furbearers, squirrel, and upland birds on designated areas of the refuge subject to the following conditions:

(i) We allow the use of dogs when hunting upland game, except that we prohibit the use of dogs when hunting coyotes and furbearers.

(ii) Shooting hours for upland game species are ½ hour before legal sunrise until legal sunset.

(iii) We prohibit the harvest of beaver and otter.

(iv) The conditions set forth at paragraphs (c)(1)(i), (ii), and (iv) of this section apply.

(3) *Big game hunting.* We allow hunting of white-tailed deer and turkey on designated areas of the refuge subject to the following conditions:

(i) You must possess and carry a State-issued refuge access permit to hunt deer and spring turkey.

(ii) We allow one portable blind or stand per hunter. You may place a stand on the refuge no more than 14 days prior to the season, and you must remove it within 14 days of the close of the season. You must remove a portable blind at the end of each day's hunt (see § 27.93 of this chapter). You must label any portable blind or stand with the owner's name and KDWPT number. Labels must be clearly visible from the ground.

(iii) We prohibit the use of dogs when hunting turkey.

(iv) You may possess only approved nontoxic shot for turkey hunting (see § 32.2(k)).

(v) The condition set forth at paragraph (c)(1)(ii) of this section applies.

(vi) We only allow archery deer hunting, except during the January antlerless deer season when we allow the use of archery, muzzleloader, and shotgun.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following condition: We prohibit the take of reptiles and amphibians.

(d) *Quivira National Wildlife Refuge—* (1) *Migratory game bird hunting.* We allow hunting of coot, crow, duck, goose, and mourning dove on designated areas of the refuge subject to the following conditions:

(i) We open refuge hunting areas from September 1 through February 28.

(ii) The refuge is open from 1½ hours before legal sunrise to 1½ hours after legal sunset.

(iii) We prohibit the retrieval of game from areas closed to hunting.

(iv) You must remove portable hunting blinds and decoys at the end of each day's hunt (see § 27.93 of this chapter).

(v) We prohibit shooting from or over roads and parking areas.

(vi) We allow the use of dogs when hunting migratory birds.

(vii) We only allow shotguns and archery equipment.

(2) *Upland game hunting.* We allow hunting of coyote, pheasant, quail, State-defined furbearers, squirrel, and rabbit on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (d)(1)(i) through (iii), (v), and (vii) of this section apply.

(ii) We allow the use of dogs when hunting upland game, except that we prohibit the use of dogs when hunting coyotes and furbearers.

(iii) We prohibit the harvest of beaver and otter.

(iv) You must possess a State-issued refuge access permit for coyote and State-defined furbearer hunting.

(3) *Big game hunting.* We allow hunting of white-tailed deer and turkey on designated areas of the refuge subject to the following conditions:

(i) You may possess only approved nontoxic ammunition for turkey and deer hunting (see § 32.2(k)).

(ii) You must possess a State-issued refuge access permit for deer and turkey hunting.

(iii) We allow one portable blind or stand per hunter. You may place a stand on the refuge no more than 14 days prior to the season, and you must remove it within 14 days of the close of the season. You must remove a portable blind at the end of each day's hunt (see § 27.93 of this chapter). You must label any portable blind or stand with the owner's name and KDWPT number. Labels must be clearly visible from the ground.

(iv) We prohibit the use of dogs when hunting turkey.

(v) The conditions set forth at paragraphs (d)(1)(i) through (iii) and (v) of this section apply.

(vi) We only allow muzzleloaders, shotguns, and archery equipment.

(4) *Sport fishing.* We allow sport fishing on all waters on the refuge subject to the following conditions:

(i) We prohibit taking of reptiles and amphibians.

(ii) We prohibit the use of trotlines and setlines.

(iii) We prohibit the use of seines for taking bait.

(iv) We prohibit fishing from water control structures and bridges.

(v) We restrict fishing in the designated "Kid's Pond," approximately ¼ mile (.4 kilometers) west-southwest of headquarters, to youth age 14 and younger, and to a parent and/or guardian age 18 or older accompanying a youth.

(vi) The creel limit for the Kid's Pond is one fish per day.

(vii) The condition set forth at paragraph (d)(1)(ii) of this section applies.

(viii) The only live bait we allow is worms; we prohibit all other live bait.

■ 16. Amend § 32.36 by:
■ a. Revising paragraphs (a)(1)(iii), (v), and (vi);

■ b. Removing paragraphs (a)(1)(vii) and (viii); and
■ c. Revising paragraphs (a)(2) and (a)(3)(i).

The revisions read as follows:

### § 32.36 Kentucky.

*       *       *       *       *

(a) * * *

(1) * * *

(iii) We prohibit hunting within 100 feet (30 meters) of a residence and discharge of firearms within 200 feet (60 meters) of any home, the abandoned railroad tracks, graveled roads, and hiking trails.

*       *       *       *       *

(v) We allow the use of dogs for waterfowl, quail, snipe, dove, woodcock, squirrel, rabbit, raccoon, opossum, and fall turkey hunting. Dog owners/handlers must have a collar on each dog with the owner's contact information.

(vi) We allow waterfowl hunting from legal shooting time until 12 p.m. (noon).

(2) *Upland game hunting.* We allow hunting of squirrel, rabbit, quail, raccoon, opossum, coyote, bobcat, fox, skunk, otter, muskrat, mink, weasel, and beaver on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (a)(1)(i) through (v) of this section apply.

(ii) We allow coyote hunting under Statewide regulations during daylight hours only.

(3) * * *

(i) The conditions set forth at paragraphs (a)(1)(i) through (v) of this section apply.

*       *       *       *       *

■ 17. Amend § 32.37 by:
■ a. Revising paragraphs (a)(1) introductory text, (a)(2) introductory text, and (c)(1)(vi);
■ b. Adding new paragraph (d)(1)(ix);
■ c. Revising paragraphs (d)(3)(iii), (e)(1)(i) and (v), (e)(2) introductory text, and (e)(2)(ii);
■ d. Adding paragraph (e)(2)(v);
■ e. Revising paragraph (f)(3) introductory text;
■ f. Removing paragraph (f)(3)(iii);
■ g. Redesignating paragraph (f)(3)(iv) as (f)(3)(iii);
■ h. Revising paragraphs (g), (k)(1) introductory text, (k)(1)(x), (k)(3)(ii), (n)(1)(xiv), (n)(4)(ii), (p)(1)(vii) and (xii), and (q)(1)(iii);
■ i. Adding paragraphs (t)(1)(vi);
■ j. Revising paragraph (t)(2)(i); and
■ k. Adding paragraphs (t)(2)(v) and (t)(3)(iii).

The revisions and additions read as follows:

### § 32.37 Louisiana.

*       *       *       *       *

(a) * * *

(1) *Migratory game bird hunting.* We allow hunting of mourning dove, duck, goose, coot, snipe, rail, gallinule, and woodcock on designated areas of the refuge subject to the following conditions:

*       *       *       *       *

(2) *Upland game hunting.* We allow hunting of squirrel, rabbit, and raccoon on designated areas of the refuge subject to the following condition: The conditions set forth at paragraphs (a)(1)(i) and (ii) of this section apply.

*       *       *       *       *

(c) * * *

(1) * * *

(vi) Each person age 18 and older must possess a valid Annual Public Use Permit (signed brochure).

*       *       *       *       *

(d) * * *

(1) * * *

(ix) Each person age 18 and older, must possess a valid Annual Public Use Permit (signed brochure).

*       *       *       *       *

(3) * * *

(ii) We allow archery deer hunting according to the State of Louisiana archery season. Hunters may take deer of either sex as governed by State-approved archery equipment and regulations. We close refuge archery hunting during refuge deer gun hunts.

*       *       *       *       *

(e) * * *

(1) * * *

(i) We allow waterfowl hunting on Wednesdays, Thursdays, Saturdays, and Sundays from ½ hour before legal sunrise until 12 p.m. (noon), including waterfowl hunting during the State special teal season and State youth waterfowl hunt. We allow snipe, rail, and gallinule hunting on Wednesdays, Thursdays, Saturdays, and Sundays from ½ hour before legal sunrise until 2 p.m.

*       *       *       *       *

(v) An adult age 18 or older must supervise youth hunters age 17 and younger during all hunts. Youth hunter age and hunter education requirements are governed by State regulations. One adult may supervise two youths during small game hunts and migratory bird hunts, but is only allowed to supervise one youth during big game hunts. Youths must remain within normal voice contact and direct sight of the adult who is supervising them. Adult guardians are responsible for ensuring that youth hunters do not violate refuge rules.

*       *       *       *       *

(2) *Upland game hunting.* We allow hunting of squirrel, rabbit, raccoon, and

quail on designated areas of the refuge subject to the following conditions:

\* \* \* \* \*

(ii) When hunting squirrel, rabbit, and raccoon, we allow the use of dogs only after the close of the State archery deer season. When hunting quail, you may only use dogs to locate, point, and retrieve.

\* \* \* \* \*

(v) We only allow raccoon to be taken during the State rabbit season.

\* \* \* \* \*

(f) \* \* \*

(3) *Big game hunting.* We allow hunting of white-tailed deer on designated areas of the refuge subject to the following conditions:

\* \* \* \* \*

(g) *Bogue Chitto National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of duck, goose, coot, and woodcock on designated areas of the refuge subject to the following conditions:

(i) We allow hunting from ½ hour before legal sunrise until 12 p.m. (noon), including during the State special teal season, State youth waterfowl hunt, and special light goose conservation season.

(ii) You must remove blinds and decoys by 1 p.m. each day (see § 27.93 of this chapter).

(iii) We prohibit goose hunting for that part of the season that extends beyond the regular duck season.

(iv) When hunting migratory game birds, you may only use dogs to locate, point, and retrieve game.

(v) Each person age 18 and older while hunting or fishing must possess a valid Annual Public Use Permit (signed brochure).

(vi) An adult age 18 or older must supervise youth hunters age 17 and younger during all hunts. Youth hunter age and hunter education requirements are governed by State regulations. One adult may supervise two youths during small game hunts and migratory bird hunts, but is only allowed to supervise one youth during big game hunts. Youths must remain within normal voice contact of the adult who is supervising them. Adult guardians are responsible for ensuring that youth hunters do not violate refuge rules.

(vii) We prohibit hunting or discharge of firearms (see § 27.42 of this chapter) within 150 feet (45.7 meters (m)) from the centerline of any public road, refuge road, designated or maintained trail, building, residence, designated camping area, or designated public facility, or from or across aboveground oil, gas, or electric facilities.

(viii) For the purpose of hunting, we prohibit possession of slugs, buckshot,

and rifle and pistol ammunition, except during the deer gun and primitive firearm seasons (see § 32.2(k)).

(ix) You may use only reflective tacks as trail markers on the refuge.

(x) We allow the incidental take of feral hog during any open refuge hunting season with weapons approved for that season.

(2) *Upland game hunting.* We allow hunting of squirrel, rabbit, raccoon, and opossum on designated areas of the refuge subject to the following conditions:

(i) We allow the use of dogs for rabbit, squirrel, raccoon, and opossum hunting on specific dates listed in the refuge hunt brochure.

(ii) During any open deer firearm or primitive firearm season on the refuge, all hunters, except waterfowl hunters and nighttime raccoon and opossum hunters, must wear hunter orange, blaze pink, or other such color as governed by State regulations.

(iii) The conditions set forth at paragraphs (g)(1)(v) through (x) of this section apply, except you may use .22-caliber rifles or smaller, and the nontoxic shot in your possession while hunting must be size 4 or smaller (see § 32.2(k)).

(iv) We will close the refuge to hunting (except waterfowl) and camping when the Pearl River reaches 15.5 feet (4.65 meters) on the Pearl River Gauge at Pearl River, Louisiana.

(v) During the dog season for squirrels and rabbits, all hunters, including archery hunters (while on the ground), except waterfowl hunters, must wear a cap or hat that is hunter-orange, blaze pink, or other such color as governed by State regulations.

(3) *Big game hunting.* We allow hunting of white-tailed deer, turkey, and feral hog on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (g)(1)(v) through (x) and (g)(2)(ii) through (iv) of this section apply.

(ii) Hunters may erect deer stands 48 hours before the deer archery season and must remove them from the refuge within 48 hours after this season closes (see § 27.93 of this chapter). We allow only one deer stand per hunter on the refuge. Deer stands must have the owner's State license/sportsmen's identification number clearly printed on the stand.

(iii) Deer hunters hunting from concealed blinds must display State Wildlife Management Area (WMA) hunter-orange or blaze-pink (as governed by State WMA regulations)

above or around their blinds that is visible from 360 degrees.

(iv) We hold a special dog hog hunt in February. During this hunt, the following conditions apply, in addition to other applicable conditions in paragraph (g)(3) of this section:

(A) You must use trained hog-hunting dogs to aid in the take of hog.

(B) We allow take of hog from ½ hour before legal sunrise until ½ hour after legal sunset.

(C) You must possess only approved nontoxic shot, or pistol or rifle ammunition not larger than .22 caliber rim-fire to take the hog after it has been caught by dogs.

(v) You must kill all hogs prior to removal from the refuge.

(vi) We prohibit the use of deer and turkey gobbler decoys.

(4) *Sport fishing.* We allow only recreational fishing year-round on designated areas of the refuge subject to the following conditions:

(i) We only allow cotton limb lines.

(ii) We close the fishing ponds at the Pearl River Turnaround to fishing from April through the first full week of June and to boating during the months of April, May, June, and July.

(iii) When the Pearl River Turnaround area is open, we allow boats that do not have gasoline-powered engines attached in the fishing ponds at the Pearl River Turnaround. Anglers must hand-launch these boats into the ponds. When the fishing ponds at the Pearl River Turnaround are open, hook and line is the only legal method of take in those ponds.

(iv) The Pearl River Turnaround area, when open to fishing, is open ½ hour before legal sunrise to ½ hour after legal sunset.

(v) The conditions set forth at paragraphs (g)(1)(x) and (g)(2)(iv) of this section apply.

\* \* \* \* \*

(k) \* \* \*

(1) *Migratory game bird hunting.* We allow hunting of duck, goose, coot, and woodcock on designated areas of the refuge subject to the following conditions:

\* \* \* \* \*

(x) We only allow the use of bright eyes or reflective tape for flagging or trail markers.

\* \* \* \* \*

(3) \* \* \*

(ii) We allow deer modern firearm hunting on the area south of the French Fork of the Little River for 2 days in December with these dates being set annually.

\* \* \* \* \*

(n) \* \* \*

(1) * * *

(xiv) We only allow the use of bright eyes or reflective tape for flagging or trail markers.

* * * * *

(4) * * *

(ii) We only allow fishing within the Coulee Des Grues Bayou from the bank adjacent to Little California Road.

* * * * *

(p) * * *

(1) * * *

(vii) We restrict the use of the ATV trails that are designated for physically challenged persons to individuals who possess a State-issued physically challenged program hunter permit or are age 60 or older.

* * * * *

(xii) We only allow the use of bright eyes or reflective tape for flagging or trail markers.

* * * * *

(q) * * *

(1) * * *

(iii) Each person age 18 and older must possess a valid Annual Public Use Permit (signed brochure).

* * * * *

(t) * * *

(1) * * *

(vi) We allow the incidental take of coyote, beaver, raccoon, and opossum when hunting for migratory bird species with firearms and archery equipment authorized for use.

(2) * * *

(i) We allow nighttime raccoon hunting in alignment with Big Lake Wildlife Management Area (WMA).

* * * * *

(v) We allow the incidental take of coyote, beaver, raccoon, and opossum when hunting for upland game species with firearms and archery equipment authorized for use.

(3) * * *

(xiii) We allow the incidental take of coyote, beaver, raccoon, and opossum when hunting for big game species with firearms and archery equipment authorized for use.

* * * * *

■ 18. Revise § 32.38 to read as follows:

**§ 32.38 Maine.**

The following refuge units are open for hunting and/or fishing as governed by applicable Federal and State regulations, and are listed in alphabetical order with additional refuge-specific regulations.

(a) *Moosehorn National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of duck, goose, American woodcock, and snipe on designated areas of the refuge subject to the following conditions:

(i) We require every hunter to possess and carry a personally signed refuge permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System).

(ii) We allow hunters to enter the refuge 2 hours before legal shooting hours, and they must exit the refuge by 1 hour past legal shooting hours.

(iii) We only allow portable or temporary blinds and decoys that must be removed from the refuge following each day's hunt (see § 27.93 of this chapter).

(iv) We allow the use of dogs consistent with State regulations.

(2) *Upland game hunting.* We allow hunting of ruffed grouse, snowshoe hare, red fox, gray and red squirrel, raccoon, skunk, and woodchuck on designated areas of the refuge subject to the following condition: The conditions set forth at paragraphs (a)(1)(i), (ii) (except for hunters pursuing raccoon at night), and (iv) of this section apply.

(3) *Big game hunting.* We allow hunting of black bear, bobcat, eastern coyote, moose, and white-tailed deer on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (a)(1)(i), (ii) (except for hunters pursuing eastern coyote at night), and (iv) of this section apply.

(ii) The hunter must retrieve all species harvested on the refuge.

(iii) We allow eastern coyote hunting from October 1 to March 31.

(iv) We allow tree stands, blinds, and ladders. You must clearly label any tree stand, blind, or ladder left on the refuge overnight with your hunting license number. You must remove your tree stand(s), blind(s), and/or ladder(s) from the refuge on the last day of the muzzleloader deer season (see § 27.93 of this chapter).

(v) You may hunt black bear, eastern coyote, and white-tailed deer during the State archery and firearms deer seasons on the Baring Division east of State Route 191.

(vi) We prohibit use of firearms to hunt bear and coyote during the archery deer season on the Baring Division east of Route 191. We prohibit the use of firearms, other than a muzzleloader, to hunt coyote during the deer muzzleloader season on the Baring Division east of Route 191.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) We only allow fishing from ½ hour before legal sunrise to ½ hour after legal sunset.

(ii) We prohibit trapping fish for use as bait.

(b) *Petit Manan National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of duck, goose, woodcock, rail, and snipe on designated areas of the refuge subject to the following condition: We allow the use of dogs consistent with State regulations.

(2) *Upland game hunting.* We allow hunting of upland game on designated areas of the refuge subject to the following conditions:

(i) We allow the use of dogs consistent with State regulations.

(ii) You may hunt coyotes from November 1 to March 31.

(iii) Hunters must retrieve all species harvested on the refuge.

(iv) We prohibit night hunting from ½ hour after legal sunset until ½ hour before legal sunrise the following day.

(3) *Big game hunting.* We allow hunting of white-tailed deer and black bear on designated areas of the refuge subject to the following conditions:

(i) Petit Manan Point is open only during the State-prescribed muzzleloader deer season.

(ii) We allow black bear hunting during the firearm season for white-tailed deer.

(iii) We allow hunters to enter the refuge 1 hour prior to legal sunrise and remain on the refuge 1 hour after legal sunset.

(iv) We prohibit the use of dogs when hunting black bear.

(4) [Reserved]

(c) *Rachel Carson National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of duck, goose, coot, woodcock, and snipe on designated areas of the refuge subject to the following conditions:

(i) Prior to entering designated refuge hunting areas, you must obtain a refuge permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) and sign and carry the permit at all times.

(ii) We open designated youth hunting areas to hunters age 15 and younger who possess and carry a refuge hunting permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System). Youth hunters must be accompanied by an adult age 18 or older. The accompanying adult must possess and carry a refuge hunting permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) and may also hunt.

(iii) We allow the use of dogs consistent with State regulations.

(iv) We only allow temporary blinds and stands, which you must remove at the end of each day's hunt (see § 27.93 of this chapter).

(2) *Upland game hunting.* We allow hunting of pheasant, quail, grouse, fox,

and coyote on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (c)(1)(i) and (iii) of this section apply.

(ii) We allow take of pheasant, quail, and grouse by falconry on the refuge during State seasons.

(3) *Big game hunting.* We allow hunting of white-tailed deer and turkey on designated areas of the refuge subject to the following conditions:

(i) The conditions as set forth at paragraphs (c)(1)(i) and (iv) of this section apply.

(ii) We allow hunting with shotgun and archery only. We prohibit rifles and muzzleloading firearms for hunting.

(iii) We allow turkey hunting during the fall season only, as designated by the State.

(iv) We allow only archery on those areas of the Little River division open to hunting.

(v) During the State firearm deer season, we only allow hunting of fox and coyote with archery or shotgun as incidental take with a refuge big game permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System).

(vi) We allow hunting from ½ hour before legal sunrise to ½ hour after legal sunset.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) We allow fishing from ½ hour before legal sunrise to ½ hour after legal sunset.

(ii) We prohibit lead tackle.

(iii) We prohibit trapping fish for use as bait.

(d) *Sunkhaze Meadows National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of migratory game birds on designated areas of the refuge subject to the following condition: We allow the use of dogs consistent with State regulations.

(2) *Upland game hunting.* We allow hunting of upland game on designated areas of the refuge subject to the following conditions:

(i) We allow hunters to enter the refuge 1 hour before legal shooting hours, and they must exit the refuge by 1 hour past legal shooting hours, except for hunters pursuing raccoons at night.

(ii) The hunter must retrieve all species harvested on the refuge.

(iii) We allow the use of dogs consistent with State regulations.

(3) *Big game hunting.* We allow hunting of black bear, bobcat, moose, coyote, and white-tailed deer on designated areas of the refuge subject to the following conditions:

(i) We allow hunters to enter the refuge 1 hour before legal shooting hours, and they must exit the refuge by 1 hour after legal shooting hours, except for hunters pursuing coyotes at night.

(ii) We allow tree stands, blinds, and ladders. You must clearly label tree stands, blinds, or ladders left on the refuge overnight with your State hunting license number. You must remove your tree stand(s), blind(s), and/or ladder(s) from the refuge on the last day of the muzzleloader deer season (see § 27.93 of this chapter).

(iii) We allow the use of dogs consistent with State regulations.

(iv) We allow coyote hunting from October 1 to March 31.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following condition: We prohibit trapping fish for use as bait.

(e) *Umbagog National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of duck, goose, snipe, coot, crow, and woodcock on designated areas of the refuge subject to the following condition: We allow the use of dogs consistent with State regulations.

(2) *Upland game hunting.* We allow hunting of fox, raccoon, woodchuck, squirrel, porcupine, skunk, snowshoe hare, ring-necked pheasant, and ruffed grouse on designated areas of the refuge subject to the following conditions:

(i) We prohibit night hunting from ½ hour after legal sunset until ½ hour before legal sunrise the following day.

(ii) We allow the use of dogs consistent with State regulations.

(3) *Big game hunting.* We allow hunting of bear, white-tailed deer, coyote, turkey, and moose on designated areas of the refuge subject to the following conditions:

(i) We allow the use of dogs consistent with State regulations.

(ii) Hunters must retrieve all species harvested on the refuge.

(iii) We allow temporary blinds and tree stands that are clearly marked with the owner's State hunting license number. You may erect temporary blinds and tree stands no earlier than 14 days prior to the hunting season, and you must remove them within 14 days after the hunting season (see § 27.93 of this chapter).

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge.

■ 19. Revise § 32.39 to read as follows:

### § 32.39 Maryland.

The following refuge units are open for hunting and/or fishing as governed by applicable Federal and State regulations, and are listed in alphabetical order with additional refuge-specific regulations.

(a) *Blackwater National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of goose and duck on designated areas of the refuge subject to the following conditions:

(i) You must obtain, and possess while hunting, a refuge waterfowl hunting permit (signed brochure or printed and signed copy of permit from *Recreation.gov*).

(ii) Up to three additional hunters may accompany you on your reserved unit.

(iii) We allow the use of dogs consistent with State regulations.

(2) [Reserved]

(3) *Big game hunting.* We allow the hunting of white-tailed deer, sika deer, and turkey on designated areas of the refuge subject to the following conditions:

(i) The general hunt regulations for this paragraph (a)(3) are:

(A) You must obtain, and possess while hunting, a turkey or deer hunting permit (printed and signed copy of permit from *Recreation.gov*).

(B) We prohibit organized deer drives unless authorized by the refuge manager. We define a "deer drive" as an organized or planned effort to pursue, drive, chase, or otherwise frighten or cause deer to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the deer.

(C) We prohibit shooting a projectile from a firearm, muzzleloader, bow, or crossbow from, down, or across any road that is traveled by vehicular traffic.

(D) We prohibit the use of rimfire or centerfire rifles and all handguns, including muzzleloading pistols, for hunting.

(ii) We do not allow archery deer hunters to hunt within areas designated for the youth hunt on designated days.

(iii) We allow turkey hunt permit holders (printed and signed copy of permit from *Recreation.gov*) to have an assistant, who must remain within sight and normal voice contact and abide by the rules set forth in the refuge's turkey brochure.

(iv) We allow youth deer and turkey hunters to hunt on designated areas on designated days (youth hunt) if they meet the criteria of a "youth hunter" as governed by State law and possess a turkey or deer hunting permit (printed and signed copy of permit from *Recreation.gov*).

(v) For the designated disabled hunt: (A) We require disabled hunters to have their America the Beautiful Access pass (OMB Control 1024–0252) in their

possession while hunting in disabled areas.

(B) Disabled hunters may have an assistant, age 18 or older, who must remain within sight and normal voice contact while hunting. Assistants must possess a printed and signed copy of a permit from *Recreation.gov* and a valid government-issued photo identification.

(4) *Sport fishing.* We allow sport fishing and crabbing on designated areas of the refuge subject to the following conditions:

(i) We allow fishing and crabbing only from April 1 through September 30 from legal sunrise to legal sunset in refuge waters, unless otherwise authorized by the refuge manager.

(ii) We allow fishing and crabbing by boat in the Big Blackwater and the Little Blackwater River.

(b) *Eastern Neck National Wildlife Refuge.* (1)–(2) [Reserved]

(3) *Big game hunting.* We allow hunting of white-tailed deer and turkey on designated areas of the refuge subject to the following conditions:

(i) *General hunt regulations for this paragraph (b)(3).* (A) You must obtain, and possess while hunting, a deer or turkey hunting permit (printed and signed copy of permit from *Recreation.gov*).

(B) We prohibit shooting a projectile from a firearm, muzzleloader, bow, or crossbow from, down, or across any road that is traveled by vehicular traffic.

(C) We prohibit the use of rimfire or centerfire rifles and all handguns, including muzzleloading pistols, for hunting.

(ii) We allow youth deer hunters to hunt on designated areas on designated days (youth hunt) if they meet the criteria of a "youth hunter" as governed by State law and possess a printed and signed copy of a permit from *Recreation.gov*.

(iii) For the designated disabled hunt: (A) We require disabled hunters to have their America the Beautiful Access pass (OMB Control 1024–0252) in their possession while hunting in disabled areas.

(B) Disabled hunters may have an assistant who must be age 18 or older and remain within sight and normal voice contact. Assistants must possess a printed and signed copy of a permit from *Recreation.gov* and a valid government-issued photo identification.

(4) *Sport fishing.* We allow sport fishing and crabbing in designated areas of the refuge subject to the following conditions:

(i) We allow fishing and crabbing from designated shoreline areas located at the Ingleside Recreation Area from legal sunrise to legal sunset, April 1 through September 30.

(ii) We allow fishing from designated shoreline areas located at the Chester River end of Boxes Point and Duck Inn Trails from legal sunrise to legal sunset.

(c) *Patuxent Research Refuge*—(1) *Migratory game bird hunting.* We allow hunting of goose, duck, and dove on designated areas of the refuge subject to the following conditions:

(i) We require a National Wildlife Refuge System Hunt Application (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System), and a signed Statement of Hunter Ethics (FWS Form 3–2516).

(ii) We prohibit hunting and scouting on Sundays and Federal holidays. No hunt-related activities may take place unless the Hunting Control Station is open.

(iii) We allow the use of dogs consistent with State regulations.

(iv) We prohibit wading in all impounded waters except for the placement and retrieval of decoys.

(2) *Upland game hunting.* We allow hunting of gray squirrel, eastern cottontail rabbit, and woodchuck on designated areas of the refuge subject to the following condition: The conditions set forth at paragraphs (c)(1)(i) through (iii) of this section apply.

(3) *Big game hunting.* We allow hunting of turkey and white-tailed deer on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (c)(1)(i) and (ii) apply.

(ii) We prohibit organized deer drives. We define a "deer drive" as an organized or planned effort to pursue, drive, chase, or otherwise frighten or cause deer to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the deer.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) We require a National Wildlife Refuge System Fishing/Shrimping/Crabbing/Frogging Application (FWS Form 3–2358).

(ii) We prohibit the use and/or possession of lead sinkers.

■ 20. Amend § 32.40 by revising paragraphs (a), (b), (c), (d), (f), (g), and (h) to read as follows:

**§ 32.40  Massachusetts.**

\* \* \* \* \*

(a) *Assabet River National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of waterfowl and woodcock on designated areas of the refuge subject to the following conditions:

(i) We allow hunters to enter the refuge 1½ hours before legal shooting hours, and they must exit the refuge by 1½ hours after legal shooting hours.

(ii) Hunters must obtain and possess a refuge-specific hunting permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) to hunt on the refuge.

(iii) You may begin scouting hunting areas 4 weeks prior to the opening day of your permitted season. We require possession of a valid refuge hunting permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) while scouting.

(iv) We allow the use of dogs consistent with State regulations.

(v) One nonhunting companion may accompany each permitted hunter. We prohibit nonhunting companions from hunting, but they may assist in other means. All companions must carry identification and stay with the hunter.

(vi) Hunters may use temporary tree stands and ground blinds while engaged in hunting during the applicable seasons. Hunters must mark stands and blinds with their permit number. Hunters must remove all stands and blinds within 30 days after the end of the permitted season.

(vii) Migratory waterfowl hunting hours are ½ hour before legal sunrise to legal sunset.

(2) *Upland game hunting.* We allow hunting of ruffed grouse, fox, coyote, gray squirrel, and cottontail rabbit on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (a)(1)(i) through (vi) of this section apply.

(ii) Upland and big game hunting hours are ½ hour before legal sunrise to ½ hour after legal sunset.

(iii) North Unit B, Unit C, and South Unit are archery only.

(iv) We prohibit the use of handguns or rifles for hunting.

(3) *Big game hunting.* We allow hunting of white-tailed deer, turkey, and bear on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (a)(1)(i) through (iii), (v), and (vi), and (2)(ii) through (iv) of this section apply.

(ii) We prohibit organized deer drives. We define a "deer drive" as an organized or planned effort to pursue, drive, chase, or otherwise frighten or cause deer to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the deer.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) We allow catch-and-release fishing only.

(ii) We allow the use of live bait with the exception of any amphibians or reptiles (frogs, salamanders, etc.).

(b) *Great Meadows National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of waterfowl on designated areas of the refuge subject to the following conditions:

(i) We allow hunters to enter the refuge 1½ hours before legal shooting hours, and they must exit the refuge by 1½ hours after legal shooting hours.

(ii) Hunters must obtain and possess a refuge-specific hunting permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) to hunt on the refuge.

(iii) Hunters may begin scouting hunting areas 4 weeks prior to the opening day of your permitted season. We require possession of a valid hunting permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) while scouting.

(iv) One nonhunting companion may accompany each permitted hunter. We prohibit nonhunting companions from hunting, but they may assist in other means. All companions must carry identification and stay with the hunter.

(v) Hunters may use temporary tree stands and ground blinds while engaged in hunting during the applicable seasons. Hunters must mark stands and blinds with their permit number. Hunters must remove all stands and blinds within 30 days after the end of the permitted season.

(vi) We allow the use of dogs consistent with State regulations.

(vii) Migratory waterfowl hunting hours are ½ hour before legal sunrise to legal sunset.

(2) *Upland game hunting.* We allow hunting of coyote on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (b)(1)(i) through (iii), (iv), and (vi) of this section apply.

(ii) Upland and big game hunting hours are ½ hour before legal sunrise to ½ hour after legal sunset.

(iii) We allow archery hunting only for upland game.

(3) *Big game hunting.* We allow archery hunting of whitetail deer, turkey, and bear on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (b)(1)(i) through (v) and (b)(2)(ii) of this section apply.

(ii) We prohibit organized deer drives. We define a "deer drive" as an organized or planned effort to pursue, drive, chase, or otherwise frighten or

cause deer to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the deer.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge.

(c) *Mashpee National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow migratory game bird hunting on designated areas of the refuge subject to the following conditions:

(i) We allow hunters to access the refuge 1½ hours before legal shooting hours until 1½ hours after legal shooting hours.

(ii) Hunters may begin scouting hunting areas 4 weeks prior to the opening day of your permitted season. We require possession of a valid refuge hunting permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) while scouting.

(iii) We allow the use of dogs consistent with State regulations.

(iv) One nonhunting companion may accompany each permitted hunter. We prohibit nonhunting companions from hunting, but they may assist in other means. All companions must carry identification and stay with the hunter.

(v) Hunters must clearly label tree stands and ground blinds with their State hunting license number.

(vi) Migratory waterfowl hunting hours are ½ hour before legal sunrise to legal sunset.

(2) *Upland game hunting.* We allow hunting of coyote, fox, raccoon, opossum, gray squirrel, quail, pheasant, crow, and ruffed grouse on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (c)(1)(i) through (iv) of this section apply.

(ii) Upland and big game hunting hours are ½ hour before legal sunrise to ½ hour after legal sunset.

(3) *Big game hunting.* We allow hunting of white-tailed deer and wild turkey on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (c)(1)(i), (ii), (iv), and (v), and (c)(2)(ii) of this section apply.

(ii) We prohibit organized deer drives. We define a "deer drive" as an organized or planned effort to pursue, drive, chase, or otherwise frighten or cause deer to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the deer.

(4) [Reserved]

(d) *Monomoy National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of migratory

waterfowl on designated areas of the refuge by boat subject to the following condition: We allow the use of dogs consistent with State regulations.

(2)–(3) [Reserved]

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) We allow fishing from legal sunrise to legal sunset on designated portions of the Monomoy Islands unless otherwise posted.

(ii) We allow surf fishing from the Morris Island shore 24 hours a day.

\*　　\*　　\*　　\*　　\*

(f) *Oxbow National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of waterfowl, woodcock, and Wilson's snipe on designated areas of the refuge subject to the following conditions:

(i) We allow hunters to enter the refuge 1½ hours before legal shooting hours, and they must exit the refuge by 1½ hours after legal shooting hours.

(ii) Hunters must obtain and possess a refuge-specific hunting permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) to hunt on the refuge.

(iii) Hunters may begin scouting hunting areas 4 weeks prior to the opening day of your permitted season. We require possession of a valid refuge hunting permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) while scouting.

(iv) We allow the use of dogs consistent with State regulations.

(v) Hunters may use temporary tree stands and ground blinds while engaged in hunting during the applicable seasons. Hunters must mark stands and blinds with their permit number. Hunters must remove all stands and blinds within 30 days after the end of the permitted season.

(vi) One nonhunting companion may accompany each permitted hunter. We prohibit nonhunting companions from hunting, but they can assist in other means. All companions must carry identification and stay with the hunter.

(vii) Migratory waterfowl hunting hours are ½ hour before legal sunrise to legal sunset.

(2) *Upland game hunting.* We allow hunting of ruffed grouse, gray squirrel, coyote, fox, and eastern cottontail rabbit on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (f)(1)(i) through (vi) of this section apply.

(ii) Upland and big game hunting hours are ½ hour before legal sunrise to ½ hour after legal sunset.

(iii) Hospital Road North Unit and Still River Depot Area are archery only.

(iv) We prohibit the use of handguns or rifles for hunting.

(3) *Big game hunting.* We allow hunting of white-tailed deer, turkey, and bear on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (f)(1)(i) through (iii), (v), and (vi) and (2)(ii) and (iv) of this section apply.

(ii) We prohibit organized deer drives. We define a "deer drive" as an organized or planned effort to pursue, drive, chase, or otherwise frighten or cause deer to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the deer.

(4) *Sport fishing.* We allow sport fishing in designated areas of the refuge.

(g) *Parker River National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of duck, goose, brant, coot, crow, merganser, rail, snipe, and woodcock on designated areas of the refuge subject to the following conditions:

(i) Hunters may enter the refuge ½ hour before legal shooting hours and must exit the refuge by ½ hour after legal shooting hours.

(ii) We prohibit the use of centerfire rifles and handguns to hunt any species.

(iii) We prohibit shooting across refuge roads and within or into administratively closed zones.

(iv) We prohibit launching motorized boats for scouting purposes prior to hunting.

(v) We allow the use of dogs consistent with State regulations.

(vi) We allow crow hunting only from September 1 through February 28.

(vii) Migratory waterfowl hunting hours are ½ hour before legal sunrise to legal sunset.

(2) *Upland game hunting.* We allow hunting of ruffed grouse, pheasant, cottontail rabbit, hare, gray squirrel, coyote, fox, raccoon, and opossum on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (g)(1)(i) through (iii), and (v) (with the exception that we prohibit dogs while hunting furbearers) of this section apply.

(ii) Upland and big game hunting hours are ½ hour before legal sunrise to ½ hour after legal sunset.

(3) *Big game hunting.* We allow hunting of white-tailed deer and wild turkey on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (g)(1)(i) through (iii) and (g)(2)(ii) of this section apply.

(ii) We allow hunting of white-tailed deer on Plum Island subject to the following conditions:

(A) We allow archery, primitive firearms, shotgun, and crossbow (by MassWildlife permit only) for certain disabled persons) hunting during a designated 2-day hunt on the first Wednesday and Thursday of the State shotgun deer season.

(B) You must have a lottery-issued hunt permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) to hunt during this 2-day time period.

(iii) We allow hunting of deer and wild turkey in Areas A, B, C, and D subject to the following condition: You may take deer using archery equipment only.

(4) *Sport fishing.* We allow saltwater fishing on designated areas of the refuge subject to the following conditions:

(i) We allow saltwater fishing on the ocean beach from legal sunrise to legal sunset without a refuge permit.

(ii) Stage Island is open to fishing from legal sunrise to legal sunset.

(iii) Nelson Island is open to fishing from legal sunrise to legal sunset.

(iv) We allow walk-on night fishing after legal sunset with a valid refuge permit (FWS Form 3–2358, National Wildlife Refuge System Fishing/ Shrimping/Crabbing/Frogging Application; vehicle sticker issued by the refuge office).

(v) We allow anglers to use over-the-sand, surf-fishing vehicles, or off-road vehicles (ORVs) with a valid refuge permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) and permit fee, as determined in an annual lottery.

(h) *Silvio O. Conte National Fish and Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of migratory game birds on designated areas subject to the following conditions:

(i) Hunters may access the refuge 1½ hours before legal sunrise until 1½ hours after legal sunset.

(ii) We prohibit access to Third Island between January 1 and June 30.

(iii) We allow the use of dogs consistent with State regulations.

(iv) Migratory waterfowl hunting hours are ½ hour before legal sunrise to legal sunset.

(2) *Upland game hunting.* We allow hunting of upland game on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (h)(1)(i) through (iii) of this section apply.

(ii) Upland and big game hunting hours are ½ hour before legal sunrise to ½ hour after legal sunset.

(3) *Big game hunting.* We allow hunting of big game on designated areas

of the refuge subject to the following condition: The conditions set forth at paragraphs (h)(1)(i) and (h)(2)(ii) of this section apply.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (h)(1)(i) and (ii) of this section apply.

(ii) We prohibit launching of motorboats from the refuge.

(iii) We prohibit the use of reptiles and amphibians as bait.

■ 21. Amend § 32.42 by revising paragraphs (b)(2) introductory text, (m)(1)(v), and (o) to read as follows:

### § 32.42  Minnesota.

\* \* \* \* \*

(b) \* \* \*

(2) *Upland game hunting.* We allow hunting of ring-necked pheasant, Hungarian partridge, cottontail and jack rabbit, raccoon, striped skunk, gray and fox squirrel, red and gray fox, and wild turkey on designated areas of the refuge subject to the following conditions:

\* \* \* \* \*

(m) \* \* \*

(1) \* \* \*

(v) We allow hunting on the Spieker tract in Clay County, as governed by applicable State regulations.

\* \* \* \* \*

(o) *Rydell National Wildlife Refuge*— (1) *Migratory game bird hunting.* We allow hunting of goose, duck, coot, woodcock, and mourning dove on designated areas of the refuge subject to the following conditions:

(i) We only allow hunting of goose, duck, and coot during the special State-administered youth waterfowl season.

(ii) We allow the use of dogs while hunting, provided the dog is under the immediate control of the hunter at all times.

(iii) Hunters must dismantle hunting blinds, platforms, and ladders made from natural vegetation at the end of each day.

(iv) We allow nonmotorized boats in areas open to migratory bird hunting during the special State-administered youth waterfowl season.

(v) We prohibit hunting during the Spring Light Goose Conservation Order.

(vi) We allow the use of wheeled, nonmotorized conveyance devices (*e.g.,* bikes, game carts).

(vii) We prohibit entry onto the refuge earlier than 2 hours before legal shooting time, and we require hunters to leave the refuge no later than 2 hours after legal shooting time.

(2) *Upland game hunting.* We allow hunting of ring-necked pheasant, gray

(Hungarian) partridge, ruffed grouse, prairie grouse, rabbit (cottontail and jack), snowshoe hare, squirrel (fox and gray), and wild turkey on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (o)(1)(ii), (iii), (vi), and (vii) of this section apply.

(ii) You may use or possess only approved nontoxic shot shells (see § 32.2(k)) in the field while hunting turkey.

(iii) We prohibit the use of centerfire, rimfire, or muzzleloading rifles, and handguns.

(3) *Big game hunting.* We allow hunting of white-tailed deer on designated areas of the refuge subject to the following conditions:

(i) We prohibit shooting at a big game animal or a decoy of a big game animal on, from, over, across, or within 30 feet (9 meters) of a roadway open to public vehicle transportation.

(ii) We require a State-issued permit to hunt white-tailed deer in the Special Permit Area of the refuge.

(iii) Archery is the only legal weapon for hunting deer, with the exception of during the special State-administered mentored youth hunt and disabled hunt.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) We prohibit the taking of any turtle, frog, leech, minnow, crayfish, and mussel (clam) species by any method on the refuge (see § 27.21 of this chapter).

(ii) We allow fishing from May 1 through November 1.

\*　　\*　　\*　　\*　　\*

■ 22. Amend § 32.43 by:
■ a. Revising paragraphs (b)(1) and (2);
■ b. Removing paragraph (b)(4)(i) and (v);
■ c. Redesignating (b)(4)(ii) through (iv) as (b)(4)(i) through (iii);
■ d. Revising paragraphs (c), (e), (f)(2) and (3), (g)(1)(i), (iv), and (x), (g)(2), (g)(3)(i) and (v), (g)(4)(iv), (h)(1)(i) and (v), (h)(2), (h)(3)(iv) and (vi), (h)(4)(i), (i)(1)(i) and (v), (i)(2), (i)(3)(iv), (vi), and (viii), (i)(4)(i), (l), and (m)(1)(i) and (v);
■ e. Adding new paragraph (m)(1)(xi); and
■ f. Revising paragraphs (m)(2)(ii) and (iii), and (m)(3)(i), (iv), (vi), and (vii); and
■ g. Adding new paragraph (m)(3)(viii).
The revisions and addition read as follows:

### § 32.43 Mississippi.

\*　　\*　　\*　　\*　　\*

(b) \* \* \*

(1) *Migratory game bird hunting.* We allow hunting of migratory ducks, geese,

mergansers, coot, rails, snipe, and woodcock on designated areas of the refuge subject to the following conditions:

(i) All hunters age 16 and older must possess a State-issued North Mississippi NWR hunting permit (code 606, available from the Mississippi Department of Wildlife, Fisheries, and Parks). While hunting on the refuge, all persons age 15 and younger ("youth hunter") must be in the presence and under the direct supervision of a licensed or exempt hunter age 21 or older. A hunter supervising a youth hunter must hold all required licenses and permits.

(ii) Hunters may enter the refuge at 4 a.m. and must exit the refuge no later than 12 p.m. (noon).

(iii) We allow hunting of migratory game birds, including under the Light Goose Conservation Order, only on Wednesdays, Saturdays, and Sundays.

(iv) Each hunter must obtain a daily Migratory Bird Hunt Report (FWS Form 3–2361). You must display the card in plain view on the dashboard of your vehicle so that the State-issued license number is readable. Prior to leaving the refuge, you must complete the reverse side of the card and deposit it at one of the refuge information stations. Include all game harvested, and if you harvest no game, report "0." We prohibit hunters possessing more than one Migratory Bird Hunt Report at a time.

(v) It is unlawful to hunt from or shoot into the 100-foot (30.5-meter) zone along either side of designated roads and parking lots.

(vi) We allow the use of dogs on the refuge when hunting migratory game birds.

(vii) You must remove decoys, blinds, boats, other personal property, and litter from the hunting area following each morning's hunt (see §§ 27.93 and 27.94 of this chapter).

(viii) We allow no more than 25 shotshells per person in the field.

(ix) We allow the take of beavers, coyotes, nutria, and feral hog during daylight hours only during any open season with weapons and ammunition legal for that season.

(2) *Upland game hunting.* We allow hunting of quail, squirrel, and rabbit on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (b)(1)(i), (ii), (v), and (ix) of this section apply.

(ii) All hunters using shotguns for small game must use approved nontoxic shot (see § 32.2(k)).

\*　　\*　　\*　　\*　　\*

(c) *Dahomey National Wildlife Refuge*—(1) *Migratory game bird*

*hunting.* We allow hunting of duck, goose, merganser, coot, rail, snipe, woodcock, and dove on designated areas of the refuge subject to the following conditions:

(i) All hunters age 16 and older must possess a North Mississippi NWR hunting permit (code 606, available from the Mississippi Department of Wildlife, Fisheries, and Parks). While hunting on the refuge, all persons age 15 and younger ("youth hunter") must be in the presence and under the direct supervision of a licensed or exempt hunter at age 21 or older ("licensed hunter"). A hunter supervising a youth hunter must hold all required licenses and permits.

(ii) Hunters may enter the refuge at 4 a.m. and must exit the refuge no later than 2 hours after legal sunset except during raccoon and frog hunts.

(iii) We allow hunting of waterfowl (ducks, teal, mergansers, coots, and geese), rail and snipe, including under the Light Goose Conservation Order, only on Wednesdays, Saturdays, and Sundays ending at 12 p.m. (noon).

(iv) Each hunter must obtain a daily Migratory Bird Hunt Report (FWS Form 3–2361). You must display the card in plain view on the dashboard of your vehicle so that the State-issued license number is readable. Prior to leaving the refuge, you must complete the card and deposit it at one of the refuge information stations. Include all game harvested, and if you harvest no game, report "0." We prohibit hunters possessing more than one Migratory Bird Hunt Report at a time.

(v) It is unlawful to hunt from or shoot into the 100-foot (30.5-meter) zone along either side of designated roads and parking lots.

(vi) We allow the use of dogs on the refuge when hunting migratory game birds and upland game. We prohibit the use of dogs during big game hunts.

(vii) You must remove decoys, blinds, boats, other personal property, and litter from the hunting area following each morning's hunt (see §§ 27.93 and 27.94 of this chapter).

(viii) We allow no more than 25 shotshells per person in the field.

(ix) We allow the take of coyote, beaver, nutria, and feral hog incidental to other lawful hunting using legal methods of take.

(2) *Upland game hunting.* We allow hunting of quail, squirrel, rabbit, and raccoon on designated areas of the refuge subject to the following conditions:

(i) You must possess a valid general Special Use Permit (FWS Form 3–1383– G) to hunt raccoon on the refuge.

(ii) Each hunter must obtain a daily Upland/Small Game/Furbearer Report (FWS Form 3–2362). You must display the card in plain view on the dashboard of your vehicle so that the State-issued license number is readable. Prior to leaving the refuge, you must complete the card and deposit it at one of the refuge information stations. Include all game harvested, and if you harvest no game, report "0." We prohibit hunters possessing more than one Upland/Small Game/Furbearer Report at a time.

(iii) The conditions set forth at paragraphs (c)(1)(i), (ii), (v) and (ix) of this section apply.

(3) *Big game hunting.* We allow hunting of white-tailed deer on designated areas of the refuge subject to the following conditions:

(i) Each hunter must obtain a daily Big Game Harvest Report (FWS Form 3–2359). You must display the card in plain view on the dashboard of your vehicle so that the State-issued license number is readable. Prior to leaving the refuge, you must complete the card and deposit it at one of the refuge information stations. Include all game harvested, and if you harvest no game, report "0." We prohibit hunters possessing more than one Big Game Harvest Report at a time.

(ii) The conditions set forth at paragraphs (c)(1)(i), (ii), (v), and (ix) of this section apply.

(iii) We prohibit organized deer drives. We define a "deer drive" as an organized or planned effort to pursue, drive, chase, or otherwise frighten or cause deer to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the deer.

(iv) We prohibit hunting or shooting across any open, fallow, or planted field.

(v) We allow valid permit holders to possess and hunt from one portable stand or blind on the refuge. You must clearly label your stand or blind with your State license/sportsmen's identification number. Stands left in the area do not reserve the hunting locations. You may place stands up to 7 days prior to the hunt, and you must remove them within 7 days after the refuge's deer season closes (see § 27.93 of this chapter). We prohibit the placement of ground blinds within mowed trails.

(vi) Hunters using a climbing tree stand must use a fall-arrest system manufactured to Treestand Manufacturer's Association standards.

(vii) We prohibit the use of buckshot on the refuge.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) We prohibit the use or possession of alcoholic beverages while fishing.

(ii) We prohibit possession or use of jugs, seines, nets, hand-grab baskets, slat traps/baskets, or any other similar devices.

(iii) We prohibit commercial fishing of any kind.

(iv) We only allow trotlines, yo-yos, limb lines, crawfish traps, or any other similar devices and only for recreational use. You must tag or mark these devices with the angler's State fishing license number written with waterproof ink, legibly inscribed or legibly stamped on the tag. You must attend these devices a minimum of once every 24 hours. When not attended, you must remove these devices from the refuge (see § 27.93 of this chapter).

(v) We allow frogging and crawfishing.

\* \* \* \* \*

(e) *Hillside National Wildlife Refuge—* (1) *Migratory game bird hunting.* We allow hunting of goose, duck, merganser, coot, and dove on designated areas of the refuge subject to the following conditions:

(i) Each person age 16 or older hunting or fishing must possess a valid Theodore Roosevelt Complex Annual Public Use Permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System).

(ii) All youth hunters age 15 and younger must be in the presence and direct supervision of a Mississippi licensed or exempt hunter, age 21 or older. One adult may supervise no more than one youth hunter.

(iii) Before hunting or fishing, all participants must display their Daily Visitor Information/Harvest Report Card (Big Game Harvest Report, FWS Form 3–2359) in plain view in their vehicle so that the State-issued license number is readable. You must return all cards upon completion of the activity and before leaving the refuge.

(iv) We prohibit all other public use on the refuge during the muzzleloader deer and limited draw turkey hunts.

(v) Valid permit holders may incidentally take opossum, coyote, beaver, bobcat, and nutria in any refuge hunt season with weapons legal for that hunt. Valid permit holders may incidentally take feral hog during deer and turkey hunts only.

(vi) We prohibit hunting or shooting into a 100-foot (30.5-meter) zone along either side of pipelines, power line rights-of-way, designated roads, and trails, and around parking lots. It is

considered hunting if you have a loaded weapon, if you have a nocked arrow while bow hunting, or if you are in an elevated tree stand or ground blind with a means to take, within these areas.

(vii) Hunters must remove all decoys, blind material, and harvested waterfowl from the area no later than 1 p.m. each day (see § 27.93 of this chapter).

(viii) We allow the use of dogs for retrieving migratory birds.

(ix) We allow goose, duck, merganser, and coot hunting beginning ½ hour before legal sunrise until 12 p.m. (noon).

(x) We do not open for early teal season.

(xi) We limit waterfowl hunters to 25 shotshells per person in the field.

(2) *Upland game hunting.* We allow hunting of squirrel, rabbit, quail, raccoon, opossum, coyote, beaver, bobcat, and nutria on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (e)(1)(i) through (vi) of this section apply.

(ii) We allow the use of dogs for hunting squirrel, raccoon, and quail, and for the February rabbit hunt.

(iii) Beginning the first day after the deer muzzleloader hunt, we prohibit entry into the Turkey Point area until March 1.

(3) *Big game hunting.* We allow hunting of white-tailed deer, turkey, and feral hog on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (e)(1)(i) through (vi) and (e)(2)(iii) of this section apply.

(ii) We prohibit organized drives. We define a "drive" as an organized or planned effort to pursue, drive, chase, or otherwise frighten or cause game to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the game.

(iii) Hunting or shooting within or adjacent to open fields and tree plantations less than 5 feet (1.5 meters (m)) in height must be from a stand a minimum of 10 feet (3 m) above the ground.

(iv) The refuge brochure provides deer check station locations and requirements. Prior to leaving the refuge, you must check all harvested deer at the nearest self-service check station (Big Game Harvest Report, FWS Form 3–2359) following the posted instructions.

(v) Hunters may possess and hunt from only one stand or blind. Hunters may place a deer stand or blind 48 hours prior to a hunt and must remove it within 48 hours after each designated

hunt (see § 27.93 of this chapter), with the exception of closed areas where special regulations apply.

(vi) During designated muzzleloader hunts, we allow archery equipment and muzzleloaders loaded with a single projectile; we prohibit breech-loading firearms of any type.

(vii) Turkey hunting opportunities will consist of three limited draw hunts within the State season time frame. Limited draw hunts require a Limited Hunt Permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) assigned by random computer drawing. At the end of the hunt, you must return the permit with information concerning the hunt to the refuge. Failure to return this permit will disqualify the hunter for any limited hunts the next year.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (e)(1)(i), (iii), (iv), and (e)(2)(iii) of this section apply.

(ii) We prohibit trotlines, limb lines, jugs, seines, and traps.

(iii) We allow frogging during the State bullfrog season.

(iv) We allow fishing in the borrow ponds along the north levee throughout the year except during the muzzleloader deer hunt.

(v) We open all other refuge waters to fishing March 1 through November 15.

(f) * * *

(2) *Upland game hunting.* We allow hunting of rabbit, opossum, coyote, beaver, bobcat, and nutria on designated areas of the refuge subject to the following conditions:

(i) Each person age 16 or older hunting or fishing must possess a valid Theodore Roosevelt Complex Annual Public Use Permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System)).

(ii) All youth hunters age 15 and younger must be in the presence and direct supervision of a Mississippi licensed or exempt hunter, age 21 or older. One adult may supervise no more than one youth hunter.

(iii) Before hunting or fishing, all participants must display their Daily Visitor Information/Harvest Report Card (Big Game Harvest Report, FWS Form 3–2359) in plain view in their vehicle so that the required information is readable. You must return all cards upon completion of the activity and before leaving the refuge.

(iv) We prohibit all other public use on the refuge during the muzzleloader deer hunt.

(v) Valid permit holders may incidentally take opossum, coyote,

beaver, bobcat, and nutria in any refuge hunt season with weapons legal for that hunt. Valid permit holders may incidentally take feral hog during deer hunts only.

(vi) We allow the use of dogs for hunting during the February rabbit hunt.

(vii) We prohibit hunting or shooting into a 100-foot (30.5-meter (m)) zone along either side of pipelines, power line rights-of-way, designated roads, and trails, and around parking lots. It is considered hunting if you have a loaded weapon, if you have a nocked arrow while bow hunting, or if you are in an elevated tree stand or ground blind with a means to take, within these areas.

(3) *Big game hunting.* We allow hunting of white-tailed deer and feral hog on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (f)(2)(i) through (iii), (v), and (vii) of this section apply.

(ii) We prohibit organized drives. We define a "drive" as an organized or planned effort to pursue, drive, chase, or otherwise frighten or cause game to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the game.

(iii) Hunting or shooting within or adjacent to open fields or tree plantations less than 5 feet (1.5 m) in height must be from a stand a minimum of 10 feet (3 m) above the ground.

(iv) Hunters may possess and hunt from only one stand or blind. Hunters may place a deer stand or blind 48 hours prior to a hunt and must remove it within 48 hours after each designated hunt (see § 27.93 of this chapter), with the exception of closed areas where special regulations apply.

(v) During designated muzzleloader hunts, we allow archery equipment and muzzleloaders loaded with a single projectile; we prohibit breech-loading firearms of any type.

* * * * *

(g) * * *

(1) * * *

(i) Each person age 16 or older who is hunting or fishing must possess a valid Theodore Roosevelt Complex Annual Public Use Permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System).

* * * * *

(iv) Valid permit holders may incidentally take opossum, coyote, beaver, bobcat, and nutria in any refuge hunt season with weapons legal for that hunt. Valid permit holders may incidentally take feral hog during deer hunts only.

* * * * *

(x) We allow hunting during open State seasons. The first 2 days of the season and all weekends, with the exception of youth weekends, are limited draw hunts. These hunts require a Limited Hunt Permit (FWS Form 3–2439, Hunt Application—National Refuge System) assigned by random computer drawing. At the end of the hunt, you must return the permit with information concerning your hunt. If you fail to return this permit, you will not be eligible for any limited hunts the next year.

* * * * *

(2) *Upland game hunting.* We allow hunting of squirrel, rabbit, raccoon, opossum, coyote, beaver, bobcat, and nutria on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (g)(1)(i) through (v) of this section apply.

(ii) We allow the use of dogs for hunting squirrel and raccoon, and for the February rabbit hunt.

(iii) Beginning the day before waterfowl season, we restrict hunting to the waterfowl hunt area.

(3) * * *

(i) The conditions set forth at paragraphs (g)(1)(i) through (v) and (g)(2)(iii) of this section apply.

* * * * *

(v) Hunters may possess and hunt from only one stand or blind. Hunters may place a deer stand or blind 48 hours prior to a hunt and must remove it within 48 hours after each designated hunt (see § 27.93 of this chapter), with the exception of closed areas where special regulations apply.

* * * * *

(4) * * *

(iv) We open refuge waters to fishing throughout the year, except in the waterfowl sanctuary, which is closed one day prior to the beginning of waterfowl season until March 1.

(h) * * *

(1) * * *

(i) Each person age 16 or older who is hunting or fishing must possess a valid Theodore Roosevelt Complex Annual Public Use Permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System).

* * * * *

(v) Valid permit holders may incidentally take opossum, coyote, beaver, bobcat, and nutria in any refuge hunt season with weapons legal for that hunt. Valid permit holders may incidentally take feral hog during deer hunts only.

* * * * *

(2) *Upland game hunting.* We allow hunting of squirrel, rabbit, quail,

raccoon, opossum, coyote, beaver, bobcat, and nutria on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (h)(1)(i) through (vi) of this section apply.

(ii) We allow the use of dogs for hunting squirrel, quail, and raccoon, and for the February rabbit hunt.

(3) * * *

(iv) The refuge brochure provides deer check station locations and requirements. Prior to leaving the refuge, you must check all harvested deer at the nearest self-service check station (Big Game Harvest Report, FWS Form 3–2359) following the posted instructions.

*　*　*　*　*

(vi) During designated muzzleloader hunts, we allow archery equipment and muzzleloaders loaded with a single projectile; we prohibit breech-loading firearms of any type.

(4) * * *

(i) The conditions set forth at paragraphs (h)(1)(i), (iii), and (iv) of this section apply.

*　*　*　*　*

(i) * * *

(1) * * *

(i) Each person age 16 or older who is hunting or fishing must possess a valid Theodore Roosevelt Complex Annual Public Use Permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System).

*　*　*　*　*

(v) Valid permit holders may incidentally take opossum, coyote, beaver, bobcat, and nutria in any refuge hunt season with weapons legal for that hunt. Valid permit holders may incidentally take feral hog during deer and turkey hunts only.

*　*　*　*　*

(2) *Upland game hunting.* We allow hunting of squirrel, rabbit, quail, raccoon, opossum, coyote, beaver, bobcat, and nutria on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (i)(1)(i) through (vi) and (x) of this section apply.

(ii) We allow the use of dogs for hunting squirrel, quail, and raccoon, and for the February rabbit hunt.

(3) * * *

(iv) The refuge brochure provides deer check station locations and requirements. Prior to leaving the refuge, you must check all harvested deer at the nearest self-service check station (Big Game Harvest Report, FWS Form 3–2359) following the posted instructions.

*　*　*　*　*

(vi) During designated muzzleloader hunts, we allow archery equipment and muzzleloaders loaded with a single projectile; we prohibit breech-loading firearms of any type.

*　*　*　*　*

(viii) Limited draw hunts require a Limited Hunt Permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) assigned by random computer drawing. At the end of the hunt, you must return the permit with information concerning the hunt to the refuge. Failure to return this permit will disqualify the hunter for any limited hunts the next year.

*　*　*　*　*

(4) * * *

(i) The conditions set forth at paragraphs (i)(1)(i), (iii), (iv), and (x) of this section apply.

*　*　*　*　*

(l) *Tallahatchie River National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of duck, geese, merganser, coot, rail, snipe, woodcock, and dove on designated areas of the refuge subject to the following conditions:

(i) All hunters age 16 and older must possess a North Mississippi NWR hunting permit (code 606, available from the Mississippi Department of Wildlife, Fisheries, and Parks). While hunting on the refuge, all persons age 15 and younger ("youth hunter") must be in the presence and under the direct supervision of a licensed or exempt hunter age 21 or older. A hunter supervising a youth hunter must hold all required licenses and permits.

(ii) Hunters may enter the refuge at 4 a.m. and must exit the refuge no later than 2 hours after legal sunset except during raccoon and frog hunts.

(iii) We allow hunting of waterfowl (ducks, teal, mergansers, coot, and geese), rail, and snipe, including under the Light Goose Conservation Order, only on Wednesdays, Saturdays, and Sundays ending at 12 p.m. (noon).

(iv) Each hunter must obtain a daily Migratory Bird Hunt Report (FWS Form 3–2361). You must display the card in plain view on the dashboard of your vehicle so that the State-issued license number is readable. Prior to leaving the refuge, you must complete the card and deposit it at one of the refuge information stations. Include all game harvested, and if you harvest no game, report "0." We prohibit hunters possessing more than one Migratory Bird Hunt Report at a time.

(v) It is unlawful to hunt from or shoot into the 100-foot (30.5-meter) zone along either side of designated roads and parking lots.

(vi) During designated muzzleloader hunts, we allow archery equipment and muzzleloaders loaded with a single projectile; we prohibit breech-loading firearms of any type.

*　*　*　*　*

(vi) We allow the use of dogs on the refuge when hunting migratory game birds and upland game. We prohibit the use of dogs during big game hunts.

(vii) You must remove decoys, blinds, boats, other personal property, and litter from the hunting area following each morning's hunt (see §§ 27.93 and 27.94 of this chapter).

(viii) We allow no more than 25 shotshells per person in the field.

(ix) We allow the take of beavers, coyotes, nutria, and feral hogs during daylight hours only during any open season with weapons and ammunition legal for that season.

(2) *Upland game hunting.* We allow hunting of quail, squirrel, rabbit, nutria and raccoon on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (l)(1)(i), (ii), (iv) (substitute Big Game Harvest Report [FWS Form 3–2359] for Migratory Bird Hunt Report [FWS Form 3–2361]), (v), and (ix) of this section apply.

(ii) All hunters using shotguns for small game must use approved nontoxic shot (see § 32.2(k)).

(3) *Big game hunting.* We allow hunting of white-tailed deer and feral hog on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (l)(1)(i), (ii), and (iv) (substitute Big Game Harvest Report [FWS Form 3–2359] for Migratory Bird Hunt Report [FWS Form 3–2361]) of this section apply.

(ii) We prohibit dogs while hunting deer. We allow the use of dogs to hunt feral hog during designated hog seasons.

(iii) We prohibit organized deer drives. We define a "deer drive" as an organized or planned effort to pursue, drive, chase, or otherwise frighten or cause deer to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the deer.

(iv) We prohibit hunting or shooting across any open, fallow, or planted field.

(v) We allow valid permit holders to possess and hunt from one portable stand or blind on the refuge. You must permanently and legibly write your State hunting license number on all stands on the refuge. Stands left on the area do not reserve the hunting locations. You may place stands up to 7 days prior to the hunt, and you must remove them no more than 7 days after the refuge's deer season closes (see § 27.93 of this chapter). Ground blinds may not be placed within mowed trails.

(vi) Hunters using climbing tree stands must use a fall-arrest system

manufactured to Treestand Manufacturer's Association standards.

(vii) We prohibit the use of buckshot on the refuge.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) We prohibit the use or possession of alcoholic beverages while fishing.

(ii) We prohibit possession or use of jugs, seines, nets, hand-grab baskets, slat traps/baskets, or any other similar devices.

(iii) We prohibit commercial fishing of any kind.

(iv) We only allow trotlines, yo-yos, limb lines, crawfish traps, or any other similar devices for recreational use. You must tag or mark these devices with the angler's State fishing license number written in waterproof ink, legibly inscribed or legibly stamped on the tag. You must attend these devices a minimum of once every 24 hours. When not attended, you must remove them from the refuge (see § 27.93 of this chapter).

(v) We prohibit snagging or attempting to snag fish.

(vi) We allow frogging and crawfishing.

(m) * * *

(1) * * *

(i) Each person age 16 or older who is hunting or fishing must possess a valid Theodore Roosevelt Complex Annual Public Use Permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System).

* * * * *

(v) Valid permit holders may incidentally take opossum, coyote, beaver, bobcat, and nutria in any refuge hunt season with weapons legal for that hunt. Valid permit holders may incidentally take feral hog during deer hunts only.

* * * * *

(xi) Limited draw hunts require a Limited Hunt Permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) assigned by random computer drawing. At the end of the hunt, you must return the permit with information concerning that hunt to the refuge. Failure to return this permit will disqualify the hunter for any limited hunts the next year.

(2) * * *

(ii) We allow the use of dogs for hunting squirrel and raccoon, and for the February rabbit hunt.

(iii) We allow rabbit hunting on the Brown Tract of Theodore Roosevelt National Wildlife Refuge that is managed by Yazoo National Wildlife Refuge.

(3) * * *

(i) The conditions set forth at paragraphs (m)(1)(i) through (vi) and (xi) of this section apply.

* * * * *

(iv) The refuge brochure provides deer check station locations and requirements. Prior to leaving the refuge, you must check all harvested deer at the nearest self-service check station (Big Game Harvest Report, FWS Form 3–2359) following the posted instructions.

* * * * *

(vi) During designated muzzleloader hunts, we allow archery equipment and muzzleloaders loaded with a single projectile; we prohibit breech-loading firearms of any type.

(vii) Limited draw hunts require a Limited Hunt Permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) assigned by random computer drawing. At the end of the hunt, you must return the permit with information concerning the hunt to the refuge. Failure to return this permit will disqualify the hunter for any limited hunts the next year.

(viii) We allow white-tailed deer hunting on the Brown Tract of Theodore Roosevelt National Wildlife Refuge that is managed by Yazoo National Wildlife Refuge.

* * * * *

■ 23. Amend § 32.45 by:
■ a. Revising paragraph (n)(1)(v);
■ b. Adding paragraph (n)(2);
■ c. Removing paragraph (n)(3)(iv);
■ d. Redesignating paragraphs (n)(3)(v) through (n)(3)(viii) as paragraphs (n)(3)(iv) through (n)(3)(vii);
■ e. Revising paragraph (w)(3) introductory text and (w)(3)(iii); and
■ f. Adding paragraph (w)(3)(iv).
The revisions and additions read as follows:

### § 32.45   Montana.

* * * * *

(n) * * *

(1) * * *

(v) Each hunter must set the appropriate blind selector (metal flip tag) before and after hunting.

* * * * *

(2) *Upland game hunting.* We allow hunting of turkey on designated areas of the refuge.

* * * * *

(w) * * *

(3) *Big game hunting.* We allow archery hunting of bear, elk, white-tailed deer, and mule deer on designated areas of the refuge subject to the following conditions:

* * * * *

(iii) You may install portable stands and blinds no sooner than August 1, and

you must remove them by December 15 of each year (see § 27.93 of this chapter).

(iv) We prohibit hunting of black bear during the State spring season.

* * * * *

■ 24. Amend § 32.46 by:
■ a. Revising paragraphs (b) and (c);
■ b. Redesignating paragraphs (d) through (f) as paragraphs (e) through (g);
■ c. Adding a new paragraph (d); and
■ d. Revising newly redesignated paragraphs (e), (f)(2) and (3), and (g).
The revisions and addition read as follows:

### § 32.46   Nebraska.

* * * * *

(b) *Crescent Lake National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of coot, crow, dove, duck, goose, merganser, rail, and snipe on designated areas of the refuge subject to the following conditions:

(i) Hunters may access the refuge from 2 hours before legal sunrise until 2 hours after legal sunset.

(ii) We allow the use of dogs.

(iii) We open the refuge to hunting from September 1 through March 15.

(iv) We prohibit publicly organized hunts unless authorized under a Special Use Permit (FWS Form 3–1383–C).

(2) *Upland game hunting.* We allow hunting of cottontail and jack rabbit, coyote, porcupine, prairie dog, State-defined furbearers, ring-necked pheasant, and prairie grouse on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (b)(1)(i) through (iv) of this section apply.

(ii) We allow electronic calls for coyote and furbearer hunting.

(iii) Coyotes and all furbearers or their parts, if left in the field, must be left at least 50 yards away from any road, trail, or building. Otherwise, hunters must remove them from the refuge.

(iv) Shooting hours are from ½ before legal sunrise until ½ hour after legal sunset.

(3) *Big game hunting.* We allow hunting of white-tailed deer, mule deer, and pronghorn antelope on designated areas of the refuge subject to the following condition: The conditions set forth at paragraphs (b)(1)(i), (iii), and (iv) of this section apply.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Anglers may enter the refuge 1 hour before legal sunrise and remain until 1 hour after legal sunset.

(ii) We open Blue, Smith, Crane, and Island Lake to fishing year-round. We close all other refuge lakes to fishing.

(iii) We prohibit leaving temporary shelters used for fishing overnight on the refuge.

(c) *Fort Niobrara National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of coot, crow, dark goose, dove, duck, light goose, rail, snipe, teal, and woodcock on designated areas of the refuge subject to the following conditions:

(i) Hunters and anglers may access the refuge from 2 hours before legal sunrise until 2 hours after legal sunset.

(ii) We allow access from designated areas of the refuge.

(iii) You must remove all blinds and decoys at the conclusion of each day's hunt (see § 27.93 of this chapter).

(iv) We allow the use of dogs when hunting August 1 through April 30.

(2) *Upland game hunting.* We allow hunting of badger, bobcat, coyote, fox, long-tailed weasel, mink, opossum, prairie dog, porcupine, rabbit, hare, raccoon, skunk, squirrel, woodchuck, State-defined furbearers, greater prairie chicken, grouse, partridge, pheasant, quail, and turkey on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (c)(1)(i), (ii), and (iv) of this section apply.

(ii) We allow hunting with muzzleloader, archery, shotgun, and falconry.

(iii) You may only possess nontoxic shot when hunting turkey (see § 32.2(k)).

(iv) Shooting hours for coyote, prairie dog, porcupine, woodchuck, and State-defined furbearers are ½ hour before legal sunrise to ½ hour after legal sunset.

(3) *Big game hunting.* We allow hunting of deer, elk, and pronghorn antelope on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (c)(1)(i) and (ii) of this section apply.

(ii) We allow hunting only with muzzleloader and archery equipment.

(iii) We allow portable tree stands and ground blinds to be used from August 16 through January 31.

(iv) We allow muzzleloader deer hunting subject to the following condition: Hunters must possess a refuge hunt permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) and comply with all of its terms and conditions.

(4) *Sport fishing.* We allow fishing on Minnechaduza Creek and on the Niobrara River, downstream from the Cornell Dam, subject to the following conditions:

(i) The conditions set forth at paragraphs (c)(1)(i) and (ii) of this section apply.

(ii) We prohibit the use of limb or set lines.

(iii) We prohibit the take of baitfish, reptiles, and amphibians.

(iv) We prohibit use or possession of alcoholic beverages while fishing on refuge lands and waters.

(d) *John W. and Louise Seier National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of coot, crow, dark goose, dove, duck, light goose, merganser, rail, snipe, teal, and woodcock on designated areas of the refuge subject to the following conditions:

(i) Hunters may access the refuge from 2 hours before legal sunrise until 2 hours after legal sunset.

(ii) You must remove all blinds and decoys at the conclusion of each day's hunt (see § 27.93 of this chapter).

(iii) We allow the use of dogs August 1 through April 31.

(2) *Upland game hunting.* We allow hunting of badger, bobcat, coyote, fox, long-tailed weasel, mink, opossum, prairie dog, porcupine, rabbit, hare, raccoon, skunk, squirrel, woodchuck, State-defined furbearers, greater prairie chicken, grouse, partridge, pheasant, quail, and turkey on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (d)(1)(i) and (iii) of this section apply.

(ii) You may only possess nontoxic shot when hunting turkey (see § 32.2(k)).

(iii) Shooting hours for coyote, prairie dog, porcupine, woodchuck, and State-defined furbearers are ½ hour before legal sunrise to ½ hour after legal sunset.

(3) *Big game hunting.* We allow hunting of deer, elk, and pronghorn antelope on designated areas of the refuge subject to the following conditions:

(i) The condition set forth at paragraph (d)(1)(i) of this section applies.

(ii) We allow portable tree stands and ground blinds to be used from August 16 through January 31.

(4) [Reserved]

(e) *North Platte National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow youth hunting of pheasant, porcupine, prairie dog, rabbit, State-defined furbearers, squirrel, turkey, and coyote on designated areas of the refuge subject to the following conditions:

(i) We close the Lake Alice Unit to all public entry from November 1 through

January 14, and we close the Minatare and Winters Creek Units to all public entry from October 15 through January 14.

(ii) Hunters must be 15 years of age or younger ("youth hunters"). A licensed hunter 19 years of age or older ("adult guide") must accompany youth hunters. Adult guides must not hunt or carry firearms.

(iii) We close the refuge to public use from legal sunset to legal sunrise. Youth hunters and adult guides may enter the designated hunting area 1 hour prior to legal sunrise.

(iv) We allow the use of dogs for hunting upland game.

(3) *Big game hunting.* We allow archery hunting of mule deer and white-tailed deer on designated areas of the refuge subject to the following conditions:

(i) The condition set forth at paragraph (e)(2)(i) of this section applies.

(ii) We close the refuge to public use from legal sunset to legal sunrise. However, archery deer hunters may enter the designated hunting area 1 hour prior to legal sunrise and remain until 1 hour after legal sunset.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge.

(f) * * *

(2) *Upland game hunting.* We allow upland game hunting on designated areas of the district subject to the following condition: The conditions set forth at paragraphs (f)(1)(i) and (ii) of this section apply.

(3) *Big game hunting.* We allow big game hunting on designated areas of the district subject to the following condition: The conditions set forth at paragraphs (f)(1)(i) and (ii) of this section apply.

* * * * *

(g) *Valentine National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of coot, crow, dove, dark goose, duck, light goose, merganser, rail, snipe, and woodcock on designated areas of the refuge subject to the following conditions:

(i) We allow hunter access from 2 hours before legal sunrise to 2 hours after legal sunset.

(ii) We allow the use of dogs.

(iii) We prohibit shooting from a motor vehicle or across any refuge roadway or right-of-way.

(iv) You must remove all blinds and decoys at the conclusion of each day's hunt (see § 27.93 of this chapter).

(2) *Upland game hunting.* We allow hunting of cottontail rabbit, coyote,

partridge, prairie chicken, quail, ring-neck pheasant, State-defined furbearers, sharp-tailed grouse, squirrel, and turkey on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (g)(1)(i) through (iv) of this section apply.

(ii) We allow coyote and State-defined furbearer hunting from September 1 to March 31. Shooting hours are ½ hour before legal sunrise to ½ hour after legal sunset.

(iii) We prohibit the use of dogs to hunt coyotes.

(iv) We prohibit the use of bait to hunt coyotes.

(v) You may only possess nontoxic shot when hunting turkey (see § 32.2(k)).

(3) *Big game hunting.* We allow hunting of elk, white-tailed deer, mule deer, and pronghorn antelope on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (g)(1)(i) and (iii) of this section apply.

(ii) We allow portable tree stands and ground blinds to be used from August 16 through January 31.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Anglers may enter the refuge 1 hour before legal sunrise and remain 1½ hours after legal sunset.

(ii) We prohibit the take of reptiles, amphibians, and minnows (see § 27.21 of this chapter), with the exception that you may take bullfrogs on refuge lakes open to fishing.

■ 25. Amend § 32.47 by:
■ a. Redesignating paragraphs (c) through (f) as paragraphs (d) through (g);
■ b. Adding a new paragraph (c); and
■ c. Revising newly redesignated paragraph (g).

The addition and revision read as follows:

§ 32.47 **Nevada.**

\* \* \* \* \*

(c) *Fallon National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of goose, duck, swan, coot, merganser, snipe, and dove on designated areas of the refuge subject to the following conditions:

(i) We allow motorized and nonmotorized boats for hunting.

(ii) We allow the use of dogs when hunting game birds.

(iii) We allow overnight stays while hunting subject to the following conditions:

(A) You may stay overnight only at designated sites within the refuge boundary.

(B) We limit overnight stays to 4 consecutive nights at one location, and to 12 consecutive nights on the refuge.

(2) *Upland game hunting.* We allow hunting of quail, rabbit, turkey, badger, beaver, and coyote on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (c)(1)(ii) and (iii) of this section apply.

(ii) We allow artificial lighting for hunting coyotes.

(3) *Big game hunting.* We allow hunting of mule deer and pronghorn on designated areas of the refuge subject to the following condition: The condition set forth at paragraph (c)(1)(iii) of this section applies.

(4) [Reserved]

\* \* \* \* \*

(g) *Stillwater National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of goose, duck, swan, coot, merganser, snipe, and dove on designated areas of the refuge subject to the following conditions:

(i) We allow the use of dogs when hunting game birds.

(ii) We allow overnight stays while hunting subject to the following conditions:

(A) You may stay overnight only at designated sites within the refuge boundary.

(B) We limit overnight stays to 4 consecutive nights at one location, and to 12 consecutive nights on the refuge.

(2) *Upland game hunting.* We allow hunting of quail, rabbit, turkey, badger, beaver, and coyote on designated areas of the refuge subject to the following conditions:

(i) Approved methods of take include shotgun and federally approved non-lead shot, bow and arrow, and falconry.

(ii) We allow the use of dogs when hunting.

(iii) The condition set forth at paragraph (g)(1)(ii) of this section applies.

(3) *Big game hunting.* We allow hunting of mule deer and pronghorn on designated areas of the refuge subject to the following conditions:

(i) Approved methods of take include shotgun, muzzle-loading rifle, and bow and arrow.

(ii) The condition set forth at paragraph (g)(1)(ii) of this section applies.

(4) [Reserved]

■ 26. Amend § 32.48 by revising paragraphs (a)(1)(ii), (b), and (c) to read as follows:

§ 32.48 **New Hampshire.**

\* \* \* \* \*

(a) \* \* \*

(1) \* \* \*

(ii) We allow the use of dogs consistent with State regulations.

\* \* \* \* \*

(b) *Silvio O. Conte National Fish and Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of duck, goose, common snipe, and American woodcock on designated areas of the refuge subject to the following condition: We allow the use of dogs consistent with State regulations.

(2) *Upland game hunting.* We allow hunting of coyote, fox, raccoon, woodchuck, red squirrel, eastern gray squirrel, porcupine, skunk, crow, snowshoe hare, ring-necked pheasant, and ruffed grouse on designated areas of the refuge subject to the following condition: We allow the use of dogs consistent with State regulations.

(3) *Big game hunting.* We allow hunting of white-tailed deer, moose, black bear, and wild turkey on designated areas of the refuge subject to the following condition: We allow tree stands and blinds that are clearly marked with the owner's State hunting license number.

(4) [Reserved]

(c) *Umbagog National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of duck, goose, snipe, coot, crow, and woodcock on designated areas of the refuge subject to the following condition: We allow the use of dogs consistent with State regulations.

(2) *Upland game hunting.* We allow hunting of fox, raccoon, woodchuck, squirrel, porcupine, skunk, snowshoe hare, ring-necked pheasant, and ruffed grouse on designated areas of the refuge subject to the following conditions:

(i) We prohibit night hunting from ½ hour after legal sunset until ½ hour before legal sunrise the following day.

(ii) We allow the use of dogs consistent with State regulations.

(3) *Big game hunting.* We allow hunting of bear, white-tailed deer, coyote, wild turkey, and moose on designated areas of the refuge subject to the following conditions:

(i) We allow the use of dogs consistent with State regulations.

(ii) Hunters must retrieve all species harvested on the refuge.

(iii) We allow temporary blinds and tree stands that are clearly marked with the owner's State hunting license number. You may erect temporary blinds and tree stands no earlier than 14 days prior to the hunting season, and you must remove them within 14 days after the hunting season (see § 27.93 of this chapter).

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge.

■ 27. Amend § 32.49 by revising paragraphs (a), (b), (c)(3)(iii), (d)(1), and (e) to read as follows:

### § 32.49 New Jersey.

\* \* \* \* \*

(a) *Cape May National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of waterfowl, coot, moorhen, rail, snipe, and woodcock on designated areas of the refuge subject to the following conditions:

(i) The snipe season on the refuge begins with the start of the State early woodcock south zone season and continues through the end of the State snipe season.

(ii) We allow the use of dogs consistent with State regulations.

(iii) We prohibit falconry.

(2) *Upland game hunting.* We allow hunting of rabbit and squirrel on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (a)(1)(ii) and (iii) of this section apply.

(ii) We allow rabbit and squirrel hunting following the end of the State's 6-day firearm season for white-tailed deer, until the close of the regular rabbit and squirrel season.

(3) *Big game hunting.* We allow hunting of white-tailed deer and turkey on designated areas of the refuge subject to the following condition: Tree stands must be marked with the owner's New Jersey Conservation Identification Number.

(4) *Sport fishing.* We allow saltwater sport fishing on designated areas of the refuge subject to the following conditions:

(i) We allow fishing from 1 hour before legal sunrise to 1 hour after legal sunset.

(ii) We close the Atlantic Ocean beach annually to all access, including fishing, between April 1 and September 30.

(iii) We prohibit fishing for, or possession of, shellfish on refuge lands.

(b) *Edwin B. Forsythe National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of waterfowl, coot, moorhen, and rail on designated areas of the refuge subject to the following conditions:

(i) We require hunters to possess a signed refuge hunt permit (Migratory Bird Hunt Application FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) at all times while scouting and hunting on the refuge.

(ii) We allow the use of dogs consistent with State regulations.

(2) *Upland game hunting.* We allow hunting of squirrel on designated areas of the refuge subject to the following condition: The conditions set forth at paragraphs (b)(1)(i) and (ii) of this section apply.

(3) *Big game hunting.* We allow hunting of white-tailed deer and wild turkey on designated areas of the refuge subject to the following conditions:

(i) The condition set forth at paragraph (b)(1)(i) of this section applies.

(ii) You must mark deer stands with the hunter's New Jersey Conservation Identification Number. You must remove deer stands from the refuge at the end of the last day of the hunting season (see §§ 27.93 and 27.94 of this chapter).

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following condition: We prohibit the use of lead fishing tackle on the refuge.

(c) \* \* \*

(3) \* \* \*

(iii) Hunters may put up tree stands beginning on the first scouting day, except on the day of the refuge's youth hunt. Hunters must retrieve their stands by 12 p.m. (noon) on the Sunday after the last day of the hunt (see § 27.93 of this chapter). All hunters must put their Conservation Identification Number on their stand, and they may have only one stand in the field at any one time.

\* \* \* \* \*

(d) \* \* \*

(1) *Migratory game bird hunting.* We allow hunting of goose and duck on designated areas of the refuge subject to the following condition: We allow the use of dogs consistent with State regulations.

\* \* \* \* \*

(e) *Wallkill River National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of migratory birds on designated areas of the refuge subject to the following conditions:

(i) Hunters must obtain a refuge hunt permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System). We require hunters to possess a signed refuge hunt permit at all times while scouting and hunting on the refuge.

(ii) Hunters may enter the refuge 2 hours before legal shooting time and must leave no later than 2 hours after legal shooting time.

(iii) We allow the use of dogs consistent with State regulations.

(2) *Upland game hunting.* We allow hunting of coyote, fox, crow, ruffed grouse, opossum, raccoon, pheasant, chukar, rabbit/hare/jackrabbit, squirrel, and woodchuck on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (e)(1)(i) through (iii) of this section apply.

(ii) We allow hunting from legal sunrise to legal sunset.

(3) *Big game hunting.* We allow hunting of white-tailed deer, bear, and wild turkey on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (e)(1)(i) and (ii) of this section apply.

(ii) We prohibit organized deer drives. We define a "deer drive" as an organized or planned effort to pursue, drive, chase, or otherwise frighten or cause deer to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the deer.

(4) *Sport fishing.* We allow sport fishing on the refuge subject to the following conditions:

(i) We open Owens Station Crossing for catch-and-release fishing only.

(ii) We allow fishing from ½ hour before legal sunrise to ½ hour after legal sunset.

(iii) We prohibit the taking of amphibians and reptiles (see § 27.21 of this chapter).

(iv) We prohibit trapping fish for use as bait.

■ 28. Amend § 32.50 by:

■ a. Revising paragraphs (a)(1)(i)(A) and (a)(2) introductory text;

■ b. Adding paragraph (a)(2)(iii); and

■ c. Revising paragraph (b).

The revisions and addition read as follows:

### § 32.50 New Mexico.

\* \* \* \* \*

(a) \* \* \*

(1) \* \* \*

(i) \* \* \*

(A) You may hunt only on Tuesdays, Thursdays, and Saturdays during the period when the State seasons that apply to the Middle Tract area are open.

\* \* \* \* \*

(2) *Upland game hunting.* We allow hunting of pheasant, quail (scaled, Gambel's, northern bobwhite, and Montezuma), Eurasian collared-dove, desert cottontail, and black-tailed jackrabbit on designated areas of the refuge subject to the following conditions:

\* \* \* \* \*

(iii) We allow Eurasian collared-dove hunting on the North Tract only during the season that is concurrently open for dove hunting within the State.

\* \* \* \* \*

(b) *Bosque del Apache National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of mourning dove, white-winged dove, and light goose on designated areas of the refuge subject to the following conditions:

(i) We allow hunting of light goose in the North Special Hunt Area on dates to be determined by refuge staff. Hunters must possess a permit available through a lottery drawing (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System).

(ii) Hunting hours for mourning and white-winged dove are from ½ hour before legal sunrise to legal sunset. Hunting hours for light goose are from ½ hour before legal sunrise to 12:00 p.m. (noon) Mountain Time.

(iii) You must remove all spent shells and all other personal equipment at the end of each day's hunt (see §§ 27.93 and 27.94 of this chapter).

(iv) We allow the use of dogs when hunting.

(v) We prohibit falconry on the refuge.

(vi) We allow the use of horses and pack stock in support of hunting in the East Hunt Unit only.

(2) *Upland game hunting.* We allow hunting of scaled, Gambel's, northern bobwhite, and Montezuma quail; cottontail rabbit; black-tailed jackrabbit; and Eurasian collared-dove on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (b)(1)(iv) through (vi) of this section apply.

(ii) Hunting hours are from ½ hour before legal sunrise to ½ hour after legal sunset.

(3) *Big game hunting.* We allow hunting of mule deer, javelina, oryx, and bearded Rio Grande turkey on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (b)(1)(vi) and (b)(2)(ii) of this section apply.

(ii) We allow hunting of bearded Rio Grande turkey for youth hunters in the North Special Hunt Area and South Special Hunt Area during the State-established youth hunt and on weekends April through May during the State-established general spring turkey hunt. All hunters must fill out FWS Form 3–2439 (Hunt Application—National Wildlife Refuge System) and pay a fee. The permit is available through a lottery drawing. If selected, you must carry your refuge hunt permit (FWS Form 3–2439) at all times during the hunt.

(iii) We allow incidental take of feral hog by those legally licensed for, and participating in, other big game hunting

activities. You may take feral hog only with a method allowed within each refuge hunt unit. We prohibit the use of dogs for this activity.

(4) *Sport fishing.* We allow fishing on designated areas of the refuge subject to the following conditions:

(i) We allow fishing from April 1 through September 30.

(ii) We allow fishing from ½ hour before legal sunrise until ½ hour after legal sunset.

(iii) We prohibit trotlines, bow fishing, seining, dip netting, and traps.

(iv) We allow frogging for bullfrog on the refuge in areas that are open to fishing. We allow the use of hook and line, spears, gigs, and archery equipment to take bullfrog.

\* \* \* \* \*

■ 29. Amend § 32.51 by:
■ a. Revising paragraphs (c) and (d);
■ b. Adding paragraph (f)(3);
■ c. Revising paragraphs (g)(3)(i) and (ii), (i), (j)(3), and (j)(4)(iv).

The revisions and addition read as follows:

**§ 32.51  New York.**

\* \* \* \* \*

(c) *Iroquois National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of duck, goose, rail, coot, gallinule, woodcock, and snipe on designated areas of the refuge subject to the following conditions:

(i) We allow the use of dogs consistent with State regulations.

(ii) For hunting of duck, goose, and coot:

(A) We allow hunting on Saturday of the New York State Youth Days.

(B) We allow hunting Tuesdays, Thursdays, and Saturdays during the regular waterfowl season, excluding opening day of deer firearms season.

(C) We require proof of successful completion of the New York State waterfowl identification course, the Iroquois nonresident waterfowl identification course, or a suitable nonresident State waterfowl identification course. All hunters must show proof of successful course completion each time they hunt.

(D) We require a refuge hunt permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System).

(E) We allow hunting from legal starting time until 12 p.m. (noon). We require hunters to return a completed Migratory Bird Hunt Report (FWS Form 3–2361) no later than 1 p.m. on the day of the hunt.

(F) Hunters must remain in designated hunting areas, unless actively pursuing downed or crippled birds.

(iii) For hunting of rail, gallinule, snipe, and woodcock, we allow hunting during the State seasons east of Sour Springs Road by all hunters, except we close rail, gallinule, snipe and woodcock hunting during refuge waterfowl hunt days to hunters without a refuge waterfowl permit.

(2) *Upland game hunting.* We allow hunting of ruffed grouse, gray squirrel, cottontail rabbit, pheasant, coyote, fox, raccoon, skunk, and opossum on designated areas of the refuge subject to the following conditions:

(i) The condition set forth at paragraph (c)(1)(i) of this section applies.

(ii) For small game hunting:

(A) We allow hunting from opening day of the State season until the last day of February.

(B) We prohibit the use of raptors to take small game.

(iii) For furbearer hunting, we prohibit hunting from legal sunset to legal sunrise.

(3) *Big game hunting.* We allow hunting of white-tailed deer and turkey on designated areas of the refuge subject to the following conditions:

(i) We require a refuge permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) for spring turkey hunting.

(ii) The condition set forth at paragraph (c)(1)(i) of this section applies.

(4) *Sport fishing.* We allow sport fishing and frogging on designated areas of the refuge subject to the following conditions:

(i) We allow fishing and frogging from legal sunrise to legal sunset.

(ii) We prohibit collecting fish for use as bait.

(d) *Montezuma National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of waterfowl, Canada goose, snow goose, and gallinule on designated areas of the refuge subject to the following conditions:

(i) We allow the use of dogs consistent with State regulations.

(ii) For the regular waterfowl season:

(A) We require daily refuge permits (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) and reservations; we issue permits to hunters with a reservation for that hunt day. We require you to complete and return your permit by the end of the hunt day.

(B) We allow hunting only on Tuesdays, Thursdays, and Saturdays during the established refuge season set within the State western zone season. We allow a youth waterfowl hunt during New York State's established youth waterfowl hunt each year.

(C) All hunters with reservations and their hunting companions must check-in at the Route 89 Hunter Check Station area at least 1 hour before legal shooting time or forfeit their reservation.

(D) We allow motorless boats to hunt waterfowl. We limit hunters to one boat per reservation and one motor vehicle in the hunt area per reservation.

(E) We prohibit shooting from within 500 feet (152.4 meters) of the Tschache Pool observation tower.

(F) We require proof of successful completion of the New York State waterfowl identification course, the Montezuma nonresident waterfowl identification course, or a suitable nonresident State waterfowl identification course. All hunters must show proof of successful course completion each time they hunt.

(G) You may hunt gallinule only during the regular waterfowl season.

(iii) For Canada goose and snow goose hunting:

(A) We allow hunting of Canada goose during the New York State September season and of snow goose during portions of the New York State snow goose season and portions of the period covered by the Light Goose Conservation Order.

(B) You must possess a valid daily hunt permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System). We require you to complete and return the daily hunt permit card by the end of the hunt day.

(C) For snow goose hunting, hunters may enter the refuge no earlier than 4 hours before legal sunrise. For Canada goose hunting, hunters may enter the refuge no earlier than 2 hours before legal sunrise.

(2) *Upland game hunting.* We allow hunting of rabbit and squirrel on designated areas of the refuge subject to the following conditions:

(i) The condition set forth at paragraph (d)(1)(i) of this section applies.

(ii) You must possess a valid daily hunt permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) and are required to complete and return the daily hunt permit card by the end of each hunt day.

(iii) We allow upland game hunters to access the refuge from 2 hours before legal sunrise until 2 hours after legal sunset.

(iv) We require the use of approved nontoxic shot for upland game hunting (see § 32.2(k)).

(3) *Big game hunting.* We allow hunting of white-tailed deer and wild turkey on designated areas of the refuge subject to the following conditions:

(i) The condition set forth at paragraph (d)(1)(i) of this section applies.

(ii) You must possess a valid daily hunt permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System). We require you to complete and return the daily hunt permit card by the end of the hunt day.

(iii) We allow white-tailed deer and turkey hunters to access the refuge from 2 hours before legal sunrise until 2 hours after the end of legal shooting time.

(iv) We allow youth and special big game hunts during New York State's established youth and special big game hunts each year.

(4) *Sport fishing.* We allow access for fishing from designated areas of the refuge subject to the following condition: We prohibit the use of lead fishing tackle.

\* \* \* \* \*

(f) \* \* \*

(3) *Big game hunting.* We allow hunting of white-tailed deer on designated areas of the refuge subject to the following conditions:

(i) We allow archery hunting on specific days between November 1 and January 31.

(ii) Hunters must obtain and possess a refuge-specific permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) for hunting on the refuge.

\* \* \* \* \*

(g) \* \* \*

(3) \* \* \*

(i) Hunters must purchase and possess a signed refuge hunt permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) at all times while scouting and hunting on the refuge.

(ii) You may hunt deer using archery equipment only.

\* \* \* \* \*

(i) *Wallkill River National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of migratory birds on designated areas of the refuge subject to the following conditions:

(i) Hunters must obtain and possess a signed refuge hunt permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) at all times while scouting and hunting on the refuge.

(ii) Hunters may enter the refuge 2 hours before legal shooting time and leave no later than 2 hours after legal shooting time.

(iii) We allow the use of dogs consistent with State regulations.

(2) *Upland game hunting.* We allow hunting of rabbit/hare, gray/black/fox squirrel, pheasant, bobwhite quail, ruffed grouse, crow, red/gray fox, coyote, bobcat, raccoon, skunk, mink, weasel, and opossum on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (i)(1)(i) through (iii) of this section apply.

(ii) We allow hunting from legal sunrise to legal sunset.

(3) *Big game hunting.* We allow hunting of white-tailed deer, bear, and wild turkey on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (i)(1)(i) and (ii), and (i)(2)(ii) of this section apply.

(ii) We prohibit organized deer drives. We define a "deer drive" as an organized or planned effort to pursue, drive, chase, or otherwise frighten or cause deer to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the deer.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) We open Owens Station Crossing for catch-and-release fishing only.

(ii) We allow fishing from ½ hour before legal sunrise to ½ hour after legal sunset.

(iii) We prohibit the taking of amphibians and reptiles.

(iv) We prohibit minnow/bait trapping.

(j) \* \* \*

(3) *Big game hunting.* We allow hunting of white-tailed deer and turkey within designated areas of the refuge subject to the following conditions:

(i) We allow archery and shotgun hunting of white-tailed deer during specific days between November 1 and January 31.

(ii) We require a permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) for hunting on the refuge.

(iii) Hunters assigned to Unit 5 must hunt from portable tree stands and must direct aim away from a public road and/or dwelling.

(4) \* \* \*

(iv) We prohibit the taking of baitfish and frogs.

■ 30. Amend § 32.52 by revising paragraph (f)(1)(vi), and adding paragraph (f)(1)(ix), to read as follows:

§ 32.52 North Carolina.

\* \* \* \* \*

(f) \* \* \*

(1) \* \* \*

(vi) Shooting hours are from ½ hour before legal sunrise until 12 p.m. (noon).

\* \* \* \* \*

(ix) Hunting by youth hunters (age 16 and younger) is subject to the following conditions:

(A) Validly licensed adults, age 21 or older, holding applicable permits must accompany and supervise, remaining in sight and voice contact at all times, any youth hunters. Each adult may supervise no more than two youth hunters.

(B) Youth hunters must possess and carry evidence of successful completion of a State-approved hunter education course.

(C) We allow hunting on Tuesdays, Wednesdays, Fridays, and Saturdays during the late and youth waterfowl State seasons.

\* \* \* \* \*

■ 31. Revise § 32.53 to read as follows:

§ **32.53 North Dakota.**

The following refuge units are open for hunting and/or fishing as governed by applicable Federal and State regulations, and are listed in alphabetical order with additional refuge-specific regulations.

(a) *Appert Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(b) *Ardoch National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(c) *Arrowwood National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of pheasant, sharp-tailed grouse, partridge, cottontail rabbit, and fox on designated areas of the refuge subject to the following conditions:

(i) We allow hunting of upland game birds on the day following the close of the State firearm deer season through the end of the regular upland bird season.

(ii) We allow hunting of cottontail rabbit and fox on the day following the close of the State firearm deer season through March 31.

(3) *Big game hunting.* We allow deer hunting on designated areas of the refuge subject to the following conditions:

(i) We prohibit entering the refuge before legal shooting hours on the opening day of firearms deer season. We require all hunters to be off the refuge 1½ hours after legal sunset.

(ii) We allow deer hunting on the refuge during the State youth deer season.

(iii) After harvesting a deer, firearm deer hunters must wear blaze orange on the refuge.

(iv) We allow access by foot travel only. You may use a vehicle on designated refuge roads and trails to retrieve deer during the following times only: 9:30 to 10 a.m.; 1:30 to 2 p.m.; and ½ hour after legal sunset for 1 hour.

(v) We allow temporary tree stands, blinds, and game cameras for daily use; you must remove them by the end of each day's hunt (see § 27.93 of this chapter).

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) We allow boats at idle speed only on Arrowwood Lake and Jim Lake from May 1 to September 30 of each year.

(ii) We allow ice fishing and dark house spearfishing. We allow snowmobiles, all-terrain vehicles (ATVs), utility terrain vehicles (UTVs), motor vehicles, and fish houses on the ice as conditions allow.

(iii) You may use and leave fish houses on the ice overnight until March 15.

(d) *Arrowwood Wetland Management District*—(1) *Migratory game bird hunting.* We allow migratory game bird hunting on designated areas of the district subject to the following condition: You must remove boats, decoys, portable blinds, other personal property, and any materials brought onto the area for blind construction at the end of each day's hunt (see §§ 27.93 and 27.94 of this chapter).

(2) *Upland game hunting.* We allow upland game hunting on designated areas of the district.

(3) *Big game hunting.* We allow big game hunting on designated areas of the district.

(4) *Sport fishing.* We allow sport fishing on designated areas of the district subject to the following condition: You must remove boats, motor vehicles, fishing equipment, and other personal property (excluding ice houses) by legal sunset (see §§ 27.93 and 27.94 of this chapter).

(e) *Audubon National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of ring-necked pheasant, gray partridge, and sharp-tailed grouse on designated areas of the refuge subject to the following conditions:

(i) We open to upland game hunting annually on the day following the close of the regular deer gun season, and we close as governed by the State season.

(ii) We allow game retrieval without a firearm up to 100 yards (90 meters) inside the refuge boundary fence and closed areas of the refuge. Retrieval time may not exceed 10 minutes. You may use dogs to assist in retrieval.

(3) *Big game hunting.* We allow hunting of white-tailed and mule deer on designated areas of the refuge subject to the following conditions:

(i) We close the refuge to hunting during the State's special youth deer hunting season.

(ii) Hunters may use designated refuge roads to retrieve downed deer.

(iii) We allow only portable tree stands. You must remove all tree stands at the end of each day's hunt (see §§ 27.93 and 27.94 of this chapter).

(4) *Sport fishing.* We allow ice fishing on designated areas of the refuge.

(f) *Audubon Wetland Management District*—(1) *Migratory game bird hunting.* We allow migratory game bird hunting on designated areas of the district subject to the following condition: You must remove boats, decoys, portable blinds, other personal property, and any materials brought onto the area for blind construction by the end of each day's hunt (see §§ 27.93 and 27.94 of this chapter).

(2) *Upland game hunting.* We allow upland game hunting on designated areas of the district.

(3) *Big game hunting.* We allow big game hunting on designated areas of the district.

(4) *Sport fishing.* We allow sport fishing on designated areas of the district subject to the following condition: You must remove boats, motor vehicles, fishing equipment, and other personal property (excluding ice houses) by the end of each day's fishing activity (see §§ 27.93 and 27.94 of this chapter).

(g) *Bone Hill National Wildlife Refuge.*
(1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following condition:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(h) *Brumba National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(i) *Buffalo Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following condition: Access is controlled by the individual landowner.

(j) *Camp Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge

subject to the following condition: Access is controlled by the individual landowner.

(k) *Canefield Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(l) *Chase Lake National Wildlife Refuge.* (1)–(2) [Reserved]

(3) *Big game hunting.* We allow deer hunting on designated areas of the refuge.

(4) [Reserved]

(m) *Chase Lake Wetland Management District*—(1) *Migratory game bird hunting.* We allow migratory game bird hunting on designated areas of the district subject to the following conditions: You must remove boats, decoys, portable blinds, other personal property, and any materials brought onto the area for blind construction by the end of each day's hunt (see §§ 27.93 and 27.94 of this chapter).

(2) *Upland game hunting.* We allow upland game hunting on designated areas of the district.

(3) *Big game hunting.* We allow big game hunting on designated areas of the district.

(4) *Sport fishing.* We allow sport fishing on designated areas of the district subject to the following condition: You must remove boats, motor vehicles, fishing equipment, and other personal property (excluding ice houses) by the end of each day's fishing activity (see §§ 27.93 and 27.94 of this chapter).

(n) *Cottonwood Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following condition:

Access is controlled by the individual landowner.

(o) *Crosby Wetland Management District*—(1) *Migratory game bird hunting.* We allow migratory game bird hunting on designated areas of the district subject to the following condition: You must remove boats, decoys, portable blinds, other personal property, and any materials brought onto the area for blind construction by the end of each day's hunt (see §§ 27.93 and 27.94 of this chapter).

(2) *Upland game hunting.* We allow upland game hunting on designated areas of the district.

(3) *Big game hunting.* We allow big game hunting on designated areas of the district.

(4) *Sport fishing.* We allow sport fishing on designated areas of the district subject to the following condition: You must remove boats, motor vehicles, fishing equipment, and other personal property (excluding ice houses) by the end of each day's fishing activity (see §§ 27.93 and 27.94 of this chapter).

(p) *Dakota Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(q) *Des Lacs National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of fox, sharp-tailed grouse, Hungarian partridge, turkey, and ring-necked pheasant on designated areas of the refuge subject to the following conditions:

(i) We open for upland game bird hunting on the day following the close of the regular deer gun season through the end of the State season.

(ii) We allow the use of hunting dogs for retrieval of upland game.

(iii) We allow fox hunting from the day following the regular firearm deer season until March 31.

(iv) We prohibit accessing refuge lands from refuge waters.

(3) *Big game hunting.* We allow deer and moose hunting on designated areas of the refuge subject to the following conditions:

(i) We only allow the use of portable tree stands and ground blinds. We prohibit leaving stands and blinds overnight on the refuge (see § 27.93 of this chapter).

(ii) We prohibit entry to the refuge before 12 p.m. (noon) on the first day of the respective bow, gun, or muzzleloader deer hunting seasons.

(iii) The condition set forth at paragraph (q)(2)(iv) of this section applies.

(4) [Reserved]

(r) *Devils Lake Wetland Management District*—(1) *Migratory game bird hunting.* We allow migratory game bird hunting on designated areas of the district subject to the following condition: You must remove boats, decoys, portable blinds, other personal property, and any materials brought onto the area for blind construction by the end of each day's hunt (see §§ 27.93 and 27.94 of this chapter).

(2) *Upland game hunting.* We allow upland game hunting on designated areas of the district subject to the following condition: You must remove boats, decoys, portable blinds, other personal property, and any materials brought onto the area for blind construction by the end of each day's hunt (see §§ 27.93 and 27.94 of this chapter).

(3) *Big game hunting.* We allow big game hunting on designated areas of the district subject to the following condition: You must remove boats, decoys, portable blinds, other personal property, and any materials brought onto the area for blind construction by the end of each day's hunt (see §§ 27.93 and 27.94 of this chapter).

(4) *Sport fishing.* We allow sport fishing on designated areas of the district subject to the following condition: You must remove boats, motor vehicles, fishing equipment, and other personal property (excluding ice houses) by the end of each day's fishing activity (see §§ 27.93 and 27.94 of this chapter).

(s) *Half Way Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(t) *Hiddenwood Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following condition: Access is controlled by the individual landowner.

(u) *Hobart Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(v) *Hutchinson Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(w) *J. Clark Salyer National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of goose, duck, and coot on designated areas of the refuge subject to the following condition: We allow the use of dogs for hunting and retrieving game birds.

(2) *Upland game hunting.* We allow hunting of ruffed and sharp-tailed grouse, Hungarian partridge, turkey, ring-necked pheasant, and fox on designated areas of the refuge subject to the following conditions:

(i) We open the refuge to hunting for sharp-tailed grouse, Hungarian partridge, and ring-necked pheasant north of the Willow-Upham road on the day following the close of the regular firearm deer season.

(ii) We open the refuge to fox hunting on the day following the close of the regular firearm deer season. Fox hunting on the refuge closes March 31.

(iii) Hunters may possess only approved nontoxic shot (see § 32.2(k)) for all upland game hunting, including turkey.

(3) *Big game hunting.* We allow hunting of deer and moose on designated areas of the refuge subject to the following conditions:

(i) You must possess and carry a refuge permit to hunt antlered deer on the refuge outside the nine public hunting areas during the regular firearms season.

(ii) We prohibit entry to the refuge before 12 p.m. (noon) on the first day of the respective bow, gun, or muzzleloader deer hunting seasons. You may access refuge roads open to the public before 12 p.m. (noon).

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) We allow boat fishing from May 1 through September 30.

(ii) We allow ice fishing and dark house spearfishing. We allow snowmobiles, all-terrain vehicles (ATVs), utility terrain vehicles (UTVs), motor vehicles, and fish houses on the ice as conditions allow.

(x) *J. Clark Salyer Wetland Management District*—(1) *Migratory game bird hunting.* We allow migratory game bird hunting on designated areas of the district subject to the following condition: You must remove boats, decoys, portable blinds, other personal property, and any materials brought onto the area for blind construction by the end of each day's hunt (see § 27.93 and 27.94 of this chapter).

(2) *Upland game hunting.* We allow upland game hunting on designated areas of the district.

(3) *Big game hunting.* We allow big game hunting on designated areas of the district.

(4) *Sport fishing.* We allow sport fishing on designated areas of the district subject to the following condition: You must remove boats, motor vehicles, fishing equipment, and other personal property (excluding ice houses) by the end of each day's fishing activity (see §§ 27.93 and 27.94 of this chapter).

(y) *Johnson Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following condition:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(z) *Kulm Wetland Management District*—(1) *Migratory game bird hunting.* We allow migratory game bird hunting on designated areas of the district subject to the following condition: You must remove boats, decoys, portable blinds, other personal property, and any materials brought onto the area for blind construction by the end of each day's hunt (see §§ 27.93 and 27.94 of this chapter).

(2) *Upland game hunting.* We allow upland game hunting on designated areas of the district.

(3) *Big game hunting.* We allow big game hunting on designated areas of the district.

(4) *Sport fishing.* We allow sport fishing on designated areas of the district subject to the following condition: You must remove boats, motor vehicles, fishing equipment, and other personal property (excluding ice houses) by the end of each day's fishing activity (see §§ 27.93 and 27.94 of this chapter).

(aa) *Lake Alice National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow migratory game bird hunting on designated areas of the refuge subject to the following conditions:

(i) We allow motorized boats only during the migratory game bird hunting season; however, motors must not exceed 10 horsepower.

(ii) You must remove all boats, decoys, portable blinds, other personal property, and any materials brought onto the refuge for blind construction by the end of each day's hunt (see §§ 27.93 and 27.94 of this chapter).

(2) *Upland game hunting.* We allow hunting of ring-necked pheasants, sharp-tailed grouse, gray partridge, cottontail rabbit, jackrabbit, snowshoe hare, and fox on designated areas of the refuge.

(3) *Big game hunting.* We allow deer and fox hunting on designated areas of the refuge subject to the following conditions:

(i) We prohibit trapping.

(ii) We allow portable tree stands. Hunters must remove tree stands from the refuge by the end of each day's hunt (see § 27.93 of this chapter).

(4) *Sport fishing.* We allow ice fishing on designated areas of the refuge subject to the following conditions:

(i) We allow vehicles and fish houses on the ice as conditions allow.

(ii) We allow public access for ice fishing from 5 a.m. to 10 p.m.

(iii) You must remove ice fishing shelters and personal property from the refuge by 10 p.m. each day (see §§ 27.93 and 27.94 of this chapter).

(bb) *Lake George National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(cc) *Lake Ilo National Wildlife Refuge.* (1)–(3) [Reserved]

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) We open the lake to fishing from 5 a.m. to 10 p.m. year round.

(ii) We open the refuge to ice fishing from October 1 through March 31.

(dd) *Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following condition: Access is controlled by the individual landowner.

(ee) *Lake Nettie National Wildlife Refuge.* (1)–(2) [Reserved]

(3) *Big game hunting.* We allow hunting of white-tailed and mule deer on designated areas of the refuge subject to the following conditions:

(i) We allow only portable tree stands.

(ii) Hunters must remove tree stands from the refuge at the end of each day's hunt (see § 27.93 of this chapter).

(4) [Reserved]

(ff) *Lake Otis National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(gg) *Lake Patricia National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(hh) *Lake Zahl National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of sharp-tailed grouse, Hungarian partridge, and ring-necked pheasant on designated areas of the refuge subject to the following conditions:

(i) We open to upland game bird hunting on the day following the close of the regular deer gun season through the end of the State season.

(ii) We allow the use of hunting dogs to retrieve upland game.

(3) *Big game hunting.* We allow deer hunting on designated areas of the refuge subject to the following conditions:

(i) You may only use portable tree stands and ground blinds. We prohibit leaving stands and blinds overnight (see § 27.93 of this chapter).

(ii) We prohibit entry to the refuge before 12 p.m. (noon) on the first day of the respective archery, gun, or muzzleloader deer hunting season.

(4) [Reserved]

(ii) *Lambs Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(jj) *Little Goose Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(kk) *Long Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of ring-necked pheasant, sharp-tailed grouse, and grey partridge on designated areas of the refuge subject to the following condition: We open to upland game bird hunting annually on the day following the close of the firearm deer season through the close of the State season.

(3) *Big game hunting.* We allow hunting of deer on designated areas of the refuge.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following condition: We only allow fishing from legal sunrise to legal sunset.

(ll) *Long Lake Wetland Management District*—(1) *Migratory game bird hunting.* We allow migratory game bird hunting on designated areas of the district subject to the following condition: You must remove boats, decoys, portable blinds, other personal property, and any materials brought onto the area for blind construction by the end of each day's hunt (see §§ 27.93 and 27.94 of this chapter).

(2) *Upland game hunting.* We allow upland game hunting on designated areas of the district.

(3) *Big game hunting.* We allow big game hunting on designated areas of the district.

(4) *Sport fishing.* We allow sport fishing on designated areas of the district subject to the following condition: You must remove boats, motor vehicles, fishing equipment, and other personal property (excluding ice houses) by the end of each day's fishing activity (see §§ 27.93 and 27.94 of this chapter).

(mm) *Lords Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(nn) *Lost Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(oo) *Lostwood National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of sharp-tailed grouse, Hungarian partridge, and ring-necked pheasant on designated areas of the refuge subject to the following condition: We allow the use of dogs to retrieve upland game.

(3) *Big game hunting.* We allow deer and moose hunting on designated areas of the refuge subject to the following condition: We prohibit entry to the refuge before 12 p.m. (noon) on the first day of the respective archery, gun, or muzzleloader deer hunting season.

(4) [Reserved]

(pp) *Lostwood Wetland Management District*—(1) *Migratory game bird hunting.* We allow migratory game bird hunting on designated areas of the district subject to the following condition: You must remove boats, decoys, portable blinds, other personal property, and any materials brought onto the area for blind construction by the end of each day's hunt (see §§ 27.93 and 27.94 of this chapter).

(2) *Upland game hunting.* We allow upland game hunting on designated areas of the district.

(3) *Big game hunting.* We allow big game hunting on designated areas of the district.

(4) *Sport fishing.* We allow sport fishing on designated areas of the district subject to the following condition: You must remove boats, motor vehicles, fishing equipment, and other personal property (excluding ice houses) by the end of each day's fishing activity (see §§ 27.93 and 27.94 of this chapter).

(qq) *Maple River National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(rr) *Pleasant Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(ss) *Pretty Rock National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species

subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(tt) *Rabb Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(uu) *Rock Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(vv) *Rose Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following condition: Access is controlled by the individual landowner.

(ww) *School Section National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following condition: Access is controlled by the individual landowner.

(xx) *Sheyenne Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following condition: Access is controlled by the individual landowner.

(yy) *Sibley Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(zz) *Silver Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(aaa) *Slade National Wildlife Refuge.* (1)–(2) [Reserved]

(3) *Big game hunting.* We allow hunting of deer on designated areas of the refuge.

(4) [Reserved]

(bbb) *Snyder Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(ccc) *Springwater National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(ddd) *Stewart Lake National Wildlife Refuge.* (1)–(3) [Reserved]

(4) *Sport fishing.* We allow ice or shore fishing on designated areas of the refuge.

(eee) *Stoney Slough National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(fff) *Storm Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(ggg) *Sunburst Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(hhh) *Tewaukon National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow ring-necked pheasant hunting on designated areas of the refuge subject to the following condition: We open for upland game hunting on the first Monday following the close of the State deer gun season through the close of the State pheasant season.

(3) *Big game hunting.* We allow deer hunting on designated areas of the refuge subject to the following conditions:

(i) We allow deer bow hunting on designated areas of the refuge as governed by State regulations.

(ii) The deer bow hunting season closes September 30, reopens the Friday following the close of the State gun deer season, and continues through the end of the State archery deer season.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge.

(iii) *Tewaukon Wetland Management District*—(1) *Migratory game bird hunting.* We allow migratory game bird hunting on designated areas of the district subject to the following condition: You must remove boats,

decoys, portable blinds, other personal property, and any materials brought onto the area for blind construction by the end of each day's hunt (see §§ 27.93 and 27.94 of this chapter).

(2) *Upland game hunting.* We allow upland game hunting on designated areas of the district.

(3) *Big game hunting.* We allow big game hunting on designated areas of the district.

(4) *Sport fishing.* We allow sport fishing on designated areas of the district subject to the following condition: You must remove boats, motor vehicles, fishing equipment, and other personal property (excluding ice houses) by the end of each day (see §§ 27.93 and 27.94 of this chapter).

(jjj) *Tomahawk National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(kkk) *Upper Souris National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of wild turkey, sharp-tailed grouse, Hungarian partridge, and pheasant on designated areas of the refuge subject to the following conditions:

(i) We allow the use of dogs for hunting and retrieving of upland game birds with the exception of wild turkey.

(ii) We allow hunters on the refuge from 5 a.m. until 10 p.m.

(3) *Big game hunting.* We allow deer and moose hunting on designated areas of the refuge subject to the following conditions:

(i) We only allow the use of portable tree stands and ground blinds. You must remove stands and blinds from the refuge at the end of each day's hunt (see § 27.93 of this chapter).

(ii) The condition set forth at paragraph (kkk)(2)(ii) of this section applies.

(iii) We prohibit entry to the refuge before 12 p.m. (noon) on the first day of the respective bow, gun, or muzzleloader deer hunting seasons.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) We allow the use of fishing boats, canoes, kayaks, and float tubes in designated boat fishing areas from Lake Darling Dam north to State Highway 28 (Greene) crossing for fishing from May 1 through September 30.

(ii) We allow fishing from nonmotorized vessels only on the Beaver Lodge Canoe Trail from May 1 through September 30.

(iii) We allow boating and fishing from vessels on the Souris River from Mouse River Park to the north boundary of the refuge from May 1 through September 30.

(iv) We allow snowmobiles, all-terrain vehicles (ATVs), utility terrain vehicles (UTVs), motor vehicles, and fish houses on the ice as conditions allow from Lake Darling Dam north to Carter Dam (Dam 41) for ice fishing.

(v) We allow you to place fish houses overnight on the ice of Lake Darling as governed by State regulations.

(vi) We allow anglers to place portable fish houses on the Souris River north of Carter Dam (Dam 41) and south of Lake Darling Dam for ice fishing, but anglers must remove the fish houses from the refuge at the end of each day's fishing activity (see § 27.93 of this chapter).

(vii) We allow anglers on the refuge from 5 a.m. until 10 p.m.

(lll) *Wild Rice National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(mmm) *Willow Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(nnn) *Wintering River National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

(ooo) *Wood Lake National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(3) *Big game hunting.* We allow hunting of all State-defined species subject to the following condition: Access is controlled by the individual landowner.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) Access is controlled by the individual landowner.

(ii) We prohibit boats during the regular North Dakota waterfowl season.

■ 32. Amend § 32.54 by:
■ a. Revising paragraph (b)(1) introductory text;
■ b. Adding paragraphs (b)(2)(iii) and (iv); and
■ c. Revising paragraph (b)(3)(ii)(C).
The revisions and additions read as follows:

### § 32.54   Ohio.

* * * * *

(b) * * *

(1) *Migratory game bird hunting.* We allow hunting of duck, goose, rail, gallinule, coot, dove, woodcock, crow, and snipe on designated areas of the refuge subject to the following conditions:

* * * * *

(2) * * *

(iii) We prohibit hunting or shooting within 150 feet (45.7 meters) of any structure, building, or parking lot.

(iv) For hunting, you may use or possess only approved nontoxic shot shells (see § 32.2(k)) while in the field.

(3) * * *

(ii) * * *

(C) The condition set forth at paragraph (b)(2)(iv) applies while turkey hunting.

* * * * *

■ 33. Amend § 32.55 by revising paragraphs (g)(4)(ii) and (vii) through (x) to read as follows:

### § 32.55   Oklahoma.

* * * * *

(g) * * *

(4) * * *

(ii) Anglers may use boats from March 1 through September 30 in designated waters unless otherwise specified on the fishing tearsheet.

* * * * *

(vii) Anglers may fish after legal sunset from a boat (during boating season) in the Cumberland Pool, except in the sanctuary zones. Anglers may fish after legal sunset at the headquarters boat ramp area, Goose Pen Pond, Sandy Creek Bridge, Murray 23, and Nida Point.

(viii) We allow bowfishing in Pennington Creek and the Washita River during daylight hours.

(ix) We prohibit the take of fish by use of hands (noodling).

(x) We prohibit the take of frog, turtle, or mussel (see § 27.21 of this chapter).

* * * * *

■ 34. Amend § 32.56 by:
■ a. Revising paragraphs (f) and (n)(1) introductory text;
■ b. Redesignating paragraph (t) as paragraph (u); and
■ c. Adding new paragraph (t).
The revisions and addition read as follows:

### § 32.56   Oregon.

* * * * *

(f) *Hart Mountain National Antelope Refuge*—(1) *Migratory game bird hunting.* We allow hunting of duck, goose, and coot on designated areas of the refuge subject to the following conditions:

(i) We allow only portable blinds and temporary blinds constructed of synthetic or nonliving natural materials.

(ii) We prohibit digging of pit blinds for waterfowl hunting.

(2) *Upland game hunting.* We allow hunting of chukar and California quail on designated areas of the refuge.

(3) *Big game hunting.* We allow hunting of deer, antelope, and bighorn sheep on designated areas of the refuge subject to the following conditions:

(i) We allow only portable blinds and temporary blinds constructed of synthetic or nonliving natural materials.

(ii) We allow ground blinds, but we prohibit construction of them earlier than 1 week prior to the opening day of

the legal season for which you have a valid permit.

(iii) You must remove blinds within 24 hours of harvesting an animal or at the end of the permittee's legal season (see § 27.93 of this chapter).

(iv) We limit hunters to one blind each, and you must tag blinds with the owner's State license or permit number.

(4) *Sport fishing.* We allow fishing on designated areas of the refuge.

* * * * *

(n) * * *

(1) *Migratory game bird hunting.* We allow hunting of duck, goose, and coot on designated areas of the refuge subject to the following conditions:

(t) *Wapato Lake National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of duck, goose, and coot on designated areas of the refuge subject to the following conditions:

(i) We allow hunting on Tuesdays, Thursdays, and Saturdays during the State waterfowl season.

(ii) The hunt area is open for access 2 hours before and after legal shooting hours.

(iii) All hunters must hunt from designated blinds except to retrieve downed birds. We prohibit hunting from levees.

(iv) We allow a maximum occupancy of four persons per blind.

(v) Disabled hunters must possess an Oregon Disabilities Hunting and Fishing Permit issued by the Oregon Department of Fish and Wildlife to qualify for preference in using the ADA Accessibility Guidelines blind or Federal Access pass.

(vi) You must remove decoys, other personal property, and trash (including empty shotgun hulls) from the refuge at the end of each day's hunt (see §§ 27.93 and 27.94 of this chapter).

(vii) We allow the use of dogs for retrieving waterfowl.

(viii) Hunters must submit a Migratory Bird Hunt Report (FWS Form 3–2361) at the end of each day's hunt.

(2)–(4) [Reserved]

* * * * *

■ 35. Amend § 32.57 by:
■ a. Revising paragraph (a);
■ b. Adding paragraphs (b)(1)(iv) and (b)(2)(iii); and
■ c. Revising paragraphs (b)(4)(iv), (c)(3), and (c)(4)(iv).
The revisions and additions read as follows:

### § 32.57   Pennsylvania.

* * * * *

(a) *Cherry Valley National Wildlife Refuge*—(1) *Migratory game bird*

*hunting.* We allow hunting of migratory game birds on designated areas of the refuge subject to the following conditions:

(i) Hunters must obtain and possess a signed refuge hunt permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) at all times while scouting and hunting on the refuge.

(ii) Hunters may enter the refuge 2 hours before legal shooting time and must leave no later than 2 hours after legal shooting time.

(iii) We allow the use of dogs consistent with State regulations.

(2) *Upland game hunting.* We allow hunting of squirrel, grouse, rabbit, pheasant, quail, woodchuck, crow, fox, raccoon, opossum, skunk, weasel, coyote, and bobcat on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (a)(1)(i), (ii), and (iii) of this section apply.

(ii) We allow hunting from legal sunrise to legal sunset.

(3) *Big game hunting.* We allow hunting of white-tailed deer, bear, and wild turkey on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (a)(1)(i) and (ii) of this section apply.

(ii) We prohibit organized deer drives. We define a ''deer drive'' as an organized or planned effort to pursue, drive, chase, or otherwise frighten or cause deer to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the deer.

(4) *Sport fishing.* We allow sport fishing on the refuge subject to the following conditions:

(i) The Cherry Creek section located on the former Cherry Valley Golf Course is open for catch-and-release fishing. Anglers at this location must:

(A) Obtain a day-use fishing permit (signed hardcopy). A maximum of three anglers per day may share the same permit; and

(B) Use only artificial lures and barbless hooks to fish.

(ii) We allow fishing from ½ hour before legal sunrise to ½ hour after legal sunset.

(iii) We allow only nonmotorized or electric-motor boats in designated areas.

(iv) We prohibit the use of eel chutes, eelpots, and fyke nets.

(v) We prohibit trapping fish for use as bait.

(vi) We prohibit the take, collection, capture, killing, and possession of any reptile or amphibian on the refuge.

(b) * * *
(1) * * *
(iv) We allow the use of dogs consistent with State regulations.
(2) * * *
(iii) The condition set forth at paragraph (b)(1)(iv) of this section applies.

* * * * *

(4) * * *
(iv) We prohibit the taking or possession of shellfish on the refuge.
(c) * * *
(3) *Big game hunting.* We allow archery-only hunting of white-tailed deer on designated areas of the refuge subject to the following condition: Hunters must possess a refuge hunt permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System).

(4) * * *
(iv) We prohibit the take, collection, or capture of any reptile or amphibian on the refuge.

* * * * *

■ 36. Revise § 32.58 to read as follows:

**§ 32.58   Rhode Island.**

The following refuge units are open for hunting and/or fishing as governed by applicable Federal and State regulations, and are listed in alphabetical order with additional refuge-specific regulations.

(a) *Block Island National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of duck, merganser, and coot on designated areas of the refuge subject to the following conditions:

(i) We require hunters to possess and carry a signed refuge hunting brochure valid for the current season.

(ii) We only allow portable or temporary blinds, and decoys must be removed from the refuge following each day's hunt (see § 27.93 of this chapter).

(iii) We allow the use of dogs consistent with State regulations. Dogs must be under direct control of the hunter at all times.

(2) [Reserved]

(3) *Big game hunting.* We allow hunting of white-tailed deer on designated areas of the refuge subject to the following conditions:

(i) We require hunters to possess and carry a signed refuge hunting brochure valid for the current season.

(ii) We only allow portable or temporary stands and blinds that must be removed from the refuge on the last day of the deer hunt (see § 27.93 of this chapter). Stands and blinds must be marked with the hunter's State hunting license number.

(4) *Sport fishing.* We allow saltwater fishing from refuge shorelines.

(b) *John H. Chafee National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of duck, goose, merganser, and coot on designated areas of the refuge subject to the following conditions:

(i) We require hunters to possess and carry a signed separate migratory game bird hunting brochure valid for the current season.

(ii) We only allow portable or temporary blinds and decoys that must be removed from the refuge following each day's hunt (see § 27.93 of this chapter).

(iii) We allow the use of dogs consistent with State regulations.

(2) *Upland game hunting.* We allow hunting of coyote and fox on designated areas of the refuge subject to the following condition: We only allow the incidental take of coyote and fox during the refuge deer hunting season with a signed refuge hunting brochure valid for the current season.

(3) *Big game hunting.* We allow hunting of white-tailed deer and wild turkey on designated areas of the refuge subject to the following conditions:

(i) We require every hunter to possess and carry a personally signed refuge hunting brochure valid for the current season.

(ii) We only allow portable or temporary stands and blinds that must be removed from the refuge on the last day of the deer hunt (see § 27.93 of this chapter). We prohibit permanent tree stands. Stands and blinds must be marked with the hunter's State hunting license number.

(4) *Sport fishing.* We allow saltwater fishing in designated areas of the refuge.

(c) *Ninigret National Wildlife Refuge.*
(1) [Reserved]
(2) *Upland game hunting.* We allow hunting of coyote and fox on designated areas of the refuge subject to the following condition: We only allow the incidental take of coyote and fox during the refuge deer hunting season. We require hunters to possess and carry a signed refuge hunting brochure valid for the current season.

(3) *Big game hunting.* We allow hunting of white-tailed deer and turkey on designated areas of the refuge subject to the following conditions:

(i) We require hunters to possess and carry a signed refuge hunting brochure valid for the current season.

(ii) We only allow portable or temporary stands and blinds that must be removed from the refuge on the last day of the deer hunt (see § 27.93 of this chapter). We prohibit permanent tree stands. Stands and blinds must be marked with the hunter's State hunting license number.

(4) *Sport fishing.* We allow saltwater fishing from refuge shorelines.

(d) *Sachuest Point National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of fox and coyote on designated areas of the refuge subject to the following condition: We only allow the incidental take of fox and coyote during limited, periodic hunts with a signed hunt application (see paragraph (d)(3)(i) of this section).

(3) *Big game hunting.* We allow hunting of white-tailed deer on designated areas of the refuge subject to the following conditions:

(i) We require every hunter to possess and carry a personally signed hunt application (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System).

(ii) We only allow hunting of big game during limited, periodic hunts.

(iii) We only allow portable tree stands and blinds. You must clearly label any tree stand or blind left on the refuge overnight with your refuge permit number. You must remove your tree stand(s) and/or blind(s) from the refuge on the last day of the refuge-authorized deer hunt (see § 27.93 of this chapter).

(4) *Sport fishing.* We allow saltwater fishing on designated areas of the refuge subject to the following conditions:

(i) Anglers may only saltwater fish at Sachuest Beach shoreline from September 16 through March 31.

(ii) Anglers may night-fish after legal sunset with a refuge permit (FWS Form 3–2358, National Wildlife Refuge System Fishing/Shrimping/Crabbing/ Frogging Application).

(e) *Trustom Pond National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of duck, goose, merganser, coot, and mourning dove on designated areas of the refuge subject to the following condition: We allow the use of dogs consistent with State regulations.

(2)–(3) [Reserved]

(4) *Sport fishing.* We allow saltwater fishing on designated areas of the refuge subject to the following condition: Anglers may saltwater fish from September 16 through March 31.

■ 37. Amend § 32.59 by revising paragraph (b)(3) introductory text to read as follows:

**§ 32.59   South Carolina.**

\*    \*    \*    \*    \*

(b) \* \* \*

(3) *Big game hunting.* We allow hunting of white-tailed deer, turkey, coyote, and feral hog on designated

areas of the refuge subject to the following conditions:

\*    \*    \*    \*    \*

■ 38. Amend § 32.60 by revising paragraph (b) to read as follows:

**§ 32.60   South Dakota.**

\*    \*    \*    \*    \*

(b) *LaCreek National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow the hunting of goose, duck, coot, common snipe, sandhill crane, crow, and mourning dove on designated areas of the refuge subject to the following conditions:

(i) Hunters may enter the refuge 2 hours before legal sunrise and remain no longer than 2 hours after legal sunset. We allow access from refuge parking areas, adjacent public lands, and adjacent private lands enrolled in public access programs.

(ii) We allow the use of motorized boats for hunting and game retrieval on the Little White River Recreation Area. We allow the use of manual powered boats for hunting and game retrieval on all waters within open hunt areas and the use of boats with electric motors on Pool #10.

(iii) We allow the use of dogs.

(iv) We prohibit shooting from or over refuge roads and parking areas.

(v) We prohibit hunting light geese during the spring conservation order.

(vi) For crow hunting, we prohibit hunting with rifles and hunting during the spring season.

(2) *Upland game hunting.* We allow the hunting of bobcat, coyote, fox, cottontail rabbit, mountain lion, prairie chicken, ring-necked pheasant, and sharp-tailed grouse on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (b)(1)(i), (ii), and (iv) of this section apply.

(ii) We allow access for bobcat, coyote, fox, and mountain lion hunting January 1 through February 15, and hunting hours are from ½ hour before legal sunrise to ½ hour after legal sunset.

(iii) We prohibit the use of dogs when hunting bobcat, coyote, fox, and mountain lion. We allow the use of dogs while hunting other upland game.

(iv) Coyotes and all furbearers or their parts, if left in the field, must be left at least 50 yards away from any road, trail, or building. Otherwise, hunters must remove them from the refuge.

(3) *Big game hunting.* We allow hunting of white-tailed and mule deer on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (b)(1)(i) through (iv) of this section apply.

(ii) Hunters may leave portable tree stands and free-standing elevated platforms on the refuge from August 25 through February 15. Hunters must remove all other personal property by the end of each day's hunt (see § 27.93 of this chapter).

(iii) We close the refuge to archery hunting during refuge firearm seasons.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) We prohibit the use or possession of live minnows or bait fish in Pools 3, 4, 7, and 10 and the Cedar Creek Trout Ponds.

(ii) We open designated fishing areas from ½ hour before legal sunrise to ½ hour after legal sunset, except the Little White River Recreation Area.

\*    \*    \*    \*    \*

■ 39. Amend § 32.61 by:
■ a. Revising paragraphs (g)(1) introductory text, (g)(1)(v) and (vi), (g)(2), and (g)(3)(i);
■ b. Removing paragraph (g)(3)(ii);
■ c. Redesignating paragraphs (g)(3)(iii) and (iv) as paragraphs (g)(3)(ii) and (iii), respectively; and
■ d. Revising paragraph (g)(4)(i).
The revisions read as follows:

**§ 32.61   Tennessee.**

\*    \*    \*    \*    \*

(g) *Tennessee National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of Canada goose, dove, and crow on designated areas of the refuge subject to the following conditions:

\*    \*    \*    \*    \*

(v) Youth hunters age 16 and younger must be accompanied by an adult 21 years old or older who has a refuge hunting permit on his or her person. The adult must remain in a position to take immediate control of the hunting device.

(vi) We allow the use of dogs for migratory bird, squirrel, raccoon, and opossum hunting.

\*    \*    \*    \*    \*

(2) *Upland game hunting.* We allow hunting of squirrel, coyote, beaver, raccoon, and opossum on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (g)(1)(i) through (vi) and (viii) of this section apply.

(ii) We allow hunting for raccoon and opossum from legal sunset to legal sunrise.

(3) \* \* \*

(i) The conditions set forth at paragraphs (g)(1)(i) through (v) and (viii) of this section apply.

\* \* \* \* \*

(4) \* \* \*

(i) We allow fishing in Swamp Creek, Sulphur Well Bay, and Bennetts Creek from March 16 through November 14. We open the remainder of the refuge portion of Kentucky Lake to fishing year-round. We allow bank fishing year-round along Refuge Lane from the New Johnsonville Pump Station.

\* \* \* \* \*

■ 40. Amend § 32.62 by revising paragraphs (f), (i), and (j) to read as follows:

§ 32.62 **Texas.**

\* \* \* \* \*

(f) *Buffalo Lake National Wildlife Refuge*—(1) *Migratory bird hunting.* We allow hunting of mourning dove, white-winged dove, and Eurasian collared-dove on designated areas of the refuge subject to the following conditions:

(i) We require hunters to obtain a Special Use Permit (FWS Form 3–1383–G).

(ii) Hunters age 17 and younger ("youth hunters") must be under the direct supervision of an adult age 18 or older ("adult supervisor").

(iii) We limit hunting to no more than 6 days with a maximum of 12 hunters, during the concurrent pheasant/quail season as governed by the State of Texas hunting season.

(iv) Hunting hours will be from 30 minutes before legal sunrise until noon.

(v) All hunters must check in and out at refuge headquarters.

(vi) Bag limits will be determined annually for each species, but will never exceed the limits set by Texas Parks and Wildlife Department (TPWD).

(2) *Upland game hunting.* We allow hunting of ring-necked pheasant, northern bobwhite, and scaled quail on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (f)(1)(ii), (iii), and (v) of this section apply.

(ii) Hunting hours will be from 9 a.m. to 4:30 p.m.

(iii) We allow only shotguns for pheasant and quail hunting.

(3) *Big game hunting.* We allow hunting of white-tailed deer, mule deer, and feral hog on designated areas of the refuge subject to the following conditions:

(i) The condition set forth at paragraph (f)(1)(ii) of this section applies.

(ii) After legal sunset, hunters may be in designated camping areas only. We prohibit hunters in all other areas of the refuge after legal sunset.

(iii) During the youth hunt, each adult supervisor may supervise only one youth hunter. A youth hunter may have up to two adult supervisors.

(4) [Reserved]

\* \* \* \* \*

(i) *Laguna Atascosa National Wildlife Refuge.* (1)–(2) [Reserved]

(3) *Big game hunting.* We allow hunting of white-tailed deer, feral hog, nilgai antelope, other exotic ungulates, and American alligator on designated areas of the refuge subject to the following conditions:

(i) We allow the incidental take of nilgai antelope, feral hog, and other rarely observed exotic ungulates (such as fallow deer, axis deer, sika deer, Barbary sheep, and black buck) during all refuge hunts, with the exception of American alligator hunts.

(ii) We require hunters to attend refuge hunter orientation before hunting on the refuge. We require each hunter to obtain and carry with them a signed and dated hunt information tearsheet (name only) in addition to the State hunt permit.

(iii) Bag limits for species hunted on the refuge are provided in the refuge hunt tearsheet annually.

(iv) Each hunter age 17 and younger must be under the direct supervision of an adult age 18 or older.

(v) We allow a scouting period prior to the commencement of each refuge hunt period. A permitted hunter and a limit of two non-permitted individuals may enter the hunt units during the scouting period, which begins after hunter orientation and ends at legal sunset. Each hunter must clearly display a Vehicle Validation Tag face up on the vehicle dashboard when scouting and hunting.

(vi) We allow hunters to enter the refuge 1½ hours before legal sunrise during their permitted hunt periods. Hunters must leave the hunt units no later than 1 hour after State legal shooting hours.

(vii) Hunters may access hunt units only by foot or bicycle.

(viii) We allow hunting from portable stands or by stalking and still hunting. There is a limit of one blind or stand per permitted hunter. Hunters must attach hunter identification (permit number or State license number) to the blind or stand. Hunters must remove all blinds and stands at the end of the permitted hunt period (see § 27.93 of this chapter).

(ix) During American alligator hunts, we allow hunters to leave hooks set over only one night period at a time; set lines must be checked daily. Hunters must field dress all harvested big game in the field and check the game at the hunt check station before removal from the refuge. Hunters may use a nonmotorized cart to assist with the transportation of harvested game animals.

(x) Hunters must field dress all harvested big game in the field and check the game at the hunt check station before removal from the refuge. Hunters may use a nonmotorized cart to assist with the transportation of harvested game animals.

(xi) We prohibit the killing or wounding of a game animal and then intentionally or knowingly failing to make a reasonable effort to retrieve and include it in the hunter's bag limit.

(4) *Sport fishing.* We allow fishing and crabbing on designated areas of the refuge subject to the following conditions:

(i) We allow fishing and crabbing year-round only from Adolph Thomae Jr. County Park, on San Martin Lake of the Bahia Grande Unit, and on the South Padre Island Unit.

(ii) We allow only pole and line, rod and reel, hand line, dip net, or cast net for fishing. We prohibit the use of crab traps or pots for crabbing. Anglers must attend all fishing lines, crabbing equipment, and other fishing devices at all times.

(iii) In the Bahia Grande Unit, inside the refuge boundary on San Martin Lake, we allow only bank and wade fishing within a designated area, which may only be accessed on foot. In other waters of the Bahia Grande Unit, we do not allow boats or fishing inside the refuge boundary.

(j) *Lower Rio Grande Valley National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of mourning, white-winged, and white-tipped dove on designated areas of the refuge subject to the following conditions:

(i) We require hunters to obtain a hunt permit (signed brochure) and to possess and carry that permit at all times during your designated hunt period. Hunters must also display the vehicle placard (part of the hunt permit) while participating in the designated hunt period.

(ii) Hunters age 17 and younger must be under the direct supervision of an adult age 18 or older.

(iii) You may access the refuge during your permitted hunt period from 1 hour before legal hunt time to 1 hour after legal hunt time. You must only hunt during legal hunt hours.

(iv) We restrict hunt participants to those listed on the refuge hunt permit (hunter, non-hunting chaperone, and non-hunting assistant).

(v) We allow hunters to use bicycles on designated routes of travel.

(vi) We allow the use of dogs to retrieve doves during the hunt.

(2) *Upland game hunting.* We allow hunting of wild turkey on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (j)(1)(i) through (v) of this section apply.

(ii) We allow turkey hunting during the spring season only.

(iii) You may only harvest one bearded turkey per hunter.

(iv) We prohibit the killing, wounding, taking, or possession of game animals and then intentionally or knowingly failing to make a reasonable effort to retrieve or keep the edible portions of the animal and include it in your bag limit.

(3) *Big game hunting.* We allow hunting of white-tailed deer, feral hog, nilgai antelope, javelina, and other exotic ungulates (as defined by the State of Texas to include fallow deer, axis deer, sika deer, Barbary sheep, and black buck) on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (j)(1)(i) through (v) and (2)(iv) of this section apply.

(ii) We allow only free-standing blinds or tripods. Hunters may set them up during the scouting days preceding each permitted hunt day and must take them down by the end of each hunt day (see § 27.93 of this chapter). Hunters must mark and tag all stands with their hunting license number during the period of use.

(iii) Hunters must field-dress all harvested big game in the field.

(iv) Hunters may use nonmotorized dollies or carts off of improved roads or trails to haul carcasses to a parking area.

(v) We prohibit the use of big game decoys.

(4) [Reserved]

\* \* \* \* \*

■ 41. Amend § 32.63 by:
■ a. Removing paragraph (a)(1)(iii);
■ b. Redesignating paragraphs (a)(1)(iv) through (vi) as paragraphs (a)(1)(iii) through (v); and
■ c. Revising paragraph (b).
  The revision reads as follows:

### § 32.63   Utah.

\* \* \* \* \*

(b) *Fish Springs National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of coot, duck, goose, mourning dove, and snipe on designated areas of the refuge subject to the following conditions:

(i) We allow the use of dogs when hunting.

(ii) You may construct temporary blinds. You must remove all blinds constructed out of materials other than vegetation at the end of each day's hunt (see § 27.93 of this chapter).

(iii) We allow the use of small boats (15 feet or less) when hunting. We prohibit gasoline motors and air boats.

(iv) You may enter the refuge 2 hours prior to legal sunrise and must exit the refuge by 1½ hours after legal sunset.

(v) You must remove decoys, boats, vehicles, and other personal property from the refuge at the end of each day's hunt (see § 27.93 of this chapter).

(vi) We have a special blind area for use by disabled hunters. We prohibit trespass for any reason by any individual not registered to use that area.

(2) *Upland game hunting.* We allow hunting of chukar, desert rabbit, and mountain rabbit on designated areas of the refuge subject to the following conditions:

(i) We close to hunting on January 31.

(ii) We allow the use of dogs when hunting.

(3) *Big game hunting.* We allow hunting of mule deer and pronghorn antelope on designated areas of the refuge subject to the following condition: We only allow archery equipment when hunting big game.

(4) [Reserved]

\* \* \* \* \*

■ 42. Amend § 32.64 by adding paragraphs (a)(1)(vii) and (a)(2)(v), and revising paragraphs (a)(4)(i)(A) and (b), to read as follows:

### § 32.64   Vermont.

\* \* \* \* \*

(a) \* \* \*
(1) \* \* \*

(vii) In all hunting areas, we allow the use of dogs consistent with State regulations.

\* \* \* \* \*

(2) \* \* \*

(v) The condition set forth at paragraph (a)(1)(vii) of this section applies.

\* \* \* \* \*

(4) \* \* \*
(i) \* \* \*

(A) We close the following areas: Goose Bay, Saxes Creek and Pothole, Metcalfe Island Pothole, Long Marsh Channel, and Clark Marsh.

\* \* \* \* \*

(b) *Silvio O. Conte National Fish and Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of duck, goose, crow, and American woodcock on designated areas of the refuge subject to the following conditions:

(i) We allow disabled hunters to hunt from a vehicle that is at least 10 feet from the traveled portion of the refuge road if the hunter possesses a State-issued disabled hunting license and a Special Use Permit (FWS Form 3–1383– G) issued by the refuge manager.

(ii) We allow the use of dogs consistent with State regulations.

(2) *Upland game hunting.* We allow hunting of coyote, fox, raccoon, bobcat, woodchuck, red squirrel, eastern gray squirrel, porcupine, skunk, snowshoe hare, eastern cottontail, and ruffed grouse on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (b)(1)(i) and (ii) of this section apply.

(ii) Shooting from, over, or within 10 feet of the traveled portion of any gravel road is prohibited.

(iii) We require hunters hunting at night to possess a Special Use Permit (FWS Form 3–1383–G) issued by the refuge manager.

(3) *Big game hunting.* We allow hunting of white-tailed deer, moose, black bear, and wild turkey on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (b)(1)(i) and (b)(2)(ii) of this section apply.

(ii) You may use portable tree stands and/or blinds. You must clearly label your tree stands and/or blinds with your hunting license number.

(iii) You may retrieve moose at the Nulhegan Basin Division with the use of a commercial moose hauler, if the hauler possesses a Special Use Permit (FWS Form 3–1383–C) issued by the refuge manager.

(4) [Reserved]

■ 43. Amend § 32.65 by:
■ a. Revising paragraph (a)(3)(iii);
■ b. Adding paragraph (a)(3)(v);
■ c. Revising paragraph (b)(1)(i);
■ d. Adding paragraphs (b)(1)(iv);
■ e. Revising paragraph (b)(3)(i);
■ f. Adding paragraph (b)(3)(v);
■ g. Revising paragraph (c)(3)(i);
■ h. Adding paragraph (c)(3)(vi);
■ i. Revising paragraphs (d), (e)(3), and (e)(4)(ii);
■ j. Adding paragraph (f)(3)(v);
■ k. Revising paragraphs (h) and (i);
■ l. Adding paragraph (j)(3)(v);
■ m. Revising paragraphs (k)(3), (k)(4)(iv), and (l)(3)(i); and
■ n. Adding paragraph (l)(3)(v).
  The revisions and additions read as follows:

### § 32.65   Virginia.

\* \* \* \* \*

(a) \* \* \*
(3) \* \* \*

(iii) We prohibit retrieval of wounded game from a "No Hunting Area" or "Safety Zone" without the consent of the refuge employee on duty at the check station.

*    *    *    *    *

(v) We prohibit the use of pursuit dogs while hunting white-tailed deer.

*    *    *    *    *

(b) * * *

(1) * * *

(i) You must obtain and possess a signed refuge hunt permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) while hunting on the refuge.

*    *    *    *    *

(iv) We allow the use of dogs consistent with State regulations.

*    *    *    *    *

(3) * * *

(i) We allow holders of a signed refuge hunt permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) to access areas of the refuge typically closed to the nonhunting public. All occupants of a vehicle or hunt party must possess a refuge hunt permit and be actively engaged in hunting. We allow an exception for those persons aiding a disabled person who possesses a valid State-issued Commonwealth of Virginia Disabled Resident Lifetime License or Commonwealth of Virginia Resident Disabled Veteran's Lifetime License.

*    *    *    *    *

(v) We prohibit the use of pursuit dogs while hunting white-tailed deer and sika.

*    *    *    *    *

(c) * * *

(3) * * *

(i) We allow holders of a signed refuge hunt permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) to access areas of the refuge typically closed to the nonhunting public. All occupants of a vehicle or hunt party must possess a refuge hunt permit and be actively engaged in hunting. We allow an exception for those persons aiding a disabled person who possesses a valid State-issued Commonwealth of Virginia Disabled Resident Lifetime License or Commonwealth of Virginia Resident Disabled Veteran's Lifetime License.

*    *    *    *    *

(vi) We prohibit the use of pursuit dogs while hunting white-tailed deer.

*    *    *    *    *

(d) *Elizabeth Hartwell Mason Neck National Wildlife Refuge.* (1)–(2) [Reserved]

(3) *Big game hunting.* We allow hunting of white-tailed deer on designated areas of the refuge subject to the following conditions:

(i) You must possess and carry a signed refuge permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System).

(ii) We only allow shotguns with slugs during the firearm season.

(iii) We prohibit organized deer drives. We define a "deer drive" as an organized or planned effort to pursue, drive, chase, or otherwise frighten or cause deer to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the deer.

(iv) We prohibit the use of pursuit dogs while hunting deer.

(v) Hunters must certify and qualify weapons and ammunition at a refuge-approved range and view the refuge orientation session online prior to issuance of a refuge permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System).

(4) [Reserved]

(e) * * *

(3) *Big game hunting.* We allow hunting of white-tailed deer and bear on designated areas of the refuge subject to the following conditions:

(i) You must possess and carry a signed refuge permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System).

(ii) We prohibit the use of pursuit dogs while hunting white-tailed deer and bear.

(4) * * *

(ii) We prohibit bank fishing on the refuge, with the exception noted in paragraph (e)(4)(i) of this section.

*    *    *    *    *

(f) * * *

(3) * * *

(v) We prohibit the use of pursuit dogs while hunting white-tailed deer.

*    *    *    *    *

(h) *Occoquan Bay National Wildlife Refuge.* (1)–(2) [Reserved]

(3) *Big game hunting.* We allow hunting of white-tailed deer on designated areas of the refuge subject to the following conditions:

(i) You must possess and carry a signed refuge permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) and be selected in the refuge lottery to hunt.

(ii) We only allow shotguns with slugs during the firearm season.

(iii) We prohibit organized deer drives. We define a "deer drive" as an organized or planned effort to pursue, drive, chase, or otherwise frighten or cause deer to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the deer.

(iv) We prohibit the use of pursuit dogs while hunting deer.

(v) Hunters must certify and qualify weapons and ammunition at a refuge-approved range and view the refuge orientation session online prior to issuance of a refuge permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System).

(4) [Reserved]

(i) *Plum Tree Island National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of migratory waterfowl, gallinule, and coot on designated areas of the refuge subject to the following conditions:

(i) We require migratory game bird hunters to obtain and carry a permit through a lottery administered by the Virginia Department of Game and Inland Fisheries.

(ii) You must hunt from a blind, as assigned by the hunting permit.

(iii) We allow the use of dogs consistent with State regulations.

(2)–(4) [Reserved]

(j) * * *

(3) * * *

(v) We prohibit the use of pursuit dogs while hunting white-tailed deer.

*    *    *    *    *

(k) * * *

(3) *Big game hunting.* We allow hunting of white-tailed deer on designated areas of the refuge subject to the following conditions:

(i) We require big game hunters to obtain a permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System).

(ii) We prohibit the use of pursuit dogs while hunting white-tailed deer.

(4) * * *

(iv) We prohibit the use of lead fishing tackle in freshwater ponds, including Wilna Pond and Laurel Grove Pond.

*    *    *    *    *

(l) * * *

(3) * * *

(i) You must obtain and carry a signed refuge big game hunt brochure while hunting.

*    *    *    *    *

(v) We prohibit the use of pursuit dogs while hunting white-tailed deer.

*    *    *    *    *

■ 44. Amend § 32.66 by revising paragraph (l)(1) and (n) to read as follows:

**§ 32.66  Washington.**

*    *    *    *    *

(l) * * *

(1) *Migratory game bird hunting.* We allow hunting of duck, goose, and coot on designated areas of the refuge subject to the following conditions:

(i) We allow hunting during the State youth season in September.

(ii) We allow hunting from the beginning of the regular waterfowl seasons through November 30 by youths (younger than age 16) on Saturday and Sunday only. An adult, age 18 or older, must accompany and supervise youth hunters. We allow the supervising adult(s) to hunt.

(iii) We allow the use of dogs when hunting.

(iv) Hunters may access the refuge no earlier than 2 hours before legal hunting hours and must leave no later than 1 hour after legal hunting hours.

(v) Hunters may hunt only from within 50 yards of posted hunting sites.

(vi) Hunting parties are restricted to a maximum of two youths and two accompanying adults per hunting site.

(vii) We allow the use of nonmotorized boats for hunting.

(viii) We only allow the use of portable blinds and temporary blinds constructed of manmade materials.

(ix) Hunters must remove all blinds, decoys, and other personal equipment from the refuge at the end of each day's hunt (see §§ 27.93 and 27.94 of this chapter).

(x) We allow migratory game bird hunting with shotguns only.

\* \* \* \* \*

(n) *Willapa National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of goose, duck, coot, and snipe on designated areas of the refuge subject to the following conditions:

(i) In the designated goose hunt area in the Riekkola Unit, hunters may take ducks, coots, and snipe only incidental to hunting geese.

(ii) We open the refuge for hunting access from 1½ hours before legal sunrise until 1½ hours after legal sunset.

(iii) We allow the use of dogs when hunting.

(iv) You must remove all personal property, including decoys and boats, by 1 hour after legal sunset (see §§ 27.93 and 27.94 of this chapter).

(2) *Upland game hunting.* We allow hunting of forest grouse (sooty and ruffed) on designated areas of the refuge subject to the following conditions:

(i) We allow archery hunting only.

(ii) The condition set forth at paragraph (n)(1)(ii) of this section applies.

(3) *Big game hunting.* We allow hunting of deer, elk, and bear on designated areas of the refuge subject to the following conditions:

(i) At Long Island, we allow only archery hunting; we prohibit hunting firearms.

(ii) We prohibit bear hunting on any portion of the refuge except Long Island.

(iii) We prohibit the use of centerfire or rimfire rifles within the Lewis, Porter Point, and Riekkola Units.

(iv) The condition set forth at paragraph (n)(1)(ii) of this section applies.

(v) You may leave your tree stand(s) in place for 3 days. You must label your tree stand(s) with your hunting license number and the date you set up the stand. You may set up stands 1½ hours before legal sunrise. You must remove your tree stand(s) and all other personal property from the refuge by 1½ hours after legal sunset on the third day (see § 27.93 of this chapter).

(vi) At Leadbetter Point, we allow hunting of elk only during the State early muzzleloader season, and by special permit in consultation with the State.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge.

■ 45. Revise § 32.67 to read as follows:

**§ 32.67  West Virginia.**

The following refuge units are open for hunting and/or fishing as governed by applicable Federal and State regulations, and are listed in alphabetical order with additional refuge-specific regulations.

(a) *Canaan Valley National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of goose, duck, rail, coot, gallinule, mourning dove, snipe, and woodcock on designated areas of the refuge subject to the following conditions:

(i) We require each hunter to possess and carry a signed refuge hunting brochure (signed brochure).

(ii) Hunters may enter the refuge 1 hour before legal sunrise and must exit the refuge, including parking areas, no later than 1 hour after legal sunset.

(iii) We prohibit overnight parking except by Special Use Permit (FWS Form 3–1383–G) on Forest Road 80.

(iv) We allow the use of dogs consistent with State regulations.

(v) We prohibit dog training except during legal hunting seasons.

(2) *Upland game hunting.* We allow the hunting of ruffed grouse, squirrel, cottontail rabbit, snowshoe hare, red fox, gray fox, bobcat, woodchuck, coyote, opossum, striped skunk, and raccoon on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (a)(1)(i), (iv) and (v) of this section apply.

(ii) You may hunt coyote, raccoon, opossum, skunk, and fox at night, but you must obtain a Special Use Permit (FWS Form 3–1383–G) at the refuge headquarters before hunting.

(iii) We only allow hunting in the No Rifle Zones with the following equipment: Archery (including crossbow), shotgun, or muzzleloader.

(iv) We prohibit the hunting of upland game species from March 1 through August 31.

(3) *Big game hunting.* We allow the hunting of white-tailed deer, black bear, and turkey on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (a)(1)(i) and (iv) and (a)(2)(iii) of this section apply.

(ii) We allow the use of dogs for hunting black bear during the gun season.

(iii) We prohibit organized deer drives. We define a "deer drive" as an organized or planned effort to pursue, drive, chase, or otherwise frighten or cause deer to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the deer.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following condition: We prohibit the use of lead fishing tackle on designated areas of the refuge.

(b) *Ohio River Islands National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of migratory game birds on designated areas of the refuge subject to the following conditions:

(i) We require each hunter to possess and carry a signed refuge hunting brochure (signed brochure).

(ii) Hunters may enter the refuge 1 hour before legal sunrise and must exit the refuge, including parking areas, no later than 1 hour after legal sunset.

(iii) We allow the use of dogs consistent with State regulations.

(2) *Upland game hunting.* We allow hunting of upland game on designated areas of the refuge subject to the following condition: The conditions set forth at paragraphs (b)(1)(i), (ii), and (iii) of this section apply.

(3) *Big game hunting.* We allow hunting of big game on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (b)(1)(i) and (ii) of this section apply.

(ii) We prohibit organized deer drives. We define a "deer drive" as an organized or planned effort to pursue, drive, chase, or otherwise frighten or cause deer to move in the direction of any person(s) who is part of the

organized or planned hunt and known to be waiting for the deer.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) We allow fishing from 1 hour before legal sunrise until 1 hour after legal sunset. This restriction does not apply to off-shore fishing.

(ii) We prohibit trotlines (setlines) and turtle lines.

■ 46. Amend § 32.68 by revising paragraphs (c) and (d) to read as follows:

**§ 32.68 Wisconsin.**

\* \* \* \* \*

(c) *Hackmatack National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of migratory game birds on designated areas of the refuge subject to the following condition: You must remove all boats, decoys, blinds, blind materials, stands, platforms, and other hunting equipment (see §§ 27.93 and 27.94 of this chapter) brought onto the refuge at the end of each day's hunt.

(2) *Upland game hunting.* We allow upland game and turkey hunting on designated areas of the refuge subject to the following conditions:

(i) For hunting, you may use or possess only approved nontoxic shot shells while in the field, including shot shells used for hunting wild turkey (see § 32.2(k)).

(ii) You must remove all boats, decoys, blinds, blind materials, stands, platforms, and other hunting equipment (see §§ 27.93 and 27.94 of this chapter) brought onto the refuge at the end of each day's hunt.

(3) *Big game hunting.* We allow big game hunting on designated areas of the refuge subject to the following conditions:

(i) You must remove all boats, decoys, blinds, blind materials, stands, platforms, and other hunting equipment (see §§ 27.93 and 27.94 of this chapter) brought onto the refuge at the end of each day's hunt.

(ii) We prohibit organized deer drives. We define a ''deer drive'' as an organized or planned effort to pursue, drive, chase, or otherwise frighten or cause deer to move in the direction of any person(s) who is part of the organized or planned hunt and known to be waiting for the deer.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following condition: We prohibit the taking of turtle and frog (see § 27.21 of this chapter).

(d) *Horicon National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of goose, duck, coot, common moorhen, and

American woodcock on designated areas of the refuge subject to the following condition: We allow only participants in the Learn to Hunt and other special programs to hunt goose, duck, coot, and common moorhen.

(2) *Upland game hunting.* We allow hunting of wild turkey, ring-necked pheasant, gray partridge, ruffed grouse, squirrel, cottontail rabbit, snowshoe hare, raccoon, opossum, striped skunk, red fox, gray fox, coyote, and bobcat on designated areas of the refuge subject to the following conditions:

(i) For hunting, you may use or possess only approved nontoxic shot shells while in the field, including shot shells used for hunting wild turkey (see § 32.2(k)).

(ii) We prohibit night hunting from ½ hour after legal sunset until ½ hour before legal sunrise the following day.

(iii) We allow the use of dogs while hunting upland game (except raccoon, opossum, striped skunk, red fox, gray fox, coyote, and bobcat), provided the dog is under the immediate control of the hunter at all times.

(iv) Coyote, red fox, gray fox, and bobcat hunting begins on the first day of the traditional 9-day gun deer season.

(v) Coyote hunting ends on the last day of the season for fox.

(vi) You may only hunt striped skunk and opossum during the season for raccoon.

(vii) You may only hunt snowshoe hare during the season for cottontail rabbit.

(viii) Hunters may enter the refuge no earlier than 1 hour before legal shooting hours and must exit the refuge no later than 1 hour after legal shooting hours.

(3) *Big game hunting.* We allow hunting of white-tailed deer and black bear in designated areas of the refuge subject to the following conditions:

(i) Hunters must remove all stands and personal property from the refuge following each day's hunt (see §§ 27.93 and 27.94 of this chapter). We prohibit hunting from any stand left up overnight.

(ii) We prohibit hunting bear with dogs.

(iii) Hunters must possess a refuge permit (FWS Form 3–2439, Hunt Application—National Wildlife Refuge System) to hunt in Area E (surrounding the office/visitor center).

(iv) Hunters may enter the refuge no earlier than 1 hour before legal shooting hours and must exit the refuge no later than 1 hour after legal shooting hours.

(v) Any ground blind used during any gun deer season must display at least 144 square inches (929 square centimeters) of solid-blaze-orange or

fluorescent pink material visible from all directions.

(4) *Sport fishing.* We allow fishing on designated areas of the refuge subject to the following conditions:

(i) We only allow bank fishing or fishing through the ice.

(ii) We prohibit the use of fishing weights or lures containing lead.

\* \* \* \* \*

■ 47. Amend § 32.69 by:
■ a. Redesignating paragraphs (a) through (e) as paragraphs (b) through (f);
■ b. Adding a new paragraph (a); and
■ c. Revising newly redesignated paragraphs (b), (c), (e)(1), and (f).

The addition and revisions read as follows:

**§ 32.69 Wyoming.**

\* \* \* \* \*

(a) *Bamforth National Wildlife Refuge.* (1) [Reserved]

(2) *Upland game hunting.* We allow hunting of chukar, grey partridge, pheasant, rabbit, sharp-tailed grouse, and turkey on designated areas of the refuge.

(3) *Big game hunting.* We allow hunting of pronghorn antelope, mule deer, and white-tailed deer on designated areas of the refuge.

(4) [Reserved]

(b) *Cokeville Meadows National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of dove, duck, dark goose, coot, merganser, light goose, snipe, Virginia rail, Sora rail, sandhill crane, and mourning dove on designated areas of the refuge subject to the following conditions:

(i) We allow the use of dogs when hunting.

(ii) Hunters may only access the refuge 1 hour before legal sunrise until 1 hour after legal sunset.

(2) *Upland game hunting.* We allow hunting of blue grouse, ruffed grouse, chukar partridge, gray partridge, cottontail rabbit, snowshoe hare, squirrel (red, gray, and fox), red fox, raccoon, and striped skunk on designated areas of the refuge subject to the following conditions:

(i) The condition set forth at paragraph (b)(1)(ii) of this section applies.

(ii) We allow the use of dogs to find and retrieve legally harvested upland game birds, cottontail rabbits, and squirrels. You may not use dogs to chase red fox, raccoon, striped skunk, or any other species not specifically allowed in this paragraph (b)(2)(ii).

(iii) Licensed migratory bird, big game, or upland/small game hunters may harvest red fox, raccoon, and striped skunk on the refuge from

September 1 until the end of the last open big game, upland bird, or small game season. You must possess, and remove from the refuge, all red fox, raccoon, and striped skunk that you harvest on the refuge.

(3) *Big game hunting.* We allow hunting of elk, mule deer, white-tailed deer, pronghorn, and moose subject to the following condition: The condition set forth at paragraph (b)(1)(ii) of this section applies.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge.

(c) *Hutton Lake National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow youth hunting of goose, duck, coot, and merganser on designated areas of the refuge during the Wyoming Zone C2 "special youth waterfowl hunting days" subject to the following conditions:

(i) We allow the use of dogs when hunting.

(ii) We prohibit the cleaning of game on the refuge.

(2) *Upland game hunting.* We allow hunting of chuker, grey partridge, pheasant, rabbit, sharp-tailed grouse, and turkey on designated areas of the refuge subject to the following conditions:

(i) The conditions set forth at paragraphs (c)(1)(i) and (ii) of this section apply.

(ii) We allow hunting November 1 through March 1.

(3) *Big game hunting.* We allow hunting of pronghorn antelope and mule deer on designated areas of the refuge subject to the following condition: We allow hunting November 1 through March 1.

(4) [Reserved]

\*    \*    \*    \*    \*

(e) \*  \*  \*

(1) *Migratory game bird hunting.* We allow hunting of dove, goose, duck, and coot on designated areas of the refuge.

\*    \*    \*    \*    \*

(f) *Seedskadee National Wildlife Refuge*—(1) *Migratory game bird hunting.* We allow hunting of dark goose, duck, coot, merganser, dove, snipe, and rail on designated areas of the refuge subject to the following conditions:

(i) We open the refuge to the general public from ½ hour before legal sunrise to ½ hour after legal sunset. Waterfowl hunters may enter the refuge 1 hour before legal shooting hours to set up decoys and blinds.

(ii) We allow the use of dogs when hunting.

(iii) You must only use portable blinds or blinds constructed from dead and downed wood.

(iv) You must remove portable blinds, tree stands, decoys, and other personal equipment from the refuge after each day's hunt (see §§ 27.93 and 27.94 of this chapter).

(2) *Upland game hunting.* We allow hunting of sage grouse, cottontail rabbit, jackrabbit, raccoon, fox, and skunk on designated areas of the refuge subject to the following condition: The conditions set forth at paragraphs (f)(1)(i) and (ii) of this section apply.

(3) *Big game hunting.* We allow hunting of pronghorn, mule deer, white-tailed deer, elk, and moose on designated areas of the refuge subject to the following condition: The condition set forth at paragraph (f)(1)(i) section applies.

(4) *Sport fishing.* We allow sport fishing on designated areas of the refuge subject to the following conditions:

(i) The condition set forth at paragraph (f)(1)(i) of this section applies.

(ii) We prohibit taking of mollusk, crustacean, reptile, and amphibian from the refuge (see § 27.21 of this chapter).

## PART 36—ALASKA NATIONAL WILDLIFE REFUGES

■ 48. The authority citation for part 36 continues to read as follows:

**Authority:** 16 U.S.C. 460(k) *et seq.*, 668dd–668ee, 3101 *et seq.*, Pub. L. 115–20, 131 Stat. 86.

■ 49. Amend § 36.39 by adding paragraph (d) to read as follows:

### § 36.39  Public use.

\*    \*    \*    \*    \*

(d) *Arctic National Wildlife Refuge.* We prohibit all domestic sheep, goats, and camelids on the refuge.

\*    \*    \*    \*    \*

### Subchapter E—Management of Fisheries Conservation Areas

## PART 71—HUNTING AND SPORT FISHING ON NATIONAL FISH HATCHERIES

■ 50. The authority citation for part 71 continues to read as follows:

**Authority:** Sec. 4, Pub. L. 73–121, 48 Stat. 402, as amended; sec. 4, Pub. L. 87–714, 76 Stat. 654; 5 U.S.C. 301; 16 U.S.C. 460k, 664, 668dd, 1534.

■ 51. Revise § 71.11 to read as follows:

### § 71.11  National fish hatcheries open for hunting.

The following hatcheries are open for hunting as governed by applicable Federal and State regulations, and are listed in alphabetical order with additional hatchery-specific regulations.

(a) *Iron River National Fish Hatchery*—(1) *Migratory game bird hunting.* We allow duck, goose, coot, rail, snipe, woodcock, dove, and crow hunting on designated areas of the hatchery.

(2) *Upland game hunting.* We allow pheasant, bobwhite quail, ruffed and sharp-tailed grouse, Hungarian partridge, rabbit/hare, squirrel, coyote, fox, bobcat, raccoon, opossum, skunk, weasel, and woodchuck hunting on designated areas of the hatchery.

(3) *Big game hunting.* We allow white-tailed deer, turkey, and bear hunting on designated areas of the hatchery subject to the following conditions:

(i) You must label tree stands and ground blinds with the owner's State hunting license number. The label must be readable from the ground.

(ii) You may place tree stands and ground blinds on the hatchery only from September 1 to December 31 annually.

(b) *Jordan River National Fish Hatchery*—(1) *Migratory game bird hunting.* We allow the hunting of woodcock, dove, duck, goose, rail, snipe, coot, and crow on designated areas of the hatchery subject to the following conditions:

(i) We allow entry into the hatchery 1 hour before legal sunrise and require hunters to leave the hatchery no later than 1 hour after legal sunset.

(ii) We prohibit shooting on or over any hatchery road within 50 feet (15 meters) from the centerline.

(iii) We allow the use of dogs while hunting, provided the dog is under the immediate control of the hunter at all times.

(2) *Upland game hunting.* We allow hunting of rabbit/hare, squirrel, coyote, fox, bobcat, raccoon, opossum, skunk, weasel, and woodchuck on designated areas of the hatchery subject to the following condition: The conditions set forth at paragraphs (b)(1)(i) through (iii) of this section apply.

(3) *Big game hunting.* We allow hunting of bear, white-tailed deer, and turkey on designated areas of the hatchery and subject to the following conditions:

(i) The conditions set forth at paragraphs (b)(1)(i) through (iii) of this section apply.

(ii) We allow the use of portable stands and blinds for hunting, and hunters must remove them at the end of each day.

(iii) You must label tree stands with the owner's Department of Natural Resources sportcard number. The label, printed in legible English that can be easily read from the ground, must be affixed to the stand.

(c) *Leadville National Fish Hatchery*—(1) *Migratory game bird hunting.* We

allow migratory game bird hunting on designated areas of the hatchery.

(2) *Upland game hunting.* We allow upland game hunting on designated areas of the hatchery.

(3) *Big game hunting.* We allow big game hunting on designated areas of the hatchery subject to the following conditions:

(i) You must label tree stands and ground blinds with the owner's State hunting license number. The label must be readable from the ground.

(ii) You may place tree stands and ground blinds on the refuge only from September 1 to December 31 annually.

(4) *Sport fishing.* See § 71.12(k) for hatchery-specific fishing regulations for this hatchery.

(d) *Leavenworth National Fish Hatchery*—(1) *Migratory game bird hunting.* We allow migratory game bird hunting on designated areas of the hatchery subject to the following condition: We allow the use of dogs for hunting in accordance with State of Washington hunting regulations.

(2) *Upland game hunting.* We allow upland game hunting on designated areas of the hatchery subject to the following condition: We allow the use of dogs for hunting in accordance with State of Washington hunting regulations.

(3) *Big game hunting.* We allow big game hunting on designated areas of the hatchery subject to the following condition: We allow the use of dogs for hunting in accordance with State of Washington hunting regulations.

(4) *Sport fishing.* See § 71.12(l) for hatchery-specific fishing regulations for this hatchery.

(e) *Little White Salmon National Fish Hatchery*—(1) *Migratory bird hunting.* We allow hunting of crow on designated areas of the hatchery subject to the following conditions:

(i) We only allow portable blinds and temporary blinds constructed of nonliving natural materials. Hunters must remove all equipment at the end of each day's hunt.

(ii) We allow the use of dogs when hunting.

(2) *Upland game hunting.* We allow hunting of bobcat, grouse, partridge, and porcupine on designated areas of the hatchery subject to the following condition: The conditions set forth at paragraphs (e)(1)(i) and (ii) of this section apply.

(3) *Big game hunting.* We allow hunting of bear, elk, black-tailed deer, mule deer, and wild turkey on designated areas of the hatchery subject to the following condition: The

conditions set forth at paragraphs (e)(1)(i) and (ii) of this section apply.

(4) *Sport fishing.* See § 71.12(m) for hatchery-specific fishing regulations for this hatchery.

(f) *Southwest Native Aquatic Resources and Recovery Center*—(1) *Migratory game bird hunting.* We allow the hunting of sandhill crane, light and dark goose, duck, merganser, coot, mourning and white-winged dove, and band-tailed pigeon on designated areas of the center.

(2) *Upland game hunting.* We allow the hunting of Eurasian collared-dove; dusky (blue) grouse; pheasant; scaled quail; and Abert's, red, gray, and fox squirrel on designated areas of the center.

(3) [Reserved]

(g) *Spring Creek National Fish Hatchery*—(1) *Migratory bird hunting.* We allow hunting of crow on designated areas of the hatchery subject to the following conditions:

(i) We only allow portable blinds and temporary blinds constructed of nonliving natural materials. Hunters must remove all equipment at the end of each day's hunt.

(ii) We allow the use of dogs when hunting.

(2) *Upland game hunting.* We allow hunting of bobcat, grouse, partridge, and porcupine on designated areas of the hatchery subject to the following condition: The conditions set forth at paragraphs (g)(1)(i) and (ii) of this section apply.

(3) *Big game hunting.* We allow hunting of bear, elk, black-tailed deer, mule deer, and wild turkey on designated areas of the hatchery subject to the following condition: The conditions set forth at paragraphs (g)(1)(i) and (ii) of this section apply.

(4) *Sport fishing.* See § 71.12(o) for hatchery-specific fishing regulations for this hatchery.

■ 52. Amend § 71.12 by:
■ a. Redesignating paragraphs (g) through (m) as paragraphs (k) through (q), respectively; paragraphs (b) through (f) as paragraphs (e) through (i), respectively; and paragraph (a) as paragraph (c); and
■ b. Adding new paragraphs (a), (b), (d), (j), and (r).

The additions read as follows:

**§ 71.12  National fish hatcheries open for sport fishing.**

\*  \*  \*  \*  \*

(a) *Abernathy Fish Technology Center.* We allow sport fishing on designated areas of the center.

(b) *Berkshire National Fish Hatchery.* We allow sport fishing on designated

areas of the hatchery subject to the following conditions:

(1) Anglers must abide by posted signage.

(2) Anglers must remain at least 50 feet away from raceways and fish culture areas to maintain biosecurity of stocked fish populations.

(3) On the Konkapot River, we prohibit angling equipment, including, but not limited to, live bait, boots, and rods, near the areas described in paragraph (b)(2).

(4) We limit access to Outreach Pond to youth (ages 13 and younger), supervised by an adult at all times.

(5) We allow fishing on Outreach Pond during open hatchery hours only.

(6) We prohibit the use of baitfish, shiners, and minnows in the Outreach Pond.

(7) We prohibit all fishing methods of take besides rods on Outreach Pond.

(8) We allow a daily creel limit of three (3) fish per individual at Outreach Pond. There is no creel limit during fishing derbies.

(9) We prohibit fishing during the winter in Outreach Pond.

(10) We prohibit the use of all lead, including tackle containing lead, when fishing in Outreach Pond.

\*  \*  \*  \*  \*

(d) *Dwight D. Eisenhower National Fish Hatchery.* We allow sport fishing on designated areas of the hatchery subject to the following conditions:

(1) Anglers must abide by posted signage.

(2) Anglers must remain at least 50 feet away from the water intake from Furnace Brook, raceways, and fish culture areas for safety and to maintain biosecurity of stocked fish populations.

(3) We prohibit angling equipment, including, but not limited to, live bait, boots, and rods, near the areas described in paragraph (d)(2).

\*  \*  \*  \*  \*

(j) *Lamar National Fish Hatchery.* We allow sport fishing on designated areas of the hatchery subject to the following condition: We only allow sport fishing from legal sunrise to legal sunset.

\*  \*  \*  \*  \*

(r) *Willard National Fish Hatchery.* We allow sport fishing on designated areas of the hatchery.

**George Wallace,**

*Assistant Secretary for Fish and Wildlife and Parks.*

[FR Doc. 2020–16003 Filed 8–28–20; 8:45 am]

**BILLING CODE 4333–15–P**